UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK ____X
MICHAEL NIEVES,

                    Plaintiff,

          v.

MIRIAM R. BEST - ACTING SUPREME
COURT JUSTICE; CHRISOPHER RIVET -
ASSISTENT DISTRICT ATTORNEY;
BRANDON RIDDLE - ASSISTEN DISTRICT
ATTORNEY;
     FIRE MARSHAL, PHILIP MEAGHER,
# 38; POLICE OFFICER, JAMES MARCINEK,
# 20371; POLICE OFFICER, RUFIAN
ARSHAD, # 20210; AND THE CITY OF
NEW YORK,

_____Defendants.____X

§ 1983 COMPLAINT
IN A CIVIL ACTION

No.:_____

JURY TRIAL DEMANDED

RECEIVED
PRO SE OFFICE

2021 AUG 24  PM 2: 26

S.D. OF N.Y.

I, Michael Nieves, being duly sworn according to the law,
depose and say that I am the plaintiff in the above entitled
proceeding. All of the following information I have
submitted below (in support of the demand, plaintiff's case,
etc.), is true and correct.

I, Michael Nieves, Pro Se, for this complaint states as
follows:

1. Michael Nieves is currently being confined at Bellevue
   Hospital Prison Ward, 19-North, 462 First Avenue, New York,
   N.Y. 10016.

2. Michael Nieves, is and was at all times mentioned herein,
   an adult citizen of the United States and is a resident of
   the State of New York.

3. Defendants was at all revelant times herein acting under
   color of the law of the  United States Government.

4. This action arises under and is brought  pursuant to 42 U.S.C. Section 1983 to remedy the deprivations under the laws and rights guaranteed by the United States Constitution. This court has jurisdiction over this action.

5. Plaintiff's claims for damages, injunctive and declaratory relief are authorized by Rule 65 of the Federal Rules of Civil Procedure.

6. Plaintiff has filed no other lawsuits dealing with the same facts involved in this action or other relating to the deprivation and violation of his rights.

7. At all relevant times herein, defendants were "persons" for the purpose of 42 U.S.C Section 1983, and acted under color of the law to deprive plaintiff of his civil and constitutional rights, as set forth more fully below.

- STATEMENT OF FACTS -

8. On March 26, 2021 assigned defense counsel, David P. Turchi, Esq., P.C. filed an Attorney  Affirmation Motion To Dismiss predicated on the grounds of CPL § 30.30 Speedy-Trial; Interest of Justice, CPL § 210.40; To strike The Certificate of Compliance; To Strike The Statement of Readiness; Compel Discovery; To Release The Defendant Under CPL § 180.80; and under CPL § 510.20 - Change Circumstances Warrant A Recognizance Release. Amongst the relevant facts for the Motion To Dismiss, includes: falsified criminal charges on a fabricated Felony  Complaint Report; digitally altered or doctored NYPD body-worn camera evidence; intentionally destroyed  NYPD body-worn camera evidence; destroyed NYPD radio run; and the defendant being falsely imprisoned for approximately 2 ½ years, to date while being maliciously prosecuted. See Exhibit (1) - Motion to Dismiss.

9. On June 14, 2021 Assistent District Attorney, Christopher
   Rivet filed an Affirmation In Response to Defendant's
   Motion To Dismiss The Indictment which is replete with an
   extreme degree of incriminatory statements of Prosecutorial
   Misconduct, Malfeasance and evident conspiratorial intent
   to cover-up for corrupt NYPD officers and said Fire
   Marshal, Philip Meagher. As more fully explained within
   the enclosed Memorandum of Law, indicated under Exhibit (5)
   in support of defense counsel, Mr. Turchi's Reply to ADA
   Rivet's Response, which was unfortunately untimely
   received from the defendant to be adopted by Mr. Turchi,
   according to his explanation; albeit nonetheless indicated
   in the footnote of page 6 to have been reviewed by the
   court without changing the result on the Motion. See
   Exhibit (2) - page 6's footnote of Judge Best's Decision
   and Order, and Exhibit (3) ADA Rivet's Response.

10. On June 23, 2021 defense counsel, David P. Turchi, Esq.,
    P.C. filed a Reply against ADA Rivet's Response to the
    Motion To Dismiss this case. The defendant submitted a
    17-page CPL 30.30 Speedy-Trial violations; Article 245
    New Discovery Law violations; Interest of Justice
    Dismissal, etc. which was supported by an estimation of 20
    accurate caselaws. Therefore, from page 10 onwards, <u>Legal
    Arguments under "Grand. Jury Testimonial Minutes Clearly
    & Convincingly Supports The Legally Required Dismissal
    OF This Case Based On False, Insufficient and Defective
    Evidence To Sustain the Indictment,"</u> are supported by
    official court documents that incriminates the prosecutor,
    the police and the Fire Marshel. The case's dismissal In
    The Interest of Justice argument was also drastically
    enhanced. See Exhibit (4) - Defense Counsel's Reply, and
    Exhibit (5) - the Memorandum of Law with Legal Arguments.

11. On July 28, 2021, Miriam R. Best - Acting Justice of the
    Supreme Court, entered a "Decision And Order," denying
    the "Motion To Dismiss" or "To Release" the defendant,
    while also denying oral argument or a hearing requested
    by defesnse counsel, Mr. Turchi. See Exhibit (2) - page
    6's footnote of Judge Best's Decision And Order. Page 5
    of her Decision And Order's footnote #: 4 also stated
    that " the court will not sign the subpoena attached to
    defendant's motion at this time." Please note on page
    13 that Judge Best clearly admits her awareness that the
    "Certificate of Compliance" against Article 245's New
    Discovery Law, was filed untimely on January 19, 2021;
     even as the statute requires full-discovery to the
    defense within 45 days, maximally, since January 1, 2020.
    Also note her awareness that on page 19, underscored
    "Arshad informed the People that the vidoe recordings were
    destroyed." See Exhibit (6) - Page 5's footnote, and
    Exhibit (7) - page 13's underlined statements & Exhibit (8)
    page 19.

12. Please also note Judge Best's fabrication on page 17,
    underscored that the body-worn camera footage from two
    different cameras showed that "the fire was not out when
    the police arrived," as well as "something was clearly in
    flames on the bathroom floor." Versus actual body-cam
    footage showing a smoldering object that was contain with
    a pot of water. See Exhibit (9) - page 17's fabrication.

13. On footnote 19 of page 19 of Judge Best's "Decision And
    Order" she clearly falsified this statement regarding
    "the body-worn camera footage being doctored and/or
    digitally manipulated and/or containing incomplete and/or
    cherry picked information," stating that "defense counsel
    has not cited any evidence to support such belief or
    warrant such a conclusion." Meanwhile, the body-worn
    camera clearly reveals that the entire hallway of the

complainants' apartment was missing from the body-worn
camera. As police walked directly out of the building
elevator, then into the bathroom area to extract the
defendant, verses the diagram of the apartment having an
estimated 15 - 20 foot hallway leading to the bathroom.
See. Exhibit (10)- Altered body-worn camera DVD.

14. Page 20 of this "Decision And Order" is underscored by an
admission by the People that the previous ADA, Brandon
Riddle failed to obtain additional body-worn camera
footage, resulting in their destruction. While page 21
underscores that the "People made diligent efforts to
obtain the material by making multiple request for said
items but could not locate the materials and officer was
on indefinite medical leave," which clearly depicts the
Judge's fabricated excuses verses her statement of
evidence. See Exhibit (11)- Page 20 & Exhibit (12)- page 21.

15. Page 24 of this "Decision And Order" also incriminates
Judge Best for presiding and ruling over a Pro Se Habeas
petition, dated January 5, 2021, where she has absolutely
no jurisdiction in this Civil Action. See Exhibit (13).

16. Page 5's footnote # 4 also states Judge Best's admission of
covering-up        NYPD body-worn camera footage mandates
by refusing to sign a subpoena for metadata for  them,
attached to the defendanat's motion at this time. See
Exhibit (6) - Page 5's footnote # 4.

17. Please also note that that criminal charge of Reckless
Endangerment in the first degree cannot be supported by
the evidence within the Grand Jury minutes, nor within any
evidence possessed by the People whom based their prosecution
on a fabricated Felony Complaint where evidence supports
the the defendant was clearly suffering from a mental disoder
and suicidation at the time of incident which required

medical and psychiatric care.

19. Assistant District Attorney, Chrisropher Rivet and the former
    ADA, Brandon Riddle has also filed a Statement of Predicate
    Violent Felony Conviction Relating To Indictment, which is
    clearly and convincing falsified and unlawful. See Exhibit (14)-
    Statement of Predicate Violent Felony Conviction. Misplaced doc. See:
    Court records.

20. ADA Rivet's Response to defense counsel, Mr. Turchi's Motion
    To Dismiss, and Judge Best's Decision And Order are also
    replete with caselaw citation which contradicts their legal
    arguments, in violation of the law and imcriminating them of
    filing forged instruments, malfeasance and conspiring to
    protect corrupt NYPD Officers and said Fire Marshal.

21. Please also see evidence of other NYS caselaws of Prosecutorial
    Misconduct, which enforces that ADA Riddle and ADA Rivet cannot
    be allowed to continue prosecuting the defendant for said
    charges. See Exhibit (15)- Copies of Prosecutorial Misconduct
    caselaws.

22. Please note that according to the Federal Rules of Appellate
    Procedure, Rule 9, Subsection (a) Release Before Judgement of
    Conviction, does exist. While many caselaws allows an
    Injunctive and Declaratory Relief Court Order for cases like
    the defendant's. See Exhibit (16)- Against Judicial Immunity
    and against Prosecutorial Immunity.

23 . Please also note the excerpt copy of <u>STARE DECISIS, PRECEDENT AND DICTA</u>. See Exhibit (17).

24 . In addition, please further note the excerpt copy of the <u>EX PARTE YOUNG DOCTRINE.</u> See Exhibit (18).

25. <u>4.19 Lost Or Destroyed Evidence</u>, where in evaluating the government's conduct, a court should consider whether the evidence was lost or destroyed while in the government's custody, whether it acted in disregard of the defendant's interests, whether it was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, where they were taken in good faith or with reasonable justification. Id. (citing loud Hawk, 628 F.2d at 1152). Factors relevant to prejudice to the defendant include the centraliaty and importance of the evidence to the case, the probative value  and reliability of secondary or substitute evidence, the nature and probable weight of the factual inferences and kinds of proof lost to the accused, and the probable effect on the jury from the absence of the evidence. Id. at 1173-74 (citing Loud  Hawk, 628 F.2d at 1152). While a showing or "bad faith" on the part of the  government is required to warrant the dismissal of a case based on lost or destroyed evidence.

26. In opposition to the false charge against the Plaintiff of <u>Reckless Endangerment In The First Degree</u>, please note the excerpt of page 4, footnote 11, as well as the entirety of elements or facts to sustain this charge. See Exhibit (19).

27. In opposition to the false charge against the Plaintiff of <u>Arson In The Second Degree</u>, please note the important element of "Intent" where the defendant lacked specific intent to damage building as element of second-degree arson where the defendant was severely intoxicated at the time he allegedly set a fire. See: People v. Tocco, 1988, 138 Misc.2d 510, 525 N.Y.S.2d 137.

29. In opposition to the false charge against the Plaintiff of
    Burglary In The First Degree, where the People failed to
    prove that defendant entered rooming house or remained with
    intent to commit crime contemporaneous with the entering or
    remaining, as required to support first-degree burglary
    conviction, rather than merely criminal trespass conviction.
    See: People v. Jones (1 Dept. 1992) 184 A.D. 2d 383, 585
    N.Y.S.2d 382.

30. The use or threaten immediate use of a dangerous instrument
    was necessary element of burglary in the first degree, which
    is not supported by any Grand Jury Testimony by the
    complainant. See: People v. Campbell (2 Dept. 1984) 100
    A.D.2d 517, 472 N.Y.S.2d 726.

31. No "Physical Injury" resulted to anyone during this incident
    as required to sustain an indictment of Burglary In The First,
    as indicated by the Grand Jury minutes and other court records.

32. In opposition to the false charge against the Plaintiff of
    Unlawful Imprisonment In The First Degree, where "Restraint In
    General" as an element of this charge, there was no showing
    that defendant exposed complainant to risk of serious physical
    injury, as required for conviction, based on the Grand Jury
    minutes and other court records. See: People v. Perry (2 Dept.
    1992) 181 A.D.2d 833, 581 N.Y.S.2d 390.

Wherefore, Plaintiff respectfully request that an Injunction and
Declaration by the court be ordered against further malicious
prosecution, false imprisonment and judicial misconduct, and that
reasonable compensation be ordered against undue psychological
pain and suffering, mental anguish and/or in the alternative that
the court ordered the reduction of these charges for time-served
without Post-Release Supervision; albeit a term of civil commitment
where proper psychiatric care and treatment and/or discharge
services to the community may be facilitated.

Dated: 10, 2021.

Yours, etc...

Michael Nieves, Pro se

Sworn To Me Before This
10th day of August        2021.

NOTARY PUBLIC

Audrey A. Jeffrey, BA JD.
Notary Public, State of New York
No. 01JE6086330
Qualified in New York County
Commission Expires. Nov. 13, 2021

EXHIBIT (1)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 81

-----------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

Indictment No.: **01241-2019**

- against -

**ATTORNEY AFFIRMATION**

MICHAEL NIEVES,

Defendant.

-----------------------------------------------------------------X

David P. Turchi, Esq., an attorney admitted to practice before the Courts of the State of New York, does hereby affirm the following to be true under penalties of perjury:

1.      I am a member of DAVID P. TURCHI, ESQ., P.C., the attorney of record for the Defendant herein and as such I am fully familiar with all of the facts and circumstances relating to the instant motion.

2.      I make this affirmation in support of the instant motion, and no prior applications have been made for the relief requested herein.

3.      I make this affirmation based upon information and belief, except as to those matters wherein I indicated actual knowledge. I base such knowledge on my review of the official court papers, the People's discovery produced to date, the case file maintained at my office, conferences with members of the District Attorney's Office and the proceedings had heretofore.

## PROCEDURAL HISTORY

4.      The Defendant herein has been deprived of his liberty for over two years as a result of this matter. He was arrested on or about March 6, 2019, stemming from an alleged

incident occurring earlier that day in the City, County and State of New York. From the day of his arrest, he was held involuntarily for approximately one month at Harlem Hospital. This was ostensibly pursuant by the Mental Hygiene Law, raising the possible issues of lack of capacity, complainant not pressing charges, lack of intent, among others. Subsequently, the Defendant was released, whereupon he was immediately seized again for the same incident on April 9, 2019 and charged with burglary in the first degree, arson in the second degree and related charges, and has been deprived of his liberty ever since. On or about April 18, 2019, over one month after his March 6, 2019 arrest, the Defendant was indicted by a Grand Jury and arraigned in Supreme Court on April 24, 2019, almost two months after his March 6, 2019 arrest. Between August 11, 2019 and May 12, 2020, the Defendant was remanded as a result of psychiatric evaluation and treatment. On May 12, 2020, the Court set bail in the amount of $50,000 bond and $25,000 cash. The People did not "certify" that discovery had been completed in the case until January 19, 2021. The matter has subsequently been on 10 times without trial, and it has been on over 20 times without trial.

5.      Now, the Defendant submits this motion seeking release or dismissal. This motion is in addition to the Defendant's contemporaneously-pending writ of habeas corpus.

## DEFENDANT IS ENTITLED TO DISMISSAL OR RELEASE BASED ON 30.30

6.      Since the Defendant's arrest in this matter, over two years have elapsed. Pursuant to CPL 30.30(1)(a), the People have six months from commencement of the criminal action in which to bring the Defendant to trial. Pursuant to CPL 30.30(2)(a), the People have 90 days to bring the Defendant to trial, or the Defendant "must be released on bail or on his or her own recognizance, upon such conditions as may be just and reasonable … ." *Emphasis added.* Here,

the People have failed to bring the Defendant to trial within the required six months since his arraignment on or about April 9, 2019, let alone 90 days required for release.

7.    The Court of Appeals has repeatedly held that the defense affirmation which accompanies a CPL 30.30 motion, in order to satisfy the movant's initial burden pursuant to CPL 210.45(1), need allege only "that the prosecution failed to declare readiness within the statutory prescribed time period." *E.g.*, *People v. Luperon*, 85 N.Y.2d 71 (1995). Thus, rather than referring specifically to every pre-readiness adjournment period, the initial affirmation need only include "sworn allegations that there has been unexcused delay in excess of the statutory minimum." *People v. Santos*, 68 N.Y.2d 859, 861 (1986). Once the defense satisfies this initial burden, the burden then shifts to the People to identify any statutory exclusion upon which it wishes to rely in bringing themselves into compliance with the statutory time limit. *People v. Berkowitz*, 50 N.Y.2d 333, 349 (1980).

8.    It is respectfully submitted that the time periods under CPL 30.30(1)(a) and/or CPL 30.30(2)(a) have elapsed. The People have failed to declare readiness within the requisite time, the People have also failed to validly certify the matter is ready for trial (*see infra*) and as such, the People's prior statements of readiness were illusory. Accordingly, the Defendant is entitled to dismissal or release.

## THIS CASE SHOULD BE DISMISSED IN THE INTERESTS OF JUSTICE

9.    Pursuant to CPL 210.40, the Court is empowered to dismiss a case in the interests of justice. In doing so, CPL 210.40(1):

> 1. An indictment or any count thereof may be dismissed in furtherance of justice, as provided in paragraph (i) of subdivision one of section 210.20, when, even though there may be no basis for dismissal as a matter of law upon any ground specified in

paragraphs (a) through (h) of said subdivision one of section 210.20, such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment or count would constitute or result in injustice. In determining whether such compelling factor, consideration, or circumstance exists, the court must, to the extent applicable, examine and consider, individually and collectively, the following:

  (a) the seriousness and circumstances of the offense;

  (b) the extent of harm caused by the offense;

  (c) the evidence of guilt, whether admissible or inadmissible at trial;

  (d) the history, character and condition of the defendant;

  (e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;

  (f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;

  (g) the impact of a dismissal upon the confidence of the public in the criminal justice system;

  (h) the impact of a dismissal on the safety or welfare of the community;

  (i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion;

  (j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose.

*Emphasis added.*

10.     Here, looking strictly at the "evidence" and partial discovery provided by the

People to date, there is no question that the Defendant is entitled to an interests of justice

dismissal. In particular, according just to these documents, while the offense appears serious on paper, there is no question that this was in any way truly serious, since the People's own discovery indicates that: no one was injured; when the police arrived, there was no active fire, not even flames, and despite the allegations of the fire marshal regarding a supposedly dangerous fire, the People's evidence alleges that one of the responding officers simply poured a pot of water on some smoldering ash; despite the fire marshall's allegations that the shower curtain (which was presumably wet), the shower carpet (also presumably wet) and the shower towel (also presumably wet) were aflame, nothing in the police "evidence" indicates any active fire or significant fire damage. In other words, the fire marshall's allegations that the Defendant somehow intentionally started a fire to destroy property (or endanger persons, albeit that is not an element of arson) is, at best, overblown and overcharged, and at worst, flat-out misstated and wrong. Additionally, the responding police officers themselves did not deem the matter serious because they transported the Defendant to Harlem Hospital for mental health treatment rather than process him through the criminal justice system right away, something suggesting that they did not perceive the Defendant as having committed a dangerous crime.

11.     Moreover, the interests of justice warrant dismissal of this case because the "complainant", who was never injured, provided the police and prosecution at least three separate versions of the "facts" as alleged now by the prosecution. In other words, there is no evidence from the People's documents that the Defendant entered or remained in the apartment with any intent to commit a crime or to intentionally threaten or hurt anyone or to steal anything. Indeed, the People's own evidence arguably suggests suicidal ideation within the apartment, and while this is not conceded hereby, such an intent – if established – would be nonetheless be a far

cry from "entry with intent to commit a crime therein." Indeed, the "complainants" did not feel there was significant danger because, according to the People's own discovery, the "complainants" both remained present inside the apartment before the police even arrived.

12.    Moreover, as set forth below, while it is clear there were over six police officers on the scene, only two body camera footages were provided by the prosecution. There must be at least five more footages. This constitutes misconduct under CPL 210.40 since those five body camera footages would probably show the full story of what happened in this case. I am informed by the prosecution that NYPD does not have anything else, which makes no sense because body camera footage is now (and then) the standard in New York City (NYPD Operations Order #54). Additionally, somehow, the NYPD has destroyed the radio run for this case (see People's VDF), which also constitutes misconduct for purposes of CPL 210.40. Notably, the absence of this important evidence is telling because it would in fact corroborate whether the "complainant" did not wish to press charges, which, upon information and belief, would have added additional contradictions to the felony complaint and grand jury testimony.

13.    Furthermore, as indicated previously, the burglary allegation is highly questionable. There is nothing in the People's discovery indicating how the Defendant came to allegedly be in the "Complainants'" home, there is nothing in the discovery indicating that the Defendant was engaged in any type of intentionally criminal behavior, and indeed, the discovery suggests just the opposite. Furthermore, there is no indication of any "breaking or entering" in this matter. Given the People's discovery documents raising issues regarding lack of capacity and lack of intent, non-criminal mental status, potential self-inflicted injuries, upon information and belief, this matter may well be a glorified misdemeanor trespass. Additionally, since his

initial arrest in March 2019, the Defendant has remained out of trouble and engaged in lawful behavior.

14.     Based on all of these factors, the Defendant is entitled to, and this Court should grant, dismissal of this case in the interests of justice dismissal under CPL 210.40.

## MOTION TO DISMISS THE CASE, STRIKE THE CERTIFICATE OF COMPLIANCE AND STATEMENTS OF READINESS OR IN THE ALTERNATIVE TO COMPEL DISCOVERY

15.     Pursuant to CPL Article 245, the People must provide all discovery to the defense, irrespective of any demand. To date, the People (and NYPD through the People) owe the defense: (1) at least 4 other body camera footages since only two were produced and there were many more officers present, (2) the radio runs from the case, which the People have advised were destroyed, (3) redactions throughout the People's discovery that are overbroad and go beyond the need to protect any witnesses, and (4) all other discovery required by CPL Article 245 and the state and federal constitutions.

16.     Newly-enacted CPL section 245.80 provides in pertinent part:

1. Need for remedy or sanction. (a) When material or information is discoverable under this article but is disclosed belatedly, the court shall impose an appropriate remedy or sanction if the party entitled to disclosure shows that it was prejudiced. Regardless of a showing of prejudice the party entitled to disclosure shall be given reasonable time to prepare and respond to the new material.

(b) When material or information is discoverable under this article but cannot be disclosed because it has been lost or destroyed, the court shall impose an appropriate remedy or sanction if the party entitled to disclosure shows that the lost or destroyed material may have contained some information relevant to a contested issue. The appropriate remedy or sanction is that which is proportionate to the potential ways in which the lost or

> destroyed material reasonably could have been helpful to the party
> entitled to disclosure.
>
> 2. Available remedies or sanctions. For failure to comply with
> any discovery order imposed or issued pursuant to this article, the
> court may make a further order for discovery, grant a continuance,
> order that a hearing be reopened, order that a witness be called or
> recalled, instruct the jury that it may draw an adverse inference
> regarding the non-compliance, preclude or strike a witness's
> testimony or a portion of a witness's testimony, admit or exclude
> evidence, order a mistrial, order the dismissal of all or some of the
> charges, or make such other order as it deems just under the
> circumstances; ... .

17.    As part of the new discovery scheme, upon good faith compliance with the

discovery requirements, the People must file and serve a certificate of compliance. Hence,

pursuant to the newly-enacted CPL 245.50(1):

> When the prosecution has provided the discovery required by
> subdivision one of section 245.20 of this article, except for any
> items or information that are the subject of an order pursuant to
> section 245.70 of this article, it shall serve upon the defendant and
> file with the court a certificate of compliance. The certificate of
> compliance shall state that, after exercising due diligence and
> making reasonable inquiries to ascertain the existence of material
> and information subject to discovery, the prosecutor has disclosed
> and made available all known material and information subject to
> discovery. It shall also identify the items provided. ...

18.    This new section has implications for speedy trial. In particular, section

245.50(3) goes on to provide that: "3. Trial readiness. Notwithstanding the provisions of any

other law, absent an individualized finding of exceptional circumstances by the court before

which the charge is pending, the prosecution shall not be deemed ready for trial for purposes of

section 30.30 of this chapter until it has filed a proper certificate pursuant to subdivision one of

this section." Additionally, pursuant to the newly-enacted CPL 30.30(5):

> Whenever pursuant to this section a prosecutor states or otherwise
> provides notice that the people are ready for trial, the court shall

> make inquiry on the record as to their actual readiness. If, after
> conducting its inquiry, the court determines that the people are not
> ready to proceed to trial, the prosecutor's statement or notice of
> readiness shall not be valid for purposes of this section. Any
> statement of trial readiness must be accompanied or preceded by a
> certification of good faith compliance with the disclosure
> requirements of section 245.20 of this chapter and the defense shall
> be afforded an opportunity to be heard on the record as to whether
> the disclosure requirements have been met.

19. First, it is clear that (1) the People have not provided the defense with full access to the discoverable information in this case; (2) the defense has no independent means of obtaining the information the People have failed to provide to me absent obtaining a Court order; (3) the People have failed to provide the defense with all the outstanding body camera footage from the officers in this matter (only two out of over six police officers on the scene, and the footage must exist as required by NYPD Operations Order #54), (4) the People have admitted that the radio run in this matter was destroyed (People's VDF), and (5) the People have overbroadly redacted the discovery.

20. In particular, the two body camera footages at issue do not depict the entire scene of the "crime," do not include interviews conducted with the "complainants", do not include the hallways later depicted (questionably) by the fire marshall in his diagram. Moreover, the depictions contained on the two body camera footages are incomplete, limited in scope and view, do not include all interviews, and further, upon information and belief, are materially inaccurate and/or doctored and/or digitally manipulated and/or contain incomplete and/or cherry-picked information, all of which could easily be cleared up with all the body camera footages including metadata. Indeed, the NYPD was required to take and preserve all body camera footages at the time of the alleged incident (NYPD Operations Order #54).

21. More importantly, the People's (and NYPD's) refusal to provide this information

is highly prejudicial to the Defendant: he cannot fully evaluate his defenses in this matter; as set forth several times in other arguments herein and the Defendant's accompanying motions, the Defendant cannot effectively make arguments pertaining to suppression, dismissal or lack of guilt due to this lack of access; the obviously questionable issues raised above directly impact upon the credibility, ability to observe, candor and intentions of the police and civilian witnesses in this case, including the fire marshall. This unadulterated information is vital and critical to the defense at trial; and in order to understand the People's case, we need the full, complete, untampered, unredacted information. As such, the prosecution and NYPD's discovery violations have materially prejudiced the Defendant, and sanctions are warranted.

22.     The sanction of dismissal is warranted because all other sanctions are inadequate. Preclusion only permits the People to be the colloquial fox-guarding-the-henhouse. Indeed, full, complete and raw evidence is the only way to set the Defendant right; since the police and prosecution have failed to do so, only dismissal provides the appropriate remedy herein. In the alternative, should the Court decline to impose dismissal of this case based on the striking of the certificate of compliance and speedy trial, the Defendant nonetheless requests that the Court find that the missing discovery was "lost or destroyed," find the Defendant irreparably prejudiced thereby and preclude the People from submitting any evidence of police observations or activity (including live testimony, BWC and radio runs) at time of trial, and/or, issue an instruction to the jury that the NYPD intentionally lost or destroyed the missing information along with an adverse inference.

23.     Finally, should the Court not dismiss this case, the defense asks the Court to order the People to provide this and any other outstanding discovery and to produce all information,

materials, documents, etc. as required by CPL 245.20, Defendant's discovery demands and the Constitutions of the United States and the State of New York.

24. The Defendant also asks that the Court authorize the issuance of a judicial subpoena duces tecum on NYPD for production of the outstanding discovery.

## DEFENDANT MUST BE RELEASED UNDER CPL 180.80

25. There is no question that the Defendant was seized, restrained and not at liberty on March 6, 2019, the alleged date of this incident. Accordingly, he was arrested on March 6, 2019. There is also no question that he was held involuntarily for over one month before he was again seized by the fire marshal and charged by the People for the same incident for which he was arrested on March 6. However, according to CPL 180.80:

> Upon application of a defendant against whom a felony complaint has been filed with a local criminal court ..., and who, since the time of his arrest or subsequent thereto, has been held in custody pending disposition of such felony complaint, and who has been confined in such custody for a period of more than one hundred twenty hours or, in the event that a Saturday, Sunday or legal holiday occurs during such custody, one hundred forty-four hours, without either a disposition of the felony complaint or commencement of a hearing thereon, **the court must release him on his own recognizance**

26. The Defendant was seized and arrested by the NYPD on March 6, 2019. This is confirmed by the Defendant's own criminal record served by the People indicating an arrest date of March 6, 2019. Accordingly, the Defendant has been in custody for over a month past the 144 hours set forth in CPL 180.80, and his release on his own recognizance is not even discretionary; it is mandatory.

27.     Therefore, should this Court not dismiss this case, the Defendant should be released under CPL 180.80.

## CHANGED CIRCUMSTANCES WARRANT A RECOGNIZANCE

28.     Defendant now moves under CPL 510.20 for release on his own recognizance.

Section 510.20(1) of CPL sets forth:

> Upon any occasion when a court has issued a securing order with respect to a principal and the principal is confined in the custody of the sheriff as a result of the securing order or a previously issued securing order, the principal may make an application for recognizance, release under non-monetary conditions or bail.

CPL 510.30 sets forth:

> 1. With respect to any principal, the court in all cases, unless otherwise provided by law, must impose the least restrictive kind and degree of control or restriction that is necessary to secure the principal's return to court when required. In determining that matter, the court must, on the basis of available information, consider and take into account information about the principal that is relevant to the principal's return to court, including:
>
>   (a) The principal's activities and history;
>
>   (b) If the principal is a defendant, the charges facing the principal;
>
>   (c) The principal's criminal conviction record if any;
>
>   (d) The principal's record of previous adjudication as a juvenile delinquent, as retained pursuant to section 354.2 of the family court act, or, of pending cases where fingerprints are retained pursuant to section 306.1 of such act, or a youthful offender, if any;
>
>   (e) The principal's previous record with respect to flight to avoid criminal prosecution;
>
>   (f) If monetary bail is authorized, according to the restrictions set forth in this title, the principal's individual financial circumstances, and, in cases where bail is authorized, the principal's ability to post

bail without posing undue hardship, as well as his or her ability to
obtain a secured, unsecured, or partially secured bond; ... .

While there is some overlap in the bail consideration factors in old and new bail statute, now –

unlike at the time of Defendant's original arraignment – the Court is obligated to impose the least

restrictive alternative, as well as taking into account the Defendant's indigency, in setting bail.

See id.

29.    The Defendant was arrested and arraigned before the changes in the bail law went

into effect, and therefore, there are charged circumstances herein.  Here, the Defendant has

minimal warrant history, indeed, he has no warrants for almost twenty years, and the two older

warrants were cleared up within a reasonable time.  Further, he is indigent, and any bail, let alone

the current bail status, is unduly restrictive of his ability to post any bail.  As such, the Defendant

respectfully asks this Court to release him on his own recognizance.


## MOTION TO RESERVE RIGHTS

30.    The Defendant respectfully requests the right to make any and all further motions

upon receipt of further discovery.  At this time, the District Attorney has provided limited

discovery concerning this case.  Additional motions may be necessary as a result of information

and disclosure from the granting of the requests made herein and/or information received within

a reasonable time.  *See People v. Frigenti*, 91 Misc.2d 139 and CPL 255.20(3).

**WHEREFORE**, the Defendant, upon the foregoing grounds, respectfully requests this

Court grant the relief sought herein and reserves the right to amend or supplement this Motion if

made necessary or appropriate by future disclosure by the District Attorney and for such other

and further relief as to this Court may seem just and proper.

Dated: New York, New York
March 26, 2021

/s/ *David P. Turchi*
David P. Turchi, Esq.
DAVID P. TURCHI, ESQ., P.C.
Attorney for Defendant
305 Madison Avenue, Ste. 4600
New York, New York 10165
212-324-1707

SUPREME COURT OF THE STATE OF NEW YORK      Indictment No.: **01241-2019**
COUNTY OF NEW YORK: PART 81

THE PEOPLE OF THE STATE OF NEW YORK

- *against* -

**MICHAEL NIEVES**,

*Defendant*.

## **MOTION TO DISMISS**

DAVID P. TURCHI, ESQ., P.C.
*Attorney for Defendant*
305 Madison Avenue, Ste. 4600
New York, New York 10165
212-324-1707

To:      ADA Christopher Rivet
District Attorney of the County of New York
One Hogan Place
New York, New York 10013

Clerk of the Court: Part 81

*Service of a copy of the within is hereby admitted.*

*Dated,*

_____

*District Attorney's Office*

EXHIBIT (2)

release, specifically, the revision to the bail laws that became effective after his arrest (*id*. ¶ 29). He claims he should be released on his own recognizance because he has had no warrants for almost 20 years, "the two older warrants were cleared up within a reasonable time," and his current bail status "is unduly restrictive of his ability to post any bail" (*id*.).[5]

B.    The People's Response

The People oppose the motion in all respects. They argue first that only 14 days of speedy trial time are chargeable to them. Therefore, defendant's motion to dismiss the indictment under CPL § 30.30(1) and his motion for release under CPL § 30.30(2) should be denied.

The People oppose the motion to dismiss in the interests of justice because it is based on "blatant misrepresentations of the truth" (Peo's Response ¶ 21) and because defendant's conviction would not result in injustice.

The People argue next that there is no basis to deem either the COC or the COR invalid. With respect to information regarding the 911 caller(s), CPL § 245.20(1) permits the People to withhold their names, adequate contact information and identifying information until 15 days before trial. The People concede that the missing radio run and body-worn camera footage should exist, but it was destroyed before the case was assigned to the prosecutor now handling the case. The current prosecutor has made diligent efforts to find the body-worn camera footage, as he has advised defense counsel. In any event, the contents of the radio run are detailed in the 911 calls and Sprint

_____

[5]On July 23, 2021, defense counsel served the court and the People by email with a *pro se* memorandum of law "in support of the pending defense motion." Counsel also requested oral argument on the motion. Counsel did not expressly adopt the arguments in the *pro se* submission, and this court is not required to consider it, *People v. Rodriguez*, 95 NY2d 497 (2000). Nevertheless, in the exercise of its discretion the court has reviewed the filing. It does not change the result on this motion. The court does not require and will not entertain oral argument.

EXHIBIT (3)

## FACTUAL BACKGROUND AND
## PROCEDURAL HISTORY

4.      On March 6, 2019, between the morning hours of approximately 7:30-8:00, Angelina Cruel Cepeda was asleep in her bedroom at her apartment located at 561 West 141 Street. Her husband, Pedro Cruel, was in the kitchen.

5.      It was around that time when Michael Nieves, the defendant, walked into the victims' home, bypassed Mr. Cruel, and walked into Ms. Cepeda's bedroom. According to Ms. Cepeda, defendant barricaded himself in the room by moving the dresser in front of the door. She watched him pull out two lighters and he began "flicking" them. Terrified, Ms. Cepeda called out to her husband. Unable to communicate with her husband, she phoned the building's superintendent to let him know about the stranger in her bedroom.

6.      Eventually, through their collective efforts, Mr. Cruel, the superintendent, and Ms. Cepeda were able to force open the door so she could escape to safety. Petitioner ran from the bedroom and locked himself in the victims' bathroom.

7.      Police officers and the fire department were called to the scene. When the officers arrived to the apartment they were confronted with the smell of smoke. The victims told the police that defendant was locked in their bathroom and that he had started a fire. Officers were able to force open the bathroom door, where they observed heavy smoke and fire. Petitioner was physically removed from the bathroom and was restrained. The officers put out the fire by pouring several pots of water on the smoldering materials. The officers believed defendant was an emotionally disturbed person, and as a result, he was take to Harlem Hospital where he was treated for burns to his hands and was admitted for psychological evaluation.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 85

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, | AFFIRMATION IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT |
| -against- | |
| Michael Nieves, | |
| Defendant. | |
| | Ind. No. 01241/2019 |

CHRISTOPHER RIVET, an attorney duly admitted to practice before the courts of the State of New York, affirms under penalties of perjury that:

1.      I am an Assistant District Attorney in New York County and am fully familiar with the facts of this case.

2.      This affirmation is submitted in response to the defendant's motion for dismissal of the charges against him pursuant to CPL §§ 30.30, 210.40(1), 245.80, and for other related relief. It is based upon my examination of the District Attorney's file, the court papers, and, if specifically indicated, official transcripts of the proceedings in this case.

3.      Defendant is presently incarcerated at Bellevue Hospital pending trial on charges of Burglary in the First Degree, Penal Law § 140.30(3); Arson in the Second Degree, Penal Law § 150.15; Burglary in the Second Degree, Penal Law § 140.25(2); and Reckless Endangerment in the First Degree, Penal Law § 120.25.

8.    Once defendant was removed, firefighters surveyed the scene, ventilated the area, and checked for any possible exposures. The fire department deemed the area safe and secure and an investigation was opened. According to Fire Marshal Philip Meagher—who was assigned this investigation—whenever there is a fire in New York City, a Marshal is assigned to investigate and determine the cause of the cause of the fire. Marshal Meagher began his investigation on March 6, 2019, when he arrived to the scene at approximately 2:00 PM. After speaking with the victims, taking their statements, and assessing the fire damage, Marshal Meagher found sufficient evidence to believe that a crime had occurred. He subsequently filled out a complaint report with defendant as the suspect. On March 7, 2019, Marshal Meagher activated a probable cause I-Card for defendant's arrest.

9.    According to the limited hospital records defendant has provided as exhibits to his numerous filings, described below, it appears that he was admitted into Harlem Hospital's psych ward on or about March 6, 2019. He remained there until on or about April 8, 2019, when he was released from Harlem Hospital and returned to his outpatient facility.

10.    On April 9, 2019, Marshal Meagher arrested defendant. He was charged by felony complaint with Burglary in the First Degree, Penal Law § 140.30(3); Arson in the Second Degree, Penal Law § 150.15; Reckless Endangerment in the First Degree, Penal Law § 120.25; and Unlawful Imprisonment in the First Degree, Penal Law § 135.10. He was arraigned in Criminal Court later that same day. A securing order was set in the amount of $20,000 cash and $15,000 insurance company bond. The case was adjourned to April 12, 2019 for grand jury action.

11. On April 12, 2019, evidence was presented to a New York County grand jury. After hearing evidence, the grand jury returned an indictment charging defendant with Burglary in the First Degree, Penal Law § 140.30(3); Arson in the Second Degree, Penal Law § 150.15; Burglary in the Second Degree, Penal Law § 140.25(2); and Reckless Endangerment in the First Degree, Penal Law § 120.25. On April 12, 2019, the case was adjourned to New York County Supreme Court Part 81 for Supreme Court Arraignment. On April 24, 2019, defendant was arraigned on New York County indictment number 01241/2019 before the Honorable Curtis Farber. The People filed with the Court and served on defense counsel a copy of the indictment, notice of immigration consequences, the People's Voluntary Discovery Form, and a predicate felony statement. The case was adjourned to June 19, 2019 for the Court to issue a decision on defense's Omnibus motion.

12. On June 19, 2019, the Court rendered its decision, finding the grand jury minutes sufficient and ordering Huntley/Dunaway hearings. At the defense's request, the case was adjourned to August 14, 2019 for control purposes. Since the June 19, 2019, court date, defendant has filed numerous pro se applications in both state and federal court. As is relevant here, defendant has filed the following applications: (i) based on the affidavit of service dated August 29, 2019, defendant filed a motion to proceed as a poor person, a petition for a writ of habeas corpus, a petition for a writ of mandamus, a petition for a writ of prohibition, an omnibus motion, and a motion to dismiss the indictment; (ii) based on the affidavit of service dated November 17, 2020, defendant filed a petition for a writ of habeas corpus; (iii) based on the affidavit of service dated December 10, 2020, defendant filed a petition for a writ of habeas corpus; (iv) on December 14, 2020, defendant again filed a

o: 12125627716      Page: 06 of 29      2021-06-23 16:40:38 UTC      18888622398      From: David P. Turchi, Esq., P.C.

Case 1:21-cv-07171-LJL   Document 2   Filed 08/24/21   Page 33 of 474

petition for a writ of habeas corpus, with an affidavit of service dated November 17, 2020; and (v) on January 5, 2021, defendant filed a petition for a writ of habeas corpus, with an affidavit of service dated December 10, 2020.

13.     On January 19, 2021, the People provided comprehensive discovery to the defendant in full satisfaction of CPL § 245.20(1) and filed with the Court and served on defendant's attorney at the time, Carlos Martir, an Automatic Discovery Form and a Certificate of Compliance and Discovery List. *See* Exhibit 1. Pursuant to CPL Article 245, the People indicated that certain discovery had been lost or destroyed. Specifically, the People informed defendant's newest attorney, David Turchi, that the police radio run and the NYPD body-worn camera footage for all officers other than James Marcinek and Rufian Arshad had been lost or destroyed.

14.     On April 16, 2021, the People filed and serve a Certificate of Readiness. After serving supplemental discovery upon defense counsel, the People filed a second Certificate of Readiness on May 17, 2021.

## THE PEOPLE'S RESPONSE TO DEFENDANT'S REQUESTED RELIEF PURSUANT TO CPL § 30.30

15.     With respect to defendant's claims pursuant CPL § 30.30, as the chart below shows, only 14 days of includable speedy-trial time have elapsed in this case.

| DATES | INCLUDABLE TIME |
| --- | --- |
| April 10, 2019 to April 12, 2019 | 2 |
| April 12, 2019 to April 24, 2019 | 12 |
| April 24, 2019 to June 19, 2019 | 0 |
| June 19, 2019 to August 14, 2019 | 0 |

| | |
|---|---|
| July 1, 2019 to August 7, 2019 | 0 |
| August 7, 2019 to October 7, 2019 | 0 |
| October 7, 2019 to October 11, 2019 | 0 |
| October 11, 2019 to October 16, 2019 | 0 |
| October 16, 2019 to May 12, 2020 | 0 |
| May 12, 2020 to July 23, 2020 | 0 |
| July 23, 2020 to August 25, 2020 | 0 |
| August 25, 2020 to October 13, 2020 | 0 |
| October 13, 2020 to November 9, 2020 | 0 |
| November 9, 2020 to February 9, 2021 | 0 |
| February 9, 2021 to March 29, 2021 | 0 |
| March 29, 2021 to April 16, 2021 | 0 |
| April 16, 2021 to May 7, 2021 | 0 |
| May 7, 2021 to May 21, 2021 | 0 |
| May 21, 2021 to June 8, 2021 | 0 |
| June 8, 2021 to July 7, 2021 | 0 |
| Total: | 14 |

16.    The People base the above-stated calculation upon the following facts and legal precedents:

      a.   April 10, 2019 to April 12, 2019: The felony complaint was filed on April 10, 2019 and evidence was presented to a New York County grand jury on April

12 2019 which would to indict defendend on the aforementioned three *charges*

This period is chargeable to the People.

b.  April 12, 2019 to April 24, 2019: The indictment was filed on April 14, 2019. The court set April 24, 2019 for arraignment on the indictment, and on that date defendant was arraigned. This delay is chargeable to the People. *People v Correa*, 77 NY2d 930 (1991).

c.  April 24, 2019 to June 19, 2019: The case was adjourned for decision on the defendant's motion. This time is excludable. *See* CPL § 30.30(4)(a); *People v Shannon*, 143 AD2d 572 (1st Dept 1988).

d.  June 19, 2019 to August 14, 2019: On June 19, 2019, the Court rendered its decision, finding the grand jury minutes sufficient and ordering Huntley/Dunaway hearings. At the defense's request, the case was adjourned to August 14, 2019 for control purposes. This time is excludable. *See* CPL § 30.30(4)(b).

e.  July 1, 2019 to August 7, 2019: On July 1, 2019, the case was advanced at the defense's request so that counsel could be relieved and new counsel could be appointed. Newly appointed counsel, Daniel Hupert, requested that the case be adjourned for control purposes. This time is excludible. *See* CPL § 30.30(4)(b); *People v. Kopciowski*, 68 NY2d 615, 617 (1986).

f.  August 7, 2019 to October 7, 2019: On August 7, 2019, Mr. Hupert requested that the court order a 730 exam to determine whether the defendant was fit to assist in his own defense. This time is excludible. *See* CPL § 30.30(4)(a).

g. October 7, 2019 to October 11, 2019: On October 7, 2019, the 730 report was not yet complete and the case was adjourned for the 730 report to be submitted. This time is excludible. *See* CPL § 30.30(4)(a).

h. October 11, 2019 to October 16, 2019: On this date, the 730 report had been submitted and defendant was found unfit. The People requested an adjournment to reviewed the report and determine whether we were going to move to confirm. This time is excludible. *See* CPL § 30.30(4)(a).

i. October 16, 2019 to May 12, 2020: On October 16, 2019, the People moved to confirm the 730 results. This time is excludible. *See* CPL § 30.30(4)(a); *see also* Executive Orders 202.8-202.87.

j. May 12, 2020 to July 23, 2020: On May 10, 2020, defendant was found fit and was returned to the Department of Corrections. The case was calendared and Mr. Hupert requested an adjournment so he could determine whether he would move to confirm or controvert the findings. This time is excludible. *See* CPL § 30.30(4)(b); *see also* Executive Orders 202.8-202.87.

k. July 23, 2020 to August 25, 2020: On July 23, 2020, Mr. Hupert appeared and requested that he be relieved and that defendant have new counsel appointed to represent him. Carlos Martir was appointed on that date and requested an adjournment. This time is excludible. *See* CPL § 30.30(4)(b); *Kopciowski*, 68 NY2d at 617; *see also* Executive Orders 202.8-202.87.

l. August 25, 2020 to October 13, 2020: On August 25, 2020, the case was adjourned for a control date. This time is excludible. *See* CPL § 30.30(4)(b); *see also* Executive Orders 202.8-202.87.

m. October 13, 2020 to November 9, 2020: On October 13, 2020, the case was adjourned for a control date at request of Mr. Martir. This time is excludible. *See* CPL § 30.30(4)(b); *Kopciowski*, 68 NY2d at 617; *see also* Executive Orders 202.8-202.87.

n. November 9, 2020 to February 9, 2021: On November 9, 2020, defendant requested yet another attorney and to proceed *pro se*. The case was adjourned for control purposes to February 9, 2021, to await the resumption of jury trials. Between November 9, 2020, and February 9, 2021, defendant filed several motions including the following: (i) based on the affidavit of service dated November 17, 2020, defendant filed a petition for a writ of habeas corpus; (ii) based on the affidavit of service dated November 20, 2020, defendant filed a motion for reassignment of counsel; (iii) based on the affidavit of service dated December 10, 2020, defendant filed a petition for a writ of habeas corpus; (iv) on December 9, 2020, the defendant filed a motion for discovery and motion for the recusal of Supreme Court Justice, and December 14, 2020, defendant filed another petition for a writ of habeas corpus, with an affidavit of service dated November 17, 2020; and (v) on January 5, 2021, defendant filed a petition for a writ of habeas corpus, with an

affidavit of service dated December 10, 2020. This time is excludible. *See* CPL 30.30(4)(a) and (b); *People v. Kendzia,* 64 NY2d 331, 338 (1985).

o. February 9, 2021 to March 29, 2021: On February 9, 2021, Mr. Martin appeared and requested that he be relieved and that defendant have new counsel appointed to represent him. David Turchi was appointed on that date and requested an adjournment. This time is excludible. *See* CPL § 30.30(4)(b).

p. March 29, 2021 to April 16, 2021: On March 29, 2021, the case was calendared before Judge Farber. On that date, Judge Farber indicated that, as a result of the defendant specifically naming Judge Farber in a lawsuit, he was unwilling to hear arguments regarding defendant's petition for habeas corpus and that he was going to recuse himself from the case. Mr. Turchi filed and served the instant motion, wherein he adopted substantive portions of defendant's habeas petitions. The case was adjourned for purpose of having a new Justice of the Supreme Court appointed to oversee the case. This time is excludable. *See* CPL § 30.30(4)(a).

q. April 16, 2021 to May 7, 2021: On April 16, 2021, the case was calendared before the Honorable Miriam Best for the first time. The case was adjourned for the People to respond to both Mr. Turchi's motion and the defendant's petition for a writ of habeas corpus. Given the nature of the two defense applications, Judge Best informed the prosecution that if the People required additional time to respond, to notify the court. On May 6, 2021, the People notified Judge Best that, despite our diligent efforts, we had yet to receive a

sufficient number of transcripts from the defendant's court proceedings to meaningfully respond to Mr. Turchi's motion. Additionally, the People notified the Court that the New York County District Attorney's Office's Appeals Bureau was assisting in the response to the defendant's habeas petition. This time is excludable. *See* CPL §30.30(4)(a); *People v. Worley*, 66 NY2d 523 (1985).

r.  May 7, 2021 to May 21, 2021: The People did not respond to the defendant's motions on the scheduled date, and the case was adjourned for the People to respond. The People's response to defendant's petition for a writ of habeas corpus was due off calendar on May 17, 2021. This additional period was necessary because of the number of motions and because of the unavailability of court transcripts. Because the People are entitled to a reasonable time to respond to motions, this period should not be charged to the People. CPL § 30.30(4)(a); *People v Batista*, 166 AD2d 278 (1st Dept 1990).

s.  May 21, 2021 to June 8, 2021: The People filed and serve our response to the defendant's petition for a writ of habeas corpus on May 17, 2021, and the case was adjourned for decision. This time is excludable. *See* CPL § 30.30(4)(a); *People v Shannon*, 143 AD2d 572 (1st Dept 1988).

t.  June 8, 2021 to July 7, 2021: On June 8, 2021, the Court issued its decision denying defendant's petition for a writ of habeas corpus. On that date, the People informed the Court that we had received a sufficient number of transcripts to respond to Mr. Turchi's instant motion. The People's response

was due off calendar on June 14, 2021, with the Court to issue a written

decision. The case was adjourned to July 7, 2021, for decision on the

defendant's motions. This time is excludable. *See* CPL §30.30(4)(a); *People v.*

*Shannon*, 143 AD2d 572 (1st Dept 1988).

17.    Effective March 17, 2020, the Honorable Ellen Biben mandated that all

calendar appearances and motion deadlines will be automatically adjourned for six weeks.

Subsequently, the COVID-19 pandemic caused the courts to administratively adjourn all

cases pending in New York City Criminal and Supreme Courts. Criminal Procedure Law §

30.30 timelines were first tolled for 30 days by Executive Order 202.8 on March 20, 2020.

That tolling was continued without modification by Executive Orders 202.14, 202.28, and

202.38. In Executive Order 202.48, issued on July 6, 2020, the Governor ordered that 30.30

would continue to be tolled until petit juries were reconvened or until August 5, whichever

came later. Executive Order 202.55 extended Executive Order 202.48, without amendment

to the CPL § 30.30 provisions, through September 4, 2020.  In Executive Order 202.60,

issued on September 4, 2020, the governor clarified that § 30.30 continued to be tolled in a

particular "jurisdiction" until that "jurisdiction" could reconvene petit criminal juries.

Executive Order 202.67, as now modified by Executive Order 202.87, further amended the

CPL § 30.30 modifications as follows: The CPL § 30.30 clock for indicted felonies in which

the individual was arraigned on the indictment by October 19, 2020 started to run on

October 20, 2020.

18.     Because only 14 days of speedy-trial time have elapsed, the defendant's motion to dismiss the case pursuant to CPL § 30.30(1), order defendant's release pursuant to CPL § 30.30(2), and for all other relief requested pursuant to CPL § 30.30 should be denied.

### THE PEOPLE'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS IN THE INTEREST OF JUSTICE

19.     The defendant has moved to dismiss the indictment "in the interest of justice." CPL §§ 210.20 and 210.40. He argues that dismissal is required by the existence of compelling factors that "clearly demonstrat[e] that ... prosecution upon [the] indictment would ... result in injustice." *Id.* For the reasons set forth below, the defendant's motion should be denied.

20.     The standards governing such motions are well settled.[1] A so-called Clayton motion should be granted only in a "rare" and "unusual" case that "cries out for fundamental justice beyond the confines of conventional considerations." *People v Belge*, 41 NY2d 60, 62-63 (1976) (Fuchsberg, J., concurring); *accord People v Perez*, 156 AD2d 7 (1st Dept 1990), appeal denied, 76 NY2d 794. The Court's ability to dismiss an indictment in the

---

[1] CPL §§170.40(1) and 210.40 set forth ten factors that a Court should consider in exercising its discretion:

    (a)    the seriousness and circumstances of the offense;

    (b)    the extent of harm caused by the offense;

    (c)    the evidence of guilt, whether admissible or inadmissible at trial;

    (d)    the history, character and condition of the defendant;

    (e)    any exceptional serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;

    (f)    the purpose and effect of imposing upon the defendant a sentence authorized for the offense;

    (g)    the impact of a dismissal on the safety or welfare of the community;

    (h)    the impact of a dismissal upon the confidence of the public in the criminal justice system;

    (i)    where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion;

    (j)    any other relevant fact indicating that a judgment of conviction would serve no useful purpose.

furtherance of justice has been viewed as a power to be used "sparingly" and requires the

Court to balance the interests of the defendant and the State. People v Serrano, 163 AD2d

497 (2d Dept 1990). Only when a miscarriage of justice would result from adherence to the

letter of the law is such a dismissal warranted. *People v Andrew*, 78 AD2d 683 (2d Dept 1980).

21.     Judged by these exacting standards, the defendant's motion plainly fails. The

defendant's conduct in this case is egregious—after walking into the home of complete

strangers, he barricaded himself in the bedroom with one of the victims, and after she was

finally able to escape, he locked himself in the bathroom where he set various items on fire,

causing significant burn and smoke damage. The defendant has six felony convictions, two

of which are violent felonies. The defense alleges that "there was no active fire, not even

flames," Def. Mot. ¶10, that items in the bathroom were "presumably wet," id., which is

*presumably* included to make one think that the allegations that defendant set objects on fire

are unfounded, despite the photographic evidence to the contrary, and that officers "simply

poured a pot of water on some smoldering ash, id. The defense's statements are blatant

misrepresentations of the truth and all the evidence that has been provided proves that.

Moreover, the defense has alleged absolutely nothing that would "clearly demonstrat[e] that

... prosecution upon [the] indictment would ... result in injustice." CPL §§ 210.20 and 210.40.

## THE PEOPLE'S RESPONSE TO THE DEFENDANT'S
## REMAINING GROUNDS FOR RELIEF

I.      **The People filed a proper Certificate of Compliance after serving
        comprehensive discovery disclosures in full satisfaction of CPL §§ 245.20(1)
        and 245.50(1).**

"Initial discovery," as defined under CPL § 245.20(1), consists of items or information must be in the "possession, custody, or control" of the People,[1] which "relate to the subject matter of the case." *Id.* "When the prosecution has provided the discovery required by subdivision one of section 245.20 . . . it shall serve upon the defendant and file with the court a certificate of compliance." CPL § 245.50(1). A proper certificate of compliance is one that "state[s] that, after exercising due diligence and making reasonable inquiries to ascertain the existence of material and information subject to discovery [under CPL § 245.20(1)], [the People have] disclosed and made available [to the defendant] all known material and information [that is] subject to discovery." CPL § 245.50(1). Additionally, a list of items disclosed must accompany the certificate. *Id.* A certificate of compliance that conforms to these requirements is, therefore, proper, and the People are free to announce their readiness for the purposes of CPL § 30.30. CPL § 245.50(3).

The People provided comprehensive discovery to the defendant in full satisfaction of CPL § 245.20(1) and, as a result, there is no basis to deem the People's Certificate of Compliance or Certificate of Readiness invalid (*See* Exhibit 1). This information was disclosed to the defendant on months before the People served our Certificate of Compliance. Having completed their disclosure obligations under CPL § 245.20(1), the People certified their compliance on January 19, 2021, in good faith, with a proper Certificate of Compliance in accordance with CPL § 245.50(1). The People additionally

---

[1] Under CPL § 245.20(2), "items and information related to the prosecution of a charge" in the possession of "any New York state or police or law enforcement agency shall also be deemed to be in the possession of the prosecution."

certified their readiness for trial in accordance with CPL § 245.50(3) on April 16, 2021, and again on May 17, 2021.

The defendant has demanded discovery to items that simply do not exist. Namely, defendant claims that he is entitled to additional body-camera footage, the police radio run, redacted information, and "all other discovery required by CPL Article 245." Def. Mot. ¶15. The People acknowledge that no police radio run has been disclosed to the defense. Police radio run recordings, along with calls placed to 911, are retained for only one year. This case is a transfer case from an Assistant District Attorney who is no longer with the Office. Given that the incident occurred March 2019, and the case was transferred to me in May 2020, the prior ADA's failure to obtain the radio run has resulted in it being destroyed. Likewise, the police body-camera footage, beyond that which has been disclosed, has been destroyed. Based on the available body-camera footage, it is clear more officers responded to the scene and interacted with defendant. The People concede that there *should* be more body-camera footage, nonetheless, as the People informed Mr. Turchi, it does not exist. On October 13, 2020, I met with Officer Rufian Arshad, one of the responding officers whose body-camera has been disclosed to the defense. During that meeting, we watched his body-camera footage and he identified the officers that were present. At the end of our meeting, I gave him a subpoena for "[a]ll body-Worn Camera footage for the following Officers, from March 6, 2019, recorded at approximately 8:15 AM through and including 9:00 AM." Shortly thereafter, I was informed by Officer Arshad that the requested video does not exist.

Additionally, the defendant claims that the People's Certificate of Compliance and Certificate of Readiness are invalid because the People failed to disclose certain redacted

information. Def. Mot. ¶15-19. The names, adequate contact information, and any identifying information of a 911 caller "may be withheld, or redacted from discovery materials, without need for a [protective order]," provided that the People disclose such information no later than fifteen days before trial, if the People intend to call the individual as a witness CPL. §§ 245.20(1)(c) (emphasis added). 245.20(1)(p). Moreover, the automatic protections extend to any "information related to of evidencing the identify of a 911 caller." CPL § 245.10(1)(a)(iv)(A). Contrary to defendant's claims, these automatic protections not only apply to any pedigree information, but all materials evidencing the identity such a witness, which could include witness statements or other discovery that would reveal their identity.

Here, People are fully entitled to redact the information that the defendant seeks, given that the People limited their redactions to information that relates to the identity of the 911 caller(s), and notified the defendant in writing that such information has not been disclosed. CPL § 245.20(1)(c). In fact, the People went beyond their duties under the statute by providing the defendant with the names and phone numbers for each of the witnesses and victims not otherwise protected by the legislative carve out. Defendant has been in possession of the information since receiving the Automatic Discovery Form on January 19, 2021. The limited redactions throughout the discovery are permissible and are only used to limit the number of instances in which the victims' and witnesses' names appear. Importantly, the initials of the victims and witnesses were left visible to assist the defense in identifying to whom the subject discovery relates. Therefore, there is no reason to invalidate

the People's Certificate of Compliance and Certificate of Readiness based on these permitted

redactions.

II.     **The People's Certificate of Compliance filed on January 19, 2021 is proper, and should not be invalidated simply because certain materials were disclosed at a later date or are lost or destroyed, despite the People's good faith efforts to obtain them.**

The crux of defendant's argument is that short of obtaining and disclosing every known

discoverable item that exists, the People may never file a valid certificate of compliance. Yet,

when confronted with reiterations of this same argument, most courts have found it unavailing.

Instead, courts have held that belated disclosures, minor oversights in the production of

material, or a good faith position that the materials in question were not discoverable, do not

invalidate certificates of compliance that were filed in good faith after the exercise of due

diligence. *See People v. Cano*, 2020 WL 8968135, Slip Op. 20365, at *2-3 (Sup. Ct., Queens Co.

Dec. 3, 2020); *People v. Alvarez*, 2021 WL 1377827, Slip Op. 50292(U), at *3 (Sup. Ct., Queens

Co. Mar. 29, 2021).

To begin, the People may file a certificate of compliance once they "provided the

discovery required by subdivision 1 of section 245.20." CPL § 245.50(1). Compliance with

CPL § 245.20(1) is defined by the disclosure of materials, relevant to the subject matter of the

case, that are in the People's "possession, custody or control." Once the People disclose all

known materials subject to discovery that are in the possession of the People, they may file a

valid certificate of compliance.

Following this logic, the People may certify compliance while awaiting materials that

they have exercised due diligence to obtain, but have still not received. *People v. Askin*, 68 Misc.

3d 372, 380-81 (Co. Ct., Nassau Co. 2020); *see e.g., People v. Alford*, 66 Misc. 3d 1233(A), Slip Op.

'o: 12125627716      Page: 20 of 29      2021-06-23 16:40:38 UTC      18886522398      From: David P. Turchi, Esq., P.C.

Case 1:21-cv-07171-LJL    Document 2    Filed 08/24/21    Page 47 of 474

50349(U), at *3 (Crim. Ct., N.Y. Co. Mar. 13, 2020) (People's certificate of compliance not rendered invalid due to certain unavailable discoverable materials; People disclosed over 350 items and affirmed that "they have turned over everything in their possession and will continue to do so"). In *Askin* the People diligently and in a timely manner tried to obtain the outstanding materials, but the items were simply not in the People's control. *Askin*, 68 Misc. 3d at 380-81 (subsequent filing of CV, previously not in People's control, did not negate certificate of compliance and statement of readiness; People may file a valid certificate of compliance while awaiting receipt of medical records they subpoenaed in a timely manner because the People have "no control over when an outside agency will fill a subpoena"). Thus, the People may certify their compliance while awaiting these documents, and do not need to delay certification until "every document they know exists, and is held to be under their control, is physically turned over to the defense." *Id.* at 378-79.

     Minor oversights in discovery production have also not been held to invalidate certificates of compliance that were otherwise filed in good faith. *See e.g.*, *People v. Gonzalez*, 68 Misc. 3d 1213(A), Slip Op. 50924(U) at *2 (Sup. Ct., Kings Co., Aug. 19, 2020); *People v. Knight*, 69 Misc. 3d 546, 552 (Sup. Ct., Kings Co. 2020); *People v. Davis*, 70 Misc. 3d 467, 479 (Crim. Ct., Bronx Co. 2020) (despite initial omission of DWI maintenance logs from discovery, "prosecutor's initial disclosures were reasonable and made after exercising due diligence"). In *Gonzalez*, the court ruled that the absence of certain items that were inadvertently omitted from the People's discovery disclosures—a scratch complaint report, an updated disclosure letter, and an expert's resume—did not vitiate the original certificate. Id. at *2. In *Knight*, the court agreed that the mere fact the People provided more discovery items does not invalidate a

certificate of compliance, which "by any measure [was] filed in 'good faith' and 'reasonable under the circumstances,'" and thus was valid. *Knight*, 69 Misc. 3d at 552.

Additionally, a certificate of compliance is valid if the People filed the certificate in good faith based on their understanding of what was needed to be provided as discovery. Article 245 drastically revised its predecessor, and so "[g]iven this learning curve, a court should not invalidate a certificate of compliance simply because it ultimately rejects a good-faith argument made by the prosecution [especially when] the People have been demonstrably diligent in satisfying their discovery obligations." *People v. Lustig*, 68 Misc. 3d 234, 247-48 (Sup. Ct., Queens Co. 2020); see e.g., *People v. Randolph*, 69 Misc. 3d 770, 773 (Sup. Ct., Suffolk Co. 2020) (though People did not initially disclose IAB files, court held that there was no basis to strike the certificate of compliance or impose sanctions because "the People [had] been acting in good faith and [provided] discovery in harmony with their understanding of the requirements").

The sum total of these decisions chip away at the defendant's proposition that nothing short of complete compliance satisfies CPL § 245.50(1) and that the People's good faith plays no part in the analysis. Indeed, the Achilles heel of the defendant's 'all or nothing' approach is its inflexibility:

The new discovery law, designed as it was to be remedial in nature, should not be construed as an inescapable trap for the diligent prosecutor who professionally, assiduously and in good faith attempts to comply with their new and extensive requirements under the discovery statute, but through no fault of his or her own, is unable to comply with every aspect of the automatic discovery rules specified in CPL 245.20.

*People v. Erby*, 68 Misc. 3d 625, 633 (Sup. Ct., Bronx Co. 2020) (emphasis added).  The

court in *Erby* expressed credulity that the legislature intended to prohibit the People from filing a certificate of compliance even if just one page out of 50,000 discovery items was outstanding—despite the People's past and ongoing efforts to obtain it and their promise to disclose it as soon as it is received. *Id.* at 629. Recognizing that such a position would create a problem, not rectify one as intended, the court concluded that the plain statutory language controls, but not when doing so runs counter to legislative intent. Yet another court agreed: "The legislature simply needed to state that until and unless the People have every document that exists in a case in their possession, they should not file a certificate of compliance and should not announce readiness for trial. Such a position is not reasonable and clearly not what the legislature intended." *Askin*, 68 Misc. 3d at 378-79.

These principles were deftly applied in *People v. Alvarez*, 2021 WL 1377827, Slip Op. 50292(U), at *9 (Sup. Ct., Queens Co. Mar. 29, 2021). The prosecutor in *Alvarez* filed a certificate of readiness, but later belatedly disclosed certain police materials. *Id.* Two memobooks were also still outstanding. *Id.* Rather than follow an inflexible disclosure standard, the court noted the People's diligent and continued efforts to obtain the materials—along with their promise to disclose them when they are obtained—and held that "the belated disclosure of these items did not render their certificate of compliance in valid." *Id.* Consistent with the multiple cases described above, the court concluded: "Given that [the certificate] was made in good faith and reasonable under the circumstances . . . the original certificate was proper, pursuant to CPL 245.50(3)." *Id.*

Here, there is every reason to believe that the People exercised diligence and good faith efforts obtain the radio run and police body-worn camera footage. Upon learning that the radio

run was not in the prior ADA's case file, nor was it stored electronically in the District Attorney's case management system, I personally tried to obtain it. By that time, the radio run was no longer available. I reached out to Fire Marshal Meagher to inquire whether he had a copy given he submitted a request for the 911 calls. Fortunately—as I was likewise missing the 911 calls—the Fire Marshal was able to provide me with the 911 calls but he did not have the radio run. Additionally, with respect to the body-worn camera footage and officer memobooks, I served one of the responding officers with a subpoena for those documents and missing footage. I also enlisted the assistance of the Office's Litigation Support Unit in an attempt to track down the missing documents and footage, but to no avail. Thus, the People's certificate of compliance and statement of readiness should not be invalidated. *See People v. Nelson*, 67 Misc. 3d 313, 317 (City Ct., Franklin Co. Feb. 10, 2020) ("delayed disclosure does not, alone, require the striking of a certificate of readiness," which is a "drastic remedy which should be used both sparingly and judiciously"); *People v. Percell*, 67 Misc. 3d 190, 193 (Crim. Ct., N.Y. Co. 2020) ("The continued efforts by the People in this case to comply with their discovery obligations do not render their prior statements of readiness illusory.").

In fact, it is the People's demonstrated due diligence and good faith efforts that distinguishes this case from that of *People v. Adrovic*, 69 Misc. 3d 563 (Crim. Ct. Kings Co. 2020). The prosecution's shortfalls in *Adrovic* were glaring to the court—there was an "unexplained failure" to provide controlled substance lab results, and a lack of due diligence in obtaining memobooks from officers who, based on the suppression hearing record, were known to the People, despite their claim otherwise. 69 Misc. 3d at 569-70. Despite the court's claimed adherence to the wording of CPL § 245.50(1), even the court had to admit a certain degree of

flexibility based on due diligence and good faith, a standard that the prosecution in *Adrovic* simply did not meet: "Honest errors may well be excusable. But here the People have failed to demonstrate any steps they took to exercise the due diligence the statute requires prior to filing a certificate of compliance." *Id.* at 570.

Importantly, the People have turned over all discoverable material that is in the People's physical possession, which puts the defendant in substantively the same position as the People. To hold that the certificate of compliance and statement of readiness must be struck is also at odds with the legislative purpose of Article 245, which is to provide defendants with what they need to make informed decisions, in a fair and expeditious manner, about whether to resolve the charges against them by guilty plea or to proceed to trial. In other words, it is to ensure the defendant has all information known to the People. That purpose is served, not by striking proper certificates of compliance filed after the People have exercised reasonably diligent efforts, but by applying the statute in a commonsense manner and giving defendants material information that is directly relevant to the charges pending against them that the People have in their physical possession.

Nor is a certificate of compliance automatically rendered invalid if discoverable material is later obtained by the People and provided to the defendant. The statute itself makes clear that the appropriate recourse would be a sanction, but only if the defendant suffered prejudice as a result of the belated discovery: "No adverse consequence to the prosecution or the prosecutor shall result from the filing of a certificate of compliance in good faith and reasonable under the circumstances; but the court may grant a remedy or sanction for a discovery violation as provided in section 245.80 of this article." CPL § 245.50(1). If discoverable material is obtained

in this case that has not yet been turned over, the People will turn it over in a timely fashion. And only at that time, if requested by the defense, a sanction may be imposed at the time of trial, upon a showing of prejudice to the defense. CPL § 245.80(1)(a).

Finding the certificate of compliance invalid here would thwart legislative intent and lead to an unreasonable, absurd, and unexpected result. Importantly, it would render CPL §§ 245.20(2), 245.50(3), and 245.80 meaningless and violate the spirit of the statute. In this case, the complaining witness is cooperative and has indicated her willingness and eagerness to testify when the case moves to trial. To hold that the People's certificate of compliance and statement of readiness is invalid is tantamount to a dismissal of the case. Such an interpretation would leave victims defenseless and without recourse for criminal conduct committed against them in cases where the People exercised reasonably diligent efforts to obtain discovery. The legislature' intent is not to dismiss cases where there is a cooperative victim; rather, it was to ensure the defendant has all materials in the physical possession of the People, and in the instances where there are materials related to the subject matter of the case but not in their physical possession, to exercise reasonably diligent efforts to get it. Therefore, the defendant's motion should be denied.

III. **The defendant does not allege, let alone demonstrate, that any remedy or sanction under CPL § 245.80 may be imposed.**

In CPL § 245.80, the statute provides two scenarios for when the court may impose sanctions, neither of which apply to this case. First, under CPL § 245.80(1), the court may only impose "an appropriate remedy or sanction" for belated discovery "if the party entitled to disclosure shows that it was prejudiced." CPL § 245.80(1). Second, for discovery that has been lost or destroyed, the court may impose "an appropriate remedy or sanction if the party

o: 12125627716  Page: 26 of 29  2021-06-23 16:40:38 UTC  18888622398  From: David P. Turchi, Esq., P.C.

Case 1:21-cv-07171-LJL  Document 2  Filed 08/24/21  Page 53 of 474

entitled to disclosure shows that the lost or destroyed material may have contained some information relevant to a contested issue." Thus, the statute requires a specific factual showing by the aggravated party before sanctions may be imposed. A general cry for "sanctions" is insufficient.

Here, the defendant does not even attempt to allege any prejudice warranting remedy or sanction. The defendant has failed to show that he is entitled to sanctions due to the lost and destroyed discovery in this case. CPL § 245.80(2). With respect to the radio run, the contents of those communications are detailed in the 911 calls and Sprint Report, both of which have been in the defense's possession since January 19, 2021. The missing body-worn camera footage is duplicative. The defense has failed to allege any rational basis to believe that the lost or destroyed material may contain some information relevant to a contested issue. Even if it is determined that a sanction should be imposed, it must be limited to that "which is proportionate to the potential ways in which the lost or destroyed material reasonably could have been helpful to the party entitled to disclosure." CPL § 245.80(2). Striking the certificate of compliance and certificate of readiness in this case based only on the missing body-camera footage and radio run would be disproportionate because the body-camera footage that is available covers the entirety of defendant's interactions with the officer, as the body-worn camera footage is from the officers that transported him to the hospital, and the contents of the radio run are not relevant to a contested issue in this case.

**IV. There is no basis to order the defendant's release pursuant to CPL § 180.80 or to modify the securing order pursuant to CPL § 510.20.**

In the first instance, CPL § 180.80 applies when a person has been charged by felony complaint in criminal court and is being held in custody pending the disposition of the

'o: 12125627716    Page: 27 of 29    2021-06-23 16:40:38 UTC    18888622398    From: David P. Turchi, Esq., P.C.

Case 1:21-cv-07171-LJL   Document 2   Filed 08/24/21   Page 54 of 474

felony complaint. *See* CPL § 180.80. On March 6, 2019, when the defendant entered the victims' home and set objects on fire, he was not charged by the NYPD nor by the New York County District Attorney's Office. He was not charged by felony complaint until after his actual arrest on April 9, 2019. Defendant was subsequently arraigned on the felony complaint and evidence was presented to the grand jury, which voted an indictment charging defendant with Burglary in the First Degree, Penal Law § 140.30(3); Arson in the Second Degree, Penal Law § 150.15; Burglary in the Second Degree, Penal Law § 140.25(2); and Reckless Endangerment in the First Degree, Penal Law § 120.25.

Not only is the defendant's understanding of the law wrong, the remedy he seeks is no longer available even if he were correct. Plainly, CPL § 180.80 states that when a defendant is held in custody on a felony complaint, the defendant must be released on his own recognizance if, within either 120 hours or 140 hours, there has been no disposition of the felony complaint or commencement of a hearing thereon. The defendant is no longer being held in custody on a felony complaint. The grand jury heard evidence in this case and voted an indictment, and the securing order is based on the indictment, not the felony complaint.

With respect to defendant's application to modify the securing order and release him on his own recognizance, there has been no change in circumstances to warrant granting such application. Contrary to defense's claim that the current bail was set prior to the criminal just reform laws implemented in January 2020, defendant's current bail was imposed in May 2021 after he was returned after being found fit. The Honorable Erika Edwards heard arguments from both parties regarding the defendant's activities and history,

'o: 12125627716    Page: 28 of 29    2021-06-23 16:40:38 UTC    18888622398    From: David P. Turchi, Esq., P.C.

Case 1:21-cv-07171-LJL   Document 2   Filed 08/24/21   Page 55 of 474

the current charges the defendant is facing, his criminal conviction record, his sentencing exposure, and the facts of the case. After hearing from Mr. Hupert, the Court imposed the current securing order in the amount of $25,000 cash bail, $25,000 credit card, $50,000 insurance company bond, and $50,000 partially secured surety bond, as that was the least restrictive means to ensure the defendant would return to court. The only changed circumstance the defense raises is that defendant was "arrested and arraigned before the changes in the bail law went into effect." Def. Mot. ¶29. As previously noted, that is incorrect given that new bail conditions were imposed on in May 2021. Importantly, however, is that regardless of when bail was set, the defendant is charged with bail eligible offenses and the changes to the bail laws would have no impact on the Court's ability to set bail or otherwise impose a securing order.

WHEREFORE, defendant's motion and the relief requested therein should be denied in its entirety.


Dated:    New York, New York
          June 14, 2021

                            Cyrus R. Vance, Jr.
                            District Attorney
                            New York County


                    By:    _____
                            Christopher Rivet
                            Assistant District Attorney
                            Of Counsel
                            (212) 335-3255

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

### THE PEOPLE OF THE STATE OF NEW YORK

-against-

Michael Nieves,

Defendant.

### AFFIRMATION IN RESPONSE TO DEFENDANT'S
### MOTION TO DISMISS THE INDICTMENT

IND. NO. 01241/2019

Cyrus R. Vance, Jr.
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

Christopher Rivet
Assistant District Attorney
Of Counsel

EXHIBIT (4)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 81
------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

Indictment No.: **01241-2019**

- against -

**REPLY**

MICHAEL NIEVES,

Defendant.
------------------------------------------------------------------X

David P. Turchi, Esq., an attorney admitted to practice before the Courts of the State of New York, does hereby affirm the following:

1.    I am a member of DAVID P. TURCHI, ESQ., P.C., the attorney of record for the Defendant herein and as such I am fully familiar with all of the facts and circumstances relating to the instant motion.

2.    I make this reply affirmation in further support of the instant motion, and no prior applications have been made for the relief requested herein.

3.    I make this affirmation based upon information and belief, except as to those matters wherein I indicated actual knowledge. I base such knowledge on my review of the official court papers, the People's discovery produced to date, the case file maintained at my office, conferences with members of the District Attorney's Office and the proceedings had heretofore.

## ERRORS IN "FACTUAL BACKGROUND AND PROCEDURAL HISTORY"

4.    The People's factual rendition improperly suggests the allegations of the case as established facts. That is not the case as a matter of law. The People's lack of clarity over the

merits of their case is demonstrated by confusion over how the complainant allegedly exited her bedroom (the People's discovery, in fact, indicate at least three different versions of how this happened). Additionally, the People's rendition of the alleged fire is embellished beyond even what their allegations purport: they there was "heavy smoke and fire" requiring "several pots of water" to extinguish. However, the allegations contained in the People's own discovery allege, at most, the presence of smoldering ash and the ostensible involvement of a single pot of water. Accordingly, the People have failed to raise sufficient allegations in their belated response sufficient to defeat the Defendant's instant motion.

## **ERRORS IN THE PEOPLE'S 30.30 CALCULATIONS**

5.      Notwithstanding the fact that the Defendant has been involuntarily incarcerated for over two years, the People purport that only 14 days are chargeable to them. This is iniquitous. While the People are certainly chargeable with the first 14 days of the case since the Defendant's arrest, the People make incorrect assumptions and statements regarding other aspects of the speedy trial, including the improperly filed certificate of compliance and readiness.

6.      As an initial matter, it should be pointed out that the period during the Defendant's "unfitness", specifically August 7, 2019 through May 10, 2020, was done against the Defendant's wishes as he has set forth in his prior *writ of habeas corpus*. It is fundamentally unfair that nine months of his over two-year incarceration was based on a CPL 730 assessment that he disagreed with.

7.      Moreover, on May 10, 2020, the Defendant was found fit, and as we are now all aware, as of January 1, 2020, the People could not be ready unless they had filed their certificate of compliance (something the People did not do until **January 19, 2021**, over six months later).

Pursuant to CPL 30.30(5) and CPL 245.50(3), the People cannot be deemed ready unless they have filed a certificate of compliance. "Clearly, the People's trial readiness is now directly tied to meeting their discovery obligations, such that discovery compliance is a condition precedent to a valid announcement of readiness for trial". *People v. Lobato*, 2020 NY Slip Op 50322[U]; [Crim Ct, Kings County 2020]); *People v Quinlan*, 2021 NY Slip Op 21020 [Crim Ct. Bronx County 2021]); *People v. Fuentes*, CR-004476-20NA [Dist. Ct. Nassau Cnty. Hon. Broderick 2021]. As was set forth in *People v. Gonzalezyunga*, 71 Misc.3d 1210(A), 2021 N.Y. Slip Op. 50346(U) (Dist. Ct. Nass. Cnty. 2021):

> CPL § 30.30(5), then links the filing of a COC to the
> People's readiness for trial, by providing, in pertinent part,
> "Any statement of trial readiness must be accompanied or
> preceded by a certification of good faith compliance with the
> disclosure requirements of section 245.20 of this chapter ."
> It is CPL § 30.30(1) which sets the ultimate time limit
> on the filing of a COC.

Further, even if the stay of CPL 30.30 excused a portion of 2020 on account of the pandemic, the stay was lifted on October 19, 2020, meaning that the People are chargeable with no less than the 90 days required for release. *See id.*

8.      Here, the People have failed to bring the Defendant to trial within the required six months since his arraignment on or about April 9, 2019, let alone 90 days required for release. Hence, the case should be dismissed or the Defendant released.


## PEOPLE'S ERRORS IN RESPONSE TO DISMISSAL IN THE INTEREST OF JUSTICE

9.      The People correctly set forth the list of factors requiring dismissal in the interests of justice but then misapply the law. *See* CPL 210.40. Indeed, the motion is based on the People's very own "evidence" and partial discovery, which confirms there is no question that the

Defendant is entitled to an interests of justice dismissal. In particular, the People's "proofs" demonstrate that there is no question that no one was injured; when the police arrived, there was no active fire, not even flames, and despite the allegations of the People herein and the fire marshal regarding a supposedly dangerous fire, the People's evidence alleges that one of the responding officers simply poured a pot of water on some smoldering ash; despite the fire marshall's allegations that the shower curtain (which was presumably wet), the shower carpet (also presumably wet) and the shower towel (also presumably wet) were aflame, nothing in the police "evidence" indicates any active fire or significant fire damage. The People's allegations that the Defense arguments are cherry-picked and contradicted by the evidence makes no sense since it is their very evidence that demonstrates the lack of severity and unwarranted potential criminal liabilities that would be unjustly heaped upon the Defendant in the event of a conviction. Simply put, the fire marshall's allegations that the Defendant somehow intentionally started a fire to destroy property (or endanger persons, albeit that is not an element of arson) is, at best, overblown and overcharged, and at worst, flat-out misstated and wrong. Indeed, the responding police officers themselves did not deem the matter serious because they transported the Defendant to Harlem Hospital for mental health treatment rather than arrest him.

10.    Moreover, the interests of justice warrant dismissal of this case because the "complainant", who was never injured, provided the police and prosecution at least three separate versions of the "facts" as alleged now by the prosecution. Certainly, if the responding officers believed in any way that the Defendant had meant to attack or frighten the complainant, they would have arrested him and not taken him to the hospital for treatment. In other words, there is no evidence from the People's documents that the Defendant entered or remained in the

apartment with any intent to commit a crime or to intentionally threaten or hurt anyone or to steal anything. Indeed, the People's own evidence arguably suggests suicidal ideation within the apartment, and while this is not conceded hereby, such an intent – if established – would nonetheless be a far cry from "entry with intent to commit a crime therein." Indeed, the "complainants" did not feel there was significant danger because, according to the People's own discovery, the "complainants" both remained present inside the apartment before the police even arrived. There is simply no evidence of scienter in this matter, and the police officers' own alleged actions demonstrate this.

11.    The People's response does not demonstrate the absence of misconduct under CPL 210.40, but in fact, confirms it insofar as the People concede that the BWCs and radio run no longer exist. This constitutes misconduct under CPL 210.40 since those five body camera footages would likely show the full story of what happened in this case. The absence of this critical evidence makes no sense because body camera footage is now (and then) the standard in New York City (NYPD Operations Order #54). Additionally, the police destroyed the radio run, which would also have important evidence in this case, including defense-favorable evidence.

12.    Finally, there is no evidence here indicating (1) how the Defendant came to allegedly be in the "complainants'" home, and indeed, the "factual background" seems to questionably indicate the Defendant simply "walked" in past the husband, (2) that the Defendant was engaged in any type of intentionally criminal behavior, and indeed, the discovery suggests just the opposite, (3) any "breaking or entering" in this matter. By contrast, the People's allegations raising issues regarding lack of capacity and lack of intent, non-criminal mental status, potential self-inflicted injuries, upon information and belief, this matter may well be a

glorified misdemeanor trespass. Additionally, since his initial arrest in March 2019, the Defendant has remained out of trouble and engaged in lawful behavior.

13. Based on all of these factors, the Defendant is entitled to, and this Court should grant, dismissal of this case in the interests of justice dismissal under CPL 210.40.

## ERRORS REGARDING THE CERTIFICATE OF COMPLIANCE AND STATEMENTS OF READINESS

14. The People's response spills a tremendous amount of ink on the issue of the certificate of conformity. As an initial matter, nothing excuses the People from providing all discovery pertaining to the case, whether or not they will ultimately seek to introduce it at trial. *See generally* CPL Article 245. Indeed, remedies are available for failure to file a certificate of compliance, including release and dismissal. *Cf.* CPL 30.30(5) and CPL 245.50(3) *with* CPL 30.30(1) & (2). There are remedies for improperly filing a certificate of compliance or failing to provide discovery, including dismissal, preclusion or other appropriate remedies. *See* CPL 245.80.

15. Nothing in the People's response excuses the People from filing a timely certificate of compliance in order to stop the clock following January 1, 2020. Nothing the People's response excuses the NYPD's intentional destruction of important evidence in this matter.

16. As indicated in the moving papers, the People's (and NYPD's) refusal to provide this information is highly prejudicial to the Defendant: he cannot fully evaluate his defenses in this matter; as set forth several times in other arguments herein and the Defendant's

accompanying motions, the Defendant cannot effectively make arguments pertaining to

suppression, dismissal or lack of guilt due to this lack of access; the obviously questionable

issues raised above directly impact upon the credibility, ability to observe, candor and intentions

of the police and civilian witnesses in this case, including the fire marshall. This unadulterated

information is vital and critical to the defense at trial; and in order to understand the People's

case, we need the full, complete, untampered, unredacted information. As such, the prosecution

and NYPD's discovery violations have materially prejudiced the Defendant, and sanctions are

warranted.

17.     Accordingly, this case should be dismissed, or in the alternative, the People

should be precluded from introducing any evidence that is impacted by the intentionally-

destroyed evidence.

## THE PEOPLE'S RESPONSE SETS FORTH NO BASIS FOR BAIL OR FOR THE INCREASE IN BAIL PREVIOUSLY ORDERED

18.     Nothing in the People's response sets forth sufficient criteria under CPL 510.20,

or CPL 510.30, to keep the Defendant on what is effectively remand status. In particular, if the

Defendant is released now, he would be in civil commitment and not at liberty. As such, no

securing order is actually necessary. Additionally, the Defendant would return to Court to clear

his name because he knows the charges to be baseless. Further, he is indigent, and any bail, let

alone the current bail status, is unduly restrictive of his ability to post any bail. As such, the

Defendant respectfully asks this Court to release him on his own recognizance.

**WHEREFORE**, the Defendant, upon the foregoing grounds, respectfully requests this

Court grant the relief sought herein and reserves the right to amend or supplement this Motion if

made necessary or appropriate by future disclosure by the District Attorney and for such other

and further relief as to this Court may seem just and proper.

Dated: New York, New York
      June 23, 2021

                                     */s/ David P. Turchi*

                                     David P. Turchi, Esq.
                                     DAVID P. TURCHI, ESQ., P.C.
                                     Attorney for Defendant
                                     305 Madison Avenue, Ste. 4600
                                     New York, New York  10165
                                     212-324-1707

SUPREME COURT OF THE STATE OF NEW YORK     Indictment No.: **01241-2019**
COUNTY OF NEW YORK: PART 81

THE PEOPLE OF THE STATE OF NEW YORK

- *against* -

**MICHAEL NIEVES,**

*Defendant.*

## MOTION TO DISMISS

DAVID P. TURCHI, ESQ., P.C.
*Attorney for Defendant*
305 Madison Avenue, Ste. 4600
New York, New York 10165
212-324-1707

To:    ADA Christopher Rivet
District Attorney of the County of New York
One Hogan Place
New York, New York 10013

Clerk of the Court: Part 81

*Service of a copy of the within is hereby admitted.*

*Dated,*

_____

*District Attorney's Office*

EXHIBIT (5)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 81
-------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

Indictment No.:  **01241-2019**

- against -

**MEMORANDUM OF LAW**

MICHAEL NIEVES,

                              Defendant.
-------------------------------------------------------------X

SUPPLIMENTAL LEGAL ARGUMENTS FOR CASE DISMISSAL SUPPORTED BY CASELAWS OF ARTICLE 245 OF THE NEW DISCOVERY LAWS & CPL 30.30

4. The new statutory framework abolishes the prior mechanism for  obtain discovery through serving a demand upon the People and instead requires that the People provide the discovery listed in CPL 245. 20 "automatically" within the deadlines established in CPL 245.10 (Lobato, 2020 NY Slip Op 50322 [U]); People v. Akrmov, 67 Misc 3d 558, 540, 2020 NY Slip Op 20069.

5. As discussed in previous decisions by this Court, (see e.g. People v. Lobato 66 Misc 3d 1230 [A], 2020 NY Slip Op 50322 [U] Crim ct, Kings County 2020] People v. Berkowitz, 68 Misc 3d 1222 [A], 2020 NY Slip Op. 51044 [U] [Crim Ct, Kings County 2020]), the newly enacted provisions of CPL 245.50 require that the People comply with the discovery obligations enumerated in Section 245.20 as. a precondition to a valid statement of readiness. ("the provision of CPL 245.50 and 30.30 interlace discovery compliance and trial readiness, such that discovery compliance is a condition precedent to a valid announcement of readiness for trial, absent 'exceptional circumstances' on a particular case").

6. Accordingly, the People reverted to a state of unreadines and could not be deemed ready until filing a proper certificate of compliance as required by CPL § 245.50 (see: People v. Roland, 67 Misc 3d 330, 335 [Crim Ct Kings County 2020]).

2

7. Accordingly, a delay in providing this discovery is not a delay resulting from other proceedings concerning the defendant, and does not fall with the ambit of the CPL § 30.30(4)(a) exclusion.

8. The fifteen days is a deadline for discovery compliance at the risk of sanctions, it is not a grace period or a tolling of the speedy trial clock. The wording of the statute does not provide for any phase-in or grace period before the People answer ready. "If it were the intention of the legislature to offer a grace period to the prosecution, they would have done so" (People v. Akramov, 67 Misc 3d 558, 560 [Crim Ct Kings County 2020]). Therefore, the People were required to meet their discovery obligations on the date the law came into effect, stated above, the People have not demonstrated or even alleged any special cirumstances that would allow this Court to excuse the People's failure to provide automatic discovery or file a certificate of compliance.

9. While the People may argue that this "reset" of readiness is nowhere explicitly stated as already discussed above, support for the Court's interpretation can be found in the text and the structure of the new statutory provisions. The new statutory framework now provides explicit direction to this Court, requiring that it assess whether the People are actually ready, in other words, if the "People have done all that is required of them to bring the case to a point where it may be tried (People v. Brown, 28 NY3d 393, 404 [2016].

3

10. Once a statement of readiness is filed, the People
are only charged for adjournments when the delay is solely
and exclusively the fault of the prosecution, and the time
cannot otherwise be excluded under Section 30.30(4) (see:
People v. Brown, 28 NY3d 392, 404 [2016]; People v. Cortes,
80 NY2d 201, 210 [1992]).

11. The Governor's executive orders also ensure that
pretrial detainees are afforded due process under 14th Amendment
even in the midst of the extraordinary challenges arising from
the COVID-19 pandemic. "Once a State has granted prisoners a
liberty interest...due process protections are necessary to
insure that the state-created right is not arbitrarily
abrogated." (Vitek v Jones, 445 US 480, 488-489 [1980] [internal
marks omitted]). The executive order vindicate this
constitutional principle by ensuring that due process right to
an evidentiary ruling for pretrial detainees is provided in
every case, including sexual offenses, within a reasonable
time.

12. There is no precise definition of what constitutes
an exceptioanl circumstance under CPL  30.30(4)(g)." People v.
Clarke, 28 NY3d 48, 41 N.Y.S. 3d 200 (2016). People v. Smietana
98 NY2d 336, 341, 746 N.Y.S2d 678, 681 (2002). It is clear,
however, that the range of the term's application is limited
by the dominant legislative intent of informing CPL 30.30,
namely, to discourage prosecutorial inaction (see People v.
Sinistaj, 67 NY2d 236, 239, 501 N.Y.S2d 793, 492 N.E.2d 1209
[1986]; People v. Worley, 66 NY2d 523, 527, 498 N.Y.S2d 116,

4

488 N.E.2d 1228 [1985]." People v Price, 14 NY3d 61, 64, 896
N.Y.S.2d 719, 721 (2010). The Court of Appeals has "allowed
application of the exclusion only when the People for practical
reasons beyond their control cannot proceed with a legally
viable prosecution (see e.g. [*6] People v. Washington, 43
NY2d 772, 401 N.Y.S.2d 1007, 372 N.E.2d 795 [1977]; People v.
Zirpola, 57 NY2d 706, 708, 454 N.Y.S.2d 702, 440 N.E.2d 787
[1982])." People v. Price, supra. at 64, 896 N.Y.S.2d 719, 721
(2010).

13. Contrary to the People's argument, CPL Article 245
and CPL § 30.30(5) caused a reset of the People's readiness
status. While their prior declaration of readiness was not
illusory, commencing on January 1, 2020, "[t]he provisions of
CPL § 245.50 and 30.30 interlace discovery compliance and
trial readiness, such that discovery compliance is a condition
precedent to a valid announcement of readiness for trial, absent
'exceptional circumstances' on a particular case (CPL § 245.50
[3])." People v Lobato, 66 Misc 3d 1230(A), 122 N.Y.S.3d 492
(Crim. Ct. Kings Co. 2020); See also: People v Piasecki, supra.
As the court aptly noted in Lobato, supra., "What constitutes
'trial ready' as of January 1, 2020, is not the same as when
the People announced ready in July [30], 2019."

14. "Whether the People have satisfied [their CPL § 30.30]
obligation is generally determined by computing the time elapsed
between the filing of the first accusatory instrument and the
People's declaration of readiness, subtracting any periods of
delay that are excludable under the terms of the statute and

5

then adding to the result in any post readiness periods of delay that are actually attributable to the People and are ineligible for exclusion.' (People v. Cortes, 80 NY2d 201, 208, 590 N.Y.S.2d 9, 604 N.E.2d 71 [1992]).

15. It is clear to this court that Article 245 is a procedural statute, which entirely reworked the framework within which discovery is to be provided, aplicable to cases prending on January 1, 2020, as well as to cases commenced on or after that effective date. See: People v. Piasecki, 66 Misc 3d 1231(A), [*4] 202 NY Slip Op 50802(U). As a practical matter, if Article 245 were not given such retroactive effect, there would be no statute governing discovery in cases already pending on January 1, 2020, given the fact that Article 240 was repealed in its entirety on that date.

16. CPL § 245.20(1) delineates what items the prosecution is required to disclose to a defendant. Notably, pursuant to the rubric established by the newly effective Article 245, unlike its predecessor, Article 240, a defendant need not

serve a demand for these items upon the prosecution. The new discovery statute clearly places the onus on the prosecution to disclose that [*3] which is required.

17. CPL § 245.10 sets forth the time frames for the prosecution's compliance with their discovery obligations. Specifically, CPL § 245.10(1)(a) originally provided, in pertinent part, "The prosecution shall perform its initial discovery obligations under subdivision one of section 245.20 of this article as soon as practicable but not later than

6

488 N.E.2d 1228 [1985]." People v Price, 14 NY3d 61, 64, 896
N.Y.S.2d  719, 721 (2010). The Court of Appeals has "allowed
application of the exclusion only when the People for practical
reasons beyond their control cannot proceed with a legally
viable prosecution (see e.g. [*6] People v. Washington, 43
NY2d 772, 401 N.Y.S.2d 1007, 372 N.E.2d 795 [1977]; People v.
Zirpola, 57 NY2d 706, 708, 454 N.Y.S.2d 702, 440 N.E.2d 787
[1982])." People v. Price, supra. at 64, 896 N.Y.S.2d 719, 721
(2010).

13. Contrary to the People's argument, CPL Article 245
and CPL § 30.30(5) caused a reset of the People's readiness
status. While their prior declaration of readiness was not
illusory, commencing on January 1, 2020, "[t]he provisions of
CPL § 245.50 and 30.30 interlace discovery compliance and
trial readiness, such that discovery compliance is a condition
precedent to a valid announcement of readiness for trial, absent
'exceptional circumstances' on a particular case (CPL § 245.50
[3])." People v Lobato, 66 Misc 3d 1230(A), 122 N.Y.S.3d 492
(Crim. Ct. Kings Co. 2020); See also: People v Piasecki, supra.
As the court aptly noted in Lobato, supra., "What constitutes
'trial ready' as of January 1, 2020, is not the same as when
the People announced ready in July [30], 2019."

14. "Whether the People have satisfied [their CPL § 30.30]
obligation is generally determined by computing the time elapsed
between the filing of the first accusatory instrument and the
People's declaration of readiness, subtracting any periods of
delay that are excludable under the terms of the statute and

5

then adding to the result in any post readiness periods of delay that are actually attributable to the People and are ineligible for exclusion.' (People v. Cortes, 80 NY2d 201, 208, 590 N.Y.S.2d 9, 604 N.E.2d 71 [1992]).

15. It is clear to this court that Article 245 is a procedural statute, which entirely reworked the framework within which discovery is to be provided, aplicable to cases prending on January 1, 2020, as well as to cases commenced on or after that effective date. See: People v. Piasecki, 66 Misc 3d 1231(A), [*4] 202 NY Slip Op 50802(U). As a practical matter, if Article 245 were not given such retroactive effect, there would be no statute governing discovery in cases already pending on January 1, 2020, given the fact that Article 240 was repealed in its entirety on that date.

16. CPL § 245.20(1) delineates what items the prosecution is required to disclose to a defendant. Notably, pursuant to the rubric established by the newly effective Article 245, unlike its predecessor, Article 240, a defendant need not serve a demand for these items upon the prosecution. The new discovery statute clearly places the onus on the prosecution to disclose that [*3] which is required.

17. CPL § 245.10 sets forth the time frames for the prosecution's compliance with their discovery obligations. Specifically, CPL § 245.10(1)(a) originally provided, in pertinent part, "The prosecution shall perform its initial discovery obligations under subdivision one of section 245.20 of this article as soon as practicable but not later than

fifteen calendar days after the defendant's arraignment."
This subparagraph further provides for an extension of up to
thirty  30 days of the prosecution's obligation, without the
need for a motion, for "materials which are exceptionally
voluminous or, despite diligent, good faith efforts, are
otherwise not in the actual possession of the prosecution.

18. CPL § 245.50(1) requires that the prosecution
"shall serve upon the defendant and file with the court a
certificate of compliance[,]" when they have provided the
discovery required by section 245.20. Section 245.50(1)
further proveds, "No adverse consequences to the prosecution
or the prosecutor shall result from filing of a certificate
of compliance in good faith; but the court may grant a remedy
or sanction for a discovery violation as provided in section
245.80 of this article."

19. CPL § 245.80 (1)(a) provides possible remedies or
sanctions for discovery violations, in pertinent part: "When
material or information is discoverable under this article
but is disclosed belatedly, the court shall impose an
appropriate remedy or sanction if the party entitled to
disclsure shows that it was prejudiced." Subparagraphs (2)
and (3) of this section set forth various remedies or sanctions
which the court may impose.

20. CPL § 245.50(3) further provides:

> Nothwithstanding the provisions of any other law,
> absent an individualized finding of exceptional
> circumstances by the court before which the charge
> j

7

is pending, the prosecution shall not be deemed
rready for trial for the purposes of section 30.30
of this chapter until it has filed a proper
certificate pursuant to subdivision one of this
section.

21. Simultaneously with this enactment and effective
date of this new Article 245, the Legislature added a new CPL
§ 30.30(5), providing, in pertinent part:

Any statement of trial readiness must be accompanied
or preceded by a certification of good faith
compliance with the disclosure requirements of
section 245.20 of this chapter and the defense
shall be afforded an opportunity to be heard on the
record as to whether the disclosure requirements
have been met.

22. There is additional evidence of the legislative intent
in balancing the goals of fairness and efficiency against the
time frame for gathering evidence in pending criminal cases,
that all § 245[1] time periods are equally subject only to the
stay, modification and sanction provisions of article 245.
Sections 245.20[5]; 245.50[1]; 245.55[3][b] expressly state
that violations of the disclosure rules are subject specifically
to a "remedy or sanction pursuant to § 245.80." In other words
§ 245.80 is the only source of remedies or sanctions throughout
the article.

23. CPL § 245.80 sets forth the standard of proof to be met
before sanctions may be imposed, and goes on to specify approved

8

sanctions. A court may impose "an appropirate remedy or sanction" only if defendant can show that he was prejudiced by any delayed disclosure, or if he shows that any discovery lost or destroyed "may have contained some information relevant to a contested issue." (§ 245.80 [1] [a] and [b]). Further clarifying the range of courts' discretion in this regard, an appropriate remedy or sanction is defined as one which is "proportionate to the potential ways in which the lost or destroyed material reasonably could have been helpful." (§ 245.80[1][b]). [FN1]

24. Courts are accustomed to follow the legal doctrine of stare decisis, which directs courts to abide by previous judicial precedent on a question of law. This encourages judicial restraint and reassures the public that court decisions arise from a continuum of legal principles of an institution, rather than the personal daprice of its members. (People v Peque, 22 NY3d 168 [2013]). "Stare decisis is the preferred course because it promotes the evenhanded, predictable and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." (Janus v Am Eden of state County and Mun Employees, Council 31, 138 Sct 2448, 2478 [2018]; see also People v Octavio, 34 Misc 3d 790, 793 [Crim Ct NY County 2011]).

25. The long-awaited revolution of criminal justice reform now upon us requires courts to apply the new discovery statute largely in the absence of prior judicial guidance. In this situation, courts must be guided by common sense and the "chief essentials" of "reason and the power to advance justice," in order to create new precedents which are "drawn from a consideration of the nature and object of law itself." (People v. Hobson, 39 NY2d 479, 488 [1979], citing Von Moschzisker, J., Stare Dcisis in Courts of Last Resort, 37 Harv L Rev 409, 414 [1924]).

26. Additionally, in legal regards to question of why NYPD had been permitted to hospitalized the defendant in this matter instead of making an arrest for prosecution, see generally People v. Adams, 26 N.Y.2d 129 (1970); Adams, 26 N.Y.2d at 135-136. People v. Wood, 12 N.Y.2d 69, 76 (1962; People v. Schmidt, 216 N.Y. 324 (1915); and Moett v. People, 85 N.Y. 373 (1881).

**GRAND JURY TESTIMONIAL MINUTES CEARLY & CONVINCING SUPPORTS THE LEGALLY REQUIRED DISMISSAL OF THIS CASE BASED ON FALSE, INSUFFICIENT, AND DEFECTIVE EVIDENCE TO SUSTAIN THE INDICTMENT**

27. Page 7 of the Grand Jury Testimony, line 1 - 25, and the entirety of the minutes cearly proves the non-existence of the second male complainant according to the 911 call. Only the female complainant has incompletely or insufficiently testified for this false indictment, upon testimony of how the defendant, Michael Nieves allegedly entered the apartment, which disproves any charges of Burglary, for what could only have been Trespassing. As NYPD body-cam would have explained during the

10

investigation by police of the male complainant that the
apartment's door had been open upon the defendant's entrance
prior to allegedly entering the female complainant's bedroom.
See: Exhibit (A).

28. Page 8 of the Grand Jury minutes clearly states the
gross illegal contradictory testimony of the female
complainant's versus Assistant District Attorney, Brandon
Riddle's falsified Felony Complaint alleging of a physical
struggle between this female and the defendant, leading to
her escape from her bedroom, charging the defendant with
Unlawful Imprisonment unconstitutional upon a perjured
Felony Complaint, which is an A Misdemeanor against Mr. Riddle
for clearly making-up false statements. See: Exhibit (B).

29. Page 13 of the Grand Jury minutes clearly states
within line 15 - 25 the minor degree of the fire where only
allegedly a few pots of water was used to turn out the fire,
even as NYPD body-cam proves that only a pot of water was
used. While no testimony  in the Grand Jury minutes supports
that a curtain or rug had been on fire, nor does any Discovery
photograph or the Fire Department New York Unofficial Incident
Report Incident Type support these false statements in the
minutes and in the Felony Complaint Report filed by Mr. Riddle.
Which is also an A Misdemeanor violation for falsifying
statements. See: Exhibit (C) & (D), respectively.

30. Page 14, line 16 - 25 of the Grand Jury minutes
clearly states the burn injuries to the defendant's hand, as
Harlem Hospital's emergency medical and psychiatric treatment

11

records due to this incident as well as NYPD's Voluntary
Disclosure Form also implying why the defendants was not
arrested, as charges were evidently not being pressed by
the complainants, stating an Emotional Disturbed Person,
suicide attempt, which supports why the NYPD Radio Run
has been indicated as being destroyed, constituting proof
of Police Misconduct. See: Exhibit (E) - Harlem Hospital
records; (F) - NYPD rap sheet print-out arrest date of
March 6, 2019, supporting CPL § 180.80 violation; (G) -
NYPD Emotional Disturb Person Procedures; and, (H) -
the Voluntary Disclosure Form's Indication of Radio Run,
Destroyed.

     31. Page 21, line 1 - 15 of the Grand Jury minutes
provides clear testimonial evidence from Fire Marshal,
Meagher that the bathroom's curtain or rug was not on fire.
Indications of minor fire damage indicate only a bath towel
was aflamed, as NYPD body-cam evidence proves that it was
handle by the defendant aflamed and tossed near the toilet
floor area in a smoldering state. See: Exhibit (I).

## COURT MINUTES PROVIDES CLEAR AND CONVINCING EVIDENCE IN SUPPORT OF CPL 30.30 CASE DISMISSAL

     31. From August 7, 2019 - May 12, 2020, during which
the 7/30 order and exam proceeding commenced, ending in
restoration to fitness, this 9-month period must be
legally decreed as non-excludable pursuant to CPL 30.30(4)
(a) due to recorded violations of the defendant's statutory
rights, where court minutes since the inception

of this case on April 9, 2019 reflects the defendant's pro se legal fitness, which negated    judge Farber's order and a request for a 7/30 exam by former counsel, Mr Hupert, Daniel whom clearly recordedly retaliated by this 7/30 exam request due to the defendant's request for a re-assignment of counsel predicated on recorded negligence, inadequate and defective representation since approximately May 2019. See: People v. Gelikkaya, 197 A.D.2d 717, 595 NYS 2d 109 (3d Dep't. 1993); People v. Reason, 37 NY 2d 614, 334 N.E. 2d 572 (1975); People v. Plainty, 238 A.D. 2d 806 NYS 2d 109 (3d Dep't. 1997); People v. Wheeler, 249 A.D. 2d 774, 672 NYS 2d, 155 (3d Dep't. 1998); and, People v. Har, 26 A.D.3d 836, 307 NYS 2d 777 (4th Dep't. 2002). Also see: Exhibit (J) - August 7, 2019 minutes Mr. Hupert Daniel, ESQ's Malpractice & Exhibit (K) - April 24, 2019 minutes of additional pro se defense.

32. By direction of the New York City Police Commissioner in Operation Order 54, date issued 7/09/2020, "In the event that a federal and/or state prosecuting authority opens an official investigation  into a critical incident, the Department will share all relevant Body-Worn Camera (BWC) footage with the prosecuting authority within 24 hours of the Department being notified of the investigation, etc. See: Exhibit (L) - Operation Order 54.

33. The Assistant District Attorney, Christopher Rivet's Affirmation In Response To Defendant's Motion To Dismiss The Indictment's Factual Background And Procedural History

in argument #: 5, presents evidence of a male complainant whom provided no Grand Jury testimony to indict the defendant as it is clearly stated that the defendant "walked into the victim's home, bypassed Mr. Cruel, and walked into Ms. Clepela's bedroom," which legally disproves a Buglary charge in any degree. While Traspassing is evident, instead; by which malicious prosecution is clearly indicated therein.

34. In argument #: 7, Mr. Rivet's admission of maliciously prosecuting an NYPD declared Emotional Disturbed Person case, requiring hospitalization and psychological evaluation is also cearly evident. See: Exhibit (M) - Mr. Rivet's argument #: 5 and #: 7.

35. In argument #: 13, page 4, Mr. Rivet clearly incriminates himself with malicious prosecution by stating "On January 19, 2021, the People provided comprehensive discovery to the defendant in full satisfaction of CPL §245. 2(1)," and "a Certificate of Compliance and Discovery List." "Pursuant to CPL Article 245 the People indicated that certain Discovery had been lost or destroyed." "Specifically, the People informed defendant's newest attorney, David Turchi, that the police radio run and NYPD body-worn camera footage for all officers other than James Marcinek and Rufian Arshad had been lost or destroyed." See: Exhibit (N) - Mr. Rivet's argument #: 13.

36. In argument #: 14, Mr. Rivet's states that "On April 16, 2021, the People filed and served a Certificate of Raeadiness," and "After serving supplemental discovery upon defense counsel, the People filed a second Certificate of

14

Readiness on May 17, 2021.

37. Please note that both filed Certificates of
Readiness on said dates above are filed in violation of
NYS Statutes, due to the gross violations of CPL 245. The
alleged full and compliant discovery was filed on
January 19, 2021 - approximately 12-months after the
January 1, 2020 CPL Article 245 law became effective. While
Article 245 provides only a maximal of 45 days to file the
Certificate of Compliance with full and complete automatic
discovery presented to the defence. See: Exhibit (O) -
Invalid Filing of the Certificate of Compliance; and, Exhibit
(P) - Invalid Filing of the Certificate of Readiness.

38. The People's Response To The Defendant's Motion To
Dismiss In the Interest of Justice, cites CPL §§ 170.40.1(1)
and 210.40 which sets forth ten factors that a Court should
consider in exersing its discretion; eight of which are
legally sufficient for the defendant's case dismissal:

(a) the seriousness and circumstance of the offense,

- where evidence and Grand Jury testimony are
legally insufficient, deceitful and too descrepant
to substantiate the indictment for all the grounds
set forth in that instant filed motion to dismiss
the case; set forth in this Suppliment to the Reply
against the Malicious Prosecutor's Affirmation In
Reponse To The Defendant's Motion to Dismiss;

(b) the extent of harm caused by the offense,

- where as set forth above in section (a), persons
were not harm and property damage were quite

**15**

minor, by an evident Emotionally Disturbed
Person, suicide attempt, lacking capacity nor
intent to commit a crime;

(c) the evidence of guilt, whether admissible or
inadmissible at trial;

- where evidence of a perjured felony complaint,
NYPD body-worn camera footage were electronically
tampered with; as stated destroyed NYPD Radio Run
and body-worn camera evidence of five other
reponding police officers being also destroyed,
may exist;

(f) the impact of a dismissal on the safety or
welfare of the community,

- where the defendant would continue to receive
  mental health  care and treatment by the Office
  of Mental Health upon the case's dismissal,
  and receive adequate discharge services and
  supervision, the safety or welfare of the
  community  is well respected and protected;

(h) the impact of a dismissal upon the confidence
  of the public in the criminal justice system,

    - where over 2 years of a vicicous, malicious
      prosecution case against the defendant for
      merely suffering from a serious mental
      illness, experiencing a severe mental
      breakdown, albeit suffering from a crack
      cocaine addiction disorder, as drug abuse
      treatment services and mental health

services are available in the community -
it has been a gross miscarriage of justice
that jeopordizes the confidence of the
public in the criminal justice system; and,

(j) any other relevant fact indicating that a
judgment of conviction would serve no useful
purpose,

- where the violations of the defendant's
civil right and the violation of the 4th,
5th, 8th, 9th, and 14th Amendment Rights
of the United State Constitution, demand
this case's dismissal.

39. Pursuant to the extreme violations of the law presented
herein, supported by the instant filed motion to dismiss
this case or release the defendant on his own
recognizance, in the alternative until such further
relief may be granted, as all the criminal charges are
baseless and falsified, and in accordance with the
New Bail Reform Laws, justice would be served.

ADDENDUM

In Opposition To The People Response To The Defendant's
Remaining Grounds For Relief

I. The People filed an inproper and invalid Certificate of
Complaince after not serving comprehensive discovery
disclosure in full satisfaction of CPL §§ 245.20(1) and
245.50(1).

- where the entirety of legal arguments supported by
many caselaw citation from pages 12 - 22 must be legally
decreed moot and insubstantial, due to the strickness of
the New Discovery Reform Law, CPL 245, since January 1,
2020 that full discovery is automatic from the People
within a maximal 45 day deadline after a defendant's
arraignment, as a proper Certificate of Complaince must
be filed timely according to this 45 day deadline; not
a Certificate of Compliance filing approximately 1 year
later, on January 19, 2021 after the New Discovery Law
effectualized. Therefore both Certificates of Readiness
and the untimely Certificate of Compliance must be
invalidated by the Court and, this case must be dismiss
in accordance with CPL § 30.30 Speedy Trial.

- where the entirety of these legal arguments by the
People's Response To The Defendant's Motion To Dismiss
this case also incriminates the New York State District
Attorney's Office, Assistent District Attorney, Brandon
Riddle and ADA Christopher Rivet, herein of Gross
Prosecutorial Misconduct and Malfeasence by Mr. Rivet's
stated admission within the People's response that his
supervisor demanded this prosecution. See: Exhibit (Q).

EXHIBIT (A)

7

████ ████/Mitre

```
 1        A.    When the man came in?
 2        Q.    Can you briefly describe what
 3   happened when the man came in?
 4        A.    He came, I don't know exactly, I
 5   was asleep in my room and he came into my
 6   bedroom.
 7        Q.    Did you know this person?
 8        A.    No.
 9        Q.    What happened when he came into
10   your bedroom?
11        A.    He lighted -- well, he shut my
12   door. He locked it and he tried to light two
13   lighters.
14        Q.    When you say tried to light two
15   lighters, can you show us what he was doing?
16        A.    Turning them on.  He was going like
17   this.
18              MR. RIDDLE:  Just for the record,
19          the witness appears to be attempting to
20          flick a lighter.
21        Q.    What did you think was going to
22   happen at that time?
23        A.    That he was going to light my room
24   on fire.
25        Q.    What did you do while he was trying
```

RL

**EXHIBIT (B)**

8

C██████ C██████/Mitre

1      to light the lighters?

2           A.    I was trying to call my husband.

3      He wasn't answering then I tried to call the

4      super.

5           Q.    And when you say you tried to call

6      your husband, was that over the phone or were

7      you calling out his name?

8           A.    No, I was calling out to him.

9           Q.    And you tried to call the super was

10     that again calling out to him or was that over

11     the phone?

12          A.    No, calling him over the phone to

13     tell him there was a man inside my room.

14          Q.    What did you do next?

15          A.    They came in -- well, I don't know

16     who it was came in.  They came inside the

17     bedroom and that's when he went into the

18     bathroom and he lit it on fire.

19          Q.    Inside of your bedroom were you

20     able to leave?

21          A.    I don't know who opened the door.

22     When the door to my bedroom was opened that is

23     when I went out.

24          Q.    Did you try to open it yourself?

25          A.    No, I didn't approach.

RL

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK                    FELONY

-against-

Michael Nieves (M 37),                                 ADA Brandon Riddle
                                                       (212) 335-4130
                                          Defendant.

Fire Marshal Philip Meagher, Shield #38 of the Bureau of Fire Investigations, states as follows:

**The defendant is charged with:**

| | | |
|---|---|---|
| 1 | PL 140.30(3) | Burglary in the First Degree (defendant #1: 1 count) |
| 2 | PL 150.15 | Arson in the Second Degree (defendant #1: 1 count) |
| 3 | PL 120.25 | Reckless Endangerment in the First Degree (defendant #1: 1 count) |
| 4 | PL 135.10 | Unlawful Imprisonment in the First Degree (defendant #1: 1 count) |

On or about March 6, 2019 at about 8:12 A.M., at 561 West 141 Street in the County and State of New York, the defendant knowingly entered and remained unlawfully in a dwelling with intent to commit a crime therein and in effecting entry and while inside and in the immediate flight therefrom he or another participant in the crime used and threatened the immediate use of a dangerous instrument; the defendant intentionally damaged a building or motor vehicle by starting a fire and another person who was not a participant in the crime was present in such building or motor vehicle at the time and the defendant knew that the circumstances were such as to render the presence of such a person therein a reasonable possibility; the defendant, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of death to another person; the defendant restrained another person under circumstances which exposed that person to a risk of serious physical injury.

**The factual basis for these charges are as follows:**

I am informed by an individual known to the District Attorney's office (informant 1) that informant 1 was inside of a bedroom in their home at the above described location when defendant entered the bedroom and locked himself inside of the bedroom with informant 1. I am further informed by informant 1 that defendant moved the dresser in front of the door so that informant 1 could not leave. I am further informed by informant 1

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Michael Nieves (M 37),

Defendant.

FELONY

ADA Brandon Riddle
(212) 335-4130

that while inside of the bedroom informant 1 observed defendant lighting a lighter in a way that caused informant 1 to fear for her safety. I am further informed by informant 1 that informant 1 and defendant struggled over the dresser as informant 1 tried to move it out of the way. I am further informed by informant 1 that when informant 1 successfully moved the dresser away from the door defendant fled the bedroom and entered bathroom. I am further informed by informant that while defendant was inside of the bathroom informant began to see smoke coming out of the bathroom.

I am informed by Police Officer James Marcinek, Shield #20371, of the New York Police Department, that when he arrived at the above described location he observed defendant in the bathroom and the shower curtain, rug, and towels were on fire. I observed damage to the wall inside the bathroom, the toilet, and the floor.

**False statements made in this written instrument are punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law, and as other crimes.**

Fire Marshal Philip Meagher

Date 4/9/19    Time 5:05pm

**EXHIBIT (C)**

13

Marcinek

1    and fire inside the bathroom.  We removed an

2    individual from the bathroom and placed him in

3    handcuffs.

4           Q.    How did you gain access to the

5    bathroom?

6           A.    We had to force our way in.  He was

7    trying to -- the person inside was trying to

8    barricade himself in, trying to stop us from

9    gaining access, so using one of the shields

10   that we have, we were able to kind of put that

11   on the door and push the door open.  It took a

12   few of us to do it.

13          Q.    You said inside the bathroom you

14   saw fire, where did you see fire?

15          A.    It was on the floor.

16          Q.    Would you -- withdrawn.

17                Was the fire still burning or did

18   it appear as there had been a fire?

19          A.    No, it was still burning.

20          Q.    What did you do after you observed

21   the fire?

22          A.    After we removed the individual, we

23   then asked for pots of water and just started

24   taking pots of water from the kitchen to put

25   out the fire in the bathroom.

RL

**EXHIBIT (D)**

14

Marcinek

1        Q.    When you were inside the apartment
2    did you hear fire alarms?
3        A.    Yeah, smoke alarms were going off.
4        Q.    What did you do after you
5    extinguished the fire?
6        A.    After we extinguished the fire, we
7    went to aid medical aid to the individual
8    removed from the bathroom.
9        Q.    Did you ever learn that
10   individual's name?
11       A.    We did.
12       Q.    What was his name?
13       A.    His name is Michael Nieves.
14       Q.    What were you able to observe about
15   his physical condition?
16       A.    He had burns on his hands.  It
17   looked like black soot under his nose.  We
18   called an ambulance for him and had him removed
19   to the hospital.
20       Q.    You said he looked like he had
21   burns to his hands.  Were you able to tell
22   whether those were fresh burn marks?
23       A.    Yes, they were fresh.
24       Q.    What led you to believe they were
25   fresh?

RL

# Fire Department New York
# Unofficial Incident Report

## Incident Reviewed By

| | |
|---|---|
| Reviewer | 911047 - PARKER TIMOTHY Battalion Chief |
| Date | 03/07/2019 |

## Incident

| | |
|---|---|
| Incident # | 1-0380-0 |
| Alarm Date/Time | 03/06/2019 08:16:35 |
| Arrival Date/Time | 03/06/2019 08:20:49 |
| Cleared Date/Time | 03/06/2019 08:51:19 |
| Incident Type | 118 - Trash or rubbish fire, contained |
| Box | 1595 |
| Admin Company | E080 |
| Community Board | 09 |
| Precinct | 030 |
| Officer Assigment | 1 - Fire suppression, included are HazMat, rescue, IC |
| Reported By | Phone |
| Left In Charge | 6B |
| Highest Level | 11 - First Alarm |
| Action Taken1 | 11 - Extinguishment by fire service personnel |
| Action Taken2 | 51 - Ventilate |
| Rescued (civilians) | 0 |
| Evacuated (civilians) | 0 |
| HazMat Radio Code | Not Applicable |
| Location | 1 - Street address |
| Address | ███████████████ |
| Floor | |
| NYCHA/Non-NYCHA Location | Non NYC Housing Authority |
| Borough | 1 - Manhattan |
| Detector | U - Unknown |
| Property Use | 429 - Multifamily dwelling |
| Mutual Aid | N - None |

*(handwritten note)* false statement v. NYPD Body cam footage of NYPD's pot of water to turn off smoldering towel.

## Times - Transmitted by Unit

| | |
|---|---|
| 10-84 | 03/06/2019 08:20:49 |

03/08/2019 - Page 1

Unofficial Incident Report: 1-0380-0

| Times - Transmitted by Unit | |
|---|---|
| Total Duration | 00:34:44 |

| Resources | |
|---|---|

| **Unit: L028** | |
|---|---|
| Dispatch Date/Time | 03/06/2019 08:17:13 |
| Enroute Date/Time | 03/06/2019 08:17:56 |
| Arrival Date/Time | 03/06/2019 08:21:20 |
| Cleared Date/Time | 03/06/2019 08:35:21 |
| Action Taken1 | 214 - Performed secondary search |
| Action Taken2 | 216 - Checked exposures |
| Main Use | 1 - Suppression |
| Unit Type | 12 - Truck or aerial |

| **Unit: BC16** | |
|---|---|
| Responsible Full Report | Yes |
| Dispatch Date/Time | 03/06/2019 08:17:13 |
| Enroute Date/Time | 03/06/2019 08:17:56 |
| Arrival Date/Time | 03/06/2019 08:21:49 |
| Cleared Date/Time | 03/06/2019 08:29:42 |
| Action Taken1 | 81 - Incident command |
| Main Use | 1 - Suppression |
| Unit Type | 92 - Chief officer car |
| Unit Report By | 911047 - PARKER TIMOTHY Battalion Chief |
| No Report Required | No |
| Narrative | Incident Narrative |



Incident number 03/06/2019-1-0380-0
On Wednesday, March 6, 2019 at 08:16 hours the following units were
dispatched to a report of a contained trash or rubbish fire. The incident
location is street address ▮▮▮▮▮▮▮▮ Manhattan NY.

Primary incident actions taken are as follows:
Actions taken - extinguished and ventilation

*[handwritten: Discrepant indications v. indication of contained trash or rubbish fire, above.]*

Upon arrival Units operated as follows:

BC16 arrived at 08:21 hours and cleared at 08:29 hours.
Actions taken - incident command

E037 arrived at 08:22 hours and cleared at 08:28 hours.
Actions taken - hook line up to hydrant and stretch precautionary line
and then stood fast    *[handwritten: Discrepant info.]*

E059 arrived at 08:22 hours and cleared at 08:40 hours.

Unofficial Incident Report: 1-0380-0

| Unit: BC16 | |
|---|---|
| | Actions taken - hook line up to hydrant |
| | E069 arrived at 08:21 hours and cleared at 08:51 hours. Actions taken - |
| | L023 arrived at 08:20 hours and cleared at 08:42 hours. Actions taken - perform secondary search of fire area, check extension, ventilation and provide manpower |
| | L028 arrived at 08:21 hours and cleared at 08:35 hours. Actions taken - perform secondary search and checked exposures |
| | Reporting Member: 911047 TIMOTHY PARKER Unit Responsible: BC16 |

| Unit: E069 | |
|---|---|
| Dispatch Date/Time | 03/06/2019 08:17:13 |
| Enroute Date/Time | 03/06/2019 08:17:56 |
| Arrival Date/Time | 03/06/2019 08:21:21 |
| Cleared Date/Time | 03/06/2019 08:51:19 |
| Main Use | 1 - Suppression |
| Unit Type | 11 - Engine |

| Unit: E037 | |
|---|---|
| Dispatch Date/Time | 03/06/2019 08:17:13 |
| Enroute Date/Time | 03/06/2019 08:17:31 |
| Arrival Date/Time | 03/06/2019 08:22:02 |
| Cleared Date/Time | 03/06/2019 08:28:39 |
| Action Taken1 | 111 - Hooked up to hydrant |
| Action Taken2 | 115 - Stretched precautionary line stood fast |
| Main Use | 1 - Suppression |
| Unit Type | 11 - Engine |

| Unit: E059 | |
|---|---|
| Dispatch Date/Time | 03/06/2019 08:17:13 |
| Enroute Date/Time | 03/06/2019 08:17:51 |
| Arrival Date/Time | 03/06/2019 08:22:34 |
| Cleared Date/Time | 03/06/2019 08:40:30 |
| Action Taken1 | 111 - Hooked up to hydrant |
| Main Use | 1 - Suppression |
| Unit Type | 11 - Engine |

Unofficial Incident Report: 1-0380-0

| Unit: L023 | |
|---|---|
| Dispatch Date/Time | 03/06/2019 08:17:13 |
| Enroute Date/Time | 03/06/2019 08:17:33 |
| Arrival Date/Time | 03/06/2019 08:20:49 |
| Cleared Date/Time | 03/06/2019 08:42:20 |
| Action Taken1 | 212 - Performed secondary search, fire area |
| Action Taken2 | 215 - Check for extension |
| Action Taken3 | 51 - Ventilate |
| Action Taken4 | 73 - Provide manpower |
| Main Use | 1 - Suppression |
| Unit Type | 12 - Truck or aerial |

incidenthistory

**INCIDENT HISTORY REPORT**

PAGE: 1

DATE: 03/06/19 08:56

| | | |
|---|---|---|
| Datetime: | **06-MAR-19 08:12:44** | Alarm Box: **1595-1** |
| Borough. | **MANHATTAN** | Alarm Level: **Initial Alarm** |
| Alarm Source: | **PD Link/Medical** | |
| Incident Classification: | **Not Sent Out (NSO)** | |
| Ten code: | | |
| Location of Alarm Box: | **BROADWAY & W 141 ST** | |
| Close Reason: | **Not Sent Out Close** | |

| | | |
|---|---|---|
| 08:12:44 | 0:00:00 | Location of Alarm Box BROADWAY & W 141 ST |
| 08:12:44 | 0:00:00 | House Number |
| 08:12:44 | 0:00:00 | Incident Stree |
| 08:12:44 | 0:00:00 | Cross Street-1 BROADWAY |
| 08:12:44 | 0:00:00 | Cross Street-2 HAMILTON PL |
| 08:12:44 | 0:00:00 | Caller Description |
| 08:12:44 | 0:00:00 | Caller Phone Number |
| 08:12:44 | 0:00:00 | Caller Name T-MOBILE USA |
| 08:12:44 | 0:00:00 | Apartment Number |
| 08:12:44 | 0:00:00 | PD Job ID 606085 |
| 08:12:44 | 0:00:00 | PD Incident Type 54E1 |
| 08:12:44 | 0:00:00 | PD Comment MC STS MALE INDIAN ....UNK CLOTHING DESCRIPT WENT |
| 08:12:44 | 0:00:00 | NSO Info Not Used INTO HIS APT ... STS LOCKED IN HIS BATHROOM ...... |
| 08:12:44 | 0:00:00 | NSO Info Not Used . UNK WEAPONS ... *PRE-REL* |
| 08:12:44 | 0:00:00 | Incident Sequence Number 372 |
| 08:12:44 | 0:00:00 | F911 PD TIME 08:08:59 |
| 08:12:44 | 0:00:00 | NYPD INCIDENT TIME 08:12:41 |
| 08:12:44 | 0:00:00 | Administrative Unit E080    **** CIDS **** |
| 08:12:44 | 0:00:00 | Chief From AA Card BC16 |
| 08:12:44 | 0:00:00 | PD Clock Behind 3 SEC. |
| 08:12:44 | 0:00:00 | Unable To Assign Unit E080 AQ CFR CFR |
| 08:12:44 | 0:00:00 | Close Incident |
| 08:12:44 | 0:00:00 | Closed For NSO Incident Number UNKNOWN |

Incidenthistory                    INCIDENT HISTORY REPORT                    PAGE: 2

DATE: 03/06/19 08:56

| Datetime: | 06-MAR-19 | 08:16:07 | Alarm Box: | 1595-2 |
| Borough: | MANHATTAN | | Alarm Level: | Initial Alarm |
| Alarm Source | UCT/911 | | | |
| Incident Classification: | Not Sent Out (NSO) | | | |
| Ten code: | | | | |
| Location of Alarm Box | BROADWAY & W 141 ST | | | |
| Close Reason: | Not Sent Out Close | | | |

| 08:16:07 | 0:00:00 | Location of Alarm Box BROADWAY & W 141 ST |
| 08:16:07 | 0:00:00 | House Number▓ |
| 08:16:07 | 0:00:00 | Incident Street▓ |
| 08:16:07 | 0:00:00 | Cross Street-1 BROADWAY |
| 08:16:07 | 0:00:00 | Cross Street-2 HAMILTON PL |
| 08:16:07 | 0:00:00 | Apartment Number▓ |
| 08:16:07 | 0:00:00 | Caller Description▓===POSS BURG==== MC STS ML T |
| 08:16:07 | 0:00:00 | Caller's Ext. RIED TO STEAL FROM LOC STS HAVE ML LOCKED IN BATHR |
| 08:16:07 | 0:00:00 | NSO Info Not Used OOM NO WPNS NO INJ MC NOW STS OWNER OF APT HAS A K |
| 08:16:07 | 0:00:00 | NSO Info Not Used NIFE IN HIS HAND MC STS OWNER TRYING TO MAKE PERP |
| 08:16:07 | 0:00:00 | NSO Info Not Used STAY AT LOC MC STS ML TRYING TO BURN THE CURTAINS |
| 08:16:07 | 0:00:00 | NSO Info Not Used OF THE BATHROOM |
| 08:16:07 | 0:00:00 | 911 Street / Incident 31R |
| 08:16:07 | 0:00:00 | Letter Code (Element) Z |
| 08:16:07 | 0:00:00 | Caller Phone Number▓ |
| 08:16:07 | 0:00:00 | Caller Name WIRELESS-VERIZON WIRELESS(COMTE |
| 08:16:07 | 0:00:00 | 911 JOB ID W06135 |
| 08:16:07 | 0:00:00 | 911 SESSION ID PS1-C038     19030606135 20190306081607ES1 |
| 08:16:07 | 0:00:00 | PD TERMINAL ID PS1-C038 |
| 08:16:07 | 0:00:00 | Incident Sequence Number 378 |
| 08:16:07 | 0:00:00 | F911 PD TIME 08:13:10 |
| 08:16:07 | 0:00:00 | NYPD INCIDENT TIME 08:16:07 |
| 08:16:07 | 0:00:00 | Administrative Unit E080     **** CIDS **** |
| 08:16:07 | 0:00:00 | Chief From AA Card BC16 |
| 08:16:18 | 0:00:11 | Caller's Ext. UNK DESC OF ML |
| 08:16:28 | 0:00:21 | Letter Code (Element) 5 |
| 08:16:28 | 0:00:21 | INCIDENT UPDATED MCTD |
| 08:16:28 | 0:00:21 | Close Incident |

*(handwritten annotations:)* No weapons, No injuries

No evidence of exaggerated attempt to burn curtains.

incidenthistory                          **INCIDENT HISTORY REPORT**                                        PAGE: 3

DATE: 03/06/19 08:56

| Datetime: | **06-MAR-19** | **08:16:31** | Alarm Box: | **1595-3** |
|---|---|---|---|---|
| Borough: | **MANHATTAN** | | Alarm Level: | **Initial Alarm** |
| Alarm Source: | **UCT/911** | | | |
| Incident Classification: | **Not Sent Out (NSO)** | | | |
| Ten code: | | | | |
| Location of Alarm Box: | **BROADWAY & W 141 ST** | | | |
| Close Reason: | **Not Sent Out Close** | | | |

| 08:16:31 | 0:00:00 | Location of Alarm Box BROADWAY & W 141 ST |
|---|---|---|
| 08:16:31 | 0:00:00 | House Number |
| 08:16:31 | 0:00:00 | Incident Street |
| 08:16:31 | 0:00:00 | Cross Street-1 BROADWAY |
| 08:16:31 | 0:00:00 | Cross Street-2 HAMILTON PL |
| 08:16:31 | 0:00:00 | Apartment Number |
| 08:16:31 | 0:00:00 | Caller Description          MC REQ FD TO LOC |
| 08:16:31 | 0:00:00 | 911 Street / Incident 31R |
| 08:16:31 | 0:00:00 | Letter Code (Element) Z |
| 08:16:31 | 0:00:00 | Caller Phone Number |
| 08:16:31 | 0:00:00 | Caller Name WIRELESS-VERIZON WIRELESS(COMTE |
| 08:16:31 | 0:00:00 | 911 JOB ID W06135 |
| 08:16:31 | 0:00:00 | 911 SESSION ID PS1-C038    19030606135 20190306081607ES1 |
| 08:16:31 | 0:00:00 | PD TERMINAL ID PS1-C038 |
| 08:16:31 | 0:00:00 | Incident Sequence Number 379 |
| 08:16:31 | 0:00:00 | Administrative Unit E080    **** CIDS **** |
| 08:16:31 | 0:00:00 | Chief From AA Card BC16 |
| 08:16:41 | 0:00:10 | Letter Code (Element) 5 |
| 08:16:41 | 0:00:10 | INCIDENT UPDATED MCTD |
| 08:16:41 | 0:00:10 | Close Incident |

incidenthistory

**INCIDENT HISTORY REPORT**

PAGE: 4

DATE: 03/06/19 08:56

| | |
|---|---|
| Datetime: | **06-MAR-19**  **08:16:35** |
| Borough: | **MANHATTAN** |
| Alarm Source: | **Phone** |
| Incident Classification: | **Multiple Dwelling 'A' - Other fire** |
| Ten code: | |

Alarm Box:   **1595-4**

Alarm Level:   **Initial Alarm**

Location of Alarm Box:   **BROADWAY & W 141 ST**

Close Reason   **Normal Close**

| Time | Elapsed | Description |
|---|---|---|
| 08:17:04 | 0:00:29 | Dispatcher CRT MCTA |
| 08:17:04 | 0:00:29 | Location of Alarm Box BROADWAY & W 141 ST |
| 08:17:04 | 0:00:29 | House Number |
| 08:17:04 | 0:00:29 | Incident Street |
| 08:17:04 | 0:00:29 | Cross Street-1 BROADWAY |
| 08:17:04 | 0:00:29 | Cross Street-2 HAMILTON PL |
| 08:17:04 | 0:00:29 | Caller Description                FIRE |
| 08:17:04 | 0:00:29 | Letter Code (Element) E |
| 08:17:04 | 0:00:29 | Incident Sequence Number 380 |
| 08:17:04 | 0:00:29 | Administrative Unit E080      **** CIDS **** |
| 08:17:04 | 0:00:29 | Chief From AA Card BC16 |
| 08:17:07 | 0:00:32 | Dispatch Reason PHONE - 1ST ALARM - RESIDENTIAL |
| 08:17:13 | 0:00:38 | E069 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | E037 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | E059 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | L023 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | L028 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | BC16 Assigned To Incident MCT0 |
| 08:17:16 | 0:00:41 | CALL LINK NUMBER W06135 |
| 08:17:17 | 0:00:42 | Caller Phone Number 3478520341 |
| 08:17:31 | 0:00:56 | E037 Acknowledged ATS |
| 08:17:33 | 0:00:58 | L023 Acknowledged ATS |
| 08:17:51 | 0:01:16 | E059 Acknowledged ATS |
| 08:17:56 | 0:01:21 | E069 Acknowledged ATS |
| 08:17:56 | 0:01:21 | L028 Acknowledged ATS |
| 08:17:56 | 0:01:21 | BC16 Acknowledged ATS |
| 08:17:57 | 0:01:22 | FD DISPATCHER COMMENT ML  LOCKED  IN BATHROOM IN APT / STARTING FIRE |
| 08:17:57 | 0:01:22 | INCIDENT UPDATED MCTA |
| 08:20:49 | 0:04:14 | L023 10-84 MDT |
| 08:21:20 | 0:04:45 | L028 10-84 MDT |
| 08:21:21 | 0:04:46 | E069 10-84 MDT |
| 08:21:25 | 0:04:50 | E069 10-84 MDT |
| 08:21:49 | 0:05:14 | BC16 10-84 MDT |
| 08:22:02 | 0:05:27 | E037 10-84 MDT |
| 08:22:34 | 0:05:59 | E059 10-84 MDT |
| 08:25:33 | 0:08:58 | FD DISPATCHER COMMENT BC16 REPORTS SMALL FIRE IN APT EXTINGUISHED PRIOR T |
| 08:25:33 | 0:08:58 | NSO Info Not Used O ARRIVAL |
| 08:25:33 | 0:08:58 | INCIDENT UPDATED MCTD |
| 08:27:13 | 0:10:38 | BC16 10-44 RSEP |
| 08:27:30 | 0:10:55 | Secondary Notification EMS:EDP |
| 08:27:32 | 0:10:57 | EMS ACK OF RCPT MDT |
| 08:28:39 | 0:12:04 | E037 Available On The Air MDT |

*(handwritten annotations):*

Evidence of not a serious fire, contained prior to th FDNY arrival

Evidence of nature of incident and EDP burn victim, hospitalized by NYPD via EMS

I/NetDispatcher -- Event Chronology

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  | Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |
|  |  |  |  | Unit=30B1-2, St=ER, Loc |
|  |  |  |  | Unit=30B1-2, St=DP, Loc |
|  |  |  |  | Unit=30B1-2, St=ER, Comment=DA Auto Promote, Loc |
|  |  |  |  | EVENT COMMENT=30B1-2 -- DA Auto Promote |
| 08:13:15 | 3/6/2019 | ps1-d41 | 358815 | EVENT COMMENT=ADVSD SS---- CW2469 |
| 08:13:22 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=S4E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |
|  |  |  |  | Unit=30RES1-2, St=DP, Loc= |
| 08:13:23 | 3/6/2019 | ps2-d08 | 364133 | Unit=30RES1-2, St=ER, Loc= |
| 08:13:28 | 3/6/2019 | sps29mdt01 | 1 | EVENT UPDATED: Location=                Cross Streets=HAMILTON PL /BROADWAY , Name=T-MOBILE USA , Address=LL(-73:57:06.3109,40:49:         75 W 141 ST MN , Call Source=ANI/ALI , Phone Number=                Zone=Z08 , PCT/Sector=30B ,Language=SPANISH ,EMD Num=1 |
|  |  |  |  | EVENT UPDATED: Location              Cross Streets=HAMILTON PL /BROADWAY , Name=T-MOB Address=LL(-73:57:06.3109,40:49:25.4675): EST 575 W 141 ST MN , Call Source=ANI/ALI , Phone Number        , Zone=Z08 , PCT/Sector=30B ,Language=SPANISH ,EMD Num=190650952 ,EMD Pers=8622 |
|  |  |  |  | Route=AMB, PCT=MN, Sector=MN, St=Pending, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |
|  |  |  |  | Route=AMB, PCT=MN, Sector=MN, St=Pending, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |
|  |  |  |  | Route=AMB, PCT=MN, Sector=MN, St=Held, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |
|  |  |  |  | EVENT COMMENT=** Event held by Route AMB |
| 08:13:35 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |
|  |  |  |  | Unit=30ST1-2, St=DP, Loc= |
| 08:13:36 | 3/6/2019 | ps2-d08 | 364133 | Unit=30ST1-2, St=ER, Loc= |
| 08:13:44 | 3/6/2019 | ps1-c007 | 365010 | EVENT COMMENT=.... STS AIDED IS LOCKED IN HIS BATHROOM... STS UNK WHO THE MALE IS ......... UNK |
|  |  |  |  | IF VILOENT ...... |
| 08:13:53 | 3/6/2019 | ps2-d08 | 364133 | EVENT COMMENT=AA---SS LOC----EDP MSG------ D1795 |
| 08:13:56 | 3/6/2019 | sps29mdt01 | 1 | EVENT COMMENT=EMS Unit Dispatched NYPDJobNumber:19030606085 EMSJobNumber:190650952 |
|  |  |  |  | DateTime:20190306081356ES EMSOperatorNumber:D728 UnitId:81G2 UnitType:BLS |
|  |  |  |  | InitialDispatchFlag:I ETA:0825 Comments: |
| 08:14:00 | 3/6/2019 | ps1-c007 | 365010 | EVENT COMMENT=SMC         ...CB |
| 08:14:05 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |
|  |  |  |  | Unit=30A1-2, St=DP, Loc= |
| 08:14:06 | 3/6/2019 | ps2-d08 | 364133 | Unit=30A1-2, St=ER, Loc= |
| 08:14:07 | 3/6/2019 | ps1-c007 | 365010 | EVENT COMMENT=SPANISH CALLER ...OP 2755 |
| 08:14:29 | 3/6/2019 | ps1-c007 | 365010 | EVENT COMMENT=ANI-ALI             T-MOBILE USA               NEW YORK COS:WPH2 LAT: |
|  |  |  |  | 040.821166 LON:-073.953191 OPER ESTRELLA-SKINNER, ARISLEYDA A-SP-MTPPDVCP300-110 |
| 08:15:41 | 3/6/2019 | ps2-d08 | 364133 | Unit=30RES1-2, St=84, Loc= |
| 08:15:44 | 3/6/2019 | ps2-d08 | 364133 | Unit=30A1-2, St=84, Loc= |
| 08:15:46 | 3/6/2019 | ps2-d08 | 364133 | Unit=30B1-2, St=84, Loc |
| 08:15:50 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |
|  |  |  |  | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Current=F |

untimely discovery violation CPL 245

IncidentHistory                          INCIDENT HISTORY REPORT                                    PAGE: 4

DATE: 03/06/19 08:56

| | | |
|---|---|---|
| Datetime: | 06-MAR-19    08:16:35 | Alarm Box.    1595-4 |
| Borough: | MANHATTAN | Alarm Level:    Initial Alarm |
| Alarm Source: | Phone | |
| Incident Classification: | Multiple Dwelling 'A' - Other fire | |
| Ten code: | | |
| Location of Alarm Box: | BROADWAY & W 141 ST | |
| Close Reason: | Normal Close | |

| | | |
|---|---|---|
| 08:17:04 | 0:00:29 | Dispatcher CRT MCTA |
| 08:17:04 | 0:00:29 | Location of Alarm Box BROADWAY & W 141 ST |
| 08:17:04 | 0:00:29 | House Number ▓▓ |
| 08:17:04 | 0:00:29 | Incident Street ▓▓ |
| 08:17:04 | 0:00:29 | Cross Street-1 BROADWAY |
| 08:17:04 | 0:00:29 | Cross Street-2 HAMILTON PL |
| 08:17:04 | 0:00:29 | Caller Description ▓▓▓▓ FIRE |
| 08:17:04 | 0:00:29 | Letter Code (Element) E |
| 08:17:04 | 0:00:29 | Incident Sequence Number 380 |
| 08:17:04 | 0:00:29 | Administrative Unit E080    **** CIDS **** |
| 08:17:04 | 0:00:29 | Chief From AA Card BC16 |
| 08:17:07 | 0:00:32 | Dispatch Reason PHONE - 1ST ALARM - RESIDENTIAL |
| 08:17:13 | 0:00:38 | E069 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | E037 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | E059 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | L023 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | L028 Assigned To Incident MCT0 |
| 08:17:13 | 0:00:38 | BC16 Assigned To Incident MCT0 |
| 08:17:16 | 0:00:41 | CALL LINK NUMBER W06135 |
| 08:17:17 | 0:00:42 | Caller Phone Number 3478520341 |
| 08:17:31 | 0:00:56 | E037 Acknowledged ATS |
| 08:17:33 | 0:00:58 | L023 Acknowledged ATS |
| 08:17:51 | 0:01:16 | E059 Acknowledged ATS |
| 08:17:56 | 0:01:21 | E069 Acknowledged ATS |
| 08:17:56 | 0:01:21 | L028 Acknowledged ATS |
| 08:17:56 | 0:01:21 | BC16 Acknowledged ATS |
| 08:17:57 | 0:01:22 | FD DISPATCHER COMMENT ML  LOCKED  IN BATHROOM IN APT / STARTING FIRE |
| 08:17:57 | 0:01:22 | INCIDENT UPDATED MCTA |
| 08:20:49 | 0:04:14 | L023 10-84 MDT |
| 08:21:20 | 0:04:45 | L028 10-84 MDT |
| 08:21:21 | 0:04:46 | E069 10-84 MDT |
| 08:21:25 | 0:04:50 | E069 10-84 MDT |
| 08:21:49 | 0:05:14 | BC16 10-84 MDT |
| 08:22:02 | 0:05:27 | E037 10-84 MDT |
| 08:22:34 | 0:05:59 | E059 10-84 MDT |
| 08:25:33 | 0:08:58 | FD DISPATCHER COMMENT BC16 REPORTS SMALL FIRE IN APT EXTINGUSHED PRIOR T |
| 08:25:33 | 0:08:58 | NSO Info Not Used O ARRIVAL |
| 08:25:33 | 0:08:58 | INCIDENT UPDATED MCTD |
| 08:27:13 | 0:10:38 | BC16 10-44 RSEP |
| 08:27:30 | 0:10:55 | Secondary Notification EMS:EDP |
| 08:27:32 | 0:10:57 | EMS ACK OF RCPT MDT |
| 08:28:39 | 0:12:04 | E037 Available On The Air MDT |

*[handwritten annotations:]*

Evidence of not a serious fire, contained prior to th FDNY arrival

Evidence of nature of incident and EDP burn victim, hospitalized by NYPD via EMS

| | | | | | |
|---|---|---|---|---|---|
| | | 08:18:44 | | | |

08:18:44

           ** >>>> by: JANEL RAMIREZ on terminal: ps2-d08

              Route cancelled: S19030606085. Duplicate of incident kept:
S19030606135

CROSS REFERENCED TO EVENT=A19030606135

CROSS REFERENCED TO EVENT=B19030606135

CROSS REFERENCED TO EVENT=D19030606135

CROSS REFERENCED TO EVENT=F19030606135

CROSS REFERENCED TO EVENT=N19030606135

CROSS REFERENCED TO EVENT=S19030606135

Disposition Assigned=DUPNCAN

| | | | | |
|---|---|---|---|---|
| 08:18:45 | 3/6/2019 | ps2-d08 | 364133 | Route=SOD, PCT=0, Sector=ESA2, P=3, Cancel Comment=Duplicate and Cancel, Primary Member=0, Current=T, Open =F, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |

EVENT CLOSED

Route=AMB, PCT=MN, Sector=MN, P=3, Cancel Comment=Duplicate and Cancel, Primary Member=0, Current=T, Open =F, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F

EVENT CLOSED

Route=BS, PCT=MN, Sector=MN, P=3, Cancel Comment=Duplicate and Cancel, Primary Member=0, Current=T, Open =F, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F

EVENT CLOSED

EVENT COMMENT=Route cancelled: A19030606085. Duplicate of incident kept: A19030606135

              Route cancelled: B19030606085. Duplicate of incident kept:
B19030606135

Disposition Assigned=DUPNCAN

Disposition Assigned=DUPNCAN

Disposition Assigned=DUPNCAN

| | | | | |
|---|---|---|---|---|
| 19030606135 | 08:13:10 | 3/6/2019 | ps1-c038 | 368104 | ANI NUM=106591472, CALLER NAME=WIRELESS-VERIZON WIRELESS(COMTE, ANI ▮▮▮▮▮▮▮▮▮▮ALI=3500BROADWAYNEW YORK, COMMENT=: SW SECTOR, COMPANY=VZW, CLASS=WPH1,LAT=+040.825082,LONG=-073.950916,XY=XY(99783651,23988112) |

| | | | | |
|---|---|---|---|---|
| | 08:13:29 | 3/6/2019 | ps1-c038 | 368104 | ANI NUM=106591481, CALLER NAME=WIRELESS-VERIZON WIRELESS(COMTE, ANI ▮▮▮▮▮▮▮▮▮▮ALI=3500BROADWAYNEW YORK, COMMENT=: SW SECTOR, COMPANY=VZW, CLASS=WPH2,LAT=+040.823988,LONG=-073.951495,XY=XY(99767648,23948244) |

| | | | | |
|---|---|---|---|---|
| | 08:14:43 | 3/6/2019 | ps1-c038 | 368104 | EVENT CREATED: Location=▮▮▮▮▮▮▮▮▮▮▮, Cross Streets=HAMILTON PL /BROADWAY , Name=WI▮▮▮▮▮▮▮▮S(COMTE , Address=LL(-73:57:03.2977,40:49:30.2951): EST 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number ▮▮▮▮▮▮▮▮▮▮ , Zone=Z08 , PCT/Sector=30B |

Route=D, PCT=30, Sector=30B, St=Pending, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F

| | | | | |
|---|---|---|---|---|
| | 08:14:43 | 3/6/2019 | loi-search | 368104 | EVENT COMMENT=** LOI search completed at 03/06/19 08:14:43 |
| | 08:14:43 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=====POSS BURG==== |

              *PRE-REL*

| | | | | |
|---|---|---|---|---|
| | 08:14:59 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=MC STS ML TRIED TO STEAL FROM LOC STS HAVE ML LOCKED IN BATHROOM |
| | 08:15:09 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=NO WPNS NO INJ |
| | 08:15:12 | 3/6/2019 | ps2-d08 | 364133 | EVENT COMMENT=Event D19030606135 has been displayed by the covering dispatcher |

           ** >>>> by: 364133 at 03/06/19 08:15:12 on terminal: ps2-d08

           ** LOI information for Event # D19030606135 was viewed at:
03/06/19 08:15:12

           ** >>>> by: JANEL RAMIREZ on terminal: ps2-d08

EVENT COMMENT=MC NOW STS OWNER OF APT HAS A KNIFE IN HIS HAND MC

| | | | | |
|---|---|---|---|---|
| | | | | Unit=30RES1-2, St=UC, Comment=Preempt |
| | | | | Unit=30RES1-2, St=AV |
| | | | | Unit=30RES1-2, St=DA, Comment=Event D19030606085 Dispatch Assigned |
| | | | | EVENT COMMENT=30RES1-2 -- Preempt |
| | | | | 30RES1-2 -- Event D19030606085 Dispatch Assigned |
| 08:15:53 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Unit=30A1-2, St=UC, Comment=Preempt |
| | | | | Unit=30A1-2, St=AV |
| | | | | Unit=30A1-2, St=DA, Comment=Event D19030606085 Dispatch Assigned |
| | | | | EVENT COMMENT=30A1-2 -- Preempt |
| | | | | 30A1-2 -- Event D19030606085 Dispatch Assigned |
| 08:16:04 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Unit=30B1-2, St=AV |
| | | | | Unit=30B1-2, St=UC, Comment=Preempt |
| | | | | Unit=30B1-2, St=DA, Comment=Event D19030606085 Dispatch Assigned |
| | | | | EVENT COMMENT=30B1-2 -- Preempt |
| | | | | 30B1-2 -- Event D19030606085 Dispatch Assigned |
| 08:17:12 | 3/6/2019 | ps2-d08 | 364133 | Unit=30ST1-2, St=84, Loc=▇▇▇▇▇▇ |
| 08:17:15 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Unit=30ST1-2, St=UC, Comment=Preempt |
| | | | | Unit=30ST1-2, St=AV |
| | | | | Unit=30ST1-2, St=DA, Comment=Event D19030606085 Dispatch Assigned |
| | | | | EVENT COMMENT=30ST1-2 -- Preempt |
| | | | | 30ST1-2 -- Event D19030606085 Dispatch Assigned |
| 08:18:29 | 3/6/2019 | ps2-d08 | 364133 | EVENT COMMENT=AUTH OF 30ST1 REQ FD TO LOC ----- D1795 |
| 08:18:42 | 3/6/2019 | ps2-d08 | 364133 | EVENT COMMENT=AUTH OF 30CO REQUESTING ESU TO LOC ---- D1795 |
| 08:18:44 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, P=3, Cancel Comment=Duplicate and Cancel, Primary Member=0, Current=T, Open =F, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | EVENT CLOSED |
| | | | | Route=SOD, PCT=0, Sector=ESA2, St=Assigned, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Route=SOD, PCT=0, Sector=ESA2, St=Pending, P=3, Current=F, Open =T, Type=54E1-AMBULANCE CASE: EDP/INSIDE, Open/Curent=F |
| | | | | Unit=0ESA2-2, St=UC, Comment=Preempt |
| | | | | Unit=0ESA2-2, St=AV, Comment=CAD AUTOMATIC PREEMPT |
| | | | | EVENT COMMENT=0ESA2-2 -- CAD AUTOMATIC PREEMPT |
| | | | | 0ESA2-2 -- Preempt |
| | | | | 0ESA2-2 -- 99R - unit preempt changed event status back to pending |
| | | | | Route cancelled: D19030606085. Duplicate of incident kept: D19030606135 |
| | | | | ** Cross Referenced to Event # D19030606135 at: 03/06/19 |

| | | | | |
|---|---|---|---|---|
| 08:15:30 | 3/6/2019 | ps1-c038 | 368104 | STS OWNER TRYING TO MAKE PERP |

STAY AT LOC



| 08:15:31 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30A1-2, St=DA, Comment=Event D19030606135 Dispatch Assigned

EVENT COMMENT=30A1-2 -- Event D19030606135 Dispatch Assigned

| 08:15:33 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30B1-2, St=DA, Comment=Event D19030606135 Dispatch Assigned

EVENT COMMENT=30B1-2 -- Event D19030606135 Dispatch Assigned

| 08:15:36 | 3/6/2019 | ps1-c038 | 368104 | EVENT UPDATED: Location ▓▓▓▓▓▓▓▓▓ , Cross Streets=HAMILTON PL /BROADWAY , Name=WI ▓▓▓▓▓ S(COMTE , Address=LL(-73:57:03.2977,40:49:30.2951): EST 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number=▓▓▓▓▓▓▓▓ Zone=Z08 , PCT/Sector=30B |

| 08:15:36 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

| 08:15:36 | 3/6/2019 | ps1-c038 | 368104 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

| 08:15:36 | 3/6/2019 | ps2-d08 | 364133 | Unit=30ST1-2, St=DA, Comment=Event D19030606135 Dispatch Assigned |

EVENT COMMENT=30ST1-2 -- Event D19030606135 Dispatch Assigned

| 08:15:38 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30RES1-2, St=DA, Comment=Event D19030606135 Dispatch Assigned

EVENT COMMENT=30RES1-2 -- Event D19030606135 Dispatch Assigned

| 08:15:50 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F

Unit=30RES1-2, St=84, Loc ▓▓▓▓▓▓

Unit=30RES1-2, St=DP, Loc ▓▓▓▓▓▓

| 08:15:51 | 3/6/2019 | ps2-d08 | 364133 | Unit=30RES1-2, St=84, Comment=DA Auto Promote, Loc=▓▓▓▓▓ MN,68:6FL |

EVENT COMMENT=30RES1-2 -- DA Auto Promote

| 08:15:53 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30A1-2, St=84, Loc=▓▓▓▓▓▓

Unit=30A1-2, St=DP, Loc ▓▓▓▓▓▓

Unit=30A1-2, St=84, Comment=DA Auto Promote, Loc=▓▓▓▓▓▓

EVENT COMMENT=30A1-2 -- DA Auto Promote



| 08:15:58 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=MC STS ML TRYING TO BURN THE CURTAINS OF THE BATHROOM |

| 08:16:04 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30B1-2, St=84, Loc ▓▓▓▓▓▓

Unit=30B1-2, St=DP, Loc ▓▓▓▓▓▓

Unit=30B1-2, St=84, Comment=DA Auto Promote, Loc= ▓▓▓▓▓▓

EVENT COMMENT=30B1-2 -- DA Auto Promote

| 08:16:07 | 3/6/2019 | sps29mdt01 | 2 | EVENT UPDATED: Location ▓▓▓▓▓▓▓▓ Cross Streets=HAMILTON PL /BROADWAY , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:57:03.2977,40:49:30.2951): EST 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number ▓▓▓▓▓▓ , Zone=Z08 , PCT/Sector=30B ,FDNY Num=19065159502M0378 |

| 08:16:07 | 3/6/2019 | ps1-c038 | 368104 | Route=FIRE, PCT=MN, Sector=MN, St=New, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

| 08:16:07 | 3/6/2019 | sps29mdt01 | 2 | Route=FIRE, PCT=MN, Sector=MN, St=Pending, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

|  |  |  |  | Route=FIRE, PCT=MN, Sector=MN, St=Held, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |
|---|---|---|---|---|

EVENT COMMENT=** Event held by Route FIRE

| 08:16:17 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=UNK DESC OF ML |
|---|---|---|---|---|

| 08:16:27 | 3/6/2019 | ps1-c038 | 368104 | ANI NUM=106591583, CALLER NAME=WIRELESS-VERIZON WIRELESS(COMTE, ANI ██████████LI=3500BROADWAYNEW YORK, COMMENT=: SW SECTOR, COMPANY=VZW, CLASS=WPH2,LAT=+040.823988,LONG=-073.951495,XY=XY(99767648,23948244) |
|---|---|---|---|---|

| 08:16:30 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=MC REQ FD TO LOC |
|---|---|---|---|---|

| 08:16:31 | 3/6/2019 | sps29mdt01 | 2 | EVENT UPDATED: Location ████████, Cross Streets=HAMILTON PL /BROADWAY , Name=WI████████████S(COMTE , Address=LL(-73:57:03.2977,40:49_____583 W 143 ST MN , Call Source=ANI/ALI , Phone Number=████████ , Zone=Z08 , PCT/Sector=30B ,FDNY Num=19065159503M0379 |
|---|---|---|---|---|

Route=FIRE, PCT=MN, Sector=MN, St=Held, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F

| 08:17:15 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |
|---|---|---|---|---|

Unit=30ST1-2, St=84, Loc=███████████

Unit=30ST1-2, St=DP, Loc ██████████

Unit=30ST1-2, St=84, Comment=DA Auto Promote, Loc ████████████

EVENT COMMENT=30ST1-2 -- DA Auto Promote

| 08:17:16 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=MC STS PD AT LOC |
|---|---|---|---|---|

| 08:17:17 | 3/6/2019 | sps29mdt01 | 2 | EVENT UPDATED: Location ███████████ Cross Streets=HAMILTON PL /BROADWAY , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:57:03.2977,40:49:30.2951): EST 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number ████████ , Zone=Z08 , PCT/Sector=30B ,FDNY Num=19065995801M0381 |
|---|---|---|---|---|

Route=FIRE, PCT=MN, Sector=MN, St=Held, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F

| 08:17:36 | 3/6/2019 | sps29mdt01 | 2 | EVENT UPDATED: Location=████████ , Cross Streets=HAMILTON PL /BROADWAY , Name=WI████████S(COMTE , Address=LL(-73:57:03.2977,40:49:30.2951): EST 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number=████████ , Zone=Z08 , PCT/Sector=30B ,FDNY Num=19065995701M0382 |
|---|---|---|---|---|

Route=FIRE, PCT=MN, Sector=MN, St=Held, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F

| 08:17:36 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=FD 390 NTFD AND RESPONDING |
|---|---|---|---|---|
| 08:17:43 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=CB 3500 BROADWAY |
| 08:17:54 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=CORRECTION CB████████ |

| 08:17:55 | 3/6/2019 | sps29mdt01 | 2 | EVENT UPDATED: Location ████████ Cross Streets=HAMILTON PL /BROADWAY , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:57:03.2977,40:49:30.2951): EST 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number=████████ , Zone=Z08 , PCT/Sector=30B ,FDNY Num=19065995602M0383 |
|---|---|---|---|---|

Route=FIRE, PCT=MN, Sector=MN, St=Held, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F

| 08:17:56 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=ANI-ALI-████████ WIRELESS-VERIZON WIRELESS COMTE 3500 BROADWAY SW SECTOR NEW |
|---|---|---|---|---|

YORK COS:WPH2 LAT: 040.823988 LON:-073.951495 OPER HORNE, JONISHAU

S-C-MTPPDVCP300-138

| 08:18:12 | 3/6/2019 | ps1-c038 | 368104 | EVENT UPDATED: Location=████████ Cross Streets=HAMILTON PL /BROADWAY , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:57:03.2977,40:49:30.2951): EST 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number=████████ , Zone=Z08 , PCT/Sector=30B ,FDNY Num=19065995602M0383 ,FDNY Pers=390 |
|---|---|---|---|---|

EVENT UPDATED: Location=████████ , Cross Streets=HAMILTON PL /BROADWAY , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:57:03.2977,40:49_____583 W 143 ST MN , Call Source=ANI/ALI , Phone Number=████████ , Zone=Z08 , PCT/Sector=30B ,FDNY Num=19065995602M0383 ,FDNY Pers=390

I/NetDispatcher -- Event Chronology

RouteFlag:N Comments:

| 08:30:59 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30A2-2, St=DP, Loc ▮▮▮▮▮

| 08:31:00 | 3/6/2019 | ps2-d08 | 364133 | Unit=30A2-2, St=84, Loc=▮▮▮▮ |

| 08:36:30 | 3/6/2019 | ps2-d08 | 357279 | EVENT COMMENT=AUTH OF 30 SGT -- NO 31 -- JUST AN EDP -- NO INJ TO MOS -- ALL UNITS ACCOUNTED |

FOR -- D2153

| 08:39:35 | 3/6/2019 | sps29mdt01 | 1 | EVENT COMMENT=EMS Unit Transporting Patient NYPDJobNumber:19030606135 EMSJobNumber:190650952 |

DateTime:20190306083935ES EMSOperatorNumber:1838
UnitId:81G2 UnitType:BLS

HospitalCode:07E RouteFlag:N HospitalName:HARLEM
PSYCHIATRIC Comments:

| 08:40:32 | 3/6/2019 | ps2-d08 | 357279 | Unit=30B1-2, St=87, Comment=HARLEM, Loc ▮▮▮▮▮ |

EVENT COMMENT=30B1-2 -- HARLEM

| 08:41:21 | 3/6/2019 | ps2-d08 | 357279 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30RES1-2, St=UC, Comment=Preempt

Unit=30RES1-2, St=AV

EVENT COMMENT=30RES1-2 -- Preempt

| 08:41:54 | 3/6/2019 | ps2-d08 | 357279 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30A1-2, St=UC, Comment=Preempt

Unit=30A1-2, St=AV

EVENT COMMENT=30A1-2 -- Preempt

| 08:42:25 | 3/6/2019 | ps2-d08 | 357279 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30ST1-2, St=UC, Comment=Preempt

Unit=30ST1-2, St=AV

EVENT COMMENT=30ST1-2 -- Preempt

| 08:42:40 | 3/6/2019 | ps2-d08 | 357279 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

Unit=30A2-2, St=AV

Unit=30A2-2, St=UC, Comment=Preempt

EVENT COMMENT=30A2-2 -- Preempt

| 08:49:10 | 3/6/2019 | ps2-ccmis | 339426 | Unit=30CO, St=~, Loc=▮▮▮▮▮ |
| 08:51:59 | 3/6/2019 | ps2-fd1 | 341401 | Route=AMB, PCT=MN, Sector=MN, P=3, Primary Member=0, Current=T, Open =F, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

EVENT CLOSED

Disposition Assigned=CANCELEV

| 08:53:53 | 3/6/2019 | ps2-d08 | 357279 | Unit=30CO, St=CU, Comment=Alarm Timer Extended: 30, Loc=561 W 141 ST MN,68:6FL |

EVENT COMMENT=30CO -- Alarm Timer Extended: 30

| 09:10:32 | 3/6/2019 | ps2-ccmis | 339426 | Unit=30B1-2, St=~, Loc ▮▮▮▮▮ |
| 09:12:13 | 3/6/2019 | ps2-par1 | 340131 | Route=FIRE, PCT=MN, Sector=MN, P=3, Primary Member=0, Current=T, Open =F, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |

EVENT CLOSED

Disposition Assigned=CANCELEV

| 09:13:44 | 3/6/2019 | ps2-d08 | 357279 | Unit=30B1-2, St=CU, Comment=Alarm Timer Extended: 30, Loc=561 W 141 ST MN,68:6FL |

EVENT COMMENT=30B1-2 -- Alarm Timer Extended: 30

| 09:23:10 | 3/6/2019 | ps2-drp2 | 332302 | Unit=30CO, St=~, Loc=▮▮▮▮▮ |

Unit=30CO, St=CU, Comment=Alarm Timer Extended: 30, Loc=561 W 141 ST

I/NetDispatcher -- Event Chronology

,EMD Num=190650952 ,EMD Pers=8622 ,FDNY Num=19065995602M0383 ,FDNY Pers=390

Route=AMB, PCT=MN, Sector=MN, St=Pending, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F

Route=AMB, PCT=MN, Sector=MN, St=Pending, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F

Route=AMB, PCT=MN, Sector=MN, St=Held, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F

EVENT COMMENT=** Event held by Route AMB

| 08:19:33 | 3/6/2019 | 1pp-joc02 | 949883 | EVENT COMMENT=Event N19030606135 has been displayed by the covering dispatcher |

*! >>>> by: 949883 at 03/06/19 08:19:33 on terminal: 1pp-joc02

| 08:19:55 | 3/6/2019 | ps1-d41 | 358815 | EVENT COMMENT=SO NOTED |
| 08:20:35 | 3/6/2019 | ps1-d41 | 358815 | Unit=0ESA2-2, St=ER, Loc=561 W 141 ST MN,68:0FL |
| 08:21:07 | 3/6/2019 | ps2-rsmn | 337961 | EVENT COMMENT=Event B19030606135 has been displayed by the covering dispatcher |

** >>>> by: 337961 at 03/06/19 08:21:07 on terminal: ps2-rsmn

EVENT UPDATED: Location ▓▓▓▓▓▓▓ , Cross Streets=HAMILTON PL /BROADWAY , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:57:03.2977,40:49:30.2951): EST 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number=▓▓▓▓▓▓▓ Zone=Z08 , PCT/Sector=30B ,EMD Num=190650952 ,EMD Pers=▓▓▓▓▓▓▓ m=19065995503M0391 ,FDNY Pers=390

Route=FIRE, PCT=MN, Sector=MN, St=Held, P=3, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F

| 08:21:24 | 3/6/2019 | sps29mdt01 | 2 | (see above EVENT UPDATED block) |
| 08:21:24 | 3/6/2019 | ps2-rsmn | 337961 | EVENT COMMENT=F: REQ FD TO LOC |
| 08:21:41 | 3/6/2019 | ps2-d08 | 364133 | EVENT COMMENT=AUTH 30ST STS PERP IS IN CUSTODY ----- FIRE IS OUT ------ NFU TO LOC ------ |

D1795

| 08:22:20 | 3/6/2019 | ps2-d08 | 364133 | EVENT COMMENT=AUTH OF 30SGT STS EVERYTHING UNDER CONTROL--- NO SHOTS FIRED AT OR BY MOS --- |

ALL MOS IS ACCOUNTED FOR------ D1795

| 08:22:25 | 3/6/2019 | ps2-d08 | 364133 | Unit=30ST1-2, St=80, Comment=CXL ESU, Loc ▓▓▓▓▓▓▓ |

EVENT COMMENT=30ST1-2 -- CXL ESU

| 08:22:44 | 3/6/2019 | ps1-d41 | 358815 | Route=SOD, PCT=0, Sector=ESA2, St=Assigned, P=3, Primary Unit=0ESA2-2, Primary Member=0, Current=T, Open =F, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F |

EVENT CLOSED

Route=SOD, PCT=0, Sector=ESA2, St=Assigned, P=3, Primary Unit=0ESA2-2, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F

Unit=0ESA2-2, St=AV

Disposition Assigned=90Y

| 08:25:01 | 3/6/2019 | ps2-d08 | 364133 | EVENT COMMENT=E: PLZ ADV ETA ON BUS UNIT W EDP AT LOC |
| 08:26:02 | 3/6/2019 | 1pp-joc02 | 949883 | Route=OPS, PCT=NYC, Sector=NYC, P=3, Primary Member=0, Current=T, Open =F, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F |

EVENT CLOSED

Disposition Assigned=CANCELEV

| 08:26:43 | 3/6/2019 | sps29mdt01 | 1 | EVENT COMMENT=Route a Message NYPDJobNumber:19030606135 EMSJobNumber:190650952 |

DateTime:20190306082643ES Comments:ENROUTE

| 08:29:26 | 3/6/2019 | sps29mdt01 | 1 | EVENT COMMENT=EMS Unit Onscene NYPDJobNumber:19030606135 EMSJobNumber:190650952 |

DateTime:20190306082926ES EMSOperatorNumber:1838 UnitId:81G2 UnitType:BLS

# Event Chronology -- D19030606135 [5 Year Archive]

☑ System Comments ☑ Associated Events

| Event | Time | Date | Terminal | Operator | Action |
|---|---|---|---|---|---|
| 19030606135 | 08:13:10 | 3/6/2019 | ps1-c038 | 368104 | ANI NUM=106591472, CALLER NAME=WIRELESS-VERIZON WIRELESS(COMTE, ANI ████████████ ALI=3500BROADWAYNEW YORK, COMMENT=: SW SECTOR, COMPANY=VZW, CLASS=WPH1,LAT=+040.825082,LONG=-073.950916,XY=XY(99783651,23988112) |
| | 08:13:29 | 3/6/2019 | ps1-c038 | 368104 | ANI NUM=106591481, CALLER NAME=WIRELESS-VERIZON WIRELESS(COMTE, ANI=████████████ ALI=3500BROADWAYNEW YORK, COMMENT=: SW SECTOR, COMP CLASS=WPH2,LAT=+040.823988,LONG=-073.951495,XY=XY(99767648,23948244) |
| | 08:14:43 | 3/6/2019 | ps1-c038 | 368104 | EVENT CREATED: Location ████████████ MN ,68 :6FL , Cross Streets=HAMILTON PL /BROADWAY , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:57:03.2977,40:49____ 583 W 143 ST MN , Call Source=ANI/ALI , Phone Number ████████████ , Zone=Z08 , PCT/Sector=30B |
| | | | | | Route=D, PCT=30, Sector=30B, St=Pending, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |
| | 08:14:43 | 3/6/2019 | loi-search | 368104 | EVENT COMMENT=** LOI search completed at 03/06/19 08:14:43 |
| | 08:14:43 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT====POSS BURG==== |
| | | | | | *PRE-REL* |
| | 08:14:59 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=MC STS ML TRIED TO STEAL FROM LOC STS HAVE ML LOCKED IN BATHROOM |
| | 08:15:09 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=NO WPNS NO INJ |
| | 08:15:12 | 3/6/2019 | ps2-d08 | 364133 | EVENT COMMENT=Event D19030606135 has been displayed by the covering dispatcher |
| | | | | | ** >>>> by: 364133 at 03/06/19 08:15:12 on terminal: ps2-d08 |
| | | | | | ** LOI information for Event # D19030606135 was viewed at: 03/06/19 08:15:12 |
| | | | | | ** >>>> by: JANEL RAMIREZ on terminal: ps2-d08 |
| | 08:15:30 | 3/6/2019 | ps1-c038 | 368104 | EVENT COMMENT=MC NOW STS OWNER OF APT HAS A KNIFE IN HIS HAND MC STS OWNER TRYING TO MAKE PERP |
| | | | | | STAY AT LOC |
| | 08:15:31 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |
| | | | | | Unit=30A1-2, St=DA, Comment=Event D19030606135 Dispatch Assigned |
| | | | | | EVENT COMMENT=30A1-2 -- Event D19030606135 Dispatch Assigned |
| | 08:15:33 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |
| | | | | | Unit=30B1-2, St=DA, Comment=Event D19030606135 Dispatch Assigned |
| | | | | | EVENT COMMENT=30B1-2 -- Event D19030606135 Dispatch Assigned |
| | 08:15:36 | 3/6/2019 | ps1-c038 | 368104 | EVENT UPDATED: Location ████████████ Cross Streets=HAMILTON PL /BROADWAY , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:57:03.2977,40:49____ 83 W 143 ST MN , Call Source=ANI/ALI , Phone Number ████████████ Zone=Z08 , PCT/Sector=30B |
| | 08:15:36 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |
| | 08:15:36 | 3/6/2019 | ps1-c038 | 368104 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |
| | 08:15:36 | 3/6/2019 | ps2-d08 | 364133 | Unit=30ST1-2, St=DA, Comment=Event D19030606135 Dispatch Assigned |
| | | | | | EVENT COMMENT=30ST1-2 -- Event D19030606135 Dispatch Assigned |
| | 08:15:38 | 3/6/2019 | ps2-d08 | 364133 | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Curent=F |
| | | | | | Unit=30RES1-2, St=DA, Comment=Event D19030606135 Dispatch Assigned |
| | | | | | EVENT COMMENT=30RES1-2 -- Event D19030606135 Dispatch Assigned |
| | | | | | Route=D, PCT=30, Sector=30B, St=Dispatch Assigned, P=3, Current=F, Open =T, |

I/NetDispatcher -- Event Chronology

| | | | | |
|---|---|---|---|---|
| 09:24:03 | 3/6/2019 | ps2-d08 | 357279 | MN,68:6FL |
| | | | | EVENT COMMENT=30CO -- Alarm Timer Extended: 30 |
| 09:24:11 | 3/6/2019 | ps2-d08 | 357279 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Primary Unit=30B1-2, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F |
| | | | | Unit=30CO, St=UC, Comment=Preempt |
| | | | | Unit=30CO, St=AV |

EVENT COMMENT=30CO -- Preempt

| | | | | |
|---|---|---|---|---|
| 09:25:31 | 3/6/2019 | sps29mdt01 | 1 | EVENT COMMENT=EMS Unit Preempt NYPDJobNumber:19030606135 EMSJobNumber:190650952 |
| | | | | DateTime:20190306092531ES EMSOperatorNumber:1838 UnitId:81G2 UnitType:BLS |
| | | | | RemovalFlag:N Comments: |
| 09:25:32 | 3/6/2019 | sps29mdt01 | 1 | EVENT COMMENT=EMS Complaint Closed NYPDJobNumber:19030606135 EMSJobNumber:190650952 |
| | | | | DateTime:20190306092531ES EMSOperatorNumber:1838 FinalDispositionCode:82B |
| | | | | Comments: |
| 09:42:46 | 3/6/2019 | ps2-d08 | 357279 | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Primary Unit=30B1-2, Primary Member=0, Current=F, Open =T, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F |
| | | | | Route=D, PCT=30, Sector=30B, St=Assigned, P=3, Primary Unit=30B1-2, Primary Member=0, Current=T, Open =F, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F |
| | | | | EVENT CLOSED |
| | | | | Unit=30B1-2, St=AV, Comment=HARLEM |
| | | | | EVENT COMMENT=HARLEM |
| | | | | Disposition Assigned=97H |
| | | | | Disposition Assigned=93Q |
| 09:54:19 | 3/6/2019 | ps2-rsmn | 343335 | Route=BS, PCT=MN, Sector=MN, P=3, Primary Member=0, Current=T, Open =F, Type=31R-BURGLARY (IN PROGRESS): RESIDENCE, Open/Current=F |
| | | | | EVENT CLOSED |
| | | | | Disposition Assigned=CANCELEV |

EXHIBIT (E)

# Fire Department New York
## Unofficial Incident Report

### Incident Reviewed By

| | |
|---|---|
| Reviewed By | 911047 - PARKER TIMOTHY Battalion Chief |
| Date | 03/07/2019 |

### Incident Info

| | |
|---|---|
| Incident # | 1-0380-0 |
| Alarm Date/Time | 03/06/2019 08:16:35 |
| Arrival Date/Time | 03/06/2019 08:20:49 |
| Cleared Date/Time | 03/06/2019 08:41:10 |
| Incident Type | 116 - Trash or rubbish fire, contained |
| Box | 1503 |
| Alarm Code | E080 |
| Community Board | 09 |
| Precinct | 030 |
| Official Assignment | 1 - Fire suppression, included are HazMat, rescue, IC |
| Reported By | Phone |
| Left In Charge | 6B |
| Highest Level | 11 - First Alarm |
| Action Taken 1 | 11 - Extinguishment by fire service personnel |
| Action Taken 2 | 51 - Ventilate |
| Rescues (Civilian) | 0 |
| Evacuated (Civilian) | 0 |
| HazMat Radio Code | Not Applicable |
| Location | 1 - Street address |
| Address | 561 W 141 ST 6 Manhattan |
| Floor | 6 |
| NYCHA/Non-NYCHA | Non NYC Housing Authority |
| Borough | 1 - Manhattan |
| Detector | U - Unknown |
| Property Use | 429 - Multifamily dwelling |
| Mutual Aid | N - None |

### Times Transmitted by Unit

| | |
|---|---|
| 10-84 | 03/06/2019 08:20:49 |

03/08/2019 - Page 1

Print: Thu, 9 May 19  1539
Harlem Hospital Center
506 Lenox Avenue
New York, NY  10037
Taddeo, Joseph, MD

Nieves, Michael          1102527-2      IP
DIS-11138B        Age: 37Y    Sex: M
DOB: 2 Feb 1982       MR# 1102527
Adm: 6 Mar 19  0857   Dis: 8 Mar 19  1400
Att Phys: Taddeo, Joseph, MD
Service: General Surgery

Chart Update

Chart Group:    Assessments/Progress Notes  -- continued

Wed, 6 Mar 19

ed, 06Mar 1936 Nursing Unit Transfer Summary Note (Hand-Of

| | |
|---|---|
| Temp | : unable to obtain |
| Allergies | : |
| | |
| Document Allergies/ADR: | |
| Medication Allergy | : No Known Med Allergies |
| Latex Allergy | : no known latex allergy |
| Food Allergy | : no known food allergy |
| Substance Allergy | : no known substance allergy |
| | |
| Diagnosis | : Burn of second degree of right palm, initial encounter |
| Transfer | : admission/transfer out of ED |
| Transferred From | : Adult ER |
| Transfer To | : Surgery - 11SU |
| Report Given By | : Fanja Tiana Rabarijaona, RN |
| Property | : vouchered, ledger number 94464 |
| Chief Complaint | : BIBEMS and NYPD patient attempted to set himself on fire |
| Past Medical Hx | : no significant history |
| Situation | : Transfer Date/Time:Wed, 06 Mar 2019  1937 Transport Mode:transported via stretcher Admission Team:Surgery LGBT:no Preferred Title:Mr Visual Disturbance:no Hearing Disability:no Mentally Challenged:no GSW/Stab Wound/Major Trauma:no Bed Type:Regular Med/Surg bed Isolation:Standard Precaution Prisoner:no Special Observation:yes Special Observation Reason(s):Suicidal Pain Scale:0 /10 |
| Background | : Post Cardiac Arrest Resuscitation:no Hypothermia Protocol Started:no Procedures in ED:12 lead ECG |
| Assessment | : Mental Status:oriented x 3 Cardiovascular Status:ECG scope NSR Respiratory Status:breathing spontaneously, GU Status:WNL |

Nieves, Michael              1102527-2        DIS-111    MR# 1102527

```
Print: Thu, 9 May 19  1339          Nieves,Michael        1102527-3     IP
   Harlem Hospital Center           10119B            Age: 37Y   Sex: M
      506 Lenox Avenue              DOB: 2 Feb 1982     MR# 1102527
      New York, NY  10037           Adm: 8 Mar 19  1500   Dis:
                                    Att Phys: Rahman,Nurur, MD
                                    Service: Psychiatry
```

Chart Update

Chart Group:   Assessments/Progress Notes/BH — continued

Sun, 10 Mar 19

un, 10Mar 1028 Psychiatry ShortNote — cont'd
        Rh            : Positive 03/06/19

        All Treated Diagnoses      : Burn of second degree of right palm,
                                      initial encounter
                                      Other foreign object in esophagus causing
                                      other injury, initial encounter
                                      Suicide attempt, initial encounter
                                      Major depressive disorder, recurrent,
                                      severe with psychotic symptoms
                                      Cocaine abuse with intoxication,
                                      uncomplicated
                                      Cannabis abuse, uncomplicated
        Primary Diagnosis          : T14.91xA Suicide attempt, initial encounter
        Supervising Attending      : Nurur Rahman, MD
        Attending Attestion        : I examined the patient; I confirm the
                                      Resident/Fellow/CNM/PA findings with my
                                      Attending Note.
                                              Nurur Rahman, MD    (10 Mar 19  1646)

un, 10Mar 1058 Progress Note by Nursing (Psych/Detox)
        Skin Status                : PRESSURE ULCER: no SKIN LESION: no
        Progress Note              : Patient refuse to go to radiology in spite of
                                      encouragement.  MD advised.
        Medication Order(s)        : Abilify; Zoloft
        Medication Effect(s)       : no adverse effects for all new medications
        Learning Assessment        : Readiness: receptive
        Learning Assessment        : Readiness: receptive
                                              Philson Angol, RN   (10 Mar 19  1101)

un, 10Mar 1820 Progress Note by Nursing (Psych/Detox)
        Progress Note              : Patient has displayed no aggressive behavior
                                      but periodically paces the unit.   Patient
                                      refused his Metamucil and protonix med.
                                      Patient also refused to go do his Xray.

Nieves,Michael                  1102527-3         10119B    MR# 1102527
```

Print: Thu, 9 May 19  1339
Harlem Hospital Center
506 Lenox Avenue
New York, NY  10037

Nieves,Michael          1102527-3         IP
10119B              Age: 37Y   Sex: M
DOB: 2 Feb 1982     MR# 1102527
Adm: 8 Mar 19  1500   Dis:
Att Phys: Rahman,Nurur, MD
Service: Psychiatry

Chart Update

Chart Group: Assessments/Progress Notes/BH -- continued

Sat, 9 Mar 19

Sat, 09Mar 0841 Psychiatric Assessment
| | |
|---|---|
| Visit Date/Time | Sat, 9 Mar 2019  0841 |
| Resident | Amit Jagtiani, MD |
| Systolic BP | 130 mmHg  8Mar 1540 |
| Diastolic BP | 78 mmHg  8Mar 1540 |
| Pulse | 73 bpm  8Mar 1540 |
| Respirations | 18  8Mar 1540 |
| Temperature | 98.0 F (36.7 C)  8Mar 1540 |
| Referred By | Tarika Nagi, MD |
| Outside Referral | EMS |
| Chief Complaint | BIBEMS and NYPD trying to set himself on fire |
| Informant | patient |
| Legal Status | Involuntary Admission (9.27) |
| Hx Present Illness | This is a 37-year-old Latino single, unemployed, domiciled ay Kingsborough psychiatric residence with self-reported history of Bipolar Disorder and Cocaine/Cannabis Use disorders, who was admitted to the Surgical Unit for evaluation of burns and swallowing of his crack pipe and suicidal ideation. Pt was admitted on 3/6/17 for R palm and forearm with partial thickness burns and glass ingestion from a suicide attempt. In the MED he was refusing IV line and CT scan and psych was consulted for decisional capacity. He was floridly psychotic and was experiencing AH/VH of spirits threatening to chop him into pieces and was deemed not having capacity to give consent for refusal of treatment. Initial CT scans of neck, chest and abdomen found hyperdensities of glass in the stomach and intestines. He was seen by GI but they didn't consider endoscopy. Metamucil was given to facilitate passage of glass pieces and he was monitored for signs or symptoms of gut |

Nieves,Michael          1102527-3         10119B     MR# 1102527

```
int: Thu,  9 May 19  1339        | Nieves,Michael           1102527-3      IP
   Harlem Hospital Center        | 10119B          Age: 37Y    Sex: M
   506 Lenox Avenue              | DOB: 2 Feb 1982      MR# 1102527
   New York, NY  10037           | Adm: 8 Mar 19  1500   Dis:
                                 | Att PhyAttRahman,Rahman,MDrur, MD
                                 | Service: Psychiatry
```

## Chart Update

**Chart Group:   Assessments/Progress Notes/BH -- continued**

**Thu, 28 Mar 19**

1u, 28Mar 1548 Psychiatry ShortNote -- cont'd

                    -Trazodone 100 mg PO QHS
                    PRN: Haldol 5 mg and Ativan 2 mg for
                    agitation
                    Observation Level: 1:1 Observation for
                    Suicide Prevention

                    2. Medical Management
                    -Protonix 40mg PO daily
                    -Metamucil 5.4g packet PO TID
                    Monitor vitals q shift

                    3. Psychosocial interventions
                    Suicide prevention education
                    Individual psychotherapy
                    Addiction counseling
                    Group therapy
                    Activity Therapy
                    Milieu therapy

                    4. Disposition-Discharge to shelter when
                    psychiatrically stable, encourage patient to
                    accept long acting meds, consider care
                    coordinator

                    5. Supervision: Case and plan discussed with
                    attending.

Labs (CLICK TO INCLUDE)

    WBC        : 3.8 03/17/19
    Hgb        : 14.0 03/17/19
    Hct        : 42.9 03/17/19
    Plt        : 146 03/17/19
    PT         : 11.40 03/06/19
    PTT        : 23.60 03/06/19
    Sed Rate   :

---

Nieves,Michael                    1102527-3        10119B    MR# 1102527

Lorrain McElvaine
The Great Depression





<u>LEGAL ARGUMENT</u>

Pursuant to New York Civil Law, Article 3, Subsection 23 - Privilege
from arrest: No person shell be arrested in civil proceedings without a
statutory provision. A person shall not be arrested in a civil action or
special proceeding, except as prescribed by statute. The writ of ne
exeat is abolished. Mr. Nieves had been released from police custody at
Harlem Hospital pursuant to Mental Hygiene Law 9.27 & 9.39 and was not
a prisoner. See Exhibit (A). Records reflect that patient has displayed
no aggressive behavior, but periodically paces the unit. See Exhibit (B).
Patient was released for treatment under the chief complaint by BIBEMS
and NYPD of trying to set himself on fire. See Exhibit (C), and Exhibit
(D). As of March 28, 2019, patient's disposition was to be discharged to
shelter when psychiatrically stable.                          Per records
patient's medication was changed and an ACT Coordinator had been prescrib-
ed: Steffany Shelton @ 347-886-6672, as well as an Assisted Outpatient
Treatment court order enforced for substance use treatment and medication
compliance.

EXHIBIT (F)

III Status:          Criminal record in NYS only

US Citizen:

## ⚜ Cycle 18
### Violent Felony Offense

**Arrest/Charge Information**
Arrest Date:April 09, 2019 06:50 am (06:50:00)

| | |
|---|---|
| Name: | MICHAEL NIEVES |
| Date of Birth: | February 02, 1982 |
| US Citizen: | |
| Sex: | Male |
| Race: | White |
| Ethnicity: | Hispanic |
| Age at time of crime/arrest: | 37 |
| Address: | 681 CLARKSON AVENUE, BROOKLYN, NY |
| Fax Number: | M11843 |
| Place of Arrest: | NYCPD 30 |
| Arrest Type: | Unknown |
| Date of Crime: | March 06, 2019 |
| Place of Crime: | NYCPD 30 |
| Criminal Justice Tracking No.: | 68974764P |
| Arresting Agency: | NYCPD PCT 030 |
| Arresting Officer ID: | 913916 |
| Arrest Number: | M19615898 |
| Arraignment: | New York County Criminal Court |

*Violation of 180.80, CPL*
*VDF of rearrest of April 9, 2019*

Arrest Charges:
-- Burglary:Dwelling With Explosives Or Deadly Weapon

| | | | | | |
|---|---|---|---|---|---|
| PL140.30 | Sub 01 | Class B | Felony | Degree 1 | NCIC 2299 |

-- Arson-2nd:Intentional Fire With Person Present

| | | | | |
|---|---|---|---|---|
| PL150.15 | Class B | Felony | Degree 2 | NCIC 2099 |

-- Reckless Endangerment-1st Degree

| | | | | |
|---|---|---|---|---|
| PL120.25 | Class D | Felony | Degree 1 | NCIC 7099 |

-- Unlawful Imprisonment-1st Degree

| | | | | |
|---|---|---|---|---|
| PL135.10 | Class E | Felony | Degree 1 | NCIC 1008 |

**No Court Reported Information**

## ⚜ Cycle 17 ⚜

**Arrest/Charge Information**
Arrest Date:February 07, 2019 05:33 pm (17:33:00)

| | |
|---|---|
| Name: | MICHAEL NIEVES |
| Date of Birth: | February 02, 1982 |
| US Citizen: | |
| Sex: | Male |
| Race: | Black |
| Ethnicity: | Hispanic |
| Age at time of crime/arrest: | 37 |
| Address: | 841 CLARKSON AVENUE, BROOKLYN, NY |
| Fax Number: | M4787 |
| Place of Arrest: | NYCPD 6 |
| Arrest Type: | Unknown |
| Date of Crime: | February 07, 2019 |
| Place of Crime: | NYCPD 6 |
| Criminal Justice Tracking No.: | 68907298N |
| Arresting Agency: | NYCPD PCT 006 |
| Arresting Officer ID: | 963449 |
| Arrest Number: | M19606360 |
| Arraignment: | New York County Criminal Court |

Arrest Charges:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 81

---

THE PEOPLE OF THE STATE OF NEW YORK

-against-

MICHAEL NIEVES,

Defendant.

PEOPLE'S
VOLUNTARY
DISCLOSURE FORM

Ind. No. 01241/2019

---

The People of the State of New York hereby voluntarily disclose to the defendant the following factual information pertaining to the above-captioned case:

**A.**     **BILL OF PARTICULARS**

1.     <u>OCCURRENCE</u>

       Date:         March 6, 2019
       App. Time:    07:30 am
       Place:        561 West 141 Street New York, NY

2.     <u>ARREST</u>

       Date:         April 9, 2019
       App. Time:    06:50 am
       Place:        681 Clarkson Avenue Brooklyn, NY 11203

**B.**     **NOTICES**

1.     <u>STATEMENTS</u>

       ☒ If checked, notice is hereby served, pursuant to CPL §710.30(1)(a), that the People intend to offer at trial evidence of a statement made by defendant to a public servant. *(Where a statement has been recorded on video, counsel should contact the assigned assistant district attorney to arrange a mutually convenient time for viewing the recording or should provide a blank DVD for copying.)*

       Statement Number:           1
       Defendant (if more than one):    Michael Nieves
       Date:                  March 6, 2019
       Approximate Time:          08:30
       Location:              in transit to Harlem Hospital
       Individual Made To:        Police Officer James Marcinek

Substance of statement: <u>I was trying to kill myself by smoke inhalation</u>

2.    IDENTIFICATION

☐ If checked, notice is hereby served, pursuant to CPL §710.30(1)(b), that the People intend to offer at trial testimony regarding an observation of defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the indictment, to be given by a witness who has previously identified defendant.

C.    **DISCOVERY**

1.    ADDITIONAL STATEMENTS

☐ If checked, the People hereby disclose written, oral or recorded statements of a defendant or of a co-defendant to be jointly tried, made, other than in the course of the criminal transaction, to a public servant engaged in law enforcement activity or to a person then acting under his direction or in cooperation with him, and which statements are not given in section B(1) above. CPL §240.20(1)(a).

2.    GRAND JURY TESTIMONY

☐ If checked, defendant or a co-defendant to be tried jointly testified before the Grand Jury relating to this criminal action. CPL §240.20(1)(b). *Such testimony is available upon payment of a stenographic fee.*

3.    SCIENTIFIC AND MEDICAL REPORTS

☐ If checked, the People hereby disclose written reports or documents or portions thereof, concerning a physical or mental examination or scientific test or experiment, relating to this criminal action, which were made by, or at the request or direction of a public servant engaged in law enforcement, or by a person whom the People intend to call as a witness of a trial, or which the People intend to introduce at trial. CPL §240.20(1)(c).

4.    PHOTOGRAPHS AND DRAWINGS

☒ If checked, there exist photographs or drawings relating to this criminal action which were made or completed by a public servant engaged in law enforcement, or which were made by a person whom the People intend to call as a witness at trial, or which the People intend to introduce at trial. CPL §240.20(1)(d). *(Counsel should contact the assigned assistant district attorney to arrange a mutually convenient time to examine this material.)*

**EXHIBIT (G)**

## Police & Emotionally Disturbed Persons | 2017

### Initial Police Response

*When coordinating the response to an incident that may involve distress* *mental illness, dispatch should provide critical information as it become* *available.* This includes, but is not limited to:

- History. Whether there have been prior incidents or suicide threats/attempts.

- Medication. Whether the EDP took or failed to take medication.

- Contacts. Any contact information for a physician, mental health professional, other legitimately involved party (e.g., family member, social worker, employe etc.).

*When encountering extreme behaviors on scene, officers should:*

- Consider the possibility of distress or a mental health episode. Do not assume t EDP is dangerous or a criminal.[1] Typical indicators of a mental episode include:

  - A plain, emotionless facial expression and body language.

  - Incoherent thoughts or speech.

  - Inability to focus or concentrate.

  - Bizarre appearance, movements, or behaviors.

  - Delusions of personal importance or identity; unrealistic over-confidence.

  - Hallucinations or perceptions unrelated to reality.

  - Agitation, often without clear reason.

  - Pronounced feelings of hopelessness, sadness, or guilt.

- Consult individuals on scene who know the EDP. They often provide the k information. For example, a parent, family member, friend or co-worker may kn about the EDP's illness and behaviors, which may alert officers about ways to c the situation instead of provoking a "fight-or-flight" response. Ask ab medication. Many EDPs do not take prescribed medications because they dislike side effects, deny their illness, or misuse them (hoping to lose weight or get high).

## Police & Emotionally Disturbed Persons | 201?

- **Consider passively monitoring the situation. Sometimes** presence alone may be best police response, especially if a person on scene is having a positive impact the EDP. Officers may monitor the situation and decide to take no action. circumstances change, officers may intervene.

- **Interact calmly and compassionately.** Officers are advised to:

  - Introduce themselves *by name* and attempt to obtain the EDP's *name*. This grea facilitates rapport and a calmer dialogue. [*Note:* It is not unprofessional to u first names. Use your judgment depending on the comfort level of the EDP.]

  - *Most important:* Understand that the failure to follow police directives during acute episode may not be an act of deliberate defiance *and* may not present officer safety issue.

  - Recognize that the EDP may be overwhelmed by sensations, though surroundings, internal sounds or voices. Try to limit the number of officers scene and other distractors, such as flashing lights.

  - Reassure the EDP that you are there to help, not harm.

  - Be friendly and accepting, but remain firm and professional.

  - Speak simply and announce your actions before initiating them. Do not mc suddenly or give rapid orders.

  - Avoid direct, continuous eye contact.

  - If possible, do not touch the EDP. Do not crowd his or her "comfort zone."

  - Ask the EDP for cooperation, and allow time to respond.

  - Remove upsetting influences and people from the scene.

  - Understand that you may not have a rational discussion, but try to keep t conversation concrete by redirecting the topic when needed.

  - Do not express impatience or irritation.

  - Acknowledge that the EDP's delusions are real to him or her. Do not argue mislead the EDP to think that you feel or think the same way.

## Police & Emotionally Disturbed Persons | 201

- Request additional resources and a supervisor (if needed).

- Apply the least amount of force consistent with public, EDP and officer safe
  Officers should factor into their tactical decision-making:

  - The display or use of a weapon or dangerous item.

  - An assault or aggressive behavior.

  - Self-injurious behavior that risks danger to the EDP or another.

  - The physical features of the location where they encounter the EDP. Specifica
    officers may be able to establish a "buffer zone" or contain the EDP in an a
    where he or she does not present a risk of harm to others. Police/EDP dialo
    at this point can be very helpful in de-escalating the situation.

*The primary goal is to de-escalate the situation safely for all involved individu*
This may be accomplished by:

- Release to community. Officers may allow the EDP to leave the scene alone or in
  company of a caretaker or other reputable person.

- Referral to mental health specialist. Many non-dangerous calls involving an E
  are best handled by encouraging or arranging professional intervention.

- Voluntary commitment. Sometimes a family may be more inclined to push
  treatment if they know it will persuade the police to avoid involuntary commitme
  This approach also works with an EDP who is rational enough to acknowledge a ne
  for treatment.

  - Under 123, § 10, voluntary commitment may be sought by: (1) a person who i
    least 16 years old; (2) a parent or guardian on behalf of a person under 18; or (3
    court-appointed guardian on behalf of a person under his care (no age limitation

  - Officers may transport the EDP to a facility for this purpose. If, at any point,
    EDP changes his mind regarding voluntary evaluation, officers may proce
    with an application for involuntary civil commitment.

- Detention for evaluation and involuntary commitment. Officers may initiat
  mental health evaluation, or they may be called on to detain an EDP on behalf c
  qualified mental health clinician.[4]

4



**Arrest for crime.** While officers are free to use their discretion and not purs charges, they should arrest an EDP when appropriate. *Note:* The Attorney Gene has ruled that determining criminal responsibility is the role of the trial court, a that officers in the field may arrest or apply for a criminal complaint on the basis probable cause to believe that the EDP committed the crime charged.[5]

**Officers are expected to fully document incidents** when they were dispatched to scene, or detained an EDP, or referred an EDP for evaluation and/or treatment. Rout or social interaction with an EDP need not be documented.

**Officers and employees must keep information about EDPs confidential,** exc when revealing information in the course of their duties for an official and lega permissible police, medical or mental health purpose.

## Supervisors & Commanders

**Supervisors and commanders should monitor police responses to incider involving EDPs.** These incidents can be challenging, and officers may need supp and assistance. In particular, supervisors and commanders should, in appropriate cas

- **Respond to the scene.**

- **Help formulate an effective response** — including everything from pass monitoring and disengagement; to community-based services; to detention a involuntary commitment.

- **Assist in securing appropriate resources.**

- **Closely monitor any use of force,** including restraints, and ensure that the subjected to the use of force are provided with timely access to medical care.

- **Ensure that all reports are complete.**

- **Debrief involved members.** Sometimes an after-action, operational debriefing warranted, and/or a critical incident stress management debriefing.

## Police & Emotionally Disturbed Persons | 201

### Section II. CIVIL COMMITMENT PROCESS

*Involuntary commitment is permissible based on a "likelihood of serious har* G.L. c. 123, § 1 defines this as:

- **Danger to self.** The EDP presents a substantial risk of physical harm to himself (e a suicidal threat or attempt); or

- **Danger to others.** The EDP presents a substantial risk of physical harm to oth persons; or

- **Inability to protect self.** The EDP presents a *very* substantial risk of injury to hims based on evidence that the EDP's judgment "is so affected that he is unable protect himself in the community."

*There are four categories of involuntary commitment.* Under G.L. c. 123, § 12( they are:

- **Category 1 — Clinician issues commitment order based on examination of ED** Following a personal examination of an EDP, a qualified mental health clinician m sign a commitment order if he or she has reason to believe that the EDP pose likelihood of serious harm.

- **Category 2 — Clinician issues commitment order in emergency, where ED refuses examination.** Even if the EDP refuses examination, a qualified clinician m still issue a commitment order based on facts and circumstances that show that t EDP poses a likelihood of serious harm.

- **Category 3 — Officer restrains EDP in emergency.** In an emergency, officers m restrain an EDP who they believe poses a likelihood of serious harm, if no qualifi clinician is available to sign a commitment order.

- **Category 4 — Judge issues Warrant of Apprehension.** At any time, *any person* m apply to a District or Juvenile Court for a commitment order and, after a hearing, t judge may issue a warrant for the apprehension of an EDP that poses a likelihood serious harm.

---

[1] Involuntary commitment under 123, § 12 is for a maximum of three days. To hold a person lon requires a separate legal proceeding under 123, §§ 7 and 8, or voluntary commitment under 123, § 10.

**Police & Emotionally Disturbed Persons** | **201**

## Police Procedures for Involuntary Commitment

### Categories 1, 2, and 4:

- Since the commitment order is issued by a clinician and/or a judge, officers n enter private homes to carry out a detention for involuntary commitme Categories 1, 2, and 4 are, in effect, arrest warrants for mental health detention.[7]

- Since EDPs constitute a diverse and, at times, unpredictable group of peop officers should obtain information from the court, clinician, and/or family. Wl called on to execute a commitment order or warrant of apprehension, officers sho always get some preliminary information from those familiar with the EDP. I example, is the EDP paranoid? Would it be better to have plainclothes person handle the situation? Should a family member be present during police entry?[8]

- Transport EDP to appropriate local facility (Categories 1 and 2) or to the court tl issued the warrant (Category 4). Officers should either utilize their own cruiser have an ambulance assigned for transport. Officers should follow in their cruiser ride in the ambulance to the mental health facility to ensure that the EDP, who tl took into custody, arrives safely.

### Category 3

- Since street officers make the decision to take the EDP into custody, they m have probable cause[9] that the EDP poses a "likelihood of serious harm."[10]

- When entering a home to take an EDP into custody under Category 3:

  - *If possible, obtain a commitment order from a clinician.* If there is time to cons with a clinician who can issue an order, this is preferred. The situation tl becomes a Category 2 entry.

  - *If exigent circumstances make consulting with a clinician impractical, se consent to enter and, if that fails, force entry.* If possible, seek superviso approval prior to forceful entry.[11]

- Transport EDP to appropriate local facility and file application for commitment Category 3 detention is not an involuntary commitment. It simply permits officers transport the EDP for evaluation. The clinician decides whether to issue commitment order or arrange another intervention (including discharge of the ED

## Transport & Restraint

*Officers are authorized to transport and restrain patients.*[ii] G.L. c. 123, § 21 specific: allows officers to:

- Transport both voluntary and involuntary patients.

- Use restraints on an adult for up to 2 hours prior to examination, and on a min for up to one hour. Take reasonable precautions, including the use of handcuffs, avoid other unnecessary restraints.

*Prior to transport, officers or dispatch shall notify the receiving facility* of estimated time of arrival, the EDP's level of cooperation, and whether any spec medical care or restraints are needed.

*Prior to transport, officers shall:*

- Search the EDP for weapons and contraband (including any containers or item possessed by the EDP unless turned over to a third party).

- Decide whether to transport the EDP in a police cruiser or by ambulance. If safe requires that an officer ride in an ambulance with the EDP, then supervisor appro is required before transport begins.

- Attempt to learn if the EDP owns or has potential access to any firearm or oth deadly weapon. Officers should evaluate how, in compliance with search a seizure law, they may seize any firearms or other dangerous weapons. Offic should document the results of this inquiry and, if necessary, follow up with pol personnel. Officers may need a warrant before entering a residence or other place search, unless they have exigent circumstances or consent.[12]

*Upon arrival at the facility, officers will:*

- Escort the individual into a treatment area designated by a facility staff member

- Inform the staff member about the facts and circumstances that resulted in EDP being transported to the facility.

---

[ii] G.L. c. 123, § 22 states that officers are "immune from civil suits . . . for restraining, transporting, . . admitting any person to a facility." To operate under the protective blanket of § 22, officers should prop document their actions in dealing with an EDP.

- In the case of an involuntary admission, provide the staff member with a writ application for a commitment order (if requested). See *Attachment A.* Keep a copy attach to the incident report.

*Officers should not normally assist facility staff with the admission proce* However, if the EDP is transported and delivered while restrained, officers may as with transferring the EDP to facility restraints and will be available to assist during admission process (if requested).

Under normal circumstances, officers will not apply facility-ordered restraints.

### Arrest & the Civil Commitment Process

*Civil commitments should be preferred over arrest for EDPs who are suspec of minor crimes* or creating other public safety issues. If an EDP is being taken i custody for civil commitment *and* suspected of a minor offense, officers are advised file an application for a criminal complaint.

*When an EDP, who may qualify for civil commitment, has committed a serio criminal offense that would normally result in arrest, officers should:*

- Arrest the EDP if there is probable cause to do so.

- Notify a supervisor about the facts supporting the arrest *and* involunt commitment. Later, these facts should be documented in the incident report.

 *The OIC or supervisor may direct that the EDP be:*

- Transported to court for evaluation and arraignment; or

- Allowed to enter a mental health facility voluntarily subject to a later appeara in court; or

- Evaluated by a mental health professional at the police lockup and, if necessa transferred to a mental health facility for involuntary commitment pending appearance in court.[13]

The OIC or supervisor may consult with the bail commissioner and consider seriousness of the offense, the treatment options available, and other relevant factors making this decision.

[1] It is estimated that 40% of emotionally disturbed persons are, at some point in their lives, arreste[d] police. Swanson, *Police Administration* (Prentice Hall, N.J.: 6th Ed.) at page 595.

[2] *San Francisco v. Sheehan*, 135 S.Ct. 1765 (2015) [Supreme Court strongly suggests that Title II o[f] Americans with Disabilities Act (ADA) mandates that police officers consider the mental health cond[ition] of the EDP when deciding the level of force that makes sense to employ to resolve the situation]. [The] amount of force used in carrying out the detention may be a source of liability, even when the deten[tion] itself is justified. *Samuelson v. City of New Ulm* 455 F.3d 871 (8th Cir. 2006).

[3] The drawback of this strategy is the relative ease with which a patient may be released. First, the fac[ility] may discharge a patient on its own. However, if the patient is a child, the facility must provide a pa[rent] or guardian with 14 days notice. Second, an adult patient may choose to leave, or a parent or guar[dian] may withdraw his child. As a safeguard, facility staff may insist on 3 days written notice and re[ason] departure to normal business hours. In extreme cases, a patient may be held beyond the 3 day peri[od if] the facility files a petition for longer term, involuntary commitment.

[4] See later discussion in Part II concerning civil commitment under 123, § 12.

[5] Op.Atty.Gen., July 1966 at 36.

[6] *Ahern v. O'Donnell*, 109 F.3d 809 (1997) specifically uses the term "category" in describing the differe[nt] methods for initiating the mental health commitment process under 123, § 12(a).

[7] Both the commitment order and warrant of apprehension constitute a type of special process w[hich] authorizes officers to enter private dwellings. *McCabe v. Lifeline Ambulance & City of Lynn*, 77 F.3d [1] (1996).

[8] Considering potential difficulties *before* the police enter and detain the EDP may avert a tragic re[sult] *McCabe v. Lifeline Ambulance & City of Lynn*, *supra*. (64 year old Holocaust survivor died at her h[ome] during a traumatic effort by police to execute a commitment order).

[9] *Ahern v. O'Donnell*, 109 F.3d 809 (1997) (probable cause required for police mental health deten[tion] under 123, § 12). *Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005) (same).

[10] *Ahern v. O'Donnell*, 109 F.3d 809 (1997) (messages left by EDP revealed a deeply disturbed depressed individual). Also see *Fuller v. City of Garden Grove*, 2007 U.S. App. Lexis 13848 (9th Cir.) (of[ficer] had probable cause to believe, at the time he detained a man for psychiatric evaluation, that the man [was] suicidal; the EDP had talked about killing himself, had access to a gun, was about to be served [with] divorce papers, had pain medication, was under a therapist's care, and was possibly on his way to lea[ve a] "goodbye" note at his daughter's house). Compare *Meyer v. Board of County Commissioners*, 482 F.3d [?] (10th Cir. 2007) (boyfriend was a town employee and personal friend of several deputies; there [was] evidence that the deputies lied to get his girlfriend involuntarily committed in retaliation for [her] reporting his domestic violence).

[11] *McCabe v. Lifeline Ambulance & City of Lynn*, *supra*. ("The potential consequences attending a del[ayed] commitment — both to the mentally ill subject and others — may be extremely serious, somet[imes] including death or bodily injury"). Compare *Comm. v. Allen*, 54 Mass. App. Ct. 719 (2002) (police serg[eant] had insufficient evidence that a disabled person he knew was in need of immediate assistance; there[fore] his warrantless entry into the apartment was invalid).

[12] Confiscating a license holder's guns is legally more complicated. See, e.g., *Pasqualone v. Gately,* Mass. 398 (1996) (prior to confiscation of weapons, license holder typically must receive written n and a right of appeal unless there is exigent circumstances). *Mazurczuk v. Chief of Police of Chelmsford,* WL 6994664 (Appeals Court) (police chief acted within his authority when he revoked the plaintiff's due to his confrontations with neighbors, lack of control, and refusal to cooperate with police).

[13] 123, § 18.

# Mental Illness

## Committee on Untreated Mental Illness

### Police Chiefs: Persons with Serious Mental Illness Increasingly Involved with Police

### Criminal Justice System Not the Solution

Decades ago persons with serious mental illness were institutionalized, often in deplorable facilities with little or no care. In some cases, persons with mild forms of mental illness were undiagnosed and lived out their lives in these facilities. In recent times these facilities were eliminated, and a model which advocates for deinstitutionalization took its place. While this model works well for persons with mild forms of mental illness and even for those with more severe forms of mentalillness with appropriate treatment and medications, there are those who require more in depth care. But when those persons do not get that care, by choice or otherwise, it is not uncommon that they exhibit behaviors which arouse suspicion, curiosity, and in some cases, also violate the law. When persons act out, exhibit strange behavior or appear disturbed, the police are often on the front lines of those calls from the public. While police are trained for a variety of situations, they are not therapists. Police do not provide treatment – they do not prescribe medications. But they are sometimes faced with a dilemma. How to protect someone who is a danger to themselves or others? Adding to the frustration is finding appropriate medical or mental health resources at a time when services are being cut. One officer noted, "What can we do when we have someone who wants to fight people on the street, or is disruptive in a convenience store and needs mental health treatment at 3:00 in the morning and there are no beds available? No shelters? No detox facilities? By taking someone to lockup and getting them off the street to a place where they are warm and fed is sometimes the only option. In good conscience, we can't leave them to hurt someone or themselves." But cops are the first ones to say that the criminal justice system is not the place to address the issues of those with mental illness. It is an option of last resort that has more commonly become the first option because of lack of services, funding, and empathy.

"What can we do when we have someone who wants to fight people on the street, or is disruptive in a convenience store and needs mental health treatment at 3:00 in the morning and there are no beds available? No shelters? No detox facilities? By taking someone to lockup and getting them off the street to a place where they are warm and fed is sometimes the only option. In good conscience, we can't leave them to hurt someone or themselves."

The New York State Association of Chiefs of Police (NYSACOP) has been an advocate for appropriate services for persons with serious mental illness, including Assisted Outpatient Treatment, where appropriate.

# Issues Faced by Police Chiefs

- Police calls related to people with untreated serious mental illness are increasingly common and consume a large amount of police resources. These calls most commonly involve:




  - Suicide
  - Quality of life offenses (disorderly conduct, trespassing, nuisance offenses)
  - Assault and threats of assault
  - Substance abuse
  - Pyromania
  - Domestic Abuse
  - Homelessness
  - Homicide
  - Attacks on officers
  - Justifiable homicides by officers

- The condition of the individuals officers are being called to respond to seems to be poorer than in the past. They are more severely ill.
- There have been many preventable tragedies in NYS
- There are fewer hospitals willing to admit those who need medical intervention. New York State is short 4,000 psychiatric beds assuming perfect community services existed.
- New Yorkers are more likely to be incarcerated for mental illness than hospitalized
- People with untreated serious mental illness sometimes present a threat to themselves or others.
- District attorneys, public defenders and court calendars are being overwhelmed.

## Consequences

- There are frequent "round-trippers": individuals who are stabilized, released, abandon their treatment, and deteriorate again to the point where police intervention occurs
- Officers have to drive far away to find an appropriate hospital
- Officers have to sit hours before the hospital examines or admits the person
- Hospitals refuse to admit and discharge before fully stabilized
- Involuntary treatment is largely only available after individuals become 'danger to self or others' rather than to prevent dangerousness
- Police are often forced to take those who need treatment to jails instead.

## Solutions

NYSACOP believes the following will help prevent individuals with untreated serious mental illness from becoming a criminal justice responsibility and will keep public, police and patients safer, while saving money to tax payers.

- NYSACOP and the International Association of Chiefs of Police (IACP) endorsed greater use of Assisted Outpatient Treatment (AOT) (known as Kendra's Law in New York State). AOT allows courts to order a small group of the most seriously ill who have already had multiple incidents of homelessness, arrest, violence, and/or hospitalization to stay in mandated and monitored treatment as a condition of

living in the community. It has successfully cut arrest violence and hospitalization 70% each. NYSACOP supports wider use of AOT.

o Evaluate mentally ill prisoners for potential inclusion in AOT prior to their release.

o Evaluate involuntarily committed hospital patients for inclusion in AOT prior to their release.

o Provide a mechanism to allow families of people with serious mental illness to inform authorities of people who could benefit from AOT and require the authorities to determine if AOT or alternative services could help.

o Mental Health Courts. Mental Health courts do after a crime has been committed, what AOT does before: it allows courts to order certain persons with serious mental illness to stay in treatment.

o Police Training. Because police have become first responders for the seriously ill, government should provide funds for specialized training for all officers within the police academies. All officers will come into frequent contact with persons with untreated serious mental illness so all should be trained. Until that time, Crisis Intervention Training (CIT) should be funded for select officers within departments.

o Greater availability of hospitals. As NYSACOP noted in an op-ed, as hospital availability decreases, incarceration increases. NYSACOP believes there should be easier access to hospitals for individuals with serious illness so police do not have to drive hours to find a hospital or wait hours for someone to be admitted. Once admitted, patients should be fully stabilized and connected to whatever services are needed to maintain that stability back in the community. As state hospitals close, local emergency rooms become overcrowded. NYSACOP supports a moratorium on closing state psychiatric beds and the building of more facilities.



Out of sight...
America's mentally ill held in:
Per 100,000 adults

o Greater role for law enforcement. Because treatment of the untreated seriously mentally ill has become a law enforcement responsibility, state legislators committees, and task-forces considering mental health policy should consult with NYSACOP and other professional police organizations and include them in their deliberations.

o Expand community services that are specifically and narrowly targeted to the most seriously ill and are evidence based to improve meaningful outcomes like reducing homelessness, suicide, arrest, and incarceration.

Chief/Ret. Michael Biasotti said, "It is this association's goal to decrease the frequency of negative interactions between the police and those with mental illness."

Individuals interested in helping those efforts should contact the NYSACOP Committee on Untreated Mental Illness at mentalillness@nychiefs.org

# More information:

Congressional Testimony of Former NYSACOP President Michael Biasotti (Video)
Police Chief op-ed in Albany Times Union on psychiatric hospital closures
Police Chief op-ed in Albany Times Union on SAFE Gun control legislation
Police Chief op-ed in New York Daily News on gun control for mentally ill
Police Chief op-ed in New York Post on Kendra's Law
Survey of 2400 senior law enforcement officers on mental illness

## Other Organizations

Mental Illness Policy Org  (NYS page here)
New York State Office of Mental Health
Treatment Advocacy Center
NAMI NYS

# New York State Association of Chiefs of Police (NYSACOP) Committee on Untreated Mental Illness:

- Chairperson: Chief (Ret) Michael Biasotti, New Windsor Police Department, NY; 2012-2013 NYSACOP President
- Chief David Zack, Cheektowaga Police Department, NY; 2016-2017 NYSACOP President
- Chief (Ret) Mark Spawn, Fulton Police Department, NY

EXHIBIT (H)

5.     PHYSICAL EVIDENCE

    a.   Defendant / Co-defendant Property (CPL § 245.20(1)(m))

        ☐ If checked, the following tangible objects were obtained from or
        possessed by the defendant or a co-defendant. Any item not listed as
        recovered from a defendant's person was constructively possessed by the
        defendant and all co-defendants. Unless otherwise noted, the items listed
        below were recovered either at or about the time of a defendant's arrest
        and/or during a search of persons or places by a public servant or an agent
        thereof. The People currently intend to introduce this property at trial or at
        a pre-trial hearing.

    b.   Other Tangible Property (CPL § 245.20(1)(o))

        ☐ If checked, there exists tangible property, in addition to any property
        already disclosed pursuant to CPL § 245.20(1)(m), that may relate to the
        subject matter of this case. The People currently intend to introduce this
        property at trial or at a pre-trial hearing.

6.     FURTHER DISCLOSURES

    a.   Computer Offenses (CPL § 245.20(1)(t))

        ☐ If checked, disclosure is hereby made of the time, place and manner of
        a violation of Unauthorized Use of a Computer (Penal Law § 156.05) or
        Computer Trespass (Penal Law § 156.10):

    b.   Other Disclosures

        ☐ If checked, disclosure is hereby made of the following information or
        materials not otherwise included in other sections of this document.

    c.   Lost or Destroyed Documents

        ☒ If checked, disclosure is hereby made of the following materials or
        documents that have been destroyed or, despite diligent, good faith efforts
        to locate the items, lost.

| Item Description | Lost/Destroyed |
|---|---|
| Radio Run | Destroyed |

Conclusive Proof of Police misconduct
/ conspiracy case



Meagher

A.    A fire in the bathroom, obvious
signs of fire, scorch marks and high heat to
wall and tile area and damage to the floor area
due to fire.

Q.    Showing you what has been marked
for identification as People's Exhibit 2, 3 and
4.  Can you tell us what you are looking at?

A.    This is a picture of the bathroom
door.  I have a picture of the bathroom door
open looking into the bathroom showing some of
the fire damage on the walls and I have a close
up picture of that same area of damage to the
walls showing fire damage.

Q.    Okay.  Marshal, I'll take those.
Do those fairly and accurately represent the
appearance of the bathroom and bathroom door
when you were there on March 6, 2019?

A.    Yes.

MR. RIDDLE:  I'm going to accept
these into evidence at this time and I'll
start with People's -- I'm sorry, Grand
Jury Exhibit Number 2.

Q.    What is that that we are looking
at?  What is this a picture of?

A.    That is a picture of the exterior

RL

Exhibit (I)



Meagher

A.    A fire in the bathroom, obvious signs of fire, scorch marks and high heat to wall and tile area and damage to the floor area due to fire.

Q.    Showing you what has been marked for identification as People's Exhibit 2, 3 and 4. Can you tell us what you are looking at?

A.    This is a picture of the bathroom door. I have a picture of the bathroom door open looking into the bathroom showing some of the fire damage on the walls and I have a close up picture of that same area of damage to the walls showing fire damage.

Q.    Okay. Marshal, I'll take those. Do those fairly and accurately represent the appearance of the bathroom and bathroom door when you were there on March 6, 2019?

A.    Yes.

MR. RIDDLE: I'm going to accept these into evidence at this time and I'll start with People's -- I'm sorry, Grand Jury Exhibit Number 2.

Q.    What is that that we are looking at? What is this a picture of?

A.    That is a picture of the exterior

RL

-Exhitib (J)

1

1     SUPREME COURT OF THE STATE OF NEW YORK

2     COUNTY OF NEW YORK:                    PART 81
      ------------------------------------------X

3     THE PEOPLE OF THE STATE OF NEW YORK,      :
                                                :   INDICTMENT NO. 1241-2019
4                         -against              :

5     MICHAEL NIEVES,                           :

6                         Defendant.            :
      ------------------------------------------X

7                         100 Centre Street
                          New York, New York 10013
8                         August 7, 2019

9

10    B E F O R E:

11              THE HONORABLE CURTIS FARBER, Judge.

12

13    A P P E A R A N C E S:

14

15    FOR THE PEOPLE:

16              OFFICE OF CYRUS VANCE, ESQ.
                DISTRICT ATTORNEY - NEW YORK COUNTY
17              1 Hogan Place
                New York, New York 10013
18              BY:  MEGAN MCNULTY, ESQ.
                Assistant District Attorney

19    FOR THE DEFENDANT:

20              DANIEL HUBERT, ESQ.
                277 Broadway
21              New York, New York 10007

22

23

24

25                    SAMANTHA SCUOTTO
                      Senior Court Reporter

                      S. Scuotto, SCR

PROCEEDINGS

1          THE CLERK:  Calendar 22, 1241 of 2019, Michael
2      Nieves.
3          MR. HUBERT3:  Daniel Hubert, H-U-P-E-R-T, 277
4      Broadway.  Good afternoon.
5          THE COURT:  Good afternoon.
6          MR. HUBERT:  Your Honor, regretfully, I know you
7      just assigned me on the last date, I have to -- after a
8      conversation with Mr. Nieves I have to ask your Honor to
9      relieve me.  The last three conversations, we had two on
10     the telephone over the last two days and one today up in
11     the pens before the case was called, Mr. Nieves indicated
12     he plans on filing a disciplinary complaint against me
13     twice and today he also said he's going to file a lawsuit
14     against me under whatever --
15         THE DEFENDANT:  May I address the Court, please?
16     Your Honor, with all due respect because of constitutional
17     rights I submitted a pro se motion to have the indictment
18     dismissed in the furtherance of justice.  Mr. HUBERT is
19     aware of that motion, all the facts, legal statements,
20     statement of the fact, legal arguments, all the exhibits.
21     He understands that the complaint -- the felony complaint
22     is a defective accusatory instrument, that it's
23     insufficient evidence to support each and every element of
24     the offense charged.
25             According to People versus Wienberger and People

*S. Scuotto, SCR*

3

PROCEEDINGS

1    versus Alejandro he understands that I was in the hospital
2    for thirty days under emotional disturbed person case laws.
3    I was not a prisoner there.  From my hospital records I was
4    there under Mental Health Hygiene Law 9.27 and 9.37, that
5    under New York State Civil Law Article 3(23) that I was
6    indeed -- Article 3(23) privilege from arrest, I was
7    submitted to a civil proceeding by the police under EDP
8    laws, emotional disturbed person laws.  I was given an ALT
9    under the Act Team, Visiting Nurse Service, the Act Team,
10   Assertive Community Treatment.  I was released to the
11   community, that I was arrested without probable cause under
12   an I-Card.  That collateral stop or arrest judicata in
13   effect stops my case from being relitigated since it was
14   already submitted to a civil proceeding.
15                THE COURT:  Can I ask the lawyers to approach
16   for a second.
17                (Whereupon an off-the-record discussion was
18   held.)
19                THE DEFENDANT:  Under the circumstances, your
20   Honor, with all due respect, I ask Mr. HUBERT to request
21   for release on my own recognizance under cases --
22                MR. HUBERT:  Judge, I will be asking to release
23   him on his own recognizance.
24                THE DEFENDANT:  Please allow me to speak, which
25   Sara Doody of the Legal Aid Society has successfully

S. Scuotto, SCR

PROCEEDINGS

```
 1      achieved, which I complied with all of rules and
 2      regulations by Cases under Terry Burns.  I asked Mr. HUBERT
 3      to ask for a bail reduction.  I asked Mr. HUBERT to assert
 4      my rights under People versus Gilbert, that proves that the
 5      Grand Jury minutes are in fact exculpatory Brady material
 6      due to lack of good cause where the Grand Jury minutes are
 7      perjured by the police and by --
 8              THE COURT:  Mr. -- I'm going to cut you off.  I
 9      have true concerns about your fitness to proceed at this
10      point in time.  I'm going to order a 730 exam.  Once I have
11      the results of the examination then I'll decide how to
12      proceed further regarding the application for relieving of
13      counsel.  Put the matter over for thirty days, September
14      9th for 730 results.  Remand.
15              THE DEFENDANT:  Your Honor, please be aware that
16      I will --
17              THE COURT:  I can't do the 30th.  October 7th.
18              THE DEFENDANT:  Your Honor, please be aware that
19      I will be filing a 1983 suit for injunctive relief --
20      damages.  Please be aware that I will be filing a suit in
21      Court of Claims, okay, that the Court is acting outside of
22      its jurisdiction in its official capacity.  You are
23      violating my constitutional rights.  October 27th?
24              THE COURT:  10-7.
25              THE DEFENDANT:  I would like new counsel,
```

S. Scuotto, SCR

PROCEEDINGS

1   please.

2            THE COURT:  I will entertain that application

3   after I get the 730 results.

4                    *    *    *    *

5

6      C E R T I F I C A T I O N

7            It is hereby certified that the foregoing is
8   a true and accurate transcript of the
    proceedings.

9

10

11                    SAMANTHA SCUOTTO
                      Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*S. Scuotto, SCR*

EXHIBIT (K)

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 81
----------------------------------------------X IND. NO.
THE PEOPLE OF THE STATE OF NEW YORK       :    1241/2019

                    - against -

MICHAEL NIEVES,

                        Defendant.
----------------------------------------------X CALENDAR CALL
                              Supreme Courthouse
                              100 Centre Street
                              New York, New York
                              April 24, 2019

B E F O R E :

          THE HONORABLE CURTIS J. FARBER,
                        Justice

A P P E A R A N C E S :

          FOR THE PEOPLE:
               OFFICE OF CYRUS R. VANCE, JR., ESQ.
               District Attorney County of New York
               BY:  DOMINIQUE ANGLADE, ESQ.,
                    Assistant District Attorney


          FOR THE DEFENDANT:
               THE LEGAL AID SOCIETY
               BY:  DAVIM HOROWITZ, ESQ.
               BY:  SARA DOODY, ESQ.


                    CHUCK DOMINICK
                 SENIOR COURT REPORTER

PROCEEDINGS                                    2.

1            THE CLERK: Calendar Number 14, 1241 of 2019,

2    Michael Nieves.

3            MR. HOROWITZ: The Legal Aid Society by Davim

4    D-A-V-I-M, last name Horowitz for Mr. Nieves.

5            MS. DOODY: The Legal Aid Society Sara Doody,

6    D-O-O-D-Y, on behalf of Mr. Nieves.

7            THE COURT: Good afternoon.

8            Have you received a copy of the indictment?

9            MR. HOROWITZ: We received a copy of the

10   indictment --

11           THE COURT: Ready to proceed?

12           MR. HOROWITZ: -- the Voluntary Disclosure Form,

13   Violent Predicate Statement and the Notice of Immigration

14   Consequences.

15           We are ready to proceed.

16           THE COURT: Let's arraign Mr. Nieves on the

17   indictment.

18           THE CLERK: Mr. Nieves, the Grand Jury of

19   New York County has filed Indictment 1241 of 2019 charging

20   you with Burglary in the First Degree and other charges.

21           How do you plead to the indictment, guilty or

22   not guilty?

23           THE DEFENDANT: Not guilty, Your Honor.

24           MS. ANGLADE: The People filed a copy of the

25   indictment, a copy of the Voluntary Disclosure Form, and

- CD-

PROCEEDINGS

3

1    the Predicate Felony Statement with the Court.  And we

2    served defense counsel with the same documents.

3                We also served defense counsel with a Notice of

4    Immigration Consequences.

5                I understand the Assigned reached out to Mr.

6    Horowitz regarding discovery and that he has a flash drive

7    he is going to provide the People so that we may turn over

8    the body camera video footage, photos and surveillance

9    video.

10               MR. HOROWITZ:  I'm turning that flash drive over

11   now.

12               Mr. Nieves does want to speak.

13               THE COURT:  What's the offer or recommendation?

14               MS. ANGLADE:  Your Honor, we have a

15   recommendation.

16               On a plea to the charge to Count 1, Burglary in

17   the First Degree, Penal Law 140.30 Subsection (3), the

18   People are recommending twelve years state prison with

19   five years post-release supervision and a waiver of

20   appeal.

21               THE COURT:  All right, with a waiver.

22               Mr. Nieves, I will let you speak, but I want to

23   put on the record that the person to my right is an

24   Official Court Reporter.  The court reporter writes down

25   everything that is being said in the courtroom.

- CD-

PROCEEDINGS                                    4

1           I'm advising you it's not in your best interest

2    to talk about the facts of the case because if you do,

3    anything that you say can be used against you.

4           The prosecutor will be writing down also

5    everything you say, so try to avoid talking about the

6    facts of the case.

7           THE DEFENDANT:  Your Honor, sorry.  Yes, Your

8    Honor.  It will take me less than five minutes to read

9    something important to the record I would like you to

10   consider and the DA to consider, please.

11          Okay, Your Honor, Court, in pleading for a

12   pending motion to dismiss the criminal charges, I've

13   written three arguments.

14          And argument one states that similar to a

15   previous incident during February 2019 or March 2019 on

16   42nd Street, wherein the New York City Police Department

17   responded to a 911 call of Mr. Nieves locking himself

18   inside a private building surrounded with bathrooms while

19   attempting suicide by setting a fire inside of it that

20   had been legally determined by the police officers to be a

21   psychiatric hospitalization case for emergency treatment

22   of Mr. Nieves instead of one in which an arrest for

23   burglary, arson, reckless endangerment, et cetera,

24   required by law due to the lawfully and empowered

25   determination of Mr. Nieves' lack of capacity, intent,

- CD -

1    motive and/or culpability to have committed a crime. As

2    the body camera recordings of their first responding to

3    the incident -- sorry. Due to the lawfully empowered

4    determination of Mr. Nieves' lack of capacity, intent,

5    motive and/or culpability to have committed a crime, as

6    the body camera recordings of the first responders to this

7    incident evinces the other psychotic state of Mr. Nieves

8    in which Bellevue Hospital's psychiatric determination

9    also concurred the police's finding of Mr. Nieves' mental

10   state, while no further arrest occurred by the fire

11   marshals whom surely must have been aware of this incident

12   respectfully regarded the subsequent incident during early

13   March of 2019, this one, where the New York City Police

14   further decided and determined similar or identical

15   administrative findings to Mr. Nieves' lack of capacity

16   intent, motive and/or culpability to have committed a

17   crime as the body camera recordings of the questioning

18   investigation of the incident evinced the nullification of

19   charging Mr. Nieves with burglary, arson, reckless

20   endangerment and wrongful imprisonment in light of the

21   facts of the incident of -- in light of the fact of the

22   incident in the emergency psychiatric hospitalization case

23   having lawfully determined by the police instead of one in

24   which an arrest was required, heretofore Harlem Hospital

25   Psychiatric treatment with an increase of medication

- CD -

PROCEEDINGS

6

1    Abilify, from ten milligrams to twenty milligrams, and

2    which placement, antidepressants prescription Zoloft 75

3    milligrams, and a thirty-day hospitalization of Mr. Nieves

4    also substantiated the police's findings and

5    determination.

6         Argument two.

7         MR. HOROWITZ:  Judge, I will continue reading.

8         Argument two:  Respectfully from a

9    jurisdictional perspective, the New York City Police had a

10   lawful responsibility to investigate this case while the

11   firearm marshal had ample time to respond at the scene of

12   the incident to conduct their investigation together with

13   the police.  Therefore, the fire marshal's subsequent

14   investigation without the police's presence that

15   unlawfully negated the police's findings should not be

16   legally admissible in court.

17        In fact, the criminal charges filed against

18   Mr. Nieves by the fire marshal's arrest of him on April 8,

19   2019 effectively unlawfully declared the police's

20   determination to hospitalize Mr. Nieves during early March

21   2019 for the same incident to be moot or without legal

22   grounds or relevance, otherwise stating the unlawful

23   actions of the police in the matter.

24        Argument three:  Mr. Nieves had been

25   hospitalized for approximately thirty days due to this

- CD-

PROCEEDINGS                                    7

1    incident.

2          The fire marshals who arrested Mr. Nieves and

3    investigated the incident had a lawful duty to timely

4    arrest Mr. Nieves at Harlem Hospital and transport him to

5    a psychiatric prison ward, such as Bellevue Hospital's

6    prison ward, to await arraignment if an arrest was

7    lawfully required.

8          Certainly, the police, who sent Mr. Nieves to

9    Harlem Hospital, filed a report of this that was available

10   to the fire marshal upon their investigation.

11         Obviously the decision to await Mr. Nieves'

12   release to society and to his residence on the grounds at

13   Kingsborough Psychiatric Center to execute their,

14   parenthetical, I-card or arrest warrant, close

15   parenthetical, was an unlawful practice had their arrest

16   of Mr. Nieves been lawful to begin with.

17         In conclusion, based on these arguments and law,

18   it is clear that these criminal charges should be

19   dismissed and that Mr. Nieves be released from detention

20   at Rikers Island.

21         Thank you very much for your consideration, Your

22   Honorable Judge.

23         Your truly, Michael Nieves.   4/23/19.

24         THE DEFENDANT:   Thank you, Your Honor.   Your

25   Honor, thank you very much.

- CD-

PROCEEDINGS                                          8

1              MS. ANGLADE:  Will a copy of that, what I

2      believe was prefaced as a motion, be provided to the

3      Court?

4              THE COURT:  Well, I will set a motion schedule.

5      Counsel will adopt whatever portion he thinks is

6      appropriate.  Just order the minutes.

7              MR. HOROWITZ:  Yes, Judge.  Thank you.

8              If I may, it occurs to me that the initial

9      police response, the body cameras, which I am assuming

10     Mr. Riddle is turning over, and any reports related to

11     Mr. Nieves' hospitalization around this incident I think

12     are Brady material.  I think they certainly go to his

13     guilt or innocence and also sentence, should he be

14     convicted.  But he referenced a prior incident on 42nd

15     Street, and I believe the police responded to that as

16     well.  We will see if he can get the exact time and date

17     of that.

18             Obviously, the police responded to that.  I

19     think that that would also go to his mental state, his

20     ultimate guilt or not guilt, and any sentence as well.

21             So I will put the DA's Office on notice of those

22     two very specific Brady requests.

23             THE COURT:  With regard to your mentioning your

24     client's own medical records, I will be more than happy to

25     sign whatever subpoenas you hand up.

- CD-

EXHIBIT (L)



## OPERATIONS ORDER

| | |
|---|---|
| SUBJECT: | **PUBLIC RELEASE OF BODY-WORN CAMERA (BWC) FOOTAGE OF CRITICAL INCIDENTS** |

| DATE ISSUED: | NUMBER: |
|---|---|
| **07-09-20** | **54** |

1.       The Department's policy regarding the public release of Body-Worn Camera (BWC) footage of a critical incident enhances Departmental transparency, while balancing privacy concerns and the need to comply with federal, state and local public disclosure laws.

2.       For the purpose of this directive, a critical incident is any incident in which the following criteria is met:

 a. Use of force by one or more officers that results in death or serious physical injury to another,

 b. Officer discharges firearm and such discharge hits or could hit another, and/or

 c. Any incident which the Police Commissioner determines the release of BWC footage will address vast public attention, or concern, or will help <u>enforce the law, preserve peace, and/or maintain public order.</u>

3.       In the event that a federal and/or state prosecuting authority opens an official investigation into a critical incident, the Department will share all relevant BWC footage with the prosecuting authority within 24 hours of the Department being notified of the investigation. In addition, the Department will publicly release BWC footage of a critical incident within 30 calendar days. The Department will release representative samples of the BWC video(s) depicting the critical incident, as well as, any salient events leading up to the event. Extraneous and/or redundant material may be omitted. The footage will be redacted (e.g., faces of involved individuals will be blurred, etc.), as appropriate, prior to being released to the public. Unedited footage of a critical incident will be maintained, and released, to an appropriate investigating authority upon request.

4.       Furthermore, the following notifications are to be made by the Department at least 24 hours prior to the public release of BWC footage of a critical incident, when possible, to:

 a. Civilian subject(s) of police action, or next of kin, if deceased, or parent/guardian, if subject is a juvenile,

 b. Legal counsel representing subject,

 c. Uniformed members of the service readily identifiable,

 d. Bureau/borough, and/or unit commanders,

 e. Police unions, as appropriate, and

 f. Other official agencies involved in such incident or investigation other than the prosecuting authority.

5.       The Department will notify the prosecuting authority 7 calendar days prior to releasing BWC footage of a critical incident to the public, except when the Police Commissioner determines that exigent circumstances require a shorter time period for such release (e.g., in order to maintain public safety, preserve the peace, etc.). In such cases, notice will be provided to the prosecuting authority 24 hours prior to releasing BWC footage of a critical incident to the public, if possible. When practical, the release of BWC footage of a critical incident may occur at either a news conference, or media availability session, with a subject matter expert and an executive from the Office of the Deputy Commissioner, Public Information present to provide

context and a chronology of the event. BWC footage may also be released on an online platform. BWC footage will not be released for commercial, non-law enforcement, or non-journalistic purposes.

6.     Prior to the release of BWC footage, consideration will be given to privacy rights, including an assessment of whether BWC footage depicts:

    a.    The interior of residences and other places where there is a reasonable expectation of privacy,

    b.    Intimate images,

    c.    Images of a member of the service or private citizen receiving medical attention,

    d.    Images of a serious physical injury or a deceased individual, and/or

    e.    The location of a domestic violence program.

7.     Any public release of BWC footage may be redacted in order to:

    a.    Comply with federal, state, or local law governing disclosure of records or existing Department procedures,

    b.    Protect confidential sources and witnesses,

    c.    Protect a person's right to a fair trial,

    d.    Protect the identity of victims of sex crimes, domestic violence and juveniles,

    e.    Protect the privacy, life or safety of any person, and/or

    f.    Avoid undue trauma due to explicit or graphic content.

In the interests of transparency, BWC footage of a critical incident may be shared without redaction with the media, subject to the considerations listed in steps "6" and "7" above.

8.     Public release of BWC footage may be delayed, or in some cases, the Department may forego public release, in order to:

    a.    Comply with a court order or restraining order preventing release of such footage, or

    b.    Comply with federal, state, or local law governing disclosure of records or existing Department procedures.

9.     Operations Order 46, series 2019, is hereby **REVOKED**.

10.    Commanding officers will ensure that the contents of this Order are brought to the attention of members of their commands.

## BY DIRECTION OF THE POLICE COMMISSIONER

**DISTRIBUTION**
**All Commands**

EXHIBIT (M)

## FACTUAL BACKGROUND AND
## PROCEDURAL HISTORY

4.     On March 6, 2019, between the morning hours of approximately 7:30-8:00, Angelina Cruel Cepeda was asleep in her bedroom at her apartment located at 561 West 141 Street. Her husband, Pedro Cruel, was in the kitchen.

5.     It was around that time when Michael Nieves, the defendant, walked into the victims' home, bypassed Mr. Cruel, and walked into Ms. Cepeda's bedroom. According to Ms. Cepeda, defendant barricaded himself in the room by moving the dresser in front of the door. She watched him pull out two lighters and he began "flicking" them. Terrified, Ms. Cepeda called out to her husband. Unable to communicate with her husband, she phoned the building's superintendent to let him know about the stranger in her bedroom.

6.     Eventually, through their collective efforts, Mr. Cruel, the superintendent, and Ms. Cepeda were able to force open the door so she could escape to safety. Petitioner ran from the bedroom and locked himself in the victims' bathroom.

7.     Police officers and the fire department were called to the scene. When the officers arrived to the apartment they were confronted with the smell of smoke. The victims told the police that defendant was locked in their bathroom and that he had started a fire. Officers were able to force open the bathroom door, where they observed heavy smoke and fire. Petitioner was physically removed from the bathroom and was restrained. The officers put out the fire by pouring several pots of water on the smoldering materials. The officers believed defendant was an emotionally disturbed person, and as a result, he was take to Harlem Hospital where he was treated for burns to his hands and was admitted for psychological evaluation.

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 85

---

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

Michael Nieves,

Defendant.

AFFIRMATION IN
RESPONSE TO
DEFENDANT'S
MOTION TO DISMISS
THE INDICTMENT

Ind. No. 01241/2019

---

CHRISTOPHER RIVET, an attorney duly admitted to practice before the courts of
the State of New York, affirms under penalties of perjury that:

1.     I am an Assistant District Attorney in New York County and am fully familiar
with the facts of this case.

2.     This affirmation is submitted in response to the defendant's motion for
dismissal of the charges against him pursuant to CPL §§ 30.30, 210.40(1), 245.80, and for
other related relief. It is based upon my examination of the District Attorney's file, the court
papers, and, if specifically indicated, official transcripts of the proceedings in this case.

3.     Defendant is presently incarcerated at Bellevue Hospital pending trial on
charges of Burglary in the First Degree, Penal Law § 140.30(3); Arson in the Second Degree,
Penal Law § 150.15; Burglary in the Second Degree, Penal Law § 140.25(2); and Reckless
Endangerment in the First Degree, Penal Law § 120.25.

**EXHIBIT (N)**

petition for a writ of habeas corpus, with an affidavit of service dated November 17, 2020; and (v) on January 5, 2021, defendant filed a petition for a writ of habeas corpus, with an affidavit of service dated December 10, 2020.

13. On January 19, 2021, the People provided comprehensive discovery to the defendant in full satisfaction of CPL § 245.20(1) and filed with the Court and served on defendant's attorney at the time, Carlos Martir, an Automatic Discovery Form and a Certificate of Compliance and Discovery List. *See* Exhibit 1. Pursuant to CPL Article 245, the People indicated that certain discovery had been lost or destroyed. Specifically, the People informed defendant's newest attorney, David Turchi, that the police radio run and the NYPD body-worn camera footage for all officers other than James Marcinek and Rufian Arshad had been lost or destroyed.

14. On April 16, 2021, the People filed and serve a Certificate of Readiness. After serving supplemental discovery upon defense counsel, the People filed a second Certificate of Readiness on May 17, 2021.

### THE PEOPLE'S RESPONSE TO DEFENDANT'S REQUESTED RELIEF PURSUANT TO CPL § 30.30

15. With respect to defendant's claims pursuant CPL § 30.30, as the chart below shows, only 14 days of includable speedy-trial time have elapsed in this case.

| DATES | INCLUDABLE TIME |
|---|---|
| April 10, 2019 to April 12, 2019 | 2 |
| April 12, 2019 to April 24, 2019 | 12 |
| April 24, 2019 to June 19, 2019 | 0 |
| June 19, 2019 to August 14, 2019 | 0 |



| | |
|---|---|
| July 1, 2019 to August 7, 2019 | 0 |
| August 7, 2019 to October 7, 2019 | 0 |
| October 7, 2019 to October 11, 2019 | 0 |
| October 11, 2019 to October 16, 2019 | 0 |
| October 16, 2019 to May 12, 2020 | 0 |
| May 12, 2020 to July 23, 2020 | 0 |
| July 23, 2020 to August 25, 2020 | 0 |
| August 25, 2020 to October 13, 2020 | 0 |
| October 13, 2020 to November 9, 2020 | 0 |
| November 9, 2020 to February 9, 2021 | 0 |
| February 9, 2021 to March 29, 2021 | 0 |
| March 29, 2021 to April 16, 2021 | 0 |
| April 16, 2021 to May 7, 2021 | 0 |
| May 7, 2021 to May 21, 2021 | 0 |
| May 21, 2021 to June 8, 2021 | 0 |
| June 8, 2021 to July 7, 2021 | 0 |
| Total: | 14 |

16.     The People base the above-stated calculation upon the following facts and legal precedents:

a.   April 10, 2019 to April 12, 2019: The felony complaint was filed on April 10, 2019 and evidence was presented to a New York County grand jury on April

5

**EXHIBIT (O)**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 85

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | CERTIFICATE OF COMPLIANCE |
| -against- | CPL § 245.50(1) |
| | Indictment No. |
| Michael Nievess, | 01241/2019 |
| Defendants. | |

Christopher Rivet, an Assistant District Attorney in the County of New York, states that, after exercising due diligence and making reasonable inquiries to ascertain the existence of material and information subject to discovery under CPL § 245.20(1), the People have disclosed and made available to the defendants all known material and information that is subject to discovery, except for any items and information subject to an order pursuant to CPL § 245.70.

The discovery provided to defense counsel is enumerated in the Automatic Discovery Form served on defense counsel on January 19, 2021, which are incorporated herein by reference, as well as in the attached lists[1].

Dated: New York, New York
May 17, 2021

Respectfully submitted,

Cyrus R. Vance, Jr.
District Attorney
New York County

By: Christopher Rivet
Assistant District Attorney
Of Counsel
(212) 335-3255

---

[1] The People's disclosures may include documents, information, and materials that are not required to be disclosed under CPL § 245.20(1) but which have been disclosed in an exercise of the People's discretion.

**EXHIBIT** (P)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 85

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Michael Nieves,

Defendants.

CERTIFICATE OF
READINESS

Indictment No.
01241/2019

    Christopher Rivet, an Assistant District Attorney in the County of New York, hereby certifies

that the People are ready for trial in the above-entitled action.

Dated:    New York, New York
        May 17, 2021

Respectfully submitted,

Christopher Rivet
Assistant District Attorney
(212) 335-3255

EXHIBIT (Q)

furtherance of justice has been viewed as a power to be used "sparingly" and requires the Court to balance the interests of the defendant and the State. People v Serrano, 163 AD2d 497 (2d Dept 1990). Only when a miscarriage of justice would result from adherence to the letter of the law is such a dismissal warranted. *People v Andrew*, 78 AD2d 683 (2d Dept 1980).

21. Judged by these exacting standards, the defendant's motion plainly fails. The defendant's conduct in this case is egregious—after walking into the home of complete strangers, he barricaded himself in the bedroom with one of the victims, and after she was finally able to escape, he locked himself in the bathroom where he set various items on fire, causing significant burn and smoke damage. The defendant has six felony convictions, two of which are violent felonies. The defense alleges that "there was no active fire, not even flames," Def. Mot. ¶10, that items in the bathroom were "presumably wet," id., which is *presumably* included to make one think that the allegations that defendant set objects on fire are unfounded, despite the photographic evidence to the contrary, and that officers "simply poured a pot of water on some smoldering ash, id. The defense's statements are blatant misrepresentations of the truth and all the evidence that has been provided proves that. Moreover, the defense has alleged absolutely nothing that would "clearly demonstrat[e] that ... prosecution upon [the] indictment would ... result in injustice." CPL §§ 210.20 and 210.40.

## THE PEOPLE'S RESPONSE TO THE DEFENDANT'S REMAINING GROUNDS FOR RELIEF

I. The People filed a proper Certificate of Compliance after serving comprehensive discovery disclosures in full satisfaction of CPL §§ 245.20(1) and 245.50(1).

"Initial discovery," as defined under CPL § 245.20(1), consists of items or information must be in the "possession, custody, or control" of the People,[1] which "relate to the subject matter of the case." *Id.* "When the prosecution has provided the discovery required by subdivision one of section 245.20 . . . it shall serve upon the defendant and file with the court a certificate of compliance." CPL § 245.50(1). A proper certificate of compliance is one that "state[s] that, after exercising due diligence and making reasonable inquiries to ascertain the existence of material and information subject to discovery [under CPL § 245.20(1)], [the People have] disclosed and made available [to the defendant] all known material and information [that is] subject to discovery." CPL § 245.50(1). Additionally, a list of items disclosed must accompany the certificate. *Id.* A certificate of compliance that conforms to these requirements is, therefore, proper, and the People are free to announce their readiness for the purposes of CPL § 30.30. CPL § 245.50(3).

The People provided comprehensive discovery to the defendant in full satisfaction of CPL § 245.20(1) and, as a result, there is no basis to deem the People's Certificate of Compliance or Certificate of Readiness invalid (*See* Exhibit 1). This information was disclosed to the defendant on months before the People served our Certificate of Compliance. Having completed their disclosure obligations under CPL § 245.20(1), the People certified their compliance on January 19, 2021, in good faith, with a proper Certificate of Compliance in accordance with CPL § 245.50(1). The People additionally

---

[1] Under CPL § 245.20(2), "items and information related to the prosecution of a charge" in the possession of "any New York state or police or law enforcement agency shall also be deemed to be in the possession of the prosecution."

certified their readiness for trial in accordance with CPL § 245.50(3) on April 16, 2021, and again on May 17, 2021.

The defendant has demanded discovery to items that simply do not exist. Namely, defendant claims that he is entitled to additional body-camera footage, the police radio run, redacted information, and "all other discovery required by CPL Article 245." Def. Mot. ¶15. The People acknowledge that no police radio run has been disclosed to the defense. Police radio run recordings, along with calls placed to 911, are retained for only one year. This case is a transfer case from an Assistant District Attorney who is no longer with the Office. Given that the incident occurred March 2019, and the case was transferred to me in May 2020, the prior ADA's failure to obtain the radio run has resulted in it being destroyed. Likewise, the police body-camera footage, beyond that which has been disclosed, has been destroyed. Based on the available body-camera footage, it is clear more officers responded to the scene and interacted with defendant. The People concede that there *should* be more body-camera footage, nonetheless, as the People informed Mr. Turchi, it does not exist. On October 13, 2020, I met with Officer Rufian Arshad, one of the responding officers whose body-camera has been disclosed to the defense. During that meeting, we watched his body-camera footage and he identified the officers that were present. At the end of our meeting, I gave him a subpoena for "[a]ll body-Worn Camera footage for the following Officers, from March 6, 2019, recorded at approximately 8:15 AM through and including 9:00 AM." Shortly thereafter, I was informed by Officer Arshad that the requested video does not exist.

Additionally, the defendant claims that the People's Certificate of Compliance and Certificate of Readiness are invalid because the People failed to disclose certain redacted

information. Def. Mot. ¶15-19. The names, adequate contact information, and any identifying information of a 911 caller "may be withheld, or redacted from discovery materials, without need for a [protective order]," provided that the People disclose such information no later than fifteen days before trial, if the People intend to call the individual as a witness. CPL §§ 245.20(1)(c) (emphasis added); 245.20(1)(g). Moreover, the automatic protections extend to any "information related to or evidencing the identity of a 911 caller." CPL § 245.10(1)(a)(iv)(A). Contrary to defendant's claims, these automatic protections not only apply to any pedigree information, but all materials evidencing the identity such a witness, which could include witness statements or other discovery that would reveal their identity.

Here, People are fully entitled to redact the information that the defendant seeks, given that the People limited their redactions to information that relates to the identity of the 911 caller(s), and notified the defendant in writing that such information has not been disclosed. CPL § 245.20(1)(c). In fact, the People went beyond their duties under the statute by providing the defendant with the names and phone numbers for each of the witnesses and victims not otherwise protected by the legislative carve out. Defendant has been in possession of the information since receiving the Automatic Discovery Form on January 19, 2021. The limited redactions throughout the discovery are permissible and are only used to limit the number of instances in which the victims' and witnesses' names appear. Importantly, the initials of the victims and witnesses were left visible to assist the defense in identifying to whom the subject discovery relates. Therefore, there is no reason to invalidate

the People's Certificate of Compliance and Certificate of Readiness based on these permitted

redactions.

II.   **The People's Certificate of Compliance filed on January 19, 2021 is proper, and should not be invalidated simply because certain materials were disclosed at a later date or are lost or destroyed, despite the People's good faith efforts to obtain them.**

The crux of defendant's argument is that short of obtaining and disclosing every known

discoverable item that exists, the People may never file a valid certificate of compliance.  Yet,

when confronted with reiterations of this same argument, most courts have found it unavailing.

Instead, courts have held that belated disclosures, minor oversights in the production of

material, or a good faith position that the materials in question were not discoverable, do not

invalidate certificates of compliance that were filed in good faith after the exercise of due

diligence. *See People v. Cano*, 2020 WL 8968135, Slip Op. 20365, at \*2-3 (Sup. Ct., Queens Co.

Dec. 3, 2020); *People v. Alvarez*, 2021 WL 1377827, Slip Op. 50292(U), at \*3 (Sup. Ct., Queens

Co. Mar. 29, 2021).

To begin, the People may file a certificate of compliance once they "provided the

discovery required by subdivision 1 of section 245.20."  CPL § 245.50(1).  Compliance with

CPL § 245.20(1) is defined by the disclosure of materials, relevant to the subject matter of the

case, that are in the People's "possession, custody or control."  Once the People disclose all

known materials subject to discovery that are in the possession of the People, they may file a

valid certificate of compliance.

Following this logic, the People may certify compliance while awaiting materials that

they have exercised due diligence to obtain, but have still not received. *People v. Askin*, 68 Misc.

3d 372, 380-81 (Co. Ct., Nassau Co. 2020); *see e.g., People v. Alford*, 66 Misc. 3d 1233(A), Slip Op.

50349(U), at *3 (Crim. Ct., N.Y. Co. Mar. 13, 2020) (People's certificate of compliance not rendered invalid due to certain unavailable discoverable materials; People disclosed over 350 items and affirmed that "they have turned over everything in their possession and will continue to do so"). In *Askin* the People diligently and in a timely manner tried to obtain the outstanding materials, but the items were simply not in the People's control. *Askin,* 68 Misc. 3d at 380-81 (subsequent filing of CV, previously not in People's control, did not negate certificate of compliance and statement of readiness; People may file a valid certificate of compliance while awaiting receipt of medical records they subpoenaed in a timely manner because the People have "no control over when an outside agency will fill a subpoena"). Thus, the People may certify their compliance while awaiting these documents, and do not need to delay certification until "every document they know exists, and is held to be under their control, is physically turned over to the defense." *Id.* at 378-79.

Minor oversights in discovery production have also not been held to invalidate certificates of compliance that were otherwise filed in good faith. *See e.g., People v. Gonzalez,* 68 Misc. 3d 1213(A), Slip Op. 50924(U) at *2 (Sup. Ct., Kings Co., Aug. 19, 2020); *People v. Knight,* 69 Misc. 3d 546, 552 (Sup. Ct., Kings Co. 2020); *People v. Davis,* 70 Misc. 3d 467, 479 (Crim. Ct., Bronx Co. 2020) (despite initial omission of DWI maintenance logs from discovery, "prosecutor's initial disclosures were reasonable and made after exercising due diligence"). In *Gonzalez,* the court ruled that the absence of certain items that were inadvertently omitted from the People's discovery disclosures—a scratch complaint report, an updated disclosure letter, and an expert's resume—did not vitiate the original certificate. Id. at *2. In *Knight,* the court agreed that the mere fact the People provided more discovery items does not invalidate a

certificate of compliance, which "by any measure [was] filed in 'good faith' and 'reasonable under the circumstances,'" and thus was valid. *Knight*, 69 Misc. 3d at 552.

Additionally, a certificate of compliance is valid if the People filed the certificate in good faith based on their understanding of what was needed to be provided as discovery. Article 245 drastically revised its predecessor, and so "[g]iven this learning curve, a court should not invalidate a certificate of compliance simply because it ultimately rejects a good-faith argument made by the prosecution [especially when] the People have been demonstrably diligent in satisfying their discovery obligations." *People v. Lustig*, 68 Misc. 3d 234, 247-48 (Sup. Ct., Queens Co. 2020); see e.g., *People v. Randolph*, 69 Misc. 3d 770, 773 (Sup. Ct., Suffolk Co. 2020) (though People did not initially disclose IAB files, court held that there was no basis to strike the certificate of compliance or impose sanctions because "the People [had] been acting in good faith and [provided] discovery in harmony with their understanding of the requirements").

The sum total of these decisions chip away at the defendant's proposition that nothing short of complete compliance satisfies CPL § 245.50(1) and that the People's good faith plays no part in the analysis. Indeed, the Achilles heel of the defendant's 'all or nothing' approach is its inflexibility:

The new discovery law, designed as it was to be remedial in nature, should not be construed as an inescapable trap for the diligent prosecutor who professionally, assiduously and in good faith attempts to comply with their new and extensive requirements under the discovery statute, but through no fault of his or her own, is unable to comply with every aspect of the automatic discovery rules specified in CPL 245.20.

*People v. Erby*, 68 Misc. 3d 625, 633 (Sup. Ct., Bronx Co. 2020) (emphasis added). The

court in *Erby* expressed credulity that the legislature intended to prohibit the People from filing a certificate of compliance even if just one page out of 50,000 discovery items was outstanding—despite the People's past and ongoing efforts to obtain it and their promise to disclose it as soon as it is received. *Id.* at 629. Recognizing that such a position would create a problem, not rectify one as intended, the court concluded that the plain statutory language controls, but not when doing so runs counter to legislative intent. Yet another court agreed: "The legislature simply needed to state that until and unless the People have every document that exists in a case in their possession, they should not file a certificate of compliance and should not announce readiness for trial. Such a position is not reasonable and clearly not what the legislature intended." *Askin*, 68 Misc. 3d at 378-79.

These principles were deftly applied in *People v. Alvarez*, 2021 WL 1377827, Slip Op. 50292(U), at *9 (Sup. Ct., Queens Co. Mar. 29, 2021). The prosecutor in *Alvarez*, filed a certificate of readiness, but later belatedly disclosed certain police materials. *Id.* Two memobooks were also still outstanding. *Id.* Rather than follow an inflexible disclosure standard, the court noted the People's diligent and continued efforts to obtain the materials—along with their promise to disclose them when they are obtained—and held that "the belated disclosure of these items did not render their certificate of compliance in valid." *Id.* Consistent with the multiple cases described above, the court concluded: "Given that [the certificate] was made in good faith and reasonable under the circumstances . . . the original certificate was proper, pursuant to CPL 245.50(3)." *Id.*

Here, there is every reason to believe that the People exercised diligence and good faith efforts obtain the radio run and police body-worn camera footage. Upon learning that the radio

run was not in the prior ADA's case file, nor was it stored electronically in the District Attorney's case management system, I personally tried to obtain it. By that time, the radio run was no longer available. I reached out to Fire Marshal Meagher to inquire whether he had a copy given he submitted a request for the 911 calls. Fortunately—as I was likewise missing the 911 calls—the Fire Marshal was able to provide me with the 911 calls but he did not have the radio run. Additionally, with respect to the body-worn camera footage and officer memobooks, I served one of the responding officers with a subpoena for those documents and missing footage. I also enlisted the assistance of the Office's Litigation Support Unit in an attempt to track down the missing documents and footage, but to no avail. Thus, the People's certificate of compliance and statement of readiness should not be invalidated. *See People v. Nelson*, 67 Misc. 3d 313, 317 (City Ct., Franklin Co. Feb. 10, 2020) ("delayed disclosure does not, alone, require the striking of a certificate of readiness," which is a "drastic remedy which should be used both sparingly and judiciously"); *People v. Percell*, 67 Misc. 3d 190, 193 (Crim. Ct., N.Y. Co. 2020) ("The continued efforts by the People in this case to comply with their discovery obligations do not render their prior statements of readiness illusory.").

In fact, it is the People's demonstrated due diligence and good faith efforts that distinguishes this case from that of *People v. Adrovic*, 69 Misc. 3d 563 (Crim. Ct. Kings Co. 2020). The prosecution's shortfalls in *Adrovic* were glaring to the court—there was an "unexplained failure" to provide controlled substance lab results, and a lack of due diligence in obtaining memobooks from officers who, based on the suppression hearing record, were known to the People, despite their claim otherwise. 69 Misc. 3d at 569-70. Despite the court's claimed adherence to the wording of CPL § 245.50(1), even the court had to admit a certain degree of

flexibility based on due diligence and good faith, a standard that the prosecution in *Adrovic* simply did not meet: "Honest errors may well be excusable. But here the People have failed to demonstrate any steps they took to exercise the due diligence the statute requires prior to filing a certificate of compliance." *Id.* at 570.

Importantly, the People have turned over all discoverable material that is in the People's physical possession, which puts the defendant in substantively the same position as the People. To hold that the certificate of compliance and statement of readiness must be struck is also at odds with the legislative purpose of Article 245, which is to provide defendants with what they need to make informed decisions, in a fair and expeditious manner, about whether to resolve the charges against them by guilty plea or to proceed to trial. In other words, it is to ensure the defendant has all information known to the People. That purpose is served, not by striking proper certificates of compliance filed after the People have exercised reasonably diligent efforts, but by applying the statute in a commonsense manner and giving defendants material information that is directly relevant to the charges pending against them that the People have in their physical possession.

Nor is a certificate of compliance automatically rendered invalid if discoverable material is later obtained by the People and provided to the defendant. The statute itself makes clear that the appropriate recourse would be a sanction, but only if the defendant suffered prejudice as a result of the belated discovery: "No adverse consequence to the prosecution or the prosecutor shall result from the filing of a certificate of compliance in good faith and reasonable under the circumstances; but the court may grant a remedy or sanction for a discovery violation as provided in section 245.80 of this article." CPL § 245.50(1). If discoverable material is obtained

in this case that has not yet been turned over, the People will turn it over in a timely fashion. And only at that time, if requested by the defense, a sanction may be imposed at the time of trial, upon a showing of prejudice to the defense. CPL § 245.80(1)(a).

Finding the certificate of compliance invalid here would thwart legislative intent and lead to an unreasonable, absurd, and unexpected result. Importantly, it would render CPL §§ 245.20(2), 245.50(3), and 245.80 meaningless and violate the spirit of the statute. In this case, the complaining witness is cooperative and has indicated her willingness and eagerness to testify when the case moves to trial. To hold that the People's certificate of compliance and statement of readiness is invalid is tantamount to a dismissal of the case. Such an interpretation would leave victims defenseless and without recourse for criminal conduct committed against them in cases where the People exercised reasonably diligent efforts to obtain discovery. The legislature' intent is not to dismiss cases where there is a cooperative victim; rather, it was to ensure the defendant has all materials in the physical possession of the People, and in the instances where there are materials related to the subject matter of the case but not in their physical possession, to exercise reasonably diligent efforts to get it. Therefore, the defendant's motion should be denied.

III.  **The defendant does not allege, let alone demonstrate, that any remedy or sanction under CPL § 245.80 may be imposed.**

In CPL § 245.80, the statute provides two scenarios for when the court may impose sanctions, neither of which apply to this case. First, under CPL § 245.80(1), the court may only impose "an appropriate remedy or sanction" for belated discovery "if the party entitled to disclosure shows that it was prejudiced." CPL § 245.80(1). Second, for discovery that has been lost or destroyed, the court may impose "an appropriate remedy or sanction if the party

entitled to disclosure shows that the lost or destroyed material may have contained some information relevant to a contested issue." Thus, the statute requires a specific factual showing by the aggravated party before sanctions may be imposed. A general cry for "sanctions" is insufficient.

Here, the defendant does not even attempt to allege any prejudice warranting remedy or sanction. The defendant has failed to show that he is entitled to sanctions due to the lost and destroyed discovery in this case. CPL § 245.80(2). With respect to the radio run, the contents of those communications are detailed in the 911 calls and Sprint Report, both of which have been in the defense's possession since January 19, 2021. The missing body-worn camera footage is duplicative. The defense has failed to allege any rational basis to believe that the lost or destroyed material may contain some information relevant to a contested issue. Even if it is determined that a sanction should be imposed, it must be limited to that "which is proportionate to the potential ways in which the lost or destroyed material reasonably could have been helpful to the party entitled to disclosure." CPL § 245.80(2). Striking the certificate of compliance and certificate of readiness in this case based only on the missing body-camera footage and radio run would be disproportionate because the body-camera footage that is available covers the entirety of defendant's interactions with the officer, as the body-worn camera footage is from the officers that transported him to the hospital, and the contents of the radio run are not relevant to a contested issue in this case.

IV.     There is no basis to order the defendant's release pursuant to CPL § 180.80 or to modify the securing order pursuant to CPL § 510.20.

In the first instance, CPL § 180.80 applies when a person has been charged by felony complaint in criminal court and is being held in custody pending the disposition of the

felony complaint. *See* CPL § 180.80. On March 6, 2019, when the defendant entered the victims' home and set objects on fire, he was not charged by the NYPD nor by the New York County District Attorney's Office. He was not charged by felony complaint until after his actual arrest on April 9, 2019. Defendant was subsequently arraigned on the felony complaint and evidence was presented to the grand jury, which voted an indictment charging defendant with Burglary in the First Degree, Penal Law § 140.30(3); Arson in the Second Degree, Penal Law § 150.15; Burglary in the Second Degree, Penal Law § 140.25(2); and Reckless Endangerment in the First Degree, Penal Law § 120.25.

Not only is the defendant's understanding of the law wrong, the remedy he seeks is no longer available even if he were correct. Plainly, CPL § 180.80 states that when a defendant is held in custody on a felony complaint, the defendant must be released on his own recognizance if, within either 120 hours or 140 hours, there has been no disposition of the felony complaint or commencement of a hearing thereon. The defendant is no longer being held in custody on a felony complaint. The grand jury heard evidence in this case and voted an indictment, and the securing order is based on the indictment, not the felony complaint.

With respect to defendant's application to modify the securing order and release him on his own recognizance, there has been no change in circumstances to warrant granting such application. Contrary to defense's claim that the current bail was set prior to the criminal just reform laws implemented in January 2020, defendant's current bail was imposed in May 2021 after he was returned after being found fit. The Honorable Erika Edwards heard arguments from both parties regarding the defendant's activities and history,

the current charges the defendant is facing, his criminal conviction record, his sentencing exposure, and the facts of the case. After hearing from Mr. Hupert, the Court imposed the current securing order in the amount of $25,000 cash bail, $25,000 credit card, $50,000 insurance company bond, and $50,000 partially secured surety bond, as that was the least restrictive means to ensure the defendant would return to court. The only changed circumstance the defense raises is that defendant was "arrested and arraigned before the changes in the bail law went into effect." Def. Mot. ¶29. As previously noted, that is incorrect given that new bail conditions were imposed on in May 2021. Importantly, however, is that regardless of when bail was set, the defendant is charged with bail eligible offenses and the changes to the bail laws would have no impact on the Court's ability to set bail or otherwise impose a securing order.

WHEREFORE, defendant's motion and the relief requested therein should be denied in its entirety.

Dated:     New York, New York
           June 14, 2021
                                        Cyrus R. Vance, Jr.
                                        District Attorney
                                        New York County

                              By:       Christopher Rivet
                                        Assistant District Attorney
                                        Of Counsel
                                        (212) 335-3255

(25)

EXHIBIT (6)

added additional contradictions to the felony complaint and grand jury testimony" (*id.*). Finally on this point, defendant claims that "the burglary allegation is highly questionable" (*id.* ¶ 13). Defendant claims that the discovery "rais[es] issues" suggesting that "this matter may well be a glorified misdemeanor trespass" (*id.*).[3]

Defendant claims that the court should strike the People's COC because various items of discovery are missing, including radio runs that were destroyed, additional body camera footage that defendant believes must exist because it is "required by NYPD Operations Order # 54" (*id.* ¶ 19), and because material was redacted "overbroadly" (*id.*). Defendant claims that he is seriously prejudiced by "the People's (and NYPD's) refusal to provide this information" (*id.* ¶ 21); therefore, "dismissal is warranted because all other sanctions are inadequate" (*id.* ¶ 22). In the alternative, defendant requests various sanctions including preclusion of evidence and/or adverse inference instructions to the jury, as well as authorizing "the issuance of a judicial subpoena duces tecum on NYPD for production of the outstanding discovery" (*id.* ¶¶ 23, 24).[4]

Defendant also claims that he must be released from custody for a CPL § 180.80 violation, because he was arrested on March 6, 2019 and "has been in custody for over a month past the 144 hours set forth" in the statute (*id.* ¶ 26). He also argues that changed circumstances warrant his

---

[3]Defendant adds that he "has remained out of trouble and engaged in lawful behavior" since "his initial arrest in March 2019" (*id.*). Of course, defendant has not been in the community since March 6, 2019.

[4]To the extent that defendant seeks a judicial subpoena *duces tecum* to the New York City Police Department for "metadata" for Fire Marshal Maegher and numerous named and unnamed police officers, he has not explained what "metadata" is, why it would be relevant and material to this case, or he believes the New York City Police Department would have metadata for a Fire Marshal. Accordingly, the court will not sign the subpoena attached to defendant's motion at this time.

-5-

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 81
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

*Typo*

(Indictment No. 4477-2018)

-against-

MICHAEL NIEVES,

**JUDICIAL SUBPOENA
DUCES TECUM**

Defendant.

-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, ss.:

TO:   NEW YORK CITY POLICE DEPARTMENT
      One Police Plaza
      New York, New York 10007

WE COMMAND YOU, to appear and attend before the Presiding Justice, <u>Supreme Court, Part 81, 13th floor, at 100 Centre Street, New York, New York  10013</u>, on **April 12, 2021** <u>at 9:30 a.m.</u>, and at any recessed or adjourned date to produce certain documents, reports, etc., now in your custody and power, that we have listed below for the above captioned case:

    a.   True copies of the body camera footage (BWC) pertaining to the incident in UF61 2019-030-000816 on March 6, 2019 at about 8:00 AM at 561 West 141st Street, New York, New York, including but not limited to BWC from: (1) Fire Marshal Philip Maegher #38, (2) PO James Marcinek #20371, (3) PO Rufian Arshad #20210, (4) <u>all other responding officers from the 30th Precinct</u>, and (5) any other responding officers.

    b.   True copies of metadata documentation for the same.

YOUR PERSONAL APPEARANCE IS NOT REQUIRED, if you provide a copy of the requested materials to the Court before **April 12, 2021 at 9:30 a.m.** at the address above.

Failure to comply with this subpoena is punishable as a contempt of Court and will make you liable to the person on whose behalf this subpoena was issued for a penalty not to exceed fifty dollars and all damages sustained due to your failure to comply.

WITNESS, Honorable _____, one of the Justices of said Court, at 100 Centre Street, New York, New York, the ____ day of March, 2021.

SO ORDERED:

_____
Justice, Supreme Court

*/s/ David P. Turchi*
David P. Turchi, Esq.
DAVID P. TURCHI, ESQ., P.C.
Attorney for Defendant
305 Madison Avenue, Ste. 4600
New York, New York  10165
212-324-1707 (o)
646-299-0321 (m)
888-862-2398 (f)
dturchi@turchilaw.com

EXHIBIT (7)

not been able to arrange a video conference with defendant (*id.* pp 4-6, 8-9). Nor did counsel know what the plea offer was (*id.* p 6). No time is charged to the People. CPL § 30.30(4)(b).

### October 13, 2020 to November 9, 2020

On October 13, 2020, defense counsel asked to adjourn the case for at least three weeks to review the discovery and to have a meeting with the People (Exhibit 14 p 5). Defendant asked for a new lawyer, and the court adjourned the case to November 9, 2020 for counsel to review the discovery and consult with defendant, and to assign new counsel if defendant still wanted one (*id.* pp 7, 9,11). Even though the Governor's Executive Orders suspending CPL § 30.30 were lifted on October 19, 2020, no time is charged to the People. CPL § 30.30(4)(b).

### November 9, 2020 to February 9, 2021

On November 9, 2020, Mr. Martir stated that he was still willing to represent defendant despite the difficulties he was having communicating with him and getting him to focus on the issues that counsel believed were "part of the case" (Exhibit 15 p 3). The People conceded that they had not yet filed a COC (*id.* p 5). Defendant then recited a list of issues he believed existed in the case and stated repeatedly that he wanted new counsel. He also made several *pro se* arguments for release (*id.* pp 6-9, 12-13, 13-14, 15, 16, 17, 19). The court declined to relieve Mr. Martir and asked him to stay in contact with defendant and to advise the court "[i]f it becomes eviden[t] that the two of you will not work" (*id.* p 19). The court also denied defendant's request to proceed *pro se*. The court stated that it would "adjourn the case [to February 9, 2021] for control purposes to await the resumption of jury trials" and "to get the case ready for trial." Defense counsel neither asked for this date nor expressly consented to it, but stated that the new date was "fine" (*id.* p 19).

The People filed a COC, automatic discovery form and discovery list on January 19, 2021

-13-

(Def Aff ¶ 4; People's Aff in Response ¶ 13).[13]

The People assert, and defendant does not contest, that

> Between November 9, 2020, and February 9, 2021, defendant filed
> several motions including the following: (i) based on the affidavit of
> service dated November 17, 2020, defendant filed a petition for a writ
> of habeas corpus; (ii) based on the affidavit of service dated
> November 20, 2020, defendant filed a motion for the reassignment of
> counsel; (iii) based on the affidavit of service dated December 10,
> 2020, defendant filed a petition for a writ of habeas corpus; (iv) on
> December 9, 2020, the defendant filed a motion for discovery and
> motion for the recusal of Supreme Court Justice, and December 14,
> 2020, defendant filed anther petition for a writ of habeas corpus, with
> an affidavit of service dated November 17, 2020; and (v) on January
> 5, 2021, defendant filed a petition for a writ of habeas corpus, with an
> affidavit of service dated December 10, 2020.

(Peo's Aff ¶ 16n.)[14]    The People are charged with eight days between November 9, 2020 and

November 17, 2020. The time from November 17, 2020 until February 9, 2021 is excluded. CPL

§ 30.30(4)(a).

### February 9, 2021 to March 29, 2021

On February 9, 2021, the court relieved Mr. Martir and assigned present counsel to represent

defendant (Exhibit 16 pp 6, 7). The People made a record that they had filed a COC on January 19,

2021 (id. p 8). Defense counsel consented to adjourn the case to March 29, 2021 for a control date,

at which time a trial date might be able to be set (id. pp 9-10). Counsel needed to familiarize himself

with the discovery and establish a relationship with defendant (id.). Thereafter, on March 26, 2021,

defense counsel filed the instant motion. No time is charged to the People even though they had not

---

[13]These documents are attached as exhibits to defendant's motion.

[14]The Honorable Steven Statsinger denied the December 14th petition on January 20,
2021, although by then defendant had filed another petition.

EXHIBIT (8)

In support of the motion to strike the People's certificate of compliance ("COC") filed on January 19, 2021, defendant alleges that the People have failed to provide him with body camera footage from four officers (Def Aff ¶ 19).[19]

The People concede that there "*should* be more body-camera footage" (Peo's Response Point 1 p 3 [emphasis in original]) but, as they informed defense counsel, it does not exist (*id.*). On October 13, 2020, the People met with a responding police officer, Police Officer Arshad, and watched his body-camera footage. At that time it became clear that "more officers responded to the scene and interacted with defendant" (*id.*).[20] After that meeting, the People gave Arshad a subpoena for "'[a]ll body-Worn Camera footage for the following Officers, from March 6, 2019, recorded at approximately 8:15 AM through and including 9:00 AM'" (*id.*). Shortly thereafter, Arshad informed the People that the video recordings were destroyed. The People "enlisted the assistance of [their] Office's Litigation Support Unit in an attempt to track down the missing documents and footage, but to no avail" (*id.* Point II p 9).[21]

When the People realized that they did not possess the 911 calls and radio runs and that they were not stored electronically in the District Attorney Office's case management system, the People

---

[19] This court will not address defendant's claims that that the body camera footage that was provided to him was "doctored and/or digitally manipulated and/or contain incomplete and/or cherry picked information" (Def Aff ¶ 20), as defendant makes these claims upon "information and belief" (*id.*) without citing any evidence to support such a belief or warrant such a conclusion.

[20] Arshad's body-camera footage had been previously disclosed to defense counsel (Peo's Aff p 16).

[21] The People appear to concede that they have also been unable to provide some missing "officer memobooks" (Peo's Response Point II p 9; *see also* Exhibit 14, p 3). Defendant does not challenge the People's COC and COR as a result of this apparent failure.

attempted to obtain those materials. By then the radio run had been destroyed, but the People were

able to obtain the 911 calls from Fire Marshal Meagher (Peo's Response Point II p 9; *see also*

Exhibit 14, p 3).

CPL § 245.50(1) provides, in relevant part, that

> When the prosecution has provided the discovery required by
> subdivision one of section 245.20 of this article, except for discovery
> that is lost or destroyed as provided by paragraph (b) of subdivision
> one of section 245.80 of this article . . . it shall serve upon the
> defendant and file with the court a certificate of compliance.

Similarly, CPL § 245.50(3) provides, in relevant part, that

> Notwithstanding the provisions of any other law, absent an
> individualized finding of special circumstances in the instant case by
> the court before which the charge is pending, the prosecution shall not
> be deemed ready for trial for purposes of section 30.30 of this chapter
> until it has filed a proper certificate pursuant to subdivision one of
> this section. A court may deem the prosecution ready for trial
> pursuant to section 30.30 of this chapter where information that might
> be considered discoverable under this article cannot be disclosed
> because it has been lost, destroyed, or otherwise unavailable as
> provided by paragraph (b) of subdivision one of section 245.80 of this
> article, despite diligent and good faith efforts, reasonable under the
> circumstances. Provided, however, that the court may grant a remedy
> or sanction for a discovery violation as provided by section 245.80 of
> this article.

Thus, the statute specifically provides that the People may file a valid COC and COR even though

discoverable material has been lost or destroyed, if they establish that they have made diligent good

faith efforts to obtain the material that are reasonable under the circumstances.

The court finds that the People have made that showing. The ADA now handling the case

affirms that the case was transferred to him in March 2020; he candidly concedes that failure of the

ADA who had the case before him to obtain the Sprint report and additional body-worn camera

EXHIBIT (9)

"'extraordinary remedy'" (*People v. Kaous*, 126 AD3d 440, 441 [1st Dept 2015] [citation omitted], *lv denied*, 27 NY3d 1000 [2016]) that "'should be exercised sparingly and only in those rare cases where there is a compelling factor which clearly demonstrates that prosecution of the indictment would be an injustice' (citations omitted)," *People v. Bookard*, 169 AD3d 816, 817 (2d Dept), *lv denied*, 33 NY3d 1029 (2019); *People v. Candelaria*, 50 AD3d 913, 913 (4th Dept), *lv denied*, 11 NY3d 735 (2008). *See also People v. Gazzillo*, 177 AD3d 1406, 1407 (4th Dept 2019); *People v. Pittman*, *supra* at 226. Importantly, a motion to dismiss in the interest of justice is not intended to be a substitute for trial. *People v. Prunty*, 101 Misc 2d 163, 168 (Crim Ct Queens County 1979); *see also People v. McConnell*, 11 Misc 3d 57, 61-62 (App Term 2d Dept 2006) (although defendant had legitimate defense which weakened the People's case, defense merely raised an issue of fact for trial and did not warrant dismissal in the interest of justice).[17]

First, this court rejects defendant's claim that his offense was not serious because no one was injured and the fire was out by the time the police arrived. Burglary in the First Degree and Arson in the Second Degree are obviously serious crimes: they are both Class B violent felonies. Moreover, based upon the court's review of body-worn camera footage from two different cameras that defendant provided to the court on June 30, 2021, the fire was not out when the police arrived. As seen and heard on the body-worn camera footage, a smoke alarm was going off as the police struggled to enter the bathroom where defendant was trying to barricade himself, and the bathroom itself was full of smoke. Officers can be heard repeating, "Open the windows," something was clearly in flames on the bathroom floor, a wall in the bathroom appears to have been scorched, and

---

[17]Although these two cases were decided under CPL § 170.40, the statutory factors for dismissing misdemeanor informations are the same as those for dismissing indictments.

someone can be heard calling for a bucket of water. It is only at approximately four minutes and 54 seconds into the videos that someone is heard saying "The fire is out," although the smoky conditions obviously continued for several more minutes.[18] Setting a fire inside a stranger's home is undoubtedly a serious crime even if defendant intended to kill only himself and not others, and to suggest that "this matter may well be a glorified misdemeanor trespass" (Turchi Aff ¶ 13) ignores the evidence. The fact that the police took defendant to a hospital rather than to a police precinct hardly means that the police "did not deem the matter serious," and in any event the decision to prosecute a case is left to the District Attorney, not the police.

Defendant's claim of police misconduct is speculative. In any event, if some responding officers failed to turn on their body-worn cameras in violation of NYPD policy, an appropriate sanction may be fashioned by the trial court – which indeed is another form of relief that defendant seeks in this motion. The fact that a radio run was destroyed is also a matter for discovery sanctions, not dismissal of the indictment in the interests of justice. This is especially so, where the People have provided defendant with two 911 calls.

Finally, the truthfulness of the complainant's allegations must be decided by a jury. A motion to dismiss in the interests of justice is not a substitute for trial.

Because defendant has not demonstrated the existence of any compelling factor or circumstance that would justify dismissing this indictment, *People v. Bookard, supra*, this branch of his motion is denied.

C. The Court Will Not Strike the Certificate of Compliance or Certificate of Readiness

_____

[18]On one of the videos at approximately 11 minutes 32 seconds someone can still be heard coughing in the apartment.

-18-

EXHIBIT (10)

DAVID P. TURCHI*

*ALSO ADMITTED IN
SOUTHERN & EASTERN
DISTRICTS OF NEW YORK

# **DAVID P. TURCHI, ESQ., P.C.**

*Attorney-at-Law*
305 Madison Avenue, Ste. 4600
New York, New York 10165
212-324-1707 (o)
646-299-0321 (c)
888-862-2398 (f)
*E-Mail: dturchi@turchilaw.com*

June 30, 2021

The Honorable Miriam Best
New York Supreme Court – Criminal Term
Part 85
Care of Supreme Court – Criminal Term Clerk
111 Centre Street
10th Floor
New York, NY 10013

> **Re: People v. Michael Nieves**
> **Indictment Number: 01241/2019**

Dear Judge Best,

In furtherance of the pending motion to dismiss and/or release, please find attached a DVD containing the body cam footage from this matter, the metadata and a diagram of the crime scene. My client has asked that I submit the same and he respectfully urges that the diagram depicts a hallway at the crime scene, which contradicts the actual body camera footage, thereby demonstrating a potential for alteration of the body camera footage, thereby undermining the People's evidence.

A duplicate copy of this letter and the DVD is being provided to ADA Rivet. Thank you.

Very truly yours,

*/s/ David P. Turchi*

David P. Turchi

DT/
Enclosure

EXHIBIT (11)

attempted to obtain those materials. By then the radio run had been destroyed, but the People were

able to obtain the 911 calls from Fire Marshal Meagher (Peo's Response Point II p 9; *see also*

Exhibit 14, p 3).

CPL § 245.50(1) provides, in relevant part, that

> When the prosecution has provided the discovery required by
> subdivision one of section 245.20 of this article, except for discovery
> that is lost or destroyed as provided by paragraph (b) of subdivision
> one of section 245.80 of this article . . . it shall serve upon the
> defendant and file with the court a certificate of compliance.

Similarly, CPL § 245.50(3) provides, in relevant part, that

> Notwithstanding the provisions of any other law, absent an
> individualized finding of special circumstances in the instant case by
> the court before which the charge is pending, the prosecution shall not
> be deemed ready for trial for purposes of section 30.30 of this chapter
> until it has filed a proper certificate pursuant to subdivision one of
> this section. A court may deem the prosecution ready for trial
> pursuant to section 30.30 of this chapter where information that might
> be considered discoverable under this article cannot be disclosed
> because it has been lost, destroyed, or otherwise unavailable as
> provided by paragraph (b) of subdivision one of section 245.80 of this
> article, despite diligent and good faith efforts, reasonable under the
> circumstances. Provided, however, that the court may grant a remedy
> or sanction for a discovery violation as provided by section 245.80 of
> this article.

Thus, the statute specifically provides that the People may file a valid COC and COR even though

discoverable material has been lost or destroyed, if they establish that they have made diligent good

faith efforts to obtain the material that are reasonable under the circumstances.

The court finds that the People have made that showing. The ADA now handling the case

affirms that the case was transferred to him in March 2020; he candidly concedes that failure of the

ADA who had the case before him to obtain the Sprint report and additional body-worn camera

footage has resulted in those materials being destroyed.

-20-

EXHIBIT (12)

footage has resulted in those materials being destroyed. This ADA then pursued other avenues to comply with the People's discovery obligations and found and provided defendant with the 911 calls. The People thereafter filed the COC on January 19, 2021. Accordingly, the court will not invalidate the People's COC and COR.[22] *People v. Lewis*, 2021 WL 2307294 (Crim Ct, Kings County 2021) (denying motion to invalidate People's COC filed before they obtained the scratch 61 and memobook; People made diligent efforts to obtain the material by making multiple requests for said items but precinct could not locate the materials and officer was on indefinite medical leave); *People v. Cano*, 71 Misc 3d 728 (Sup Ct, Queens County 2020) (where People gave detailed explanation of their efforts to locate discoverable material and their determination that materials did not exist, People fulfilled their discovery obligations; their inability to provide draft complaint did not vitiate COC).

Finally, to the extent that defendant challenges the People's redactions in some materials as "overbroad," he has failed to identify any particular redaction for this court to evaluate. In any event, the People assert, and defendant does not contest, that the People redacted only "information that relates to the identity of the 911 caller(s), and notified the defendant in writing that such information had not been disclosed" as permitted by CPL § 245.20(1)(c) (Peo's Aff p 17). If the People have made overbroad redactions in the material they have disclosed, the proper remedy would be to order further disclosure, not to dismiss any of the charges in the indictment or to give the jury an adverse

---

[22]When defendant filed his original motion dated March 26, 2021, the People had filed only one COC. Although defendant filed a reply dated June 23, 2021, he did not add any challenge to the COC or COR dated May 17, 2021, nor will the court invalidate either of those filings.

inference charge. Accordingly, this branch of defendant's motion is denied.[23]

D.     Alleged Discovery Violations Do Not Warrant Dismissal at this Time

Defendant argues that dismissal is "warranted because all other sanctions are inadequate" (Def Aff ¶ 22). The People oppose. As to the radio run, they argue that "the contents of those communications are detailed in the 911 calls and Sprint Report, both of which have been in the defense's possession since January 19, 2021" (Peo's Aff p 25). As to the destroyed body-worn camera footage, the People argue that it is duplicative (*id.*)

CPL § 245.80 provides remedies and sanctions when material or information subject to disclosure is disclosed belatedly, is missing, or has been destroyed. If the discovery is disclosed belatedly, then the party entitled to disclosure must show prejudice before a remedy or sanction is imposed, CPL § 245.80(1)(a). If the discovery cannot be disclosed because it has been lost or destroyed, then

> the court shall impose an appropriate remedy or sanction if the party entitled to disclosure shows that the lost or destroyed material may have contained some information relevant to a contested issue. The appropriate remedy or sanction is that which is proportionate to the potential ways in which the lost or destroyed material reasonably could have been helpful to the party entitled to disclosure.

CPL § 245.80(1)(b). Under CPL § 245.80(2), the court may address a discovery violation by, *inter alia*, ordering further discovery, instructing the jury that it may draw an adverse inference regarding the non-compliance, precluding or striking all or part of a witness's testimony, ordering the dismissal of all or some of the charges, or making such other order as the court deems just under the circumstances.

---

[23]Should defendant seek to challenge specific redactions, this court will order a discovery conference upon his request.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CRIMINAL TERM PART 85
-----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK          :
                                             :
        -against-                            :       DECISION AND ORDER
                                             :
MICHAEL NIEVES,                              :       Indictment No. 1241-2019
                                             :
                    Defendant.               :
-----------------------------------------------------------------X

MIRIAM R. BEST, A.S.C.J.

Defendant moves to dismiss the indictment on numerous grounds: for a speedy trial violation under CPL § 30.30(1); in the interests of justice; and for failure to turn over discovery. Defendant also moves the court to strike the People's first certificate of compliance ("COC") and their certificate of readiness ("COR"), because the People have disclosed that some discoverable items have been destroyed or do not exist, and therefore have not provided those items to him. Finally, defendant moves for his release on recognizance on numerous grounds: for a speedy trial violation under CPL § 30.30(2)(a); for a violation of CPL § 180.80; and because of changed circumstances, specifically, the enactment of a new bail statute which was not the law at the time bail was set here, and whose provisions require the court to set the least restrictive form of bail.

For the reasons that follow, the motion is denied. There is no need for oral argument or for a hearing.

## Background

In a Criminal Court complaint filed on April 9, 2019, Fire Marshal Philip Meagher alleged that Informant 1 told him that on March 6, 2019, at approximately 8:12 am, at 561 West 141st Street in New York County, defendant entered Informant 1's bedroom, locked himself inside the bedroom

-1-

and moved a dresser in front of the door so that Informant 1 could not leave.  While inside the bedroom, Informant 1 saw defendant lighting a lighter in a way that caused her to fear for her safety. Informant 1 struggled with defendant in order to move the dresser away from the door, which she was able to do.  Defendant went into the bathroom, and Informant 1 then began to see smoke coming out of the bathroom.  Fire Marshal Meagher also alleged that when Police Officer James Marcinek arrived at the location, he saw defendant in the bathroom and the shower curtain, rug and towels were on fire.  Fire Marshal Meagher himself saw damage to the wall inside the bathroom, the toilet and the floor.

According to the People, fire fighters and police officers were called to the apartment and

> [t]he victims told the police that defendant was locked in their bathroom and that he had started a fire.  Officers were able to force open the bathroom door, where they observed heavy smoke and fire. [Defendant] was physically removed from the bathroom and was restrained. . . . The officers believed defendant was an emotionally disturbed person, and as a result, he was take[n] to Harlem Hospital where he was treated for burns to his hands and was admitted for psychological examination.

> . . . Marshal Meagher began his investigation on March 6, 2019 . . . . After speaking with the victims, taking their statements, and assessing the fire damage, [he] found sufficient evidence to believe that a crime had occurred.  He subsequently filled out a complaint report with defendant as the suspect.  On March 7, 2019, Marshal Meagher activated a probable cause I-card for defendant's arrest.

(Peo's Aff in Response ¶¶ 7, 8.)  Defendant, by contrast, claims that he was arrested on March 6, 2019 "ostensibly pursuant to the Mental Hygiene Law," and thereafter held involuntarily at Harlem Hospital for approximately one month (Turchi Aff ¶ 4).  He alleges that when he was released "he was immediately seized again for the same incident . . . charged . . . and has been deprived of his

liberty ever since" (*id.*). According to the People, on April 8, 2019 defendant "was released from Harlem Hospital and returned to his outpatient facility" and was arrested by Marshal Meagher that day (Peo's Aff in Response ¶¶ 9, 10).

Defendant was arraigned in night court on April 9, 2019, bail was set and the case was adjourned to Part F for April 12th for grand jury action.[1]  On April 12th, the People filed a certificate of grand jury action and the case was adjourned to April 24th for Supreme Court arraignment.[2]  The indictment, charging defendant with Burglary in the First and Second Degrees, Arson in the Second Degree, Reckless Endangerment in the First Degree and Unlawful Imprisonment in the First Degree, was filed on April 18, 2019.

This case has been adjourned many times for many reasons, including the need to assign defendant new counsel and the need to assign a new judge.  Because the reasons for these adjournments are relevant to this court's decision on defendant's speedy trial motions, the proceedings that took place on the various dates when the case was called are summarized below, pp 8-15.

<div align="center">The Parties' Contentions</div>

A.    Defendant's Contentions

---

[1]The Criminal Court paperwork indicates that defendant was arrested at 06:50, or 6:50 am, on April 9, 2019, which was a Tuesday (*see* Exhibit 1).  Accordingly, the People had until the close of business on Friday, April 12th to secure an indictment or defendant would have been entitled to release under CPL § 180.80.

[2]On April 12, 2019, this case was called during the day in Part F and defendant was not present.  The court set alternative dates and adjourn parts (April 24th in Part 81 in the event defendant were indicted, or May 8th in Part F for grand jury action otherwise) and then adjourned the case forthwith to night court (*see* Exhibits 2, 3).  On April 12th in AR3 the People filed a certificate of affirmative grand jury action (Exhibit 4) and the matter was adjourned to April 24 in Part 81 for Supreme Court arraignment (Exhibits 2, 5).

Defendant contends that he is entitled to release pursuant to CPL §§ 30.30(1)(a) and (2)(a). He claims that "the People have failed to bring [him] to trial within the required six months since his arraignment on or about April 9, 2019, let alone 90 days required for his release" (Turchi Aff § 6). He claims further that the People "have failed to declare readiness within the requisite time, . . . have also failed to validly certify the matter is ready for trial . . . and as such, [their] prior statements of readiness were illusory" (*id.* § 8).

Defendant argues next that the case should be dismissed in the interest of justice, pursuant to CPL § 210.40. He claims that "while the offense appears serious on paper, there is no question that this was in any way truly serious" (*id.* § 10). According to defendant, the discovery he has received shows that no one was injured; there was no active fire when the police arrived; and the responding police officers "did not deem the matter serious because they transported the Defendant to Harlem Hospital for mental health treatment rather than process him through the criminal justice system right away, something suggesting that they did not perceive the Defendant as having committed a dangerous crime" (*id.*). He claims further that the complainant has given "at least three different versions of the 'facts'" (*id.* § 11). Far from suggesting that defendant entered or remained in the apartment with the intent to commit a crime "or to intentionally threaten or hurt anyone or steal anything," the People's evidence "arguably suggests suicidal ideation," which, if true, "would . . . be a far cry from 'entry with intent to commit a crime therein'" (*id.*). Defendant also claims police misconduct, since "it is clear there were over six police officers on the scene," yet only two sets of body camera footage have been provided, and the radio run has been destroyed (*id.* ¶ 12). This in particular has prejudiced defendant because, he claims, "it would in fact corroborate whether 'the complainant' did not wish to press charges, which, upon information and belief, would have

-4-

added additional contradictions to the felony complaint and grand jury testimony" (*id.*). Finally on this point, defendant claims that "the burglary allegation is highly questionable" (*id.* ¶ 13). Defendant claims that the discovery "rais[es] issues" suggesting that "this matter may well be a glorified misdemeanor trespass" (*id.*).[3]

Defendant claims that the court should strike the People's COC because various items of discovery are missing, including radio runs that were destroyed, additional body camera footage that defendant believes must exist because it is "required by NYPD Operations Order # 54" (*id.* ¶ 19), and because material was redacted "overbroadly" (*id.*). Defendant claims that he is seriously prejudiced by "the People's (and NYPD's) refusal to provide this information" (*id.* ¶ 21); therefore, "dismissal is warranted because all other sanctions are inadequate" (*id.* ¶ 22). In the alternative, defendant requests various sanctions including preclusion of evidence and/or adverse inference instructions to the jury, as well as authorizing "the issuance of a judicial subpoena duces tecum on NYPD for production of the outstanding discovery" (*id.* ¶¶ 23, 24).[4]

Defendant also claims that he must be released from custody for a CPL § 180.80 violation, because he was arrested on March 6, 2019 and "has been in custody for over a month past the 144 hours set forth" in the statute (*id.* ¶ 26). He also argues that changed circumstances warrant his

_____

[3]Defendant adds that he "has remained out of trouble and engaged in lawful behavior" since "his initial arrest in March 2019" (*id.*). Of course, defendant has not been in the community since March 6, 2019.

[4]To the extent that defendant seeks a judicial subpoena *duces tecum* to the New York City Police Department for "metadata" for Fire Marshal Maegher and numerous named and unnamed police officers, he has not explained what "metadata" is, why it would be relevant and material to this case, or he believes the New York City Police Department would have metadata for a Fire Marshal. Accordingly, the court will not sign the subpoena attached to defendant's motion at this time.

-5-

release, specifically, the revision to the bail laws that became effective after his arrest (*id.* ¶ 29).  He claims he should be released on his own recognizance because he has had no warrants for almost 20 years, "the two older warrants were cleared up within a reasonable time," and his current bail status "is unduly restrictive of his ability to post any bail" (*id.*).[5]

B.    The People's Response

The People oppose the motion in all respects.  They argue first that only 14 days of speedy trial time are chargeable to them.  Therefore, defendant's motion to dismiss the indictment under CPL § 30.30(1) and his motion for release under CPL § 30.30(2) should be denied.

The People oppose the motion to dismiss in the interests of justice because it is based on "blatant misrepresentations of the truth" (Peo's Response ¶ 21) and because defendant's conviction would not result in injustice.

The People argue next that there is no basis to deem either the COC or the COR invalid.  With respect to information regarding the 911 caller(s), CPL § 245.20(1) permits the People to withhold their names, adequate contact information and identifying information until 15 days before trial.  The People concede that the missing radio run and body-worn camera footage should exist, but it was destroyed before the case was assigned to the prosecutor now handling the case.  The current prosecutor has made diligent efforts to find the body-worn camera footage, as he has advised defense counsel.  In any event, the contents of the radio run are detailed in the 911 calls and Sprint

---

[5]On July 23, 2021, defense counsel served the court and the People by email with a *pro se* memorandum of law "in support of the pending defense motion."  Counsel also requested oral argument on the motion.  Counsel did not expressly adopt the arguments in the *pro se* submission, and this court is not required to consider it, *People v. Rodriguez*, 95 NY2d 497 (2000).  Nevertheless, in the exercise of its discretion the court has reviewed the filing.  It does not change the result on this motion.  The court does not require and will not entertain oral argument.

report that were provided to counsel in January 2021, and the missing body-worn camera footage is duplicative (*id.* Point I p 3; Point II pp 8-9; Point III pp 11-12).[6] The People argue that "[t]he crux of defendant's argument is that short of obtaining and disclosing every known discoverable item that exists, the People may never file a valid certificate of compliance," an argument that "most courts have found . . . unavailing" (*id.* Point II p 5). Moreover, "the People have turned over all discoverable material that is in [their] physical possession, which puts the defendant in substantively the same position as the People" (*id.* Point II p 10). The only appropriate remedy under the statute would be a sanction, if defendant could demonstrate prejudice, but he has neither alleged nor demonstrated any prejudice. Finally, even if a sanction were appropriate, striking the COC and COR would be disproportionate, *see* CPL § 245.80(2).

Regarding defendant's CPL § 180.80 claim, the People argue that defendant misunderstands the law and that no remedy under that section would still be available to him even if he were correct, because he is no longer being held on a felony complaint. Nor is there any basis to release defendant on his own recognizance. There has been no change in circumstances, and, contrary to his claim, the current bail was set in May 2020, after he was returned fit and after the new bail law came into effect.

## Analysis

### A.    There Has Been No Speedy Trial Violation

---

[6] The People numbered the paragraphs in their response only through ¶ 21, which is contained in a section entitled "The People's Response to the Defendant's Motion to Dismiss in the Interest of Justice." Then they began a new section entitled "The People's Response to Defendant's Remaining Grounds for Relief," in which neither paragraphs nor pages are numbered. In order to simplify my citations to their filing, I have assigned page numbers, beginning with 1, to this final section of the People's response.

Defendant moves both to dismiss the indictment for a speedy trial violation under CPL § 30.30(1)(a) and to be released from custody under CPL § 30.30(2)(a). Subdivision (1)(a) of the statute requires that where a defendant is charged with a felony, the People must announce their readiness for trial within six months of the commencement of the criminal action, absent excludable time. Subdivision (2)(a) requires that a defendant who is charged with a felony must be released on bail or recognizance if the People are not ready for trial within 90 days from the commencement of his commitment to custody, again absent excludable time. Under both of these subdivisions, excludable time periods include, *inter alia*, delays resulting from proceedings to determine the defendant's competence to stand trial and periods during which the defendant is incompetent to stand trial; pre-trial motion practice; adjournments granted at the request of or with the consent of defendant or defense counsel; and delays caused by extraordinary circumstances. CPL § 30.30(4). For the reasons that follow, defendant is not entitled to dismissal or release for a speedy trial violation.

April 9 to April 12, 2019

Defendant was arraigned in night court on a criminal court complaint on April 9, 2019. The case was adjourned to Part F on April 12, 2019 for grand jury action.[7] The People are charged with three days.

April 12 to April 24, 2019

The People served a certificate of grand jury action on April 12 and the case was adjourned to Part 81 for April 24 for Supreme Court arraignment. The People concede that they are charged

---

[7]This information is clear from Exhibit 1. The People's claim that the felony complaint was filed on April 10, 2019 (Peo's Aff in Response ¶ 16a) is incorrect.

with 12 days.

### April 24 to June 19, 2019

On April 24, 2019, defendant entered a not guilty plea and the court set a motion schedule. The case was adjourned to June 19, 2019 for decision. No time is charged to the People. CPL § 30.30(4)(a).

### June 19 to August 7, 2019

On June 19, 2019, the court issued a decision on defendant's omnibus motion, denying the motion to dismiss or reduce and ordering a *Huntley/Dunaway* hearing. The People assert, and the court's notes confirm, that the case was adjourned at defense counsel's request to August 14 for control (Peo's Aff in Opp ¶ 16d).[8] The People assert, and the court's notes confirm, that the case was then advanced on July 1 so that the Legal Aid Society could be relieved and new counsel could be assigned. Daniel Hupert was assigned on July 1st.[9] The People assert, the court's notes confirm, and defendant does not contest, that Mr. Hupert asked to adjourn the case to August 7 for control purposes (*id* ¶ 16e). No time is charged to the People. CPL § 30.30(4)(b).

### August 7, 2019 to May 12, 2020

On August 7, 2019, defendant appeared with Mr. Hupert. Counsel moved to be relieved because defendant had informed him that he intended to file both a disciplinary complaint and a

---

[8]The People attempted to obtain the minutes of June 19, 2019. However, the court reporter, Elizabeth Chan, is retired. While the Supreme Court Court Reporters' Office ordered the raw stenographic notes, this case was not found in the body of the notes (*see* Exhibit 7). Defendant does not contest the People's assertions regarding the events of June 19, 2019 and July 1, 2019.

[9]While the court has not been provided with the minutes of July 1, 2019, Mr. Hupert's notice of appearance is in the court's file and is dated July 1, 2019.

-9-

lawsuit against him (Exhibit 8, p 2). Then defendant addressed the court. Defendant stated that he

had submitted a *pro se* motion to dismiss the indictment "in the furtherance of justice" and asked Mr.

Hupert to move for his release on recognizance (*id.* p 3). Defendant also stated that he

> was in the hospital for thirty days under emotional[ly] disturbed
> person case laws. I was not a prisoner there. From my hospital
> records I was there under Mental Hygiene Law 9.27 and 9.37, that
> under New York State Civil Law Article 3(23) that I was indeed –
> Article 3(23) privilege from arrest, I was submitted to a civil
> proceeding by the police under . . . emotional[ly] disturbed person
> laws. I was given an ALT under the Act Team, Visiting Nurse
> Service, the Act Team, Assertive Community Treatment. I was
> released to the community, that I was arrested without probable cause
> under an I-card. That collateral stop or arrest judicata [*sic*] in effect
> stops my case from being relitigated since it was already submitted to
> a civil proceeding.

(*Id.* p 3.) Justice Curtis Farber declined to relieve counsel at that time and ordered defendant to be

examined pursuant to CPL Article 730 because of the court's "true concerns about [defendant's]

fitness to proceed at this point in time" (*id.* p 4).[10]

Defendant was not returned as fit until May 12, 2020 (*see* Exhibit 11), by which time CPL

§ 30.30 had been suspended by the Governor's Executive Order because of the COVID-19 virus

pandemic. Although the People did not file a COC until January 19, 2021, for the reasons that

follow, no time is charged to them for the time between August 7, 2019 and May 12, 2020.

As the court explained in *People v. Jaquez*, 71 Misc 3d 1110, 1117 (Sup Ct, New York

County April 14, 2021),

> After January 1, 2020, the People could not be ready, and
> could not be found to be ready (*see* CPL 30.30[5] [whenever a

---

[10]After the court ordered the 730 exam, defendant also stated that he intended to sue the
court for "acting outside of its jurisdiction in its official capacity. . . . [and] violating
[defendant's] constitutional rights" (Exhibit 8 p 4).

-10-

> prosecutor provides notice that the People are ready for trial, the court
> must make inquiry on the record as to their actual readiness]), until
> they filed a certificate of compliance with discovery. Any previous
> statement of readiness, while not invalid under the old law, could not
> be held valid under the new (*see* CPL 245.50[3] [prosecution "shall
> not be deemed ready for trial" until it has filed a proper certificate of
> compliance]). In this sense, the case reverted to a prereadiness state
> as of January 1 . . . . Thus, the People were obligated to answer ready
> – and only became able validly to do so do – once a certificate of
> compliance was filed. In failing to file a certificate of readiness, the
> People failed to stop the clock (citation omitted).

Nevertheless, as the court explained in *People v. Erby*, 68 Misc 3d 625, 633 (Sup Ct Bronx County

2020) (Hornstein, J.),

> While the introduction of CPL article 245 constituted a sweeping and
> systematic change to the discovery law, . . . . CPL 30.30[4] still lists
> circumstances under which an adjournment is excludable and there
> is no basis upon which to conclude that CPL article 245 nullified the
> vast body of speedy trial case law in New York. . . . Moreover, even
> if it were conceded that the People were in a 'pre-readiness' posture,
> the CPL 30.30[4] exclusions would still apply [*see People v. Cortes*,
> 80 NY2d 201 [1992]).

*See also People v. Otero*, 70 Misc 3d 526, 531 (City Ct, City of Albany 2020) ("prosecutors who do

not comply with discovery can still find refuge in the CPL 30.30(4)(d) exclusions"); *People v. Cada*,

69 Misc 3d 882, 886 (Crim Ct, City of New York 2020) (Kirschner, J.) ("under CPL 30.30(4) -

before and after January 1 [2020]- any valid exclusion would have the effect of tolling the speedy

trial clock for the entire length of the adjournment period").

Accordingly, because time is excludable when the defendant is not fit to stand trial, CPL §

30.30(4)(a), no time is charged to the People for this time period.

May 12, 2020 to July 23, 2020

On May 12, 2020, defendant told the court that he wanted Mr. Hupert to remain his lawyer

-11-

"as long as he represents me to the fullest of the law to try to have me released on [my] own recognizance to work with the evidence that proves that I have not committed the charges that I have been arrested for" (Exhibit 11 pp 7-8). Counsel made a bail application,[11] the court added credit card and partially secured surety bond options and then adjourned the case to June 8 to allow counsel time to consult with defendant about whether to confirm or contest the finding of fitness and for any further bail application (*id.* pp 3-4, 8-10). According to the court file, the case was administratively adjourned from June 8 to July 20, and then from July 20 to August 31, but at some point was advanced to July 23, 2020. Because the Governor's Executive Orders suspending CPL § 30.30 remained in effect, no time is charged. CPL § 30.30(4)(b).

### July 23, 2020 to August 25, 2020

On July 23, the case was called in Tap A and the court granted Mr. Hupert's application to be relieved. Mr. Martir was assigned as counsel. ADA Christopher Rivet made his first appearance in the case. Defense counsel consented to adjourn the case to August 31, 2020 (Exhibit 12 pp 3-4).[12] However, the case was advanced and called on August 25, 2020. Because the Governor's Executive Orders suspending CPL § 30.30 remained in effect, and because defendant consented to this adjournment, no time is charged to the People. CPL § 30.30(4)(b).

### August 25, 2020 to October 13, 2020

On August 25, 2020, Mr. Martir consented to adjourn the case to October 13, 2020 "for control" (Exhibit 13 p 6). He had not received the discovery from prior counsel (*id.* pp 3-4) and had

---

[11]Defendant had been remanded for the CPL § 730 exam.

[12]Although the transcript says that Mr. Martir was "excusing time" to familiarize himself with the case (Exhibit 12 p 4), I infer that what Mr. Martir agreed to do was exclude the time.

-12-

not been able to arrange a video conference with defendant (*id.* pp 4-6, 8-9). Nor did counsel know what the plea offer was (*id.* p 6). No time is charged to the People. CPL § 30.30(4)(b).

### October 13, 2020 to November 9, 2020

On October 13, 2020, defense counsel asked to adjourn the case for at least three weeks to review the discovery and to have a meeting with the People (Exhibit 14 p 5). Defendant asked for a new lawyer, and the court adjourned the case to November 9, 2020 for counsel to review the discovery and consult with defendant, and to assign new counsel if defendant still wanted one (*id.* pp 7, 9,11). Even though the Governor's Executive Orders suspending CPL § 30.30 were lifted on October 19, 2020, no time is charged to the People. CPL § 30.30(4)(b).

### November 9, 2020 to February 9, 2021

On November 9, 2020, Mr. Martir stated that he was still willing to represent defendant despite the difficulties he was having communicating with him and getting him to focus on the issues that counsel believed were "part of the case" (Exhibit 15 p 3). The People conceded that they had not yet filed a COC (*id.* p 5). Defendant then recited a list of issues he believed existed in the case and stated repeatedly that he wanted new counsel. He also made several *pro se* arguments for release (*id.* pp 6-9, 12-13, 13-14, 15, 16, 17, 19). The court declined to relieve Mr. Martir and asked him to stay in contact with defendant and to advise the court "[i]f it becomes eviden[t] that the two of you will not work" (*id.* p 19). The court also denied defendant's request to proceed *pro se*. The court stated that it would "adjourn the case [to February 9, 2021] for control purposes to await the resumption of jury trials" and "to get the case ready for trial." Defense counsel neither asked for this date nor expressly consented to it, but stated that the new date was "fine" (*id.* p 19).

The People filed a COC, automatic discovery form and discovery list on January 19, 2021

(Def Aff ¶ 4; People's Aff in Response ¶ 13).[13]

The People assert, and defendant does not contest, that

> Between November 9, 2020, and February 9, 2021, defendant filed
> several motions including the following: (i) based on the affidavit of
> service dated November 17, 2020, defendant filed a petition for a writ
> of habeas corpus; (ii) based on the affidavit of service dated
> November 20, 2020, defendant filed a motion for the reassignment of
> counsel; (iii) based on the affidavit of service dated December 10,
> 2020, defendant filed a petition for a writ of habeas corpus; (iv) on
> December 9, 2020, the defendant filed a motion for discovery and
> motion for the recusal of Supreme Court Justice, and December 14,
> 2020, defendant filed anther petition for a writ of habeas corpus, with
> an affidavit of service dated November 17, 2020; and (v) on January
> 5, 2021, defendant filed a petition for a writ of habeas corpus, with an
> affidavit of service dated December 10, 2020.

(Pco's Aff ¶ 16n.)[14]  The People are charged with eight days between November 9, 2020 and

November 17, 2020. The time from November 17, 2020 until February 9, 2021 is excluded. CPL

§ 30.30(4)(a).

### February 9, 2021 to March 29, 2021

On February 9, 2021, the court relieved Mr. Martir and assigned present counsel to represent

defendant (Exhibit 16 pp 6, 7). The People made a record that they had filed a COC on January 19,

2021 (*id.* p 8). Defense counsel consented to adjourn the case to March 29, 2021 for a control date,

at which time a trial date might be able to be set (*id.* pp 9-10). Counsel needed to familiarize himself

with the discovery and establish a relationship with defendant (*id.*). Thereafter, on March 26, 2021,

defense counsel filed the instant motion. No time is charged to the People even though they had not

[13]These documents are attached as exhibits to defendant's motion.

[14]The Honorable Steven Statsinger denied the December 14th petition on January 20,
2021, although by then defendant had filed another petition.

-14-

yet filed a COR. CPL § 30.30(4)(a).

### March 29, 2021 to April 16, 2021

On March 29, 2021, Justice Curtis Farber recused himself from this case, explaining in a written form that defendant had sued him (Exhibit 17 pp 3, 5).[15] The case was adjourned to April 16, 2021 for the case to be reassigned to a different judge. No time is charged to the People for this time period. CPL §§ 30.30(4)(a), (4)(g).

### April 16, 2021 to Date

On April 16, 2021, the People filed and served a Certificate of Readiness ("COR"). The prosecutor asked for May $7^{th}$ to respond to counsel's motion and had not yet received defendant's *habeas* petition (Exhibit 18 pp 3-4). This court denied counsel's application to release defendant and adjourned the case to May $14^{th}$ for decision (*id.* pp 6-8).

On May 6, 2021, the People requested until May 17, 2021 to file their response to this motion and to defendant's *pro se habeas* petition. The People advised the court and counsel by email that they were waiting for the minutes of court appearances. The court granted the application by email and then again during a virtual proceeding on May 14, 2021.

On May 17, 2021, the People served and filed a second COC as well as a COR.

On June 4, 2021, this court issued a decision denying the writ and dismissing the *habeas* petition (Exhibit 19).

The People timely filed their response to the instant motion on June 14, 2021.

No time is charged to the People for this time period. CPL §§ 30.30(4)(a).

---

[15] Justice Farber's Judiciary Law § 9 Reason for Recusal is attached as an exhibit to defendant's motion.

-15-

Conclusion as to Speedy Trial Time

Upon calculating all of the speedy trial time periods applicable to this matter, the court finds that 23 days of delay are chargeable to the People. Accordingly, defendant's motion to dismiss the indictment for a speedy trial violation is denied.[16] For the same reason, he is not entitled to release under CPL § 30.30(2)(a).

B.    The Interests of Justice Do Not Warrant Dismissal of the Indictment

Motions made under CPL § 210.40 must be made within 45 days of arraignment, unless the defendant shows good cause for making the motion beyond that time period. CPL §§ 210.20(1[i], 2); *People v. Phail*, 184 AD3d 675, 675-76 (2d Dept), *lv denied*, 35 NY3d 1069 (2020); *People v. Pittman*, 228 AD2d 225 (1st Dept), *lv denied*, 88 NY2d 992 (1996). This branch of defendant's motion is untimely, and he offers no explanation as to why he could not have included it in his omnibus motion. If the People had raised this procedural bar here, the court would deny this branch of the motion on this basis. Because they have not, however, the court must consider the merits of defendant's claims.

Dismissal of an indictment in the interest of justice is "required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant . . . would constitute or result in injustice." CPL §210.40(1); *see People v. Clayton*, 41 AD 2d 204 (2d Dept 1973). The discretionary authority to dismiss an indictment in furtherance of justice pursuant to CPL 210.40 is an

---

[16]*See also People v. Parris*, 2106 AD3d 555, 556 (1st Dept) (constitutional speedy trial motion properly denied, where "most of the delay was caused by motion practice, adjournment requests by defense counsel and defendant's own actions in filing 15 pro se motions and repeatedly obtaining new counsel."), *lv denied*, 21 NY3d 1018 (2013).

-16-

"'extraordinary remedy'" (*People v. Kaous*, 126 AD3d 440, 441 [1st Dept 2015] [citation omitted],
*lv denied*, 27 NY3d 1000 [2016]) that "'should be exercised sparingly and only in those rare cases
where there is a compelling factor which clearly demonstrates that prosecution of the indictment
would be an injustice' (citations omitted)," *People v. Bookard*, 169 AD3d 816, 817 (2d Dept), *lv
denied*, 33 NY3d 1029 (2019); *People v. Candelaria*, 50 AD3d 913, 913 (4th Dept), *lv denied*, 11
NY3d 735 (2008). *See also People v. Gazzillo*, 177 AD3d 1406, 1407 (4th Dept 2019); *People v.
Pittman, supra* at 226. Importantly, a motion to dismiss in the interest of justice is not intended to
be a substitute for trial. *People v. Prunty*, 101 Misc 2d 163, 168 (Crim Ct Queens County 1979);
*see also People v. McConnell*, 11 Misc 3d 57, 61-62 (App Term 2d Dept 2006) (although defendant
had legitimate defense which weakened the People's case, defense merely raised an issue of fact for
trial and did not warrant dismissal in the interest of justice).[17]

First, this court rejects defendant's claim that his offense was not serious because no one was
injured and the fire was out by the time the police arrived. Burglary in the First Degree and Arson
in the Second Degree are obviously serious crimes: they are both Class B violent felonies.
Moreover, based upon the court's review of body-worn camera footage from two different cameras
that defendant provided to the court on June 30, 2021, the fire was not out when the police arrived.
As seen and heard on the body-worn camera footage, a smoke alarm was going off as the police
struggled to enter the bathroom where defendant was trying to barricade himself, and the bathroom
itself was full of smoke. Officers can be heard repeating, "Open the windows," something was
clearly in flames on the bathroom floor, a wall in the bathroom appears to have been scorched, and

---

[17]Although these two cases were decided under CPL § 170.40, the statutory factors for
dismissing misdemeanor informations are the same as those for dismissing indictments.

-17-

someone can be heard calling for a bucket of water. It is only at approximately four minutes and 54 seconds into the videos that someone is heard saying "The fire is out," although the smoky conditions obviously continued for several more minutes.[18] Setting a fire inside a stranger's home is undoubtedly a serious crime even if defendant intended to kill only himself and not others, and to suggest that "this matter may well be a glorified misdemeanor trespass" (Turchi Aff ¶ 13) ignores the evidence. The fact that the police took defendant to a hospital rather than to a police precinct hardly means that the police "did not deem the matter serious," and in any event the decision to prosecute a case is left to the District Attorney, not the police.

Defendant's claim of police misconduct is speculative. In any event, if some responding officers failed to turn on their body-worn cameras in violation of NYPD policy, an appropriate sanction may be fashioned by the trial court – which indeed is another form of relief that defendant seeks in this motion. The fact that a radio run was destroyed is also a matter for discovery sanctions, not dismissal of the indictment in the interests of justice. This is especially so, where the People have provided defendant with two 911 calls.

Finally, the truthfulness of the complainant's allegations must be decided by a jury. A motion to dismiss in the interests of justice is not a substitute for trial.

Because defendant has not demonstrated the existence of any compelling factor or circumstance that would justify dismissing this indictment, *People v. Bookard, supra,* this branch of his motion is denied.

C.     The Court Will Not Strike the Certificate of Compliance or Certificate of Readiness

---

[18]On one of the videos at approximately 11 minutes 32 seconds someone can still be heard coughing in the apartment.

In support of the motion to strike the People's certificate of compliance ("COC") filed on January 19, 2021, defendant alleges that the People have failed to provide him with body camera footage from four officers (Def Aff ¶ 19).[19]

The People concede that there "*should* be more body-camera footage" (Peo's Response Point I p 3 [emphasis in original]) but, as they informed defense counsel, it does not exist (*id.*). On October 13, 2020, the People met with a responding police officer, Police Officer Arshad, and watched his body-camera footage. At that time it became clear that "more officers responded to the scene and interacted with defendant" (*id.*).[20] After that meeting, the People gave Arshad a subpoena for "'[a]ll body-Worn Camera footage for the following Officers, from March 6, 2019, recorded at approximately 8:15 AM through and including 9:00 AM'" (*id.*). Shortly thereafter, Arshad informed the People that the video recordings were destroyed. The People "enlisted the assistance of [their] Office's Litigation Support Unit in an attempt to track down the missing documents and footage, but to no avail" (*id.* Point II p 9).[21]

When the People realized that they did not possess the 911 calls and radio runs and that they were not stored electronically in the District Attorney Office's case management system, the People

---

[19]This court will not address defendant's claims that that the body camera footage that was provided to him was "doctored and/or digitally manipulated and/or contain incomplete and/or cherry picked information" (Def Aff ¶ 20), as defendant makes these claims upon "information and belief" (*id.*) without citing any evidence to support such a belief or warrant such a conclusion.

[20]Arshad's body-camera footage had been previously disclosed to defense counsel (Peo's Aff p 16).

[21]The People appear to concede that they have also been unable to provide some missing "officer memobooks" (Peo's Response Point II p 9; *see also* Exhibit 14, p 3). Defendant does not challenge the People's COC and COR as a result of this apparent failure.

attempted to obtain those materials. By then the radio run had been destroyed, but the People were

able to obtain the 911 calls from Fire Marshal Meagher (Peo's Response Point II p 9; *see also*

Exhibit 14, p 3).

CPL § 245.50(1) provides, in relevant part, that

> When the prosecution has provided the discovery required by
> subdivision one of section 245.20 of this article, except for discovery
> that is lost or destroyed as provided by paragraph (b) of subdivision
> one of section 245.80 of this article . . . it shall serve upon the
> defendant and file with the court a certificate of compliance.

Similarly, CPL § 245.50(3) provides, in relevant part, that

> Notwithstanding the provisions of any other law, absent an
> individualized finding of special circumstances in the instant case by
> the court before which the charge is pending, the prosecution shall not
> be deemed ready for trial for purposes of section 30.30 of this chapter
> until it has filed a proper certificate pursuant to subdivision one of
> this section. A court may deem the prosecution ready for trial
> pursuant to section 30.30 of this chapter where information that might
> be considered discoverable under this article cannot be disclosed
> because it has been lost, destroyed, or otherwise unavailable as
> provided by paragraph (b) of subdivision one of section 245.80 of this
> article, despite diligent and good faith efforts, reasonable under the
> circumstances. Provided, however, that the court may grant a remedy
> or sanction for a discovery violation as provided by section 245.80 of
> this article.

Thus, the statute specifically provides that the People may file a valid COC and COR even though

discoverable material has been lost or destroyed, if they establish that they have made diligent good

faith efforts to obtain the material that are reasonable under the circumstances.

The court finds that the People have made that showing. The ADA now handling the case

affirms that the case was transferred to him in March 2020; he candidly concedes that failure of the

ADA who had the case before him to obtain the Sprint report and additional body-worn camera

footage has resulted in those materials being destroyed.

-20-

footage has resulted in those materials being destroyed. This ADA then pursued other avenues to comply with the People's discovery obligations and found and provided defendant with the 911 calls. The People thereafter filed the COC on January 19, 2021. Accordingly, the court will not invalidate the People's COC and COR.[22] *People v. Lewis*, 2021 WL 2307294 (Crim Ct, Kings County 2021) (denying motion to invalidate People's COC filed before they obtained the scratch 61 and memobook; People made diligent efforts to obtain the material by making multiple requests for said items but precinct could not locate the materials and officer was on indefinite medical leave); *People v. Cano*, 71 Misc 3d 728 (Sup Ct, Queens County 2020) (where People gave detailed explanation of their efforts to locate discoverable material and their determination that materials did not exist, People fulfilled their discovery obligations; their inability to provide draft complaint did not vitiate COC).

Finally, to the extent that defendant challenges the People's redactions in some materials as "overbroad," he has failed to identify any particular redaction for this court to evaluate. In any event, the People assert, and defendant does not contest, that the People redacted only "information that relates to the identity of the 911 caller(s), and notified the defendant in writing that such information had not been disclosed" as permitted by CPL § 245.20(1)(c) (Peo's Aff p 17). If the People have made overbroad redactions in the material they have disclosed, the proper remedy would be to order further disclosure, not to dismiss any of the charges in the indictment or to give the jury an adverse

---

[22]When defendant filed his original motion dated March 26, 2021, the People had filed only one COC. Although defendant filed a reply dated June 23, 2021, he did not add any challenge to the COC or COR dated May 17, 2021, nor will the court invalidate either of those filings.

inference charge. Accordingly, this branch of defendant's motion is denied.[23]

    D.    Alleged Discovery Violations Do Not Warrant Dismissal at this Time

Defendant argues that dismissal is "warranted because all other sanctions are inadequate" (Def Aff ¶ 22). The People oppose. As to the radio run, they argue that "the contents of those communications are detailed in the 911 calls and Sprint Report, both of which have been in the defense's possession since January 19, 2021" (Peo's Aff p 25). As to the destroyed body-worn camera footage, the People argue that it is duplicative (*id.*)

CPL § 245.80 provides remedies and sanctions when material or information subject to disclosure is disclosed belatedly, is missing, or has been destroyed. If the discovery is disclosed belatedly, then the party entitled to disclosure must show prejudice before a remedy or sanction is imposed, CPL § 245.80(1)(a). If the discovery cannot be disclosed because it has been lost or destroyed, then

> the court shall impose an appropriate remedy or sanction if the party entitled to disclosure shows that the lost or destroyed material may have contained some information relevant to a contested issue. The appropriate remedy or sanction is that which is proportionate to the potential ways in which the lost or destroyed material reasonably could have been helpful to the party entitled to disclosure.

CPL § 245.80(1)(b). Under CPL § 245.80(2), the court may address a discovery violation by, *inter alia*, ordering further discovery, instructing the jury that it may draw an adverse inference regarding the non-compliance, precluding or striking all or part of a witness's testimony, ordering the dismissal of all or some of the charges, or making such other order as the court deems just under the circumstances.

_____

[23]Should defendant seek to challenge specific redactions, this court will order a discovery conference upon his request.

While some remedy or sanction may be appropriate for the destruction of the radio run and body-camera footage, that will depend on the circumstances under which those materials were destroyed and how, if at all, defendant has been prejudiced by their unavailability. At this stage, however, defendant has not shown that dismissal of the indictment is the proper and proportionate remedy for the destruction of this evidence. Accordingly, this branch of defendant's motion is deferred to the trial court for a hearing to determine whether the destroyed material was relevant to a contested issue and whether it reasonably could have been helpful to defendant. *See People v. Kelly,* 62 NY2d 516 (1984) (before dismissing informations for People's conceded failure to preserve discoverable material, trial court should have considered alternative sanctions); *People v. Davis,* 27 Misc 3d 1226(A) (Sup Ct Bronx County 2010) (Duffy, J.) (court ordered a hearing on alleged *Brady* violation to determine what, if any, *Brady* material was lost, how it was lost, and what, if any, prejudice resulted).

E.     Defendant Is Not Entitled To Release Under CPL § 180.80

Defendant claims

> There is no question that the Defendant was seized, restrained and not at liberty on March 6, 2019, the alleged date of this incident. Accordingly, he was arrested on March 6, 2019. There is also no question that he was held involuntarily for over one month before he was again seized by the fire marshal and charged by the People for the same incident for which he was arrested on March 6.

(Def Aff ¶ 25.) Accordingly defendant claims that he was in custody for over a month "past the 144 hours set forth in CPL 180.80" and he must be released (*id.* ¶ 26.)

The People argue that 180.80 applies only when a person has been charged by felony complaint in criminal court and is being held in custody pending the disposition of the felony

-23-

complaint (Peo's Aff pp 25-26 ). Here, defendant was not charged by felony complaint until after

his arrest on April 9, 2019, and he is not being held on a felony complaint now. Accordingly, on its

face CPL §180.80 does not apply now. The court agrees.

Moreover, defendant raised this issue in his *pro se habeas* petition of January 5, 2021. There,

defendant stated that

> He was taken by police to the hospital on March 6, 2019 and was
> subsequently part of a civil proceeding at Harlem Hospital pursuant
> to Mental Hygiene Law §§ 9.27 and 9.37. On April 9, 2019,
> petitioner was released from Harlem Hospital to a
>
>> Transitional Residential Service program- "Road To
>> Success" of Kingsboro Psychiatric Center with
>> adjusted medications, an Assisted Outpatient
>> Treatment (AOT) Court Order, and a Visiting Nurse
>> Service, Assertive Community Treatment Care
>> Coordinator, Stephanie Shelton, Harlem Hospital
>> records reflect that the plaintiff was *"not a
>> prison[er]."* See:Exhibit (B).
>
> (Pet pp 31-32 of 87, emphasis supplied.) After his release from the
> hospital, Petitioner was arrested on April 9, 2019 at approximately
> 6:00 am by Fire Marshall Phillip Meagher "under an I-Card" (*id.* p
> 32).

(*See* Exhibit 19, pp 6-7, footnotes omitted.) This court denied the petition, holding that

> Petitioner's own allegations make it clear that the time within which
> the People had to vote an indictment began with his arrest on April 9,
> 2019 at 6:00 am. This is so because prior to April 9th, Petitioner was
> not in police custody but rather was involuntarily committed to the
> hospital pursuant to Mental Hygiene Law §§ 9.27 and 9.37 and
> thereafter released.
>
> Petitioner was arraigned on the felony complaint on April 9,
> 2019 and the case was adjourned to April 12, 2019. . . . The time
> between Petitioner's arrest on April 9, 2019 at 6:00 am and April 12,
> 2019 when the People filed a certificate of grand jury action was well
> within the 120 hours provided for by the statute. Indeed, the court file

-24-

does not indicate that any motion for release was made by Petitioner on April 12, 2019. Accordingly, this branch of Petitioner's motion is without merit and must be denied.

(*Id.* pp 7-8, footnote omitted.) Defendant's claims in support of his motion for release are the same now, and the court adheres to its prior decision.

For all of these reasons, defendant's motion for release pursuant to CPL § 180.80 is denied.

<u>Defendant's Release On Recognizance Is Not Warranted</u>

At defendant's criminal court arraignment on April 9, 2019, bail was set in the amount of $50,000 insurance company bond or $25,000 cash. He moved to be released on his own recognizance several times thereafter, both when in court and in *pro se* filings; some of those applications are described below.

In May 2020, after defendant was returned as fit to proceed and remand was no longer appropriate, the People made a bail request. After reviewing defendant's prior criminal history,[24] the facts of the case, defendant's prior failures to appear and a prior parole revocation, the People argued that bail in the amount of $50,000 bond, $50,000 partially secured bond and $25,000 cash was the least restrictive means to ensure defendant's return to court (Exhibit 11 pp 6-7). Defense counsel argued that the People's request was "excessive" and stated

> If you look at the video of this, it's pretty clear that Mr. Nieves at the time, and I'm not saying he committed any of the acts obviously alleged, but he was going through a cycle psychological incident, for want of a better word. I think there's certainly questions about the incident if that can even be established.

(*Id.* p 8.) The court then set bail at $50,000 insurance company bond, $25,000 cash or credit card,

---

[24]If convicted of either of the top two counts of the indictment, both class B violent felony offenses, defendant, as a second violent felony offender, would face a minimum determinate term of imprisonment of 10 years and a maximum term of 25 years (PL § 70.04[3]).

-25-

or $50,000 partially secured bond at 10 percent (*id.* p 9).

On November 9, 2020, defendant again moved *pro se* to be released on his own recognizance

(Exhibit 15 p 18). The court denied that application, stating,

> You have six felony convictions. You have tenuous community ties. You are facing a substantial amount of time if you are convicted. The People are recommending 12 years jail with five years post release supervision. Given all those factors, I have determined that monetary bail is the less restrictive form of release conditions necessary to return you to court. That is why I am not prepared to change it.

(*Id.* pp 18-19.)

Defendant claims that a change in circumstances warrants release on recognizance, specifically, that he was arrested and arraigned before the new bail law went into effect (Def Aff ¶ 29). This claim ignores the fact that defendant's current bail was set on May 12, 2020, after the new bail law went into effect. Moreover, when the court denied defendant's subsequent *pro se* bail application on November 9, 2020, the court explicitly considered the factors listed in CPL § 510.30(1)(a)-(f), and determined that the bail set on May 12, 2020 was the least restrictive means to assure defendant's return to court. This court agrees.

Moreover, defendant now alleges only that he

> has minimal warrant history, indeed, he has no warrants for almost twenty years, and the two older warrants were cleared up in a reasonable time. Further, he is indigent, and any bail, let alone the current bail status, is unduly restrictive of his ability to post any bail. As such, the Defendant respectfully asks this court to release him on his own recognizance.

(Def Aff ¶ 29.) This does not constitute any change in circumstances. The bail application is denied.

## Conclusion

For all of these reasons, the motion to dismiss the indictment, to release defendant, and to

strike the COC and COR is denied. The motion for discovery sanctions is respectfully referred to

the trial court.

This opinion constitutes the decision and order of the court.

Dated: New York, New York
July 28, 2021

Miriam R. Best
Acting Justice of the Supreme Court

Exhibit 1

# Criminal Court of the City of New York

## New York County

## Felony Complaint

HOROWITZ

**F**

The People of the State of New York

vs.

DEFENDANT:

CHARGES:

DOCKET NUMBER:

Michael Nieves    (M 37)

M19615898    04/09/2019 06:50

681 CLARKSON AVENUE

BROOKLYN NY

M19615898

PL 140.30(3)
PL 150.15
PL 120.25
PL 135.10

**CR-011626-19NY**

**FELONY**

Interpreter: Language _____    Screener: RIDDLE, BRANDON - TB80

---

**Notices Served at Arraignment:**

☑ CPL 190.50 - Grand Jury

☑ Cross Grand Jury

☐ Waive Cross Grand Jury

☐ CPL 710.30(1) (A) - Statement

☐ CPL 710.30(1) (B) - Identification

☐ CPL 250.20 - Alibi

☐ PL 450.10(48 hrs /15 days) - Property

☑ OTHER: _Wiggins_

_Reserved_

**Adjournment:**

Part: ___    Date: 4/12/19  GSA

☐ CPL 180.80/30.30 Waived

**Securing Order:**

1. ☐ Release on Recognizance (ROR)

2. ☐ Release under Supervision (RUS)

3. $50,000 ___ Insurance Company Bond

4. $25,000 Cash

5. _____ Credit Card

6. _____ Bond ☐ Surety ☐ Appearance
   ☐ Unsec ☐ Partial Sec ☐ Sec

7. ☐ Remand

☐ Surety Exam - 48 hours/72 hours

☐ Temporary Order of Protection

☐ ART. 730 Exam Ordered

☐ Protective Custody    ☐ Medical Attention

☐ Psychiatric Evaluation    ☐ Suicide Watch

---

| Arresting Officer | Court Reporter | Date | Part |
|---|---|---|---|
| PHILIP MEAGHER | Melissa Jimenez-De Armas Official Court Reporter | APR 0 9 2019 | AR 3 |

Judge:

CRC 3194 Rev. 6/18

HON. MARISOL MARTINEZ ALONSO

**RECEIVED**

APR 1 6 2019

SUPREME COURT
INDICTMENT BUREAU

Exhibit 2

# CRIMINAL COURT OF THE CITY OF NEW YORK
## RECORD OF COURT ACTION

| Date | | Present | Absent | Readiness |
|------|--|---------|--------|-----------|
| 4-12-19 | HOLD _____  Ne needs 1 of 2nd call *1st* | ☐ Defendant<br>☑ Attorney | ☑ Defendant<br>☐ Attorney | ☐ π ready<br>☐ π not ready |

Interpreter

**Reason for Adjournment**
- ☐ S/D
- ☐ OFD/Discovery
- ☐ Possible Disposition
- ☐ Decision
- ☐ Hearing
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Program _____

| Part | | |
|------|--|--|
| F | PT @ 3 4/24/19<br>PT F 5/8/19 | T/W AR3 4/12/19 |

| Judge | |
|-------|--|
| Hon.<br>J. Svethey | ☐ TOP |

Notify
- ☐ Charged
- ☐ Excluded
- ☐ Defendant
- ☐ Attorney
- ☐ Defendant Excused

| Reporter | |
|----------|--|
| L. Macaluso | SBC<br>Bail Condition                    Judge |

---

| Date | | Present | Absent | Readiness |
|------|--|---------|--------|-----------|
| APR 1 2 2019 | HOLD ___ McCarthy ___<br>Adjourned NS/48<br>TT (out of GRD) | ☐ Defendant<br>☐ Attorney | ☐ Defendant<br>☐ Attorney | ☐ π ready<br>☐ π not ready |

Interpreter

**Reason for Adjournment**
- ☐ S/D
- ☐ OFD/Discovery
- ☐ Possible Disposition
- ☐ Decision
- ☐ Hearing
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Program _____

| Part | |
|------|--|
| AR 3 | 4/24/19<br>PT3           SBC |

| Judge | |
|-------|--|
| HON. MARISOL MARTINEZ ALONSO | |

Notify
- ☐ Charged
- ☐ Excluded
- ☐ Defendant
- ☐ Attorney
- ☐ Defendant Excused

| Reporter | |
|----------|--|
| Melissa Jimenez-De Armas<br>Official Court Reporter | ☐ TOP<br>SBC<br>Bail Condition                    Judge |

---

| Date | | Present | Absent | Readiness |
|------|--|---------|--------|-----------|
| | HOLD _____ | ☐ Defendant<br>☐ Attorney | ☐ Defendant<br>☐ Attorney | ☐ π ready<br>☐ π not ready |

Interpreter

**Reason for Adjournment**
- ☐ S/D
- ☐ OFD/Discovery
- ☐ Possible Disposition
- ☐ Decision
- ☐ Hearing
- ☐ Bench Trial
- ☐ Jury Trial
- ☐ Program _____

| Part | |
|------|--|
| | |

| Judge | |
|-------|--|
| | |

Exhibit 3

1

1   CRIMINAL COURT OF THE CITY OF NEW YORK
    COUNTY OF NEW YORK              PART F
2   - - - - - - - - - - - - - - - - - -x
    THE PEOPLE OF THE STATE OF NEW YORK,
3                                        :
            -against-                            Docket No.:
4                                                CR-011626-19NY
                                         :
5   MICHAEL NIEVES,                          CALENDAR CALL

6                                  Defendant.:
    - - - - - - - - - - - - - - - - - -x
7
                          100 Centre Street
8                         New York, New York 10013

9                         April 12, 2019

10

11

    B E F O R E:
12
          THE HONORABLE JONATHAN SVETKEY, Judge
13
    A P P E A R A N C E S:
14
    FOR THE PEOPLE:
15
          OFFICE OF CYRUS VANCE, JR., ESQ.
16        District Attorney, New York County
          One Hogan Place
17        New York, New York 10013

18        BY:  KATHERINE DEMARTINI, ESQ.,
                Assistant District Attorney
19
    FOR THE DEFENDANT:
20
          Legal Aid Society
21        49 Thomas Street
          New York, New York 10013
22
          BY:  DAVIM HOROWITZ, ESQ.
23

24

25                                   Lauren Macaluso
                                     Official Court Reporter

P R O C E E D I N G S                    2

1           THE COURT OFFICER:  Prison matter, docket ending

2      626; Michael Nieves.  Defendant is not yet produced.

3           MR. HOROWITZ:  The Legal Aid Society by Davim

4      Horowitz for Mr. Nieves.  I'm asking for alternate dates.

5           THE COURT:  Are you waiving your client's

6      appearance for both this and the second call?

7           MR. HOROWITZ:  I am.

8           THE COURT:  This is a Trial Bureau 80 case.  Part

9      81, how's April 24th?

10          MR. HOROWITZ:  That's good.

11          THE COURT:  Part F, May 8th, Counsel?

12          MR. HOROWITZ:  Yes.

13          THE COURT:  We'll second call the case.  Thank you,

14     Counsel.

15          MR. HOROWITZ:  Thank you.

16               *         *         *         *

17          THE COURT OFFICER:  Recalling prison matter, docket

18     ending 626; Michael Nieves.  Alternate dates were given

19     earlier.

20          MS. DEMARTINI:  I still have not received an update

21     from the assigned.

22

23

24               (Continued on next page.)

25

P R O C E E D I N G S                           3

1           THE COURT:  This case was called earlier.

2     Alternate dates were given earlier.  We'll forthwith this

3     case to AR3, today's date, April 12th.  Same bail

4     conditions.

5                      *    *    *    *    *

6

7     Certified to be a true and accurate transcript.

8     _Lauren Macaluso_

9     Lauren Macaluso - Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 4

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART __

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Michael Nieves

Defendant.

CERTIFICATE OF
AFFIRMATIVE
GRAND JURY
ACTION

Docket No. CR-011626 - 19 NY
Grand Jury No. ~

Brandon Riddle , an Assistant District Attorney in the County of New York, certifies that the Grand Jury has heard evidence in the above-captioned case and has voted an indictment charging defendant with one or more crimes.

Dated: New York, New York
4-12-19

Respectfully Submitted,

Cyrus R. Vance, Jr.
District Attorney
New York County

By: _____
Assistant District Attorney
Of Counsel
Brandon Riddle

Exhibit 5

```
 1 │ CRIMINAL COURT OF THE CITY OF NEW YORK
   │ COUNTY OF NEW YORK:   PART AR3
 2 │ -------------------------------------X

 3 │ THE PEOPLE OF THE STATE OF NEW YORK,      DOCKET NO.

 4 │             -against-                     CR-011626-19NY

 5 │ MICHAEL NIEVES,

 6 │                         Defendant.

 7 │ -------------------------------------X

 8 │                   100 Centre Street
   │                   New York, New York
 9 │
   │                   April 12, 2019
10 │
   │ B E F O R E:
11 │
   │         THE HONORABLE JUDGE M. MARTINEZ-ALONSO
12 │
   │ A P P E A R A N C E S:
13 │
   │ FOR THE PEOPLE:
14 │
   │         CYRUS R. VANCE JR.
15 │         District Attorney, New York County
   │         One Hogan Place
16 │         New York, New York 10013
17 │         BY:   ANDREW KEENAN, ESQ.

18 │
   │ FOR THE DEFENDANT:
19 │
   │         LEGAL AID SOCIETY
20 │         49 Thomas Street
   │         New York, New York 10013
21 │
   │         BY:   EDWARD MCCARTHY, ESQ.
22 │
23 │
   │                              Melissa Jimenez-De Armas
24 │                              Official Court Reporter
25 │
```

2

PROCEEDINGS

1              COURT OFFICER:  Forthwith, Part F, CR-011626-19NY,

2      Michael Nieves.

3              MR. McCARTHY:  Legal Aid Society by Ed McCarthy,

4      appearing for my colleague Davim Horowitz.

5              MR. KEENAN:  The People are filing a certificate

6      of affirmative grand jury action.

7              THE COURT:  Alternate dates were picked in Part

8      F.  This case -- you're waiving your client's appearance

9      for this call, correct Mr. McCarthy?

10             MR. McCARTHY:  Yes.

11             THE COURT:  This case will be adjourned, Part 81,

12     April 24, 2019, for Supreme Court arraignment.  Same bail

13     conditions.

14                     *     *     *     *     *

REPORTER'S CERTIFICATION

15

Certified to be a true and accurate transcript of the original

16                        stenographic notes.

17

18                     MELISSA JIMENEZ-DE ARMAS
                       Official Court Reporter
19

20

21

22

23

24

25

Exhibit 6

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 81

-------------------------------------------X  IND. NO.

THE PEOPLE OF THE STATE OF NEW YORK      : 1241/2019

               – against –                  :

MICHAEL NIEVES,                          :

                   Defendant.

-------------------------------------------X  **CALENDAR CALL**

                       Supreme Courthouse
                       100 Centre Street
                       New York, New York
                       April 24, 2019

B E F O R E :

              THE HONORABLE CURTIS J. FARBER,
                           Justice


A P P E A R A N C E S :

        FOR THE PEOPLE:
              OFFICE OF CYRUS R. VANCE, JR., ESQ.
              District Attorney County of New York
              BY:  DOMINIQUE ANGLADE, ESQ.,
                 Assistant District Attorney




        FOR THE DEFENDANT:
              THE LEGAL AID SOCIETY
              BY:  DAVIM HOROWITZ, ESQ.
              BY:  SARA DOODY, ESQ.






                        CHUCK DOMINICK
                    SENIOR COURT REPORTER

2

PROCEEDINGS

1            THE CLERK:  Calendar Number 14, 1241 of 2019,

2    Michael Nieves.

3            MR. HOROWITZ:  The Legal Aid Society by Davim

4    D-A-V-I-M, last name Horowitz for Mr. Nieves.

5            MS. DOODY:  The Legal Aid Society Sara Doody,

6    D-O-O-D-Y, on behalf of Mr. Nieves.

7            THE COURT:  Good afternoon.

8            Have you received a copy of the indictment?

9            MR. HOROWITZ:  We received a copy of the

10   indictment --

11           THE COURT:  Ready to proceed?

12           MR. HOROWITZ:  -- the Voluntary Disclosure Form,

13   Violent Predicate Statement and the Notice of Immigration

14   Consequences.

15           We are ready to proceed.

16           THE COURT:  Let's arraign Mr. Nieves on the

17   indictment.

18           THE CLERK:  Mr. Nieves, the Grand Jury of

19   New York County has filed Indictment 1241 of 2019 charging

20   you with Burglary in the First Degree and other charges.

21           How do you plead to the indictment, guilty or

22   not guilty?

23           THE DEFENDANT:  Not guilty, Your Honor.

24           MS. ANGLADE:  The People filed a copy of the

25   indictment, a copy of the Voluntary Disclosure Form, and

– CD–

3

PROCEEDINGS

1      the Predicate Felony Statement with the Court.  And we

2      served defense counsel with the same documents.

3              We also served defense counsel with a Notice of

4      Immigration Consequences.

5              I understand the Assigned reached out to Mr.

6      Horowitz regarding discovery and that he has a flash drive

7      he is going to provide the People so that we may turn over

8      the body camera video footage, photos and surveillance

9      video.

10             MR. HOROWITZ:  I'm turning that flash drive over

11     now.

12             Mr. Nieves does want to speak.

13             THE COURT:  What's the offer or recommendation?

14             MS. ANGLADE:  Your Honor, we have a

15     recommendation.

16             On a plea to the charge to Count 1, Burglary in

17     the First Degree, Penal Law 140.30 Subsection (3), the

18     People are recommending twelve years state prison with

19     five years post-release supervision and a waiver of

20     appeal.

21             THE COURT:  All right, with a waiver.

22             Mr. Nieves, I will let you speak, but I want to

23     put on the record that the person to my right is an

24     Official Court Reporter.  The court reporter writes down

25     everything that is being said in the courtroom.

— CD—

4

PROCEEDINGS

1          I'm advising you it's not in your best interest

2     to talk about the facts of the case because if you do,

3     anything that you say can be used against you.

4          The prosecutor will be writing down also

5     everything you say, so try to avoid talking about the

6     facts of the case.

7          THE DEFENDANT:  Your Honor, sorry.  Yes, Your

8     Honor.  It will take me less than five minutes to read

9     something important to the record I would like you to

10    consider and the DA to consider, please.

11         Okay, Your Honor, Court, in pleading for a

12    pending motion to dismiss the criminal charges, I've

13    written three arguments.

14         And argument one states that similar to a

15    previous incident during February 2019 or March 2019 on

16    42nd Street, wherein the New York City Police Department

17    responded to a 911 call of Mr. Nieves locking himself

18    inside a private building surrounded with bathrooms while

19    attempting suicide by setting a fire inside of it, that

20    had been legally determined by the police officers to be a

21    psychiatric hospitalization case for emergency treatment

22    of Mr. Nieves instead of one in which an arrest for

23    burglary, arson, reckless endangerment, et cetera,

24    required by law due to the lawfully and empowered

25    determination of Mr. Nieves' lack of capacity, intent,

– CD–

5

PROCEEDINGS

1      motive and/or culpability to have committed a crime.  As

2      the body camera recordings of their first responding to

3      the incident -- sorry.  Due to the lawfully empowered

4      determination of Mr. Nieves' lack of capacity, intent,

5      motive and/or culpability to have committed a crime, as

6      the body camera recordings of the first responders to this

7      incident evinces the other psychotic state of Mr. Nieves

8      in which Bellevue Hospital's psychiatric determination

9      also concurred the police's finding of Mr. Nieves' mental

10     state, while no further arrest occurred by the fire

11     marshals whom surely must have been aware of this incident

12     respectfully regarded the subsequent incident during early

13     March of 2019, this one, where the New York City Police

14     further decided and determined similar or identical

15     administrative findings to Mr. Nieves' lack of capacity

16     intent, motive and/or culpability to have committed a

17     crime as the body camera recordings of the questioning

18     investigation of the incident evinced the nullification of

19     charging Mr. Nieves with burglary, arson, reckless

20     endangerment and wrongful imprisonment in light of the

21     facts of the incident of -- in light of the fact of the

22     incident in the emergency psychiatric hospitalization case

23     having lawfully determined by the police instead of one in

24     which an arrest was required, heretofore Harlem Hospital

25     Psychiatric treatment with an increase of medication

-- CD--

PROCEEDINGS

1   Abilify from ten milligrams to twenty milligrams, and

2   which placement, antidepressants prescription Zoloft 75

3   milligrams, and a thirty-day hospitalization of Mr. Nieves

4   also substantiated the police's findings and

5   determination.

6        Argument two --

7        MR. HOROWITZ:   Judge, I will continue reading.

8        Argument two:   Respectfully from a

9   jurisdictional perspective, the New York City Police had a

10   lawful responsibility to investigate this case while the

11   firearm marshal had ample time to respond at the scene of

12   the incident to conduct their investigation together with

13   the police.   Therefore, the fire marshal's subsequent

14   investigation without the police's presence that

15   unlawfully negated the police's findings should not be

16   legally admissible in court.

17        In fact, the criminal charges filed against

18   Mr. Nieves by the fire marshal's arrest of him on April 8,

19   2019 effectively unlawfully declared the police's

20   determination to hospitalize Mr. Nieves during early March

21   2019 for the same incident to be moot or without legal

22   grounds or relevance, otherwise stating the unlawful

23   actions of the police in the matter.

24        Argument three:   Mr. Nieves had been

25   hospitalized for approximately thirty days due to this

7

PROCEEDINGS

1      incident.

2              The fire marshals who arrested Mr. Nieves and

3      investigated the incident had a lawful duty to timely

4      arrest Mr. Nieves at Harlem Hospital and transport him to

5      a psychiatric prison ward, such as Bellevue Hospital's

6      prison ward, to await arraignment if an arrest was

7      lawfully required.

8              Certainly, the police, who sent Mr. Nieves to

9      Harlem Hospital, filed a report of this that was available

10     to the fire marshal upon their investigation.

11             Obviously the decision to await Mr. Nieves'

12     release to society and to his residence on the grounds at

13     Kingsborough Psychiatric Center to execute their,

14     parenthetical, I-card or arrest warrant, close

15     parenthetical, was an unlawful practice had their arrest

16     of Mr. Nieves been lawful to begin with.

17             In conclusion, based on these arguments and law,

18     it is clear that these criminal charges should be

19     dismissed and that Mr. Nieves be released from detention

20     at Rikers Island.

21             Thank you very much for your consideration, Your

22     Honorable Judge.

23             Your truly, Michael Nieves.  4/23/19.

24             THE DEFENDANT:  Thank you, Your Honor.  Your

25     Honor, thank you very much.

                           -- CD--

8

PROCEEDINGS

1      MS. ANGLADE:  Will a copy of that, what I

2   believe was prefaced as a motion, be provided to the

3   Court?

4      THE COURT:  Well, I will set a motion schedule.

5   Counsel will adopt whatever portion he thinks is

6   appropriate.  Just order the minutes.

7      MR. HOROWITZ:  Yes, Judge.  Thank you.

8      If I may, it occurs to me that the initial

9   police response, the body cameras, which I am assuming

10   Mr. Riddle is turning over, and any reports related to

11   Mr. Nieves' hospitalization around this incident I think

12   are Brady material.  I think they certainly go to his

13   guilt or innocence and also sentence, should he be

14   convicted.  But he referenced a prior incident on 42nd

15   Street, and I believe the police responded to that as

16   well.  We will see if he can get the exact time and date

17   of that.

18      Obviously, the police responded to that.  I

19   think that that would also go to his mental state, his

20   ultimate guilt or not guilt, and any sentence as well.

21      So I will put the DA's Office on notice of those

22   two very specific Brady requests.

23      THE COURT:  With regard to your mentioning your

24   client's own medical records, I will be more than happy to

25   sign whatever subpoenas you hand up.

- CD-

9

PROCEEDINGS

1          MR. HOROWITZ:  We will obviously look into that.

2     Whatever is appropriate for the Court.

3          THE COURT:  When can you get your motions in?

4          MR. HOROWITZ:  Judge, I can have my motions in

5     the week of May 16th.

6          THE COURT:  May 15th for your motions?

7          MR. HOROWITZ:  That's fine.

8          THE COURT:  How much time for the People to

9     respond?

10          MS. ANGLADE:  Your Honor, the People request

11     three weeks, please.

12          THE COURT:  People's response, June 5th.

13          Put the matter back here for decision June 19th

14     or 26th?

15          MR. HOROWITZ:  June 19th, if that works for the

16     Court.

17          THE COURT:  That should be fine.

18          MR. HOROWITZ:  Thank you.

19          COURT OFFICER:  Bail stays the same?

20          THE COURT:  Yes.

21          (CONTINUED ON THE FOLLOWING PAGE)

22

23

24

25

— CD—

10

PROCEEDINGS

1        THE CLERK:  Bail is 50,000 over 25,000.

2        COURT OFFICER:  Okay, sir, step to your left.

3        THE DEFENDANT:  Thank you, Judge.  Thank you,

4    People.

5        (Case adjourned to June 19, 2019)

6                        oOo
                (It is hereby certified that the
7                (foregoing is a true and accurate
                (transcript of the proceedings.
8                (     *Chuck Dominick*
                 (     _____
9                (     CHUCK DOMINICK
                 (     Senior Court Reporter
10                      oOo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

– **CD**–

Exhibit 7

Exhibit 8

1

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NEW YORK:              PART 81
     ------------------------------------X
3    THE PEOPLE OF THE STATE OF NEW YORK,   :
                                            :   INDICTMENT NO. 1241-2019
4                    -against               :
                                            :
5    MICHAEL NIEVES,                        :
                                            :
6                    Defendant.             :
     ------------------------------------X
7                    100 Centre Street
                     New York, New York 10013
8                    August 7, 2019

9

10   B E F O R E:

11             THE HONORABLE CURTIS FARBER, Judge.

12

13
     A P P E A R A N C E S:
14
     FOR THE PEOPLE:
15
                     OFFICE OF CYRUS VANCE, ESQ.
16                   DISTRICT ATTORNEY - NEW YORK COUNTY
                     1 Hogan Place
17                   New York, New York 10013
                     BY:  MEGAN MCNULTY, ESQ.
18                   Assistant District Attorney

19   FOR THE DEFENDANT:

20                   DANIEL HUBERT, ESQ.
                     277 Broadway
21                   New York, New York 10007

22

23

24

25                        SAMANTHA SCUOTTO
                          Senior Court Reporter

                          *S. Scuotto, SCR*

PROCEEDINGS

1          THE CLERK:  Calendar 22, 1241 of 2019, Michael

2     Nieves.

3          MR. HUBERT3:  Daniel Hubert, H-U-P-E-R-T, 277

4     Broadway.  Good afternoon.

5          THE COURT:  Good afternoon.

6          MR. HUBERT:  Your Honor, regretfully, I know you

7     just assigned me on the last date, I have to -- after a

8     conversation with Mr. Nieves I have to ask your Honor to

9     relieve me.  The last three conversations, we had two on

10    the telephone over the last two days and one today up in

11    the pens before the case was called, Mr. Nieves indicated

12    he plans on filing a disciplinary complaint against me

13    twice and today he also said he's going to file a lawsuit

14    against me under whatever --

15         THE DEFENDANT:  May I address the Court, please?

16    Your Honor, with all due respect because of constitutional

17    rights I submitted a pro se motion to have the indictment

18    dismissed in the furtherance of justice.  Mr. HUBERT is

19    aware of that motion, all the facts, legal statements,

20    statement of the fact, legal arguments, all the exhibits.

21    He understands that the complaint -- the felony complaint

22    is a defective accusatory instrument, that it's

23    insufficient evidence to support each and every element of

24    the offense charged.

25         According to People versus Wienberger and People

*S. Scuotto, SCR*

PROCEEDINGS

1       versus Alejandro he understands that I was in the hospital

2       for thirty days under emotional disturbed person case laws.

3       I was not a prisoner there. From my hospital records I was

4       there under Mental Health Hygiene Law 9.27 and 9.37, that

5       under New York State Civil Law Article 3(23) that I was

6       indeed -- Article 3(23) privilege from arrest, I was

7       submitted to a civil proceeding by the police under EDP

8       laws, emotional disturbed person laws. I was given an ALT

9       under the Act Team, Visiting Nurse Service, the Act Team,

10      Assertive Community Treatment. I was released to the

11      community, that I was arrested without probable cause under

12      an I-Card. That collateral stop or arrest judicata in

13      effect stops my case from being relitigated since it was

14      already submitted to a civil proceeding.

15              THE COURT: Can I ask the lawyers to approach

16      for a second.

17              (Whereupon an off-the-record discussion was

18      held.)

19              THE DEFENDANT: Under the circumstances, your

20      Honor, with all due respect, I ask Mr. HUBERT to request

21      for release on my own recognizance under cases --

22              MR. HUBERT: Judge, I will be asking to release

23      him on his own recognizance.

24              THE DEFENDANT: Please allow me to speak, which

25      Sara Doody of the Legal Aid Society has successfully

4

1 achieved, which I complied with all of rules and

2 regulations by Cases under Terry Burns.  I asked Mr. HUBERT

3 to ask for a bail reduction.  I asked Mr. HUBERT to assert

4 my rights under People versus Gilbert, that proves that the

5 Grand Jury minutes are in fact exculpatory Brady material

6 due to lack of good cause where the Grand Jury minutes are

7 perjured by the police and by --

8     THE COURT:  Mr. -- I'm going to cut you off.  I

9 have true concerns about your fitness to proceed at this

10 point in time.  I'm going to order a 730 exam.  Once I have

11 the results of the examination then I'll decide how to

12 proceed further regarding the application for relieving of

13 counsel.  Put the matter over for thirty days, September

14 9th for 730 results.  Remand.

15     THE DEFENDANT:  Your Honor, please be aware that

16 I will --

17     THE COURT:  I can't do the 30th.  October 7th.

18     THE DEFENDANT:  Your Honor, please be aware that

19 I will be filing a 1983 suit for injunctive relief --

20 damages.  Please be aware that I will be filing a suit in

21 Court of Claims, okay, that the Court is acting outside of

22 its jurisdiction in its official capacity.  You are

23 violating my constitutional rights.  October 27th?

24     THE COURT:  10-7.

25     THE DEFENDANT:  I would like new counsel,

PROCEEDINGS

1        please.

2                    THE COURT:   I will entertain that application

3        after I get the 730 results.

4                         *     *     *     *

5


6        C  E  R  T  I  F  I  C  A  T  I  O  N

7                    It is hereby certified that the foregoing is
         a true and accurate transcript of the
8        proceedings.

9


10       _____
                      SAMANTHA SCUOTTO
11                    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25


*S. Scuotto,  SCR*

Exhibit 9

1

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:        PART 81
2    - - - - - - - - - - - - - - - - - - - - - - - - - -X

3    THE PEOPLE OF THE STATE OF NEW YORK :   INDICTMENT NO
                                             1241 - 2019
4                                        :

5            -against-                   :

6    MICHAEL NIEVES,                     :
                              Defendant.
7    - - - - - - - - - - - - - - - - - - - - - - - - - -X
                              100 Centre Street
8                             New York, New York
                              October 7, 2019
9

10   H O N O R A B L E :

11          CURTIS FARBER, PRESIDING

12                          Supreme Court Judge.

13   A P P E A R A N C E S :

14          FOR THE PEOPLE:

15                  OFFICE OF THE DISTRICT ATTORNEY
                    NEW YORK COUNTY
16                  ONE HOGAN PLACE
                    NEW YORK, NEW YORK 10013
17          BY:   MATTHEW THIMAN,
                    ASSISTANT DISTRICT ATTORNEY
18

19          FOR THE DEFENDANT:

20          BY:   DANIEL HUPERT, ESQ.

21

22

23                          SENIOR COURT REPORTER
                            DENISE JOHNSON
24

25

2

PROCEEDINGS

```
1              COURT CLERK:  Calling 23, indictment 1241 of
2    2019, Michael Nieves.  Produced but not before the court.
3              MR. HUPERT:  Daniel Hupert, H-U-P-E-R-T.  Good
4    afternoon, Judge.  I waive him for the purpose of this
5    calendar call.  It appears that the 730 report has not yet
6    been submitted.
7              COURT CLERK:  Not yet submitted.  I did write to
8    them and they said, clinicians requested medical records
9    on 9-20 and have received them.  Therefore, the report
10   will be ready by Friday, 10-11.
11             THE COURT:  This Friday.  Do you want to come
12   back Friday?
13             MR. HUPERT:  I can come back Friday.
14             THE COURT:  All right.  How have you been,
15   Mr. Hupert?
16             MR. HUPERT:  Hanging in there.
17             THE COURT:  Always a pleasure to see you.
18             MR. HUPERT:  You too, judge, as always.
19             THE COURT:  October 11th, 730 results.
20             MR. HUPERT:  Thank you.
21   ************************************************************
22   This is certified to be a true and accurate transcript of the
23   above proceeding recorded by me.
24                         _____Denise Johnson_____
                                 DENISE JOHNSON
25                           SENIOR COURT REPORTER
```

3

PROCEEDINGS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 10

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 81
    - - - - - - - - - - - - - - - - - -
3   THE PEOPLE OF THE STATE OF NEW YORK,

4                                    Indictment No.

5            -against -              1241-2019

6   MICHAEL NIEVES,

7                         Defendant.
    - - - - - - - - - - - - - - - - - -
8                         100 Centre Street
                          New York, New York 10013
9                         October 11, 2019

10  B E F O R E:

11        THE HONORABLE CURTIS FARBER,

12                     J U S T I C E

13  A P P E A R A N C E S:

14        CYRUS R. VANCE, JR.,
          DISTRICT ATTORNEY - NEW YORK COUNTY
15        Attorneys for the People
             One Hogan Place
16           New York, New York 10013
          BY:  SAMUEL COCKS, ESQ.
17           Assistant District Attorney

18

19        LAW OFFICE OF DANIEL HUPERT, ESQ.
          ASSIGNED COUNSEL PLAN (18B)
20        Attorneys for the Defendant
             299 Broadway
21           New York, New York 10007
          BY:  DANIEL HUPERT, ESQ.

22

23                       Lisa S. Webb, CCR
                         Senior Court Reporter
24

25

PROCEEDINGS                      2

1        COURT CLERK: Calling calendar number two,

2    1241 of 2019, Michael Nieves from the back.

3        MR. HUPERT:  Daniel Hupert, 299 Broadway, for

4    Mr. Nieves.

5        THE COURT:  Good afternoon, Mr. Hupert.

6        MR. COCKS:  Sam Cocks, for the People.

7        THE COURT:  Good afternoon.  And, good afternoon

8    Mr. Nieves.

9        The matter is on for 730 results.  Have both

10   sides seen a copy of the report?

11       MR. HUPERT:  I have.  Yes, your Honor.

12       THE COURT:  Mr. Nieves has been found to be

13   unfit.

14       What is the Defense's position?

15       MR. HUPERT:  I move to confirm that report, your

16   Honor.

17       THE COURT:  People.

18       MR. COCKS:  The assigned has not seen the report,

19   per the note, and would like an opportunity to review it.

20       THE COURT:  All right.

21       What is your schedule, Mr. Hupert?  When can you

22   come back?

23       I would like to do it on a shorter date.

24       THE DEFENDANT:  What's going on?

25       THE COURT:  Are you available?

PROCEEDINGS                                    3

1        MR. HUPERT:  Judge, I can come back on Tuesday,

2   Wednesday or Thursday.  Actually, just Tuesday and

3   Wednesday of next week.  After that I'm out of town until

4   the 29th, I think it is, we're coming back.  I'll be out

5   from the 17th to the 29th basically.

6        THE COURT:  The assigned can review this by next

7   week Tuesday or Wednesday.

8        MR. COCKS:  I would assume so.  It doesn't appear

9   to be that voluminous.

10        THE COURT:  What day would you prefer, Tuesday or

11   Wednesday?

12        MR. HUPERT:  If it's okay with your Honor, let's

13   do it Wednesday the 16th.

14        THE COURT:  October 16th.

15        THE DEFENDANT:  Your Honor, I would like counsel

16   reassigned, please.

17        THE COURT:  We're going to wait until next week

18   and we'll see how the prosecution wants to proceed, sir.

19        I'll see everyone back here October 16th.  Thank

20   you.

21                    *   *   *   *   *   *

22   The preceding transcript is certified to be a true and accurate

23   record of the proceedings.

24

25                    Lisa S. Webb, CCR, Sr. Court Reporter

                    LISA S. WEBB, CCR
                    SENIOR COURT REPORTER

NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
TRANSCRIPT ORDER REQUEST

**TRANSCRIPT INVOICE #**
80 -21- 106

**TO BE FILLED OUT BY REQUESTOR**

**CASE INFORMATION**

| | | Predicate | Non-Predicate |
|---|---|---|---|
| **ADA NAME** | Christopher Rivet | **BUREAU** Trial Bureau 80 | |
| Ext | −3255 | | Fax 212-335-4152 |
| Transcript Liaison | Milessa Nunez | | Ext -4123 |

DEFENDANT (Last, First)  Nieves, Michael     DOCKET OR INDICTMENT # CR-011626-19NY

COURT (Check One)          Criminal      Family

PART 81          JUDGE Curtis Farber     COURT REPORTER  E Chan

**TESTIMONY REQUESTED**

| | | | Original | Copy |
|---|---|---|---|---|
| | X | Daily | $3.75/ page | $1.25/ page |
| | | Expedited | *$3.15/ page | $1.10/ page |
| | | *(within Five work days) | | |
| | | Regular | $2.50/ page | $1.00/ page |

DEFENSE ORDERING?     Yes    No   (If Yes, Copy Rate will be provided)

JAIL CASE?             Yes    No

**TYPE OF TESTIMONY**

| | | |
|---|---|---|
| | Arraignment | Search Warrant Application |
| | Calendar Call | Sentencing Minutes |
| | Plea Minutes | Protective Order Proceeding |
| X | Other | All purpose appearance |
| | Hearing | *Originals require approval from Bureau Chief/Deputy AND* |
| | | *Administrative Assistant DA* |
| | Trial | *Originals require approval from Bureau Chief/Deputy AND* |
| | | *Administrative Assistant DA* |

*Cannot find in notes 6/19/19*

Date(s) of Proceedings      6/19/2019

Date Required      4/20/2021

Describe Case      Burglary in the First Degree, needed for 30.30 motion
& Justify Need

*Tiana Walton*

Bureau Chief / Deputy          Administrative ADA

**TO BE FILLED OUT BY COURT REPORTER**     DATE MINUTES RETURNED

NUMBER OF PAGES _____     RATE PER PAGE  $ _____     TOTAL COST _____

MAKE PAYMENT TO     NAME _____     SSN ___ - ___ - ___

ADDRESS _____

For order/ delivery questions, contact transcript liaison (see above)
For payment inquiries call the Fiscal Unit @ 335-9724

**TO BE FILLED OUT BY TRANSCRIPT LIAISON - PAYMENT APPROVAL**

| | | Processing Instructions for Transcript Liaison |
|---|---|---|
| Date Faxed to Reporter _____ | Time _____ | 1. Make copy of approved form for bureau file. |
| Faxed By _____ | Transcript Liaison Telephone | 2. Send copy of approved form to Court Reporter. |
| TRANSCRIPT RECEIVED AND ACCEPTED ON (DATE) _____ | | 3. Send original with approval signatures to Fiscal |
| NUMBER OF PAGES _____ | RATE PER PAGE $ _____ | on the second and fourth Wednesday of the month |
| SIGNATURE _____ | | |

DANYForm Rev. (7/2011)

## Supreme Court
### of the
## State of New York



111 Centre Street
New York, N.Y. 10013

AFFIDAVIT

Supreme Court of the State of New York
Court Reporters' Office
111 Centre Street, Room 921
New York, NY 10013

Date: _6/9/2021_

Date of Proceeding: _6/19/2019_

People v. _Michael Nieves_

Indictment: _1241-19_

On _6/19/19_ Senior Court Reporter _Elizabeth Chan_ was
assigned to Part _81_ of the Supreme Court, New York County.

_Elizabeth Chan_ is retired. This office has ordered the raw stenographic notes
from archives. The stenographic notes were received, but unfortunately they cannot be
transcribed because:

1) The case was not found in the body of the notes;

2) There was water damage and/or the ink was degraded to such an extent that the notes
were rendered undecipherable.

The Court Reporters' Office

Exhibit 11

1

1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK - CRIMINAL TERM - PART TAP A
2  - - - - - - - - - - - - - - - - - - -x
3  THE PEOPLE OF THE STATE OF NEW YORK,

             -against-                    Indictment No.:
4                                         1241-2019

5  MICHAEL NIEVES,                        Proceeding

6                       Defendant.
   - - - - - - - - - - - - - - - - - - -x
7                    (Teleconference)
                     100 Centre Street
8                    New York, New York 10013

9                    May 12, 2020

10 B E F O R E:

11      THE HONORABLE ERIKA M. EDWARDS, Judge

12 A P P E A R A N C E S:

13 FOR THE PEOPLE:

14
        OFFICE OF CYRUS R. VANCE, JR.
15      District Attorney New York County
        One Hogan Place
16      New York, New York 10013

17      BY:  BRANDON RIDDLE, ESQ.

18 FOR THE DEFENDANT:

19      DANIEL HUPERT, ESQ.
        Attorneys for Defendant
20      277 Broadway
        New York, New York

21

22

23

24

25

                  ─Ivelisse Rodriguez, Senior Court Reporter─

1           THE CLERK:   Indictment 1241/2019, Michael Nieves.

2           THE COURT:   Can I get appearances, please.

3           MR. RIDDLE:   For the People, ADA Brandon Riddle,

4     R-I-D-D-L-E.   Good morning, everyone.

5           THE COURT:   Mr. Hupert.

6           MR. HUPERT:   For Mr. Nieves, Daniel Hupert,

7     H-U-P-E-R-T, 277 Broadway under my normal circumstances,

8     and good morning, your Honor.

9           THE COURT:   Good morning, everybody.  Mr. Nieves,

10    I'm Judge Erika Edwards.  We are proceeding via Skype

11    because of the Covid-19 pandemic as well as the orders of

12    our Governor of the State of New York and our chief judge

13    to restrict court operations.  We are appearing via

14    video.  Your attorney Mr. Hupert, the prosecutor the

15    court reporter and myself are all appearing remotely as

16    well as you.  The only people in the courtroom are the

17    court officers and the sergeant.  Do you consent to

18    proceeding in this manner?

19          THE DEFENDANT:   Yes, your Honor.

20          THE COURT:   Okay.  Mr. Hupert, do you consent as

21    well?

22          MR. HUPERT:   Yes, your Honor.

23          THE COURT:   Mr. Riddle, do you consent?

24          MR. RIDDLE:   Yes, your Honor.

25          THE COURT:   Very good.  Mr. Nieves, can you hear

1          us?

2                    THE DEFENDANT:  Yes, your Honor.  I can hear you.

3                    THE COURT:  Can you see us?

4                    THE DEFENDANT:  Yes, your Honor, I can hear you.

5                    THE COURT:  Okay.  But can you see with your eyes?

6          Can you see us?

7                    THE DEFENDANT:  Yes, ma'am.  I can see you.

8                    THE COURT:  Okay.  Excellent.  It's my

9          understanding you came back fit.  Mr. Hupert, do you

10         confirm or controvert this finding?

11                   MR. HUPERT:  Your Honor --

12                   THE DEFENDANT:  Can you speak up.  I didn't hear

13         you just now.

14                   THE COURT:  I was asking your attorney if he wants

15         to confirm the finding or controvert it or how he wants

16         to proceed.

17                   MR. HUPERT:  Your Honor, although as I indicated

18         off the record, I tried to schedule a video conference

19         with Mr. Nieves after I was advised that he had been

20         found fit and returned.  I was unable to schedule it.  I

21         didn't find a booth available.  I haven't been able to

22         speak with Mr. Nieves on it.  I don't know his opinion on

23         it.  I need to speak with him to see whether there's

24         really improvement to the extent, as a nondoctor, I can

25         make those kind of determinations.  So at this point I'm

1    not in a position where I can either confirm or not

2    confirm.

3              THE COURT:  Mr. Hupert, you mentioned off the

4    record, I want to make sure it's on the record and that

5    Mr. Nieves hears you made extensive efforts to try to

6    have the facility produce him for a video conference

7    prior to today, several; is that correct?

8              MR. HUPERT:  Yes, your Honor.  When I first

9    learned that he'd been found fit, I tried to find out

10   where he was being --

11             THE DEFENDANT:  Mr. Hupert, you're breaking up.  I

12   can't hear what you're saying at all.

13             MR. HUPERT:  I'm sorry, I said when I first

14   learned from the Court -- can you hear me now?  When I

15   first learned from the Court that Mr. Nieves had been

16   found fit, I tried to find online to see where he's being

17   housed.  He wasn't returned to Department of Correction's

18   custody.  He was returned two days later, might have been

19   one day.  As soon as I learned that he was back down in

20   Department of Correction's custody, I put in an

21   application for video conference.

22             Initially this court appearance was scheduled for

23   May 8th, and I believe he came back about a week and a

24   half before then.  I don't have the file in front of me.

25   Something like that.  And I tried to schedule a video

Proceeding                                    5

1          conference.  I was told they couldn't do anything before

2          the eighth.  Then because of the court availability, we

3          got adjourned until today.  I got back in touch with him

4          and said, can you do anything on the 8th or the 11th?

5          There were no booths available.  I was unable to arrange

6          time to speak with him before today.

7                  THE COURT:  What I'd like to do, Mr. Hupert,

8          you've been making a lot of efforts in order to speak

9          with Mr. Nieves in private.  I want to adjourn this case

10         if we can to give you more time to do so.  This is

11         certainly not your fault and unfortunately, there's a

12         limited amount of booths available, so this way you'd get

13         a chance to adjourn it.  I'd like to adjourn this maybe a

14         couple of weeks if you think that would be sufficient

15         time to speak with your client privately.

16                 MR. HUPERT:  My experience with trying to get

17         these booths is usually about two to three weeks after I

18         make the request that they're able to set up a booth.

19         Before we get to that.

20                 THE COURT:  Mr. Hupert, just hold on just one

21         moment, please.

22                 (A pause in the proceeding.)

23                 THE COURT:  Back on the record.  Mr. Hupert, if it

24         takes that long, this is terrible.  I'm going to have to

25         give a longer adjournment for this.  What is the bail

─────────Ivelisse Rodriguez, Senior Court Reporter─────────

| | |
|---|---|
| 1 | status at this point?  What are the bail conditions? |
| 2 | MR. HUPERT:  Remand, Judge. |
| 3 | THE COURT:  Remand.  Okay. |
| 4 | THE CLERK:  So we have to set bail right now. |
| 5 | THE COURT:  Mr. Riddle.  Do you have an |
| 6 | application for bail?  What was it before the remand, I |
| 7 | should say? |
| 8 | THE CLERK:  It was $50,000 over $25,000. |
| 9 | THE COURT:  So Mr. Riddle, what's your position on |
| 10 | bail? |
| 11 | MR. RIDDLE:  Your Honor, we believe that the |
| 12 | previous bail amount should be -- the previous bail |
| 13 | condition should be reinstated with an added condition of |
| 14 | $50,000 partially secured bond. |
| 15 | This defendant is a violent predicate who faces a |
| 16 | minimum of 10 years in state prison and a maximum of 25; |
| 17 | however, because of his violent history, he could be |
| 18 | found a persistent felon and sentenced to considerably |
| 19 | more. |
| 20 | In this particular case, the facts are pretty |
| 21 | egregious where he enters an apartment, barricades |
| 22 | himself in a bedroom, and begins to threaten by flicking |
| 23 | lighters at a woman who was inside of the room.  He then |
| 24 | locks himself up in the bathroom and sets many of the |
| 25 | things in the bathroom on fire.  When police arrived, he |

Ivelisse Rodriguez, Senior Court Reporter

1          was taken out of the apartment and to the hospital for

2          treatment.

3                    Based on the seriousness of this case and his

4          violent history and the fact that he's failed to appear

5          on multiple occasions and had parole revoked, we believe

6          that bail is appropriate to ensure his return to court

7          and is the least restrictive means of doing that.

8                    THE COURT:  Okay.  Mr. Hupert, I'll hear you as to

9          bail.

10                    MR. HUPERT:  Your Honor, before I address bail,

11          with the Court's permission, I'd like to ask Mr. Nieves

12          if he still wants me to remain as his counsel.

13                    THE DEFENDANT:  Well, you know, I filed a 1983

14          complaint with the United States District Court and Judge

15          Liman J. Lewis is overseeing the case in the United

16          States District Court against the police, and I've been

17          granted the opportunity to file suit against the police

18          and the fire marshals.

19                    THE COURT:  Mr. Nieves, I have to ask you to not

20          talk about another matter.  You're on the record.  The

21          question was are you asking for a new attorney or do you

22          want Mr. Hupert to stay on at this time?

23                    THE DEFENDANT:  I would like Mr. Hupert to remain

24          my attorney as long as he represents me to the fullest of

25          the law to try to have me released on his own

1    recognizance to work with the evidence that proves that I

2    have not committed the charges that I've been arrested

3    for.

4            MR. HUPERT:  You can't talk about the facts.

5            THE COURT:  You can't talk about the facts or it

6    can be used against you.  We have a court reporter taking

7    things down.  I'm not saying you can't, but you're being

8    asked by your attorney.  Let me hear with regard to bail.

9            MR. HUPERT:  I was not the attorney when the bail

10   had been set.  I would suggest that the bail that had

11   been set and Mr. Riddle is requesting to be set is

12   excessive.  Obviously, whatever your Honor's

13   determination is here if I remain as counsel, I reserve

14   the right to move to modify whatever bail conditions

15   after I do get the necessary medical records if I'm able

16   to make an emergency application if the records establish

17   the facts for that.

18           Having said that I think the initial bail was

19   excessive.  If you look at the video of this, it's pretty

20   clear that Mr. Nieves at the time, and I'm not saying he

21   committed any of the acts obviously alleged, but he was

22   going through a cycle psychological incident, for want of

23   a better word.  I think there's certainly questions about

24   the incident if that can even be established.

25           THE COURT:  Here's what I'm going to do.  I'm

Proceeding                                        9

 1    going to reinstate the bail with some additional

 2    conditions that hopefully would perhaps give --

 3                THE DEFENDANT:  Your Honor, I can't hear anything

 4    I can't hear what my lawyer is saying.  I can't hear what

 5    you're saying.

 6                THE COURT:  Well, your lawyer is not talking.  I'm

 7    talking now.  I am going to give you some bail.  I'm

 8    changing the remand status.  The new bail is $50,000

 9    insurance company bond, $25,000 cash, $25,000 credit card

10    and a $50,000 partially secured bond at 10 percent.

11                So $50,000 insurance company bond and partially

12    secured bond at 10 percent, $25,000 c

13    ash and a $25,000 credit card.  We're going to give

14    Mr. Hupert an opportunity to see if he can schedule this

15    for release based on your asthma condition and whatever

16    other conditions he finds in your medical records, and

17    I'm going to adjourn this matter then.  Let's go three

18    weeks out for the determination as to whether or not

19    Mr. Hupert confirms or controverts the 730 finding.

20                Just give me a moment.  Actually, let me ask our

21    clerk what do we have?  Is there a date about three weeks

22    out in TAP A?

23                THE CLERK:  Yes, we're going to keep this a Part

24    81 case.  You can put it on a Monday.

25                THE COURT:  Monday in Part 81?

1            THE CLERK:  Yeah.

2            THE COURT:  Just give me a moment.  How's

3    June 8th?  June 8th.

4            MR. HUPERT:  June 8th, your Honor?

5            THE COURT:  Yes.  Part 81.

6            MR. HUPERT:  If I may, your Honor, Mr. Nieves you

7    have my cell phone number right?  Can you write it down

8    now.  There's a script I need to read you to get

9    permission to submit a HIPPA.

10           THE COURT:  Let's go off the record.

11           (An off-the-record discussion was held.)

12           THE COURT:  All right, everybody.  We're done for

13   today.  Thank you so much.

14              *    *    *    *    *

15   Certified to be a true and accurate transcript.

16

17                    *Ivelisse Rodriguez*
                    Ivelisse Rodriguez
18                    Senior Court Reporter

19

20

21

22

23

24

25

Exhibit 12

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK : CRIMINAL TERM : PART TAP-A
 2   ------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK  : Indictment No:
 3                                        : 1241-19
                                          :
 4              -against-                 :
                                          :
 5                                        :
     MICHAEL NIEVES,                      :
 6                                        :
                         Defendant  : CALENDAR CALL
 7                                  : REASSIGNMENT OF COUNSEL
     ------------------------------------x
 8
                         111 Centre Street
 9                       New York, New York  10013
                         July 23, 2020
10

11   B E F O R E:
12          HONORABLE ABRAHAM CLOTT,
                 JUSTICE OF THE SUPREME COURT
13

14   A P P E A R A N C E S:
15
                    CYRUS VANCE, ESQ.
16          DISTRICT ATTORNEY, NEW YORK COUNTY
                 (For the People)
17               One Hogan Place
                 New York, New York  10013
18          BY:  CHRISTOPHER RIVET, ESQ.
                 Assistant District Attorney
19
            DANIEL HUPERT, ESQ.
20          CARLOS MARTIR, ESQ.
                 (For the Defendant)
21

22

23

24                         Dawn M. Candella
                           Senior Court Reporter
25
```

1    COURT CLERK:  Number two on the Part 81 calendar,

2    indictment 1241 of 2019, Michael Nieves.

3    MR. HUPERT:  Daniel Hupert, 277 Broadway.

4    Your Honor, given the problems we've had having

5    him produced for this, I do waive him for the purpose of

6    this appearance.

7    THE COURT:  All right.

8    Mr. Rivet, are you standing on this?

9    MR. RIVET:  Yes, Your Honor.  I am the newly

10    assigned ADA on this case.

11    THE COURT:  Put in your appearance.

12    MR. RIVET:  And for the People, Christopher Rivet,

13    R-I-V-E-T.

14    THE COURT:  Good afternoon, Mr. Rivet.  Sorry

15    about getting your name wrong.

16    Mr. Hubert, I understand you wish to be relieved

17    and have new 18B counsel assigned.  Please state the reasons

18    why.

19    MR. HUBERT:  Your Honor, just to give the Court a

20    bit of background, Mr. Nieves had asked that I be relieved

21    quite some time ago shortly after I was assigned.  That was

22    under consideration by Judge Farber at the time the 730 was

23    ordered and then Mr. Nieves was found unfit, so, obviously,

24    that was never ruled on.  When he came back, we proceeded, I

25    tried to work with him.

1    On the 16th of this month, I received two
2  voicemails from Mr. Nieves and, without going into great
3  detail, the first one threatened to sue me for five million
4  dollars, he is very litigious, and in the second one he told
5  me that he would take mercy on me and settle for only one
6  million, but that he felt that the fact that he was suing me
7  created a conflict of interest.
8    THE COURT:  I agree that it would.
9    And do you feel that communications have broken
10 down irretrievably?
11   MR. HUPERT:  Yes, Your Honor.
12   THE COURT:  Mr. Rivet, does the Government take
13 any position?
14   MR. RIVET:  No, Your Honor.
15   THE COURT:  All right.
16   Mr. Hubert is relieved for the reasons stated on
17 the record.
18   Mr. Martir, I am afraid to ask but are you
19 prepared to accept assignment?
20   MR. MARTIR:  Yes, Your Honor.  I have less money
21 than Mr. Hubert.
22   THE COURT:  Mr. Martir is assigned under section
23 18B of the County Law.
24   Is there an 18-B date for this matter?
25   COURT CLERK:  This is written down for

1   August 31st.

2         THE COURT:   For what?

3         MR. HUPERT:   At least for conference, but not the

4   fitness finding from Kirby, that happened in mid-May.

5         THE COURT:   Is that in Judge Farber's part?

6         MR. HUPERT:   Part 81.

7         THE COURT:   All right.   This remains on the

8   calendar in Part 81.

9         Mr. Martir, are you excusing time to familiarize

10   yourself with the case?

11         MR. MARTIR:   Yes, Your Honor.

12         THE COURT:   Very well.

13         Anything further from the Government?

14         MR. RIVET:   No, Your Honor.

15         THE COURT:   Anything further from the Defense?

16         MR. HUPERT:   Judge, if I may?

17         Mr. Martir, let me give you my cell phone number.

18   There is a big file here and I will obviously arrange to get

19   it to you.

20         (WHEREUPON, THERE WAS A PAUSE IN THE PROCEEDINGS)

21         MR. MARTIR:   What part do I have the assignment of

22   counsel sent to?  Your part, Your Honor?

23         Mr. Clerk?

24         COURT CLERK:   You would have to sign it and email

25   it to the judge and he will sign it and email it back to

1    you, I guess.

2                (WHEREUPON, THERE WAS A PAUSE IN THE PROCEEDINGS)

3                THE COURT:  Anything else?

4                MR. RIVET:  Nothing further.

5

6

7                I, Dawn M. Candella, in and for the State of New
York, do hereby certify that the foregoing transcript is
8    true and accurate to the best of my knowledge, skill and
ability.

9

10        *Dawn Candella*
          Dawn M. Candella,
11        Senior Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 13

1

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK: CRIMINAL TERM:   PART 81
2   - - - - - - - - - - - - - - - - - - - -x
    THE PEOPLE OF THE STATE OF NEW YORK,
3                                               :
          -against-                             INDICTMENT NO.:
4                                                 1241/2019
                                                :
5   MICHAEL NIEVES,

6                          Defendant.           :
    - - - - - - - - - - - - - - - - - - -x
7
                         Virtual Court
8                        New York, New York 10013

9                        August 25, 2020

10  B E F O R E:

11       THE HONORABLE CURTIS FARBER,
                         Justice of the Supreme Court
12
    A P P E A R A N C E S:
13
    FOR THE PEOPLE:
14
         OFFICE OF CYRUS VANCE JR., ESQ.
15       District Attorney New York County
         One Hogan Place
16       New York, New York 10013

17       BY:  CHRISTOPHER RIVET, ESQ.
                  Assistant District Attorney
18
    FOR THE DEFENDANT:
19
         CARLOS MARTIR, ESQ.
20       Attorney for Defendant

21

22

23

24
                                    Donna McNeill, CSR
25                                  Senior Court Reporter

Proceeding                                    2

1          THE CLERK:  Calling calendar number four,

2     Indictment 441 of 2019, Michael Nieves.

3          THE COURT:  Appearances, please.

4          MR. MARTIR:  Carlos Martir, M-a-r-t-i-r, for Mr.

5     Nieves.

6          THE COURT:  Good afternoon.

7          MR. RIVET:  Good afternoon.  For the People,

8     Christopher Rivet, R-i-v-e-t.

9          THE COURT:  Good afternoon, Mr. Nieves.  I'm Judge

10    Curtis Farber.  I'll be presiding at today's proceeding.

11    Are you able to see and hear me without difficulty?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  If at any point in time you're unable

14    to see or hear me, I need you to let me know right away.

15    Okay?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Hold on one second.  I think we just

18    lost Mr. Rivet.

19         (Brief pause.)

20         THE DEFENDANT:  May I address Mr. Martir, Your

21    Honor?  Can we have a moment?

22         MR. MARTIR:  No, not now, sir.

23         THE CLERK:  Back on, Judge.

24         THE COURT:  Okay, Mr. Rivet.  All right.  Last time

25    I saw everyone was over a year ago when, October 2019, when

                *Donna McNeill, CSR - Senior Court Reporter*

1        Mr. Nieves was found to be unfit.  I understand he returned

2        to fitness on May 8.  Judge Edwards presided and counsel was

3        appointed July 23 by Judge Clott, and we are meeting for the

4        first time since.  Is that correct?

5               MR. MARTIR:  That's correct, Your Honor.

6               THE COURT:  All right.  So prior to the 730 order,

7        motions were complete.  A Huntley/Dunaway hearing had been

8        ordered.  The grand jury minutes were found to be

9        sufficient.

10              So, Mr. Rivet, where are we on an offer?

11              MR. RIVET:  Your Honor, the current recommendation

12       is the same as it was back from, I believe the last date

13       which was August of last year 2019 which is twelve years

14       with five years of post-release supervision.

15              THE COURT:  All right.  Mr. Martir, have you

16       received all the discovery?

17              MR. MARTIR:  There's a problem.  Mr. Daniel Hupert

18       who was prior counsel made a -- I made a couple of number of

19       calls, and he had a number that had been provided, was a

20       number that was just not responsive and wouldn't allow me to

21       leave a message.  I just got his cell phone number and left

22       him a message.

23              My understanding is the discovery is voluminous,

24       and he wanted to find a way of getting the materials to me.

25       That has been my attempt in the last three weeks with the

Proceeding                                                    4

1    issue with the number, but that number that I had was just

2    not good.  I left a message requesting arrangement to get

3    the materials, allow me to review it for Mr. Nieves.

4                THE COURT:  Is all the discovery electronic in

5    nature?

6                MR. RIVET:  I believe that the discovery was likely

7    provided prior to the implementation of DANY discovery.

8    What I can do, counsel, is, I can insure that everything has

9    been digitalized, and if so, or rather, if not, I will

10   digitize it and get that sent to you through the eDiscovery

11   sharing application which that way at least can reduce the

12   amount of time it takes to get it from previous counsel.

13               MR. MARTIR:  Whatever you can do will be

14   appreciated.

15               THE DEFENDANT:  One other thing.

16               MR. MARTIR:  One other thing just for Mr. Nieves'

17   benefit.  I have attempted to set up some video conferences,

18   but they're not doing any at this point.  So that's what's

19   made it difficult for me to reach out to him since they're

20   not allowing video conferencing at this point.

21               THE DEFENDANT:  I appreciate that.  So are you

22   saying you tried to reach me in the past but couldn't?

23               MR. MARTIR:  They're not setting up video

24   conferencing at all.

25               THE DEFENDANT:  So is this the last one we're

                  *Donna McNeill, CSR - Senior Court Reporter*

Proceeding                                                    5

1    having?

2              MR. MARTIR:   Until they reinstate video

3    conferencing.

4              THE COURT:   Mr. Martir, who did you speak to about

5    that because I was under the understanding that they are

6    allowing it now?

7              MR. MARTIR:   I called two weeks ago and spoke with

8    the video conferencing room.  Stacey I believe.

9              THE COURT:   But don't contact them.  Jen, are you

10   on the line?  No, all right.  Do you know who -- hold on a

11   second.

12             THE DEFENDANT:   Mr. Martir.

13             MR. MARTIR:   We'll talk later.  Don't talk now.

14             THE DEFENDANT:   Okay.

15             THE COURT:   Mr. Martir, I don't have the direct

16   contact for you, but my understanding is that there are ways

17   to arrange directly through Department of Corrections, not

18   through the video conferencing unit from the courthouse, but

19   through the court, but directly with corrections where you

20   can do video conferencing with your client.

21             MR. MARTIR:   I'll get that number then.

22             THE COURT:   All right.  You could call Mr. Albert

23   Stein I guess in the first instance.  Maybe he'll be able to

24   give you the contact information.

25             MR. MARTIR:   Okay.

1           THE COURT:  Otherwise if you need to contact the

2    corrections liaison at the courthouse now and they should be

3    able to point you in the right direction as well.

4           All right.  That way the two of you can have time

5    to speak as well as you'll be able to review the discovery.

6           Have you engaged in plea negotiations?  Are you

7    going to be engaged in plea negotiations?

8           MR. MARTIR:  Your Honor, like I said, I need to

9    speak with my client, review the discovery, and then not

10   only know what the offer, I guess he knew what the offer

11   was, that was not communicated to me at the last conference

12   we had with the judge March 7.

13          THE COURT:  Why don't we do this?  I'll give you an

14   October date for control purposes.

15          MR. MARTIR:  Fine, Judge.

16          THE COURT:  With the understanding you want to

17   advance the case for any particular reason, let us know,

18   we'll squeeze you in.  My calendar right now is scheduled

19   two weeks up, two weeks down and so on.  I'm up the week of

20   October 13th if that's good for you.

21          MR. MARTIR:  That's fine, Judge.

22          THE COURT:  All right.  What I'll do is put you on

23   for October 13th for control with the understanding that it

24   will be one day that week but not necessarily that day.

25   Once we get the assigned slots by Department of Corrections,

*Donna McNeill, CSR - Senior Court Reporter*

Proceeding                                                          7

1      then we will let you know.

2                  THE DEFENDANT:  Judge, Your Honor, may I address

3      you, please?

4                  THE COURT:  Before you speak, let me just tell you

5      there is a court reporter on the line who is writing down

6      everything you say.

7                  THE DEFENDANT:  Okay.

8                  THE COURT:  So it's in your best interest not to

9      talk about the facts of the case 'cause anything you say can

10     be used against you.

11                 THE DEFENDANT:  I understand, sir.

12                 THE COURT:  Okay.

13                 THE DEFENDANT:  So, you know, I've made the worse

14     phone calls, my attorney, and I want to ask my attorney if

15     he could help me.  We'll speak about that afterwards I

16     guess, but I wanted to ask you directly if in light of all

17     the facts, in light of all my complaints, you know, I filed

18     a complaint against the current program, you know, which had

19     substantial overwhelming evidence in my defense at least for

20     release on my own recognizance.

21                 I filed a writ of habeas corpus.  There's a lot of

22     evidence in my favor, and I was hoping that you would

23     consider releasing me on my own recognizance because I'm not

24     a danger to the community.

25                 This is a case where I was actually hospitalized by

                    *Donna McNeill, CSR - Senior Court Reporter*

Proceeding                                          8

1    police, you know, who didn't determine that was any criminal

2    intent nor significant damage to property nor person.  They

3    decided to civilly commit me.  I was hoping you will

4    consider releasing me in my own recognizance.  That way I'll

5    go into protection, in protection of mental health in the

6    civil unit.  I was hoping that you could help me.  This way

7    because I have charges that's written in the felony

8    complaint.

9             THE COURT:  I know a bail application was already

10   made before Judge Edwards on May 8.

11            So, counsel, is there any new circumstances or

12   changed circumstances?

13            MR. MARTIR:  Well, Judge, I indicated I'm not aware

14   of, but I would like the opportunity to speak with him and

15   if there is additional information that may have not been

16   presented at that time, I would like to have the option or

17   leave to do that.

18            THE COURT:  Absolutely.  If you find that there's

19   some change, you can advance the case for a bail

20   application.

21            Mr. Rivet, anything else by the People?

22            MR. RIVET:  No, Your Honor.

23            THE COURT:  All right.  Mr. Martir, anything else?

24            MR. MARTIR:  Nothing further, Your Honor.  I will

25   get in touch with corrections and set up a video

*Donna McNeill, CSR ~ Senior Court Reporter*

Proceeding                                    9

1    conferencing if I can, Your Honor.

2              THE DEFENDANT:  I'll talk to you, Mr. Martir.  Can

3    we talk now some more before you leave?

4              MR. MARTIR:  If that's available at this time.

5

6

7                   *   *   *   *   *   *   *

8

9

10   CERTIFIED to be a true and accurate transcription of the

11   aforementioned proceedings held in the above matter.

12

13

14   _Donna Mc Neill_____

15   DONNA McNEILL, CSR, Senior Court Reporter

16

17

18

19

20

21

22

23

24

25

Exhibit 14

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK : CRIMINAL TERM : PART 81
 2  ------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK  : Indictment No:
 3                                       : 1241-19
                                         :
 4              -against-                :
                                         :
 5  MICHAEL NIEVES,                      :
                                         :
 6                                       :
                            Defendant  : CALENDAR CALL
 7                                       :
    ------------------------------------x
 8                        111 Centre Street
 9                        New York, New York  10013
                          October 13, 2020
10

11  B E F O R E:
12           HONORABLE CURTIS FARBER,
                JUSTICE OF THE SUPREME COURT
13

14  A P P E A R A N C E S:
15
                 CYRUS VANCE, ESQ.
16         DISTRICT ATTORNEY, NEW YORK COUNTY
                (For the People)
17              One Hogan Place
                New York, New York  10013
18         BY:   CHRISTOPHER RIVET, ESQ.
                Assistant District Attorney
19

20         CARLOS MARTIR, ESQ.
                (For the Defendant)
21

22

23

24                        Dawn M. Candella
                          Senior Court Reporter
25
```

1     COURT CLERK:  Calendar number 10, Michael Nieves,

2   indictment 1421 of '19.

3     Appearances, please?

4     MR. RIVET:  Good afternoon.

5     For the People, Christopher Rivet, R-I-V-E-T.

6     MR. MARTIR:  Carlos Martir on behalf of

7   Mr. Nieves.

8     THE COURT:  Good afternoon to both of you.

9     And good afternoon, Mr. Nieves.  I am Judge Curtis

10  Farber and I will be presiding at today's proceedings.  Are

11  you able to see and hear me without any problem?

12     THE DEFENDANT:  Yes, sir.

13     THE COURT:  Are you also able to see and hear both

14  your lawyer as well as the prosecutor?

15     THE DEFENDANT:  Yes, sir.

16     THE COURT:  At any point in time if you become

17  unable to hear or see any of us, you need to let me know

18  right away.  Do you understand?

19     THE DEFENDANT:  Yes.

20     THE COURT:  All right.

21     So I saw everyone back on May 8th.  Mr. Nieves had

22  returned fit, it was Judge Edwards, and new counsel was

23  ultimately assigned July 23rd and I actually saw everyone on

24  August 25th and we adjourned till today for control

25  purposes.

1           So where are we at, Mr. Rivet?

2           MR. RIVET:  On October 6th, I provided discovery

3    to defense counsel.  My understanding was that the previous

4    ADA had already served all discovery on prior counsel.  I

5    guess there was an issue with getting that to the new

6    attorney.

7           In reviewing the discovery that has been compiled

8    thus far from the previous ADA, I noticed that there were

9    some missing documents and missing documentation, video and

10   911 calls, so I have been working on trying to obtain that.

11   In fact, just this morning I was able to get some of those

12   things, so I will be providing that to counsel later today.

13          With respect to the other body cam footage and

14   memo books, I am still working on that, Your Honor.  I

15   should know hopefully by the end of the week whether or not

16   I will be saying that those items are lost or destroyed and

17   would hopefully be able to file a Certificate of Compliance

18   no later than a week or a week and a half from today.

19          THE COURT:  All right.

20          And has there been any discussions about revising

21   your original plea offer?

22          MR. RIVET:  I did speak with my supervisor and, at

23   this time, we are not going to change anything about the

24   current offer.

25          THE COURT:  Is it still 12 years jail, five years

1  post?

2             MR. RIVET:  That is it, yes, Your Honor.

3             THE COURT:  Even though there had been the 730

4  issues, your office is not taking that into consideration?

5             MR. RIVET:  I discussed it with my supervisor,

6  Your Honor, and the short answer is no.

7             THE COURT:  Mr. Martir?

8             MR. MARTIR:  Yes, Your Honor.

9             Just to confirm that I have received discovery.

10  Discovery is voluminous.  One of the reasons why Mr. Nieves

11  has attempted to reach out to me a number of times, but we

12  couldn't discuss the case since I did not have the

13  discovery.  I then indicated it is voluminous.  We have been

14  in contact and it takes a while to review it, but, once I

15  have reviewed it, I will provide it to Mr. Nieves, unless

16  there is a motion to not allow him to have this material.  I

17  will review it and will be able to discuss the case with

18  Mr. Nieves properly.

19             He has attempted to reach out to me and I am sure

20  it is frustrating, but, like I said, I did not have the

21  discovery.  I do have it now and I am sure the People will

22  continue with their efforts to provide me with the

23  materials.

24             THE COURT:  All right.

25             What do you want me to do in terms of an adjourn

1  date?

2          THE DEFENDANT:  May I speak, please?

3          THE COURT:  One second, Mr. Nieves, and I will let

4  you speak.

5          MR. MARTIR:  I would like to have at least three

6  weeks to review the materials and, if there are any

7  materials missing or evidence, to allow me to have a meeting

8  or discuss it with the People.

9          THE COURT:  What I was going to propose was a

10  longer date with the understanding that you can always

11  contact me to conference the case either on the record or

12  off the record, obviously with your adversary present,

13  because, I mean, we are going to be going forward to a

14  trial and there is not going to be any trial capacity for

15  a while.

16          MR. MARTIR:  Okay, Judge, that is fine.

17          THE COURT:  The choice is end of November or

18  beginning of January.  I only choose those two times because

19  that is when my part is up.

20          MR. MARTIR:  I understand.  I would ask for

21  January, Your Honor.

22          THE DEFENDANT:  No, no, no, that is way too long.

23  That is way too long.

24          All due respect, can I speak, Your Honor?

25          THE COURT:  Mr. Nieves, just be careful what you

1 are about to say because there is a court reporter that is
2 writing down everything that is being said and, if you talk
3 about the facts of the case, it could be used against you.
4 If it's something unrelated to the facts of the case, that
5 is fine, but be careful.

6       THE DEFENDANT:  I understand, sir.

7       With all due respect, Your Honor, since counsel
8 Mr. Martir has been employed --  can you hear me, sir?

9       THE COURT:  Yes, I can hear you fine.

10       THE DEFENDANT:  Since counsel has been appointed
11 around July of this year, I have had no discussions at all
12 over the phone with Mr. Martir per his obligation to do so.
13 For the past three months I have had no telephone
14 conversations with him, no visits with him whatsoever, no
15 mail correspondence whatsoever, he's not answered any of my
16 messages.  My social worker called him on one occasion
17 several weeks ago and he told the social worker that he
18 would have a video conference with me to discuss the case.
19 He's never done this whatsoever.

20       During August 25th, counsel had indicated on the
21 record that he could not have video conferences with me due
22 to procedures and policy of DOC.  You, on the record,
23 corrected him, Judge Farber, saying he is allowed to have
24 video conference with me.  Mr. Martir has never scheduled
25 any video conferences with me whatsoever, answered any of my

1    phone calls.  I have had multiple lawyers contact him asking

2    him to contact me to speak to me over the phone, I've had

3    his supervisor Mr. Alperstein contact him, I have had 18B

4    panel email him on two occasions, he's neglected these type

5    of petitions on numerous occasions.

6          I asked him over the phone to file habeas corpus

7    on my behalf, which indicates 1993 for false prosecution.  I

8    asked him to file a writ of habeas corpus and he's done

9    nothing of what I asked him to do.

10          I filed a motion to have me released on my own

11    recognizance indicating the new bail reform laws.  I humbly

12    asked Mr. Martir to help me on a number of occasions and

13    he's neglected me with deliberate indifference against his

14    code of professional conduct and I am asking Your Honor to

15    please have counsel reassigned.

16          MR. MARTIR:  As I indicated, I have spoken to a

17    number of people that called me and I am not in a position

18    to discuss a case without having any documents.  I don't

19    have any documents.  I have received messages from

20    Mr. Nieves, I have indicated to his social worker to have

21    him call me at a time that I am available.  I am not

22    avoiding him.

23          THE DEFENDANT:  No, no, you are avoiding me.  That

24    is a blatant lie.

25          THE COURT:  Mr. Martir, when can you visit?

1    MR. MARTIR:  Excuse me, Your Honor?

2    THE COURT:  When can you arrange for a video

3    visit?

4    MR. MARTIR:  Your Honor, once again, I have

5    applied a number of times and the facility has not been able

6    to coordinate the meeting.  I would be willing, now that I

7    have the discovery, to meet with him in person at the

8    facility that he is in, I have no problems with that.

9    THE DEFENDANT:  With all due respect, Your Honor,

10   I'd like different counsel reappointed.  This counsel is not

11   representing me in my best interests.  There is evidence all

12   over the phone records of this.  I have numerous attorneys

13   who will call and let you know that this lawyer is not

14   representing me.  He is not doing nothing for me whatsoever.

15   THE COURT:  Mr. Martir?

16   MR. MARTIR:  Your Honor, just for the record, as I

17   indicated, I just got discovery recently from the People.

18   Discussing a matter without having any information does not

19   make a meeting productive.

20   THE COURT:  Mr. Martir, are you going to be able

21   to work with Mr. Nieves?

22   MR. MARTIR:  Absolutely, Judge.  I definitely have

23   no issues.  I don't know if I am the third, but I am at

24   least the second attorney in this case.  I am prepared to

25   represent him.  I am experienced.  I certainly do not negate

1  my responsibilities to my clients, Your Honor.

2         THE COURT:  I am not saying you did, I just want

3  to make sure it is going to be able to be a working

4  relationship.

5         MR. MARTIR:  Now that I have the discovery, Your

6  Honor, I can discuss the matter with Mr. Nieves.  That is

7  not an issue.

8         THE DEFENDANT:  Your Honor, all due respect, all

9  due respect, please, Your Honor, all due respect, please

10  have counsel reassigned.  I have been locked up 18 months

11  already for a case that I've been already civilly committed

12  before.  There is so much evidence in favor of at least me

13  being released on my own recognizance.  I have not heard

14  Mr. Martir once argue for me to be released on my own

15  recognizance or to have the bail reduced.

16         THE COURT:  Okay.

17         THE DEFENDANT:  There is nothing on my behalf to

18  help me.

19         THE COURT:  Mr. Nieves, how about if I put the

20  case over for a few weeks, give Mr. Martir an opportunity to

21  speak with you and, after he meets with you, if you still

22  feel you cannot work with him, I will give you a new lawyer,

23  how's that?

24         THE DEFENDANT:  So may I ask when this court date

25  will be?

```
 1              THE COURT:  I will put it over for like --
 2              (WHEREUPON, THERE WAS A PAUSE IN THE PROCEEDINGS)
 3              THE COURT:  How's November 10th?
 4              MR. MARTIR:  Your Honor, that is not good for me.
 5   I start a federal trial on the 10th and that is a solid
 6   date.  I am available the 6th, the 4th, the 5th.
 7              THE COURT:  November 6th.
 8              MR. MARTIR:  Thank you, Judge.
 9              MR. RIVET:  If possible, Your Honor, that first
10   week of November I have been planning on taking off.  I do
11   have some appearances before you, but my schedule is rather
12   light, if it's a factor that Your Honor can take into
13   consideration.
14              THE COURT:  If you plan to take off --
15              So are you around the following week?
16              MR. MARTIR:  Yes, Your Honor.
17              THE COURT:  Mr. Martir, can you do Monday, the
18   9th, the day before your federal trial?
19              MR. MARTIR:  Yes, Your Honor.
20              THE COURT:  All right.
21              Does that work for you, Mr. Rivet?
22              MR. RIVET:  Yes, Your Honor.  Thank you.
23              THE DEFENDANT:  With all due respect, Your Honor,
24   with all due respect, Your Honor, I cannot have one
25   conversation with Mr. Martir in three months.  In three
```

1    months he has not visited me.

2         THE COURT:  I understand what you are saying.

3    What he wanted to do is wait till he had all the discovery

4    to meet with you, otherwise the conversation would be very

5    limited.  So he now has given us his assurance that he is

6    going to come out and personally visit you.  So let him come

7    out and personally visit you, review the discovery, and

8    then, if you feel that you can't work with him, you will let

9    me know and I will have another lawyer assigned.

10        THE DEFENDANT:  I understand, Your Honor.  With

11   all due respect, this is an attorney who is on the record

12   now for the second time not even arguing in my behalf for

13   bail reduction according to new bail reform laws going to

14   have the case dismissed nor to have me released on my own

15   recognizance.  There is all types of documents and evidence

16   he could have gathered.  I have documents he could have

17   looked at to ask you to have my case released on my own

18   recognizance.

19        THE COURT:  I am sure if he thinks it is

20   appropriate he will make those applications on November 9th.

21   I am not precluding any of those applications, you can

22   always make them, he was just waiting for the discovery.  So

23   let's see what happens on November 9th and, again, if you

24   feel on November 9th that you still don't want to work with

25   him, I will have another lawyer lined up.

1   THE DEFENDANT:  Your Honor, Judge, Mr. Martir

2   isn't asking you to release me on my own recognizance.

3   THE COURT:  Well, I mean, I will tell you, you

4   talk about the bail reform law but certain charges, such as

5   the one in this case, aren't automatically what you would

6   call not bail eligible.  These charges you can still have

7   bail set.  So you're talking about the bail reform, it does

8   and does not apply to you in this situation.  The third form

9   of bail is appropriate, yes, it's been set when it hadn't

10   been set originally.  A determination has already been made

11   that the least restrictive form of release conditions were

12   set to ensure your return to court.  But let him look over

13   the discovery and, if he sees something that is in the

14   discovery that I am not aware of, he will let me know and he

15   will make a new application.

16   THE DEFENDANT:  Your Honor, with all due respect,

17   I know you have to conclude this, but I would like to remind

18   you and the Court, I am sure you may be aware, there is a

19   case predicated on due process violations per CPL 180.80,

20   due process requires that within an arrest I'm supposed to

21   be arraigned within 72 hours, at the most.  This is the case

22   where I was sent to Harlem Hospital.  I won't go into all

23   the details.  I was released from custody by PD, I was

24   released back to the community and, subsequently, fire

25   marshall came to arrest me on a fabricated felony complaint.

1    This is a case I been arraigned for 30 days after the fact

2    occurred.  This is the case that is being prosecuted in

3    gross due process violation.  I'd like to --

4          THE COURT:  I understand what you are saying and

5    we are going to take it all under consideration on

6    November 12th.

7          THE DEFENDANT:  November 12th or the 9th, sir?

8          THE COURT:  What date did we say?

9          9th, excuse me, you are correct, November 9th.

10          THE DEFENDANT:  Your Honor, with all due respect,

11    can you direct Mr. Martir to have telephone conversations

12    with me?  It's possible to speak to me over the phone.

13    There is no way he can continue being my attorney without

14    speaking to me over the phone.  All my attorneys have spoken

15    to me over the phone.

16          THE COURT:  Mr. Martir, obviously, I understand

17    your schedule, but, to the best that you are able to, I

18    would encourage telephone contact with Mr. Nieves in

19    addition to the in-person visit that you tell us you are

20    going to have.

21          MR. MARTIR:  Yes, Your Honor.

22          THE COURT:  All right.

23          THE DEFENDANT:  Thank you, sir.

24          THE COURT:  You are welcome.

25          All right, I will see you back on November 9th.

1          MR. MARTIR:  Take care, Mr. Nieves.

2          THE DEFENDANT:  Okay, sir.

3

4

5          I, Dawn M. Candella, in and for the State of New
   York, do hereby certify that the foregoing transcript is
6  true and accurate to the best of my knowledge, skill and
   ability.
7

8          *Dawn Candella*
           Dawn M. Candella,
9          Senior Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Dawn M. Candella*
*Senior Court Reporter*

Exhibit 15

1

```
 1  SUPREME COURT: NEW YORK COUNTY.
    TRIAL TERM : PART 81
 2  ------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK
 3                                          IND.#:
                                            1241/2019
 4
                 -against-
 5
 6  MICHAEL NIEVES                    PROCEEDINGS:

 7      Defendant.
    ------------------------------------X
 8
                        100 Centre Street
 9                      New York, New York 10013

10
                        November 9, 2020
11

12  B E F O R E:    HONORABLE CURTIS FARBER
                    Justice of the Supreme Court
13

14  A P P E A R A N C E S:

15
    FOR THE PEOPLE:
16
            CYRUS R. VANCE, JR., ESQ.
17          New York County District Attorney
            One Hogan Place
18          New York, New York  10013
            BY:  CHRISTOPHER RIVET, ESQ.
19          Assistant District Attorney

20
    FOR THE DEFENDANT:
21
            CARLOS MATIR, ESQ.
22          For the Defendant

23

24
                                Theresa Magniccari
25                              Senior Court Reporter
```

```
 1              (Whereupon, the following proceeding took place
 2    virtually via Microsoft Teams:)
 3              ***
 4              THE CLERK:  Calendar Number 5, Michael Nieves,
 5    Indictment 1241 of 2019.
 6              MR. RIVET:  For the People, Christopher Rivet,
 7    R-I-V-E-T.
 8              THE COURT:  Good afternoon.
 9              Carlos Matir, on behalf of Mr. Michael Nieves.
10              THE COURT:  Good afternoon.
11              Good afternoon, Mr. Nieves.
12              THE DEFENDANT:  Good afternoon.
13              THE COURT:  Mr. Nieves, I am Judge Curtis Farber.
14    I will be presiding at today's proceedings.  I want to make
15    sure you are able to see and hear me without any problem.
16    Are you also able to see and hear both your lawyer as well
17    as the prosecutor?
18              THE DEFENDANT:  Yes, sir.
19              THE COURT:  If at any point in time you become
20    unable to hear anyone of us, please let me know right away;
21    do you understand?
22              THE DEFENDANT:  Absolutely.
23              THE COURT:  All right.
24              So this matter was on for the possibility of a
25    change in counsel or other matters.  What is going on, Mr.
```

Proceedings                                    3

1    Matir?

2    ~~MR. MATIR:   Well, your Honor, I spoke with my~~

3    client, I meet with him about two weeks ago at Bellevue.

4    I am trying to communicate with him and have him understand

5    the nature of the charges, and it wasn't a productive

6    meeting, but I certainly have spoken with him on the phone

7    to indicate my willingness to continue representing him with

8    respect to the charges that are pending against him.

9          THE COURT:   All right.

10         MR. MATIR:   I have indicated to him that the issues

11   that he wishes me to concentrate on are not really the

12   issues that are part of this case.  But, like I said to him,

13   I am making the statement to the court, I am still prepared

14   to represent him in this criminal matter.

15         THE COURT:   Mr. Nieves.

16         THE DEFENDANT:   Your Honor, with all due respect to

17   the court and to Mr. Matir, during our last conversation

18   with Mr. Matir he indicated and implied that he had enough

19   evidence to potentially have this case dismissed or for me

20   to be released on my own recognizance.  There is a phone

21   record of it.  I don't need another lawyer.  He knows how to

22   defend the case in my best interest that doesn't rely on the

23   prosecutor's motive for this matter.  So I would like to

24   address the court according to the 14th Amendment due

25   process equal protection of the law in my matter in which I

1    am allowed to defend myself on the record neither as a

2    pro se defendant per se, but as a defendant in general where

3    since my due process rights and the 4th and 5th Amendment of

4    the constitution have been violated in this matter,

5    respectfully, your Honor, I would like to address the court

6    on the record and to have you consider my arguments which

7    would be very brief in this matter.

8             THE COURT:  I am listening.

9             THE DEFENDANT:  Thank you, sir.

10            So the issues that I brought to Mr. Matir's

11   attention and I would like to bring to your attention in

12   this matter is that according to records and according to

13   documentation that I provided to Mr. Matir, that has been

14   emailed to him from my mental hygiene attorney, Ken Maccum

15   two weeks ago, point one is that at the beginning of this

16   case, your Honor, with the Legal Aid Society, Davim Hurwitz,

17   you indicated on the record that the prosecutor was supposed

18   to comply with all discovery, all body cam information

19   timely.  That's within the 45 day period max.  To date,

20   since the last court hearing on the schedule, the prosecutor

21   indicated that no full discovery has been provided to

22   counsel.  That it has been provided in part and other body

23   cam material is still not forthwith.  Not only that, your

24   Honor, that situation, this is in violation of Discovery

25   Reform Law Article 245, in which case a compliance

Proceedings                                    5

1    certificate should have been filed within the 45 day period

2    after I was arraigned on this matter.  As of today, no

3    certificate of compliance has been filed on the record in

4    violation of the discovery reform laws.

5         THE COURT:  Mr. Rivet, where are you in

6    discovery?

7         MR. RIVET:  All discovery in possession of the

8    People has been turned over to counsel.  I do need to file a

9    certificate of compliance.  I haven't put together the

10   discovery list that is required to be filed with the

11   certificate of compliance.  All discovery that is in my

12   possession has been turned over to counsel.

13        THE COURT:  The discovery has been turned over,

14   it's just a formality now for Mr. Rivet to file the

15   certificate.

16        Let me move onto your next point.

17        THE DEFENDANT:  In regards to that matter as well,

18   the law is clear and strict where it says within 45 days

19   according to the new reform law that a compliance

20   certificate should have been filed on the record according

21   to the law.  That certificate of compliance has not been

22   filed.  Discovery has not been provided in full to counsel

23   in about 18 months.  On the last court date the prosecutor

24   indicated --

25        THE COURT:  Mr. Nieves, we have a very limited time

Proceedings                                               6

1    slot.

2         THE DEFENDANT:  I get to see you very briefly, very

3    shortly, I have to address the matters.  I am being falsely

4    incarcerated.  The DA is violating the law.  Counsel is not

5    fully representing me.

6         THE COURT:  The District Attorney is getting

7    charged the time to file the certificate of compliance.  He

8    has given the discovery and he has to file the certificate

9    of compliance.

10        Your next issue.

11        THE DEFENDANT:  The next issue, according to

12   records, I was locked up, I was arrested without probable

13   cause, a violation of the Fourth Amendment.  The police

14   records, the hospital records show I was submitted to a

15   civil proceeding at Harlem Hospital for care and treatment.

16   I was not a prisoner there, according to the medical records

17   there.  I was released to the community 30 days later, where

18   police then came and arrested me on the same incident in

19   violation of CPL 140, in violation of CPL 180.80, timely

20   arraignment hearing.  This is a matter that is being

21   prosecuted in a gross due process violation.

22        What you all did was respect police in this matter,

23   if they intended to arrest me and have me prosecuted, they

24   was supposed to stay with me at the premises at Harlem

25   Hospital and escort me to Bellevue Hospital.

1      THE COURT:  All procedures will be addressed during

2   the proceeding.  There is nothing to be addressed now.  I am

3   not making any determination regarding this issue.  Mr.

4   Nieves, what I am about to do is set your case down for

5   trial.  So I just need you to understand.  Are you ready to

6   go forward with trial?

7      THE DEFENDANT:  I would like counsel reassigned.

8   With all due respect, he has provided ineffective assistance

9   of counsel.  Counsel has overwhelming evidence in my favor

10  to request for indictment dismissal or release on my own

11  recognizance.  I would like counsel reassigned.  He has not

12  answered any of my phone calls, he plays games over the

13  phone without answering my phone calls.

14      THE COURT:  I have given you three different

15  lawyers.  You have had Davim Hurwitz, you've had Daniel

16  Hupert, and now you have Mr. Matir.  You can't keep going

17  through lawyers.

18      THE DEFENDANT:  He is not representing me.  My

19  rights are not being respected pro se.  I am here on the

20  record indicating there is prosecution misconduct and a

21  gross due process violation and constitutional violation and

22  I am indicating that the prosecution has not complied with

23  discovery reform laws.  I do not have access to any

24  discovery information.  He is not adequately representing

25  me.

1           THE COURT:  Say that again.  Have you made the

2    discovery available to your client?

3           MR. MATIR:  I provided and mailed an additional

4    package of material.  I informed him based on my

5    conversation with prior counsel, I was also provided

6    discovery, the District Attorney provided me discovery

7    because prior counsel, because of whatever delays, was not

8    able to provide me with the materials, but prior counsel has

9    informed me that Mr. Nieves has what I have, but I have

10   provided him additional --

11          THE DEFENDANT:  With all due respect, he is not on

12   the record representing me.  He has not said one word in my

13   defense to have the case dismissed on the record.  He has

14   not at one point asked for me to be released in my own

15   recognizance, citing all the case laws and strategy in

16   violation.

17          With all due respect, I would like counsel

18   reassigned according to my rights.  I would like to address

19   the court pro se.

20          THE COURT:  I am not giving you another lawyer.

21   You have gone through three.  You have used up your

22   allotment.

23          THE DEFENDANT:  I would like to address the court

24   pro se.

25          THE COURT:  You had prior attorneys who were hard

1    working attorneys.  You have a hard working attorney now.

2    There is no reason.  I am not going to do this.  I gave you

3    three different attorneys.  I told you on the last date, I

4    am pretty sure I said that this is going to be your last

5    attorney.

6              THE DEFENDANT:  You did not say that.  With all due

7    respect, you said give it three weeks, see how it goes.  If

8    the attorney is not representing you, I will assign you a

9    different attorney.

10             THE COURT:  But now he told me he visited you.  You

11   confirmed he visited you.  He sent you the package of

12   material.  If you want to proceed pro se, tell me, I will

13   ask you some questions about that now.  Do you want to go

14   pro se?

15             THE DEFENDANT:  Yes, I would like counsel removed.

16             THE COURT:  Those are two different things.  Pro se

17   means you are going to have no lawyer, you are going to

18   represent yourself.  Is that what you want to do?

19             THE DEFENDANT:  Yes, I want no lawyer, I want to

20   represent myself.

21             THE COURT:  I will make a determination on whether

22   or not that's appropriate.

23             Mr. Nieves, you have made an application to

24   represent yourself at trial.  The law requires that before I

25   rule on this application, I must first determine whether

1    your decision to give up the right to be represented by a

2    lawyer is knowingly and intelligently made.  I will make

3    that determination after I ask you a series of questions.

4    I will rely on your answers to these questions in deciding

5    whether your request to represent yourself is knowing,

6    intelligent and unequivocal.

7              If at any point I or anyone else says something you

8    do not understand, please call that back to my attention.

9    We will continue until you understand.

10             Tell me your first name and date of birth.

11             THE DEFENDANT:  Michael Nieves.  Date of birth,

12    2/2/82.

13             THE COURT:  Do you read, write, speak and

14    understand the English language?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  How many years of schooling have you

17    had?

18             THE DEFENDANT:  I completed my GED at 17.

19             THE COURT:  And have you gone onto college?

20             THE DEFENDANT: No, sir.

21             THE COURT:  What is your employment history?

22             THE DEFENDANT:  My employment history?

23             THE COURT:  Have you ever worked?

24             THE DEFENDANT:  Yes, I worked at Office Assignments

25    at 19 years old.  I worked for graduate school.  I worked

Proceedings                                    11

1     for Credit Alliance, an international investment bank.

2                THE COURT:  What did you do there at the bank?

3                THE DEFENDANT:  I worked as an office manager and

4     also worked as database engineer.  I created databases for

5     the vice-president and president of the Compliance

6     Department.  I worked as a junior administrative assistant

7     for NYU School of Graduate Arts and Science.  I worked for

8     the Dudley (sic) Agency as a senior receptionist, spread

9     sheet designer.

10               THE COURT:  Have you ever been involved in the

11    Criminal Justice System before?

12               THE DEFENDANT:  Yes, sir.

13               THE COURT:  Mr. Nieves?

14               THE DEFENDANT:  Yes, sir, I have.

15               THE COURT:  What was your past record?

16               THE DEFENDANT:  My past record, I believe I was

17    previously sentenced to five years by you in 2009.

18               THE COURT:  You weren't sentenced by me, I wasn't

19    even a Judge then.

20               THE DEFENDANT:  My apologies.

21               THE COURT:  What were you convicted of in 2009?

22               THE DEFENDANT:  I was convicted, I pled to

23    attempted robbery in the second degree.

24               THE COURT:  Do you have any other convictions?

25               THE DEFENDANT:  I have a conviction for criminal

Proceedings                                    12

1    possession of a weapon in the third degree.

2               THE COURT:  When was that?

3               THE DEFENDANT:  Excuse me, that was in 2004.

4               THE COURT:  Do you know how many felony convictions

5    you have?

6               THE DEFENDANT:  Approximately four.

7               THE COURT:  How many misdemeanor convictions?

8               THE DEFENDANT:  I am not too sure.

9               THE COURT:  Just so you understand correctly, you

10   have actually six felony convictions and eight misdemeanors.

11              What type of courts have you appeared before?

12              THE DEFENDANT:  I have appeared before this court.

13   I have appeared here.  This is the only court I have

14   appeared  to, Manhattan Supreme Court and Bronx Supreme

15   Court.

16              THE COURT:  Have you had enough time to reflect on

17   your decision to go pro se?

18              THE DEFENDANT:  With all due respect, I reflected

19   and I am on the record and the record reflects Mr. Matir has

20   not submitted one single motion.  There is no bail request

21   application.  There are no motions of any sort for

22   re-addressing this matter.  I presented adequate

23   information/evidence to Mr. Matir over the visit, over the

24   phone for him to have on the record advocated for my

25   release.  He is on the record mute saying nothing in my

Proceedings                                    13

1   defense.

2            THE COURT:  Can you explain to me what you are

3   charged with?

4            THE DEFENDANT:  I am being charged with burglary

5   one, arson two, reckless endangerment one, false

6   imprisonment one.

7            THE COURT:  And can you explain to me what the

8   functions of the court and the jury are?

9            THE DEFENDANT:  The function of the jury is to

10  determine whether or not I am guilty or innocent.

11           THE COURT:  What about the Judge, what is the

12  Judge's role?

13           THE DEFENDANT:  The Judge's role is to be impartial

14  and to serve as referee of sorts.

15           THE COURT:  Have you ever represented yourself

16  before?

17           THE DEFENDANT:  No, sir.

18           THE COURT:  Have you discussed this case with Mr.

19  Matir?

20           THE DEFENDANT:  Mr. Matir is a former prosecutor.

21  Okay.  And to my awareness, he is biased because of this.

22  He has adequate information.  He has a complete package of

23  evidence in my defense, including reports from the Chief of

24  Police which states the NYPD submitted me to a civil

25  proceeding instead of arresting me and prosecuting me over

1    this matter, for lack of capacity in the matter, for no

2    criminal intent in the matter, for the complainant's

3    advocating for hospitalization over arrest.  Mr. Matir has

4    more than enough information to have at least requested a

5    bail.  He is acting on the record in violation of his code

6    of professional conduct.

7              THE COURT:  Mr. Nieves, I need you to concentrate

8    on this proceeding right now.  You keep on mentioning bail

9    release.  I am trying to determine whether or not I should

10   let you represent yourself.  Let's stay focused.

11             THE DEFENDANT:  Okay.

12             THE COURT:  Why do you want to represent yourself?

13             THE DEFENDANT:  Because I am being afforded no

14   legal representation from counsel in violation of the Sixth

15   Amendment of the constitution.  That's according to Davim

16   Hurwitz.  That's according to Daniel Hupert, 18B, and

17   currently according to Mr. Matir.

18             THE COURT:  The law recognizes the right of a

19   person to defend themselves, but the law also recognizes

20   that such a choice may not be a wise one.

21             Let me alert you to some of the dangers of self

22   representation for you to be aware of before you finally

23   decide whether you want to give up your right to be

24   represented by a lawyer.

25             Even the most intelligent layman has small and

1    sometimes no skill in the field of law.  Left without the

2    assistance of counsel, he may be put on trial without proper

3    charge and convicted upon incomplete, irrelevant or

4    inadmissible evidence.  Often the layman lacks the skill and

5    knowledge to adequately prepare his defense even though he

6    has a god one.

7              THE DEFENDANT:  Can you repeat that.

8              THE COURT:  You have to let me finish.

9              Without counsel, even though an accused may not be

10   guilty, he faces the danger of conviction because he does

11   not know how to adequately protect his legal rights.

12   Lawyers are both college and law school trained before they

13   are permitted to take the bar exam.  Only those who pass the

14   bar exam are licensed to practice law.  Of that group, the

15   number who become criminal lawyers is small.  In order to

16   defend at a trial, the lawyer needs a comprehensive

17   knowledge of the rules of evidence as well as the

18   understanding of the art of jury selection and the art of

19   cross examination.  Most non-lawyers do not have such

20   education and training.

21              Do you understand that in choosing to represent

22   yourself you are not entitled to any aid from an attorney

23   throughout these proceedings at all?

24              THE DEFENDANT:  Your Honor, I am on the record

25   requesting for new counsel.  To date I have been assigned

1   malfeasance attorneys.  According to the record and

2   according to your awareness, a case like this should not

3   have proceeded this far without any record indicating what I

4   indicated on the record.  This case is a case in violation

5   of due process, in violation of all my constitutional

6   rights.  I have no representation on the record.  I am put

7   in the corner where you are saying --

8           THE COURT:  Mr. Nieves, you made a choice.  You

9   don't have to be represented by yourself.  You don't have to

10  self-represent.  You can have a lawyer.

11          THE DEFENDANT:  I don't want Mr. Matir as my

12  counsel.

13          THE COURT:  But you have gone through three lawyers

14  already?

15          THE DEFENDANT:  They're misrepresenting me.  I have

16  two lawsuits against these other malfeasance practicing

17  attorneys pending right now in the civil court.

18          THE COURT:  Once again, do you understand if you

19  represent yourself, you are not going to have the assistance

20  of an attorney throughout the proceedings?

21          THE DEFENDANT:  I understand that completely.

22          THE COURT:  Do you understand this includes your

23  own testimony as well should you testify?

24          THE DEFENDANT:  I understand that as well.

25          THE COURT:  Do you understand you will be held to

1    the same legal stance at trial as if you were an attorney?

2              THE DEFENDANT:  I understand it as well.

3              THE COURT:  Do you understand that the legal

4    profession contains many terms of art which are generally

5    unknown to an individual not trained in the law.  By

6    self-representing you risk not being able to understand the

7    terms of art that are being used in the court proceedings.

8    You may not understand what is happening.

9              THE DEFENDANT:  I understand that.

10             THE COURT:  Do you understand if you choose to

11   self-represent, you will be subject to the same rules of

12   evidence at any proceeding that an attorney would be subject

13   to?

14             THE DEFENDANT:  Your Honor, I would like new

15   counsel for the record, please.

16             THE COURT:  So you are not asking really to proceed

17   pro se.  You just don't want Mr. Matir as your lawyer.

18             THE DEFENDANT:  It's not that I just don't want

19   him.  He is on the record misrepresenting me.  He is on the

20   record for three whole months not answering a single one of

21   my phone calls.  He is on the record for three whole months

22   not giving me one visit.  He is on the record seeing me at

23   the hospital without bringing my discovery information.

24   He is on the record today -- it's not funny, Mr. Matir, I am

25   going to see you in Federal Court.

1           Now, Judge Farber, with all due respect, he is not

2   on the record today indicating that I indicated about the

3   prosecutor's lack of compliance with the certificate of

4   compliance which shows there is remedy for this matter.

5   There is sanction and remedy.

6           THE COURT:  I am going to cut you off.  We're about

7   to lose the time slot.  I am not going to go forward with

8   your request to go pro se.  It's clear to me that's not what

9   you want.  What you want is for Mr. Matir to no longer be

10  your attorney.  The trouble is, if I thought there would be

11  a lawyer that you could work with, I may consider giving you

12  a further lawyer.  It's clear to me from the fact that you

13  have gone through three, there is no one who is ever going

14  to satisfy you.  That you are going to find fault with

15  everyone unless they say what you want to believe as opposed

16  to perhaps what is really going to happen.

17          THE DEFENDANT:  Counsel never asked for me to be

18  released in my recognizance.  I am asking you to release me

19  in my own own recognizance.

20          THE COURT:  You have six felony convictions.  You

21  have tenuous community ties.  You are facing a substantial

22  amount of time if you are convicted.  The People are

23  recommending 12 years jail with five years post release

24  supervision.  Given all those factors, I have determined

25  that monetary bail is the less restrictive form of release

Proceedings                                  19

1  conditions necessary to return you to court.  That is why I
2  am not prepared to change it.  What I am prepared to do is
3  adjourn the case for control purposes to await the
4  resumption of jury trials and the case will be scheduled for
5  trial.
6           THE DEFENDANT:  What was that?
7           THE COURT:  I am going to adjourn the case to get
8  ready for trial.
9           THE DEFENDANT:  I would like new counsel.
10          THE COURT:  How is February 9th for everyone?
11          THE DEFENDANT:  I would like new counsel.
12          MR. MATIR:  That's fine.
13          THE COURT:  All right.
14          Mr. Matir, I am going to ask you to stay in contact
15  with your client.  If it becomes evidence that the two of
16  you will not work, let me know, I will hear an application
17  for new counsel.  But if it's simply a matter of personality
18  conflicts, we're exhausting the numbers of lawyers who are
19  available.
20          THE DEFENDANT:  What is the next court date?
21          THE COURT:  February 9th.
22          THE DEFENDANT:  It is for what?
23          THE COURT:  It is for control, with the
24  understanding as soon as we can start trial there is going
25  to be a trial date.

Proceedings                                      20

```
 1              THE DEFENDANT:  I would like counsel reassigned.
 2              THE COURT:  Mr. Matir, please keep me posted if
 3    there is any change in your client's status.
 4              MR. MATIR:  Yes, Judge.
 5              THE DEFENDANT:  I will file a suit, a lawsuit
 6    against you just so you know that.
 7              THE COURT:  Mr. Nieves, I will see you on February
 8    9th.
 9                        ****
10
11              Certified to be a true and accurate transcription
12    of the minutes taken in the above-captioned matter.
13
14                             Theresa Magniccari
15                             -------------------------
16                             Theresa Magniccari
17                             Senior Court Reporter
18
19
20
21
22
23
24
25
```

Exhibit 16

1

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK : CRIMINAL TERM : PART 81
2   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3   THE PEOPLE OF THE STATE OF NEW YORK

4                   -against-                    Indictment

5   MICHAEL NIEVES,                              1241/19

6                               Defendant.

7   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

8                               100 Centre Street
                                New York, New York
9

10                              February 9, 2021

11  BEFORE:

12              HONORABLE JUSTICE CURTIS FARBER

13  A P P E A R A N C E S :

14              CYRUS R. VANCE, JR., ESQ.
                District Attorney
15              New York County
                BY:  CHRISTOPHER RIVET, ESQ.
16                        For the People

17

18              CARLOS MARTIR, ESQ.
                          For the Defendant
19

20              DAVID TURCHI, ESQ.
                          For the Defendant
21
                                DIANA DAVILA-MONGE
22                              Sr. Court Reporter

23

24

25

2

Proceedings

```
 1          COURT CLERK:  Calling number two on the
 2   calendar Michael Nieves Indictment Number 1241 of
 3   2019.
 4          The defendant, defense counsel and the
 5   assistant district attorney are present via TEAMS.
 6          Counsel, please state your appearance for
 7   the record.
 8          MR. RIVET:  For the People Christopher
 9   Rivet.
10          Good morning, Your Honor.
11          THE COURT:  Good morning.
12          MR. MARTIR:  Carlos Martir on behalf of
13   Mr. Nieves.
14          Good morning.
15          THE COURT:  Good morning, Mr. Martir.
16          Good morning, Mr. Nieves.
17          THE DEFENDANT:  Good morning.
18          THE COURT:  Mr. Nieves, I'm Judge Curtis
19   Garber, and I will be presiding over today's
20   proceedings.
21          I want to make sure you are able to see
22   me and hear me.
23          THE DEFENDANT:  Yes.
24          THE COURT:  Are you able to see Mr. Rivet
25   as well as Mr. Martir?
```

Proceedings

1          THE DEFENDANT:  Yes.

2          THE COURT:  If at any point in time

3     during these proceedings you become unable to see

4     or hear me or anyone else who is speaking, please

5     let me know.

6          All right?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Mr. Nieves, just before I

9     turned on my camera I was able to hear you say to

10    Mr. Martir you hadn't seen or heard from him in

11    three months.

12          THE DEFENDANT:  Yes, he hasn't responded

13    to any of my phone calls.

14          He has not mailed me discovery

15    information submitted to him by the d.a. thus far.

16          He's been completely unhelpful, you know.

17    There's no motions to dismiss this case or to have

18    the charges reduced.

19          THE COURT:  I want to ask you -- I'm not

20    asking about motion practice.

21          On October 13th you had indicated the

22    possibility that you were seeking new counsel, and

23    I asked you to think about it more and it was

24    discussed that Mr. Martir and you would meet.

25          Did you meet after the last court date?

Proceedings

1              THE DEFENDANT:  Absolutely not, sir.

2              I submitted a motion for re-assignment of

3       counsel consideration and, you know, unfortunately

4       respectfully I submitted a motion to recuse you.

5              I don't want to seem like I'm being

6       arrogant or I'm challenging you or disrespecting

7       you.  I'm not.  I don't want it to be misconstrued

8       as me powertripping.

9              I'm trying to observe, you know, legal

10      protocols in ways to get assistance when it's not

11      working right the way it's supposed to, you know.

12             So, I want to apologize if you are

13      offended because I sent information to the press

14      about this.  I don't want to incite, you know, the

15      anger of The Court any further than it is, but I

16      need help.

17             THE COURT:  I'm not upset at all.

18             In fact, you will see another person's

19      name on the screen David Turchi who I lined up in

20      advance for your benefit.

21             Let me speak to Mr. Martir.

22             MR. MARTIR:  Well, Your Honor, Mr. Nieves

23      has reached out to me at least fourteen times a day

24      with messages.

25             I have been in touch and obviously, Your

Proceedings

1       Honor, I was prepared to discuss prior to

2       Mr. Nieves coming on the screen my daily contact,

3       weekly contact with the medical personnel, which I

4       really don't feel comfortable discussing at this

5       point, but I have been in touch with them on a

6       daily basis.

7                My last meeting with Mr. Nieves was not

8       productive.  In fact it was not productive.  I'm

9       just going to say that, Judge.

10               THE COURT:  You actually did meet?

11               MR. MARTIR:  Yes, at Bellevue and right

12      now, Your Honor, Mr. Nieves has been in Bellevue

13      for approximately six months.

14               Once again I'm working on trying to get

15      this case resolved, not resolved in terms of a plea

16      which is not what he wants, but he still harps on

17      the procedural motions that he has been engaged in

18      and I am trying to get him to understand the

19      aspects of the defense in this case, not the

20      procedural.

21               As Your Honor recalls at the last

22      conference that was the bulk of Mr. Nieves'

23      contention with respect to this case.

24               I was prepared to ask The Court to render

25      another 730, which is what the recommendation of

Proceedings

1      the medical personnel is.

2              He's certainly not aware at least not

3      assisting in a defense of this case.

4              THE DEFENDANT:  Your Honor, with all due

5      respect, the record speaks for itself, you know.

6              You saw my motion to reassign counsel.  I

7      sent in a motion for habeas corpus.  I have been

8      very cooperative with my attorney.

9              He hasn't filed any motions on my behalf.

10     He has not once on the record spoke in my defense,

11     and I have been very patient and humble with

12     Mr. Martir.

13             I understand exactly what's going on in

14     court right now.  We cleared that last time when

15     you asked me whether or not I wanted to waive

16     counsel, which I had refused.

17             THE COURT:  All right.  Mr. Nieves,

18     although I had indicated that, you know, you have

19     already gone through three attorneys, there does

20     seem to be some breakdown in the relationship

21     between you and Mr. Martir.

22             Are you still asking for a new attorney?

23             THE DEFENDANT:  Absolutely, sir.

24             For the record I am absolutely requesting

25     new counsel.

Proceedings

1          I believe that there is a fundamental
2      misunderstanding as to the procedural aspects,
3      which is potentially holding up the case.

4          All discovery has been turned over.
5      There is a certificate of compliance, and after you
6      you speak with your client if you can please let me
7      know whether or not there will be any reciprocal
8      discovery I would appreciate that.

9          THE COURT:  All right.  Mr. Turchi, are
10     you consenting to this adjournment for you to get
11     up to speed?

12         MR. TURCHI:  I unfortunately will need to
13     since I know nothing about the case.  I had no
14     discovery.  I'm certain through the electronic
15     discovery system I can get that.

16         Mr. Nieves, I'm very sorry to meet you
17     like this.

18         I will reach out to my client, Your
19     Honor, as soon as Corrections permits me hopefully
20     this week but no later than next week would be my
21     anticipation.

22         It is important I get to know Mr. Nieves
23     and he gets to know me, but I anticipate and I'm
24     hopeful to be able to develop a strong relationship
25     with him so we can proceed with this matter in a

10

Proceedings

1    way that is in his best interests under the law.

2              THE COURT:  All right.  Mr. Turchi, would

3    you want a control date simply for you to tell me

4    that you are up to speed and we will go from there?

5              MR. TURCHI:  I think that would make

6    sense.

7              Are we going by weeks of the months or

8    days of the week?

9              THE COURT:  As you know The Court is only

10   in session two weeks of every month.

11             So, do you want early April or do you

12   want early May?

13             MR. TURCHI:  I was hoping for March as a

14   control date.

15             THE COURT:  March is already full.  It's

16   only two weeks away.

17             MR. TURCHI:  April then.

18             THE COURT:  If you need to for any reason

19   advance the case let me know and I can always

20   secure a slot on the urgent matters calendar.

21             MR. TURCHI:  What week of April?

22             THE COURT:  The week of April 5th or the

23   week of March 29th.

24             MR. TURCHI:  Monday, March 29th, if that

25   is okay.

Proceedings

1           THE COURT:  Mr. Nieves, I want you to
2   understand and I'm serious that I'm not putting
3   fault on any lawyer right now or on you.  This is
4   going to be your fourth attorney.

5           THE DEFENDANT:  Okay, sir, I appreciate
6   you very much.

7           THE COURT:  This is going to be your very
8   last attorney.

9           THE DEFENDANT:  I'm going to do my best
10  to work with my attorney respectfully.

11          I worked with Brian J. Sullivan.  I'm
12  still in contact with Brian J. Sullivan who
13  represented my last case against Rikers Island.  I
14  had it dismissed.

15          THE COURT:  Mr. Nieves, I'm going to cut
16  you off.

17          I am going to grant your request for a
18  new counsel for the sole reason that I want you to
19  start with a new attorney and try your best to get
20  along with this attorney.

21          THE DEFENDANT:  Absolutely.

22          THE COURT:  I would ask Mr. Martir if he
23  can just assist Mr. Turchi on getting up to speed
24  with all the work we have been doing.

25          In consultation with his doctors,

DDM

8

Proceedings

1     Mr. Turchi, after you speak to Mr. Martir and

2     you've had an opportunity to meet with Mr. Nieves

3     if you wish to advance the case for the purposes of

4     requesting any type of examination you will let me

5     know.

6           Otherwise, I'm going to give you a longer

7     date to allow you to get up to speed on the case,

8     review the discovery, meet with Mr. Nieves again

9     with leave to advance the case for any appropriate

10    purpose.

11          Meanwhile, Mr. Rivet, where are you on

12    discovery?

13          MR. RIVET:  On January 19th the People

14    filed and served a certificate of compliance on

15    this case.

16          THE COURT:  What date?

17          MR. RIVET:  January 19th.

18          THE COURT:  Okay.  Thank you.

19          MR. RIVET:  Your Honor, Mr. Nieves'

20    petition for habeas corpus was dismissed outright,

21    and I believe that going forward for new counsel it

22    will be helpful to address the misunderstanding as

23    to the procedural aspects of the law with respect

24    to 180.80 and, Mr. Turchi, you and I can speak

25    separately.

Proceedings

1       THE COURT:   That actually is okay.   I do

2    have a slot available.

3       THE DEFENDANT:   Your Honor, may I address

4    The Court briefly?

5       THE COURT:   March 29th.

6       MR. TURCHI:   David Turchi incoming

7    counsel to Mr. Michael Nieves.

8       THE COURT:   Just present me with an

9    assignment order and I will assign you.

10       MR. TURCHI:   212-324-4170 is my phone

11    number.

12       THE COURT:   Mr. Martir, I will relieve

13    you with the thanks of The Court.

14       I just ask that you arrange for a time to

15    turn over all the information to Mr. Turchi.

16       Mr. Nieves, I'm going to give you an

17    opportunity to speak.   As I warn you each date

18    don't talk about the facts of the case.   There is a

19    court reporter writing everything down that's being

20    said, and the prosecutor can use what you say

21    against you.

22       Before you speak I want you to

23    understand, one, I have not seen any of the civil

24    filings that you have.

25       Number two, I do not take it personally

DDM

Proceedings

1    that you filed anything against The Court.  That is

2    your right to do.

3              I will stay impartial throughout these

4    proceedings as it relates to this case, so you do

5    not have to worry about The Court being at all

6    upset with you.  I'm not.

7              THE DEFENDANT:  Thank you, sir.

8              With all due respect if you indulge me

9    briefly, this is a case that I believe according to

10   my research is predicated on constitutional and due

11   process violations.

12             The felony complaint report is replete

13   with inconsistencies and discrepancies.

14             For instance, the felony complaint report

15   indicated that a curtain and rug was on fire inside

16   a bathroom in this matter.

17             If that was the case, the building would

18   have been on fire, and I never would have survived

19   the incident.

20             There was no curtain.  The felony

21   complaint report is stating that a curtain was on

22   fire and a rug.

23             This case is a case that originated on

24   March 6th.  On March 6th the police thoroughly

25   assessed and evaluated the case and decided that

Proceedings

1    based on hearing the complainant on body cam that I

2    required treatment, hospitalization over

3    prosecution, so they sent me to Harlem Hospital;

4    and afterwards I was arrested thirty days later by

5    fire marshals on an I-card, which the rap sheet of

6    me says that the arrest date actually occurred on

7    March 6th. So, that violated CPL 190.80.

8          The other issue is that the D.A. only

9    actually had forty-five days since new discovery

10   went into effect to be in compliance with discovery

11   submission to the courts.

12         The last time the D.A. spoke on the

13   record he stated and implied that the police had

14   not completely turned over all discovery or body

15   cam evidence, that he got what they gave him.  So,

16   I don't think the discovery information is complete

17   and thorough.

18         The other issue I want to say to The

19   Court is just like whatever I say can incriminate

20   myself I believe based on the 14th Amendment what I

21   say in your presence on the record has a bearing on

22   my defense for release, for dismissal and for

23   release on my own recognizance.

24         When I state that my constitutional

25   rights were violated that's the 4th Amendment, the

14

Proceedings

1    5th Amendment and 6th Amendment -- so far I have a

2    new attorney -- and the 14th Amendment.

3              I'd like you to consider that this is a

4    case that the police originally decided that had no

5    criminal capacity, no criminal intent whatsoever

6    and legally decided to hospitalize me.

7              I'm asking for The Court's mercy to

8    please give me a chance in the community on my own

9    recognizance.

10             I had a serious suicide attempt after my

11   last court date on November 9th.  If I was released

12   on my own recognizance I would still be in the

13   hospital's custody.  I would still be in the civil

14   ward with better treatment, better care.

15             I would still go to court.  I don't plan

16   on absconding on this case.  I worked so hard on it

17   to have the case resolved.

18             I would really appreciate if not today

19   maybe some time in the near future if you would

20   consider a release on my own recognizance in

21   furtherance of justice in light of the facts of

22   this case.

23             I'm not a flight risk.  Obviously, you

24   know, if I was outside going crazy smoking crack,

25   committing crimes I would have gotten caught.

Proceedings

1        There is so much evidence that I was not

2  outside committing crimes.  I was panhandling.  I

3  was strung out.  I have a serious psych issue.

4        I'd like The Court to consider that the

5  police did decide to hospitalize me.

6        Now the D.A. is offering me twelve years

7  which is like a murder cop-out type of plea

8  bargain.

9        He said I had six felonies.  I believe I

10  only have four felonies.

11        I'm asking and praying for The Court's

12  mercy and consideration because I am a reformed,

13  rehabilitated inmate.

14        I haven't had a felony conviction since

15  2009.  I have been in the community during that

16  time and I have had no rearrests since that time.

17        I have not re-offended inside the

18  institutions.  I have a clean behavior record.  I'm

19  not a violent person.

20        I'm really hoping if not today maybe in

21  the near future that you will consider release on

22  my own recognizance, so I can get better

23  psychiatric treatment, so I can have an opportunity

24  to work with my attorney.  It will serve justice.

25        Right now I feel like I'm in a corner

Proceedings

1     where I'm sending out information to the press.

2     Essentially I'm being forced to litigate, you know,

3     in a way that, you know, could make a federal judge

4     look bad.  It makes me look bad.  I don't want to

5     do that.

6              I don't want to try to ruin the integrity

7     and reputation of The Court.  I'm desperate to

8     reach out for help in the press in this matter.

9              What's going on with a twelve year plea

10    bargain?  It's atrocious.  This is a case that

11    should have been dismissed.  I should have been

12    sent back to Kings.

13             THE COURT:  What I am going to do is I am

14    going to give you an opportunity now to speak to

15    your new lawyer.

16             Mr. Turchi will advise you about what

17    motions he can make.  He will make all appropriate

18    motions regarding the case including any motions

19    concerning your present bail status.

20             All right?

21             THE DEFENDANT:  Okay, sir.

22             Thank you.

23             THE COURT:  So, I will see everyone on

24    March 29th.

25             Mr. Turchi report back to The Court on

DDM

17

Proceedings

1          his ability to move forward.

2                    THE DEFENDANT:   May I say one more thing?

3                    THE COURT:   I'll see you on March 29th.

4                         -o0o-

5     CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPTION OF
      THE MINUTES TAKEN BY ME.
6

7          ----------------------------------------
           DIANA DAVILA-MONGE
8          Sr. Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DDM

Exhibit 17

1

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK - CRIMINAL TERM - Part 81 VIRTUAL
 2  ----------------------------------x  )
    THE PEOPLE OF THE STATE OF NEW YORK  )  INDICTMENT #
 3                                       )  1241/2019
                                         )  30027/2021
 4         -against-                     )
                                         )
 5                                       )
    MICHAEL NIEVES,                      )
 6                                       )
                              DEFENDANT. )  PROCEEDINGS
 7                                       )
                                         )
 8  ----------------------------------x

 9         _____100 Centre Street_____
          _____New York, New York 10013_____
10        _____March 29, 2021_____

11        _____

12
    B E F O R E:    HONORABLE C. FARBER
13                    Justice of the Supreme Court

14  A P P E A R A N C E S:

15
    For the People:
16
          CYRUS R. VANCE, JR., ESQ.
17        New York County District Attorney
          One Hogan Place
18        New York, New York  10013
          BY: CHRISTOPHER RIVET, ESQ.
19        Assistant District Attorney

20  For the Defendant:

21        18-B Assigned Counsel Panel
          BY: DAVID TURCHI, ESQ.
22

23

24

25
                                                      -Y.P.
```

2

```
                          ─PROCEEDINGS─
13:32:54   1              THE CLERK:  Calling Michael Nieves,
13:32:57   2    calendar number 4, 1241 of 2019 and calendar number 17,
13:33:11   3    30027 of 2021.
13:33:14   4              Appearances, please.
13:33:17   5              MR. TURCHI:  For Mr. Nieves, David Turchi.
13:33:22   6    Good afternoon, everyone.
13:33:24   7              MR. RIVET:  Good afternoon.  For the People,
13:33:28   8    Christopher Rivet.
13:33:33   9              THE COURT:  Good afternoon.
13:33:34  10              Good afternoon, Mr. Nieves.
13:33:35  11              THE DEFENDANT: Good afternoon, Judge Farber.
13:33:37  12              THE COURT:  I'm Judge Farber.  I will be
13:33:40  13    presiding over today's proceedings.
13:33:46  14              THE DEFENDANT: Sorry?
13:33:47  15              THE COURT:  Are you able to see and hear me
13:33:49  16    without any problem?
13:33:50  17              THE DEFENDANT: Yes, sir.
13:33:50  18              THE COURT:  Are you able to see and hear
13:33:54  19    your lawyer as well as the prosecutor?
13:33:56  20              THE DEFENDANT: Yes, sir.
13:33:56  21              THE COURT:  If at any time during the
13:33:59  22    proceedings you have difficulty seeing or hearing us,
13:34:02  23    let us know, okay.
13:34:04  24              THE DEFENDANT: Absolutely.
13:34:04  25              THE COURT:  First and foremost, after the
```

Y.P.

3

---PROCEEDINGS---

| | | |
|---|---|---|
| 13:34:08 | 1 | last court date and the information provided to me, I |
| 13:34:11 | 2 | did do research as to Mr. Nieves' filings, specifically |
| 13:34:19 | 3 | filings that involved the Court, myself, in particular. |
| 13:34:24 | 4 | Based on that fact, although I do not |
| 13:34:26 | 5 | personally feel I would not be anything but fair to |
| 13:34:32 | 6 | Mr. Nieves, to avoid an appearance of impropriety, it's |
| 13:34:38 | 7 | best that I recuse myself -- |
| 13:34:40 | 8 | THE DEFENDANT: Sorry, Your Honor, you're |
| 13:34:43 | 9 | breaking up.  Do not mean to interrupt you.  It's like |
| 13:34:47 | 10 | you breaking up.  I want to hear what you are saying |
| 13:34:49 | 11 | clearly. |
| 13:34:50 | 12 | THE COURT:  What I'm saying, I know you |
| 13:34:53 | 13 | brought lawsuits in the past.  By doing my own research, |
| 13:34:58 | 14 | since I never been served, I found you brought a |
| 13:35:02 | 15 | civil suit against me. |
| 13:35:03 | 16 | Although I take no umbrage against you at |
| 13:35:07 | 17 | all, by filing the lawsuit, you created a scenario where |
| 13:35:12 | 18 | someone can question my impartiality later on, and |
| 13:35:16 | 19 | although I believe I would be impartial, I do not want |
| 13:35:20 | 20 | to present a situation where someone would challenge the |
| 13:35:25 | 21 | impartiality, so I will recuse myself from handling the |
| 13:35:30 | 22 | case any further. |
| 13:35:31 | 23 | I've been told to adjourn the case to TAP A, |
| 13:35:36 | 24 | 11:00 a.m., April 16th, where a new judge will be |
| 13:35:41 | 25 | assigned. |

Y.P.

4

─────────────PROCEEDINGS─────────────

13:35:41  1          Mr. Turchi, I know, filed a motion.  I will

13:35:45  2     leave that motion with the new judge to set a schedule

13:35:48  3     for the response.

13:35:50  4          THE DEFENDANT: May I address the Court?

13:35:52  5     Sorry Mr. Turchi.

13:35:54  6          THE COURT:  Yes, Mr. Nieves.

13:35:55  7          THE DEFENDANT: So, again, you know, my

13:35:57  8     apologies if the complaints caused confusions or

13:36:04  9     problems.  Honestly, I was not trying to attack you at

13:36:09  10    all in any shape or fashion, it's just I had no other

13:36:12  11    alternative based on, you know, the level of persecutory

13:36:17  12    misconduct.

13:36:20  13          From that penal law, I have been aware of

13:36:22  14    the lawfulness of my case so I did what I thought was

13:36:25  15    the right thing by complaining to the higher ones who

13:36:29  16    were not aware of the full facts of the case.  I do

13:36:32  17    apologize if I caused you any types of problems.

13:36:35  18          THE COURT:  No apologies necessary.  I wish

13:36:39  19    you the best --

13:36:41  20          MR. TURCHI:  Your Honor, I'm so sorry, but I

13:36:44  21    do have to make one application. Mr. Nieves has been in

13:36:47  22    for two years and we have put a lot of work into the

13:36:51  23    motion.  I know he put a lot of work into the writ.

13:36:55  24    Would you at least entertain an application to release

13:37:00  25    him?

─────────────────────────────────────Y.P.

5

─────────PROCEEDINGS─────────

| | | |
|---|---|---|
| 13:37:00 | 1 | THE COURT:  I cannot handle anything further |
| 13:37:04 | 2 | on the case. The case is adjourned to April 16th. |
| 13:37:10 | 3 | I do have a notation from the last date that |
| 13:37:12 | 4 | there was question about whether or not you wanted me to |
| 13:37:16 | 5 | order suicide watch, Mr. Turch. |
| 13:37:18 | 6 | MR. TURCHI:  Yes. |
| 13:37:19 | 7 | THE COURT:  Do you want me to have that |
| 13:37:21 | 8 | ordered? |
| 13:37:24 | 9 | MR. TURCHI:  Yes. |
| 13:37:24 | 10 | THE COURT:  Suicide watch is ordered. |
| 13:37:26 | 11 | THE DEFENDANT: Mr. Turchi, may I speak? |
| 13:37:30 | 12 | Your Honor, may I speak on the nature of the |
| 13:37:34 | 13 | suicide watch? |
| 13:37:35 | 14 | THE COURT:  It is your attorney's request. |
| 13:37:38 | 15 | MR. TURCHI:  I know you do not need it but |
| 13:37:40 | 16 | just out of an abundance of caution.  Don't worry about |
| 13:37:44 | 17 | it. |
| 13:37:44 | 18 | THE DEFENDANT: I understand sir.  Shall we |
| 13:37:47 | 19 | speak about it later? |
| 13:37:48 | 20 | MR. TURCHI:  Call me as soon as you can. |
| 13:37:50 | 21 | THE DEFENDANT: Thank you, sir.  Thank you. |
| 13:37:52 | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Y.P.

6

─────────────────────PROCEEDINGS─────────────────────

13:37:52   1          THE COURT:   Thank you, everyone.   Stay well.

13:37:54   2          THE DEFENDANT: Thank you, Your Honor.   Thank

13:37:57   3   you Mr. Turchi.

4   ***********************************************************

5          I, Yvette Pacheco, certify that this is a true and

6   accurate copy of the transcribed proceedings taken by me

7   in this matter.

8

9                        *Yvette Pacheco*

10          ─────────────────────────────────
                          Yvette Pacheco
11                     Senior Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Y.P.

Exhibit 18

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK: CRIMINAL TERM   PART TAP A
 2   - - - - - - - - - - - - - - - - - - - -x
 3   THE PEOPLE OF THE STATE OF NEW YORK,
                                            :
             -against-                          INDICT NO.:
 4                                              1241/2019
                                                SCI 30027
 5                                          :
     MICHAEL NIEVES,
 6
                         Defendant.         :
 7   - - - - - - - - - - - - - - - - - - - -x

 8                   (VIRTUALLY)

 9                April 16, 2021

10   B E F O R E:

11        THE HONORABLE MIRIAM BEST, Judge

12   A P P E A R A N C E S:

13   FOR THE PEOPLE:

14        OFFICE OF CYRUS VANCE JR., ESQ.
          District Attorney New York County
15        One Hogan Place
          New York, New York 10013
16
          BY:  CHRISTOPHER RIVET, ESQ.
17               Assistant District Attorney

18   FOR THE DEFENDANT:

19        DAVID TURCHI, ESQ.
          Attorney for Defendant
20        305 Madison Avenue
          New York, New York 10165
21

22

23

24

25

              Laura DeMattia - Senior Court Reporter
```

1    THE CLERK:  On the Part 85 calendar,

2    Indictment 1241 of 2019, and SCI ID number 30027 as

3    to Michael Nieves.

4        Defense counsel, your appearance please.

5        MR. TURCHI:  David Turchi, T-U-R-C-H-I, for

6    Mr. Nieves.  Good morning, everyone.

7        THE CLERK:  Good morning.

8        For the People.

9        MR. RIVET:  Good morning.  For the People,

10   Christopher Rivet, R-I-V-E-T.

11       THE COURT:  Good morning.

12       Mr. Nieves, can you see and hear what is

13   happening in your case now, sir?

14       THE DEFENDANT:  Yes, ma'am.

15       THE COURT:  Sir, my name is Judge Best, and

16   this case was just assigned to me this week.  So, we

17   are having a status conference to discuss scheduling

18   matters with respect to your petition for writ of

19   habeas corpus, as well as a motion that your lawyer

20   has filed.  We are doing this remotely where each of

21   us is in a separate location because of the COVID-19

22   pandemic.  Do you understand that, sir?

23       THE DEFENDANT:  Yes, Your Honor.

24       THE COURT:  If at any point you cannot see or

25   hear what is happening in your case, would you

*Laura DeMattia - Senior Court Reporter*

PROCEEDINGS                                   3

1 ┃   please let me know right away?

2 ┃         THE DEFENDANT:  Absolutely, ma'am.

3 ┃         THE COURT:  All right.  Thank you.

4 ┃         As I said, these matter were just sent to me

5 ┃   this week.  Mr. Rivet, when did the People respond

6 ┃   to both of these filings?

7 ┃         MR. RIVET:  Your Honor, the People would

8 ┃   request a date of May 7th for the People's response.

9 ┃   I am not in receipt of the defendant's habeas

10 ┃  petition, the defendant's most recent habeas

11 ┃  petition.  I went through all the defendant's

12 ┃  filings, and last filing that I am in possession of

13 ┃  is dated December 10th of 2020, which was for a

14 ┃  motion to furnish stenographic transcripts.

15 ┃        THE COURT:  This one that I have was filed

16 ┃  with the county clerk on January 6, 2021, and filed

17 ┃  in Supreme Court Criminal Court on February 18,

18 ┃  2021.  So, we will get a copy of this to you today,

19 ┃  Counselor.

20 ┃        MR RIVET:  Thank you.

21 ┃        THE COURT:  Let me look through it.  I am

22 ┃  looking to see whether there is an affidavit of

23 ┃  service.  There is, actually, an affidavit of

24 ┃  service saying that Mr. Nieves did send a copy to

25 ┃  the New York County District Attorney at One Hogan

*Laura DeMattia - Senior Court Reporter*

PROCEEDINGS                                    4

1   Place.  So maybe it was misdirected or something
2   like that, but we will get a copy to you.
3            MR. RIVET:  Thank you.
4            THE COURT:  Did you get a copy of Mr. Turchi's
5   motion?
6            MR. RIVET:  Yes, I have a copy of that, Your
7   Honor.
8            THE COURT:  Okay.
9            MR. TURCHI:  Before you adjourn the case, if I
10  can be heard, Your Honor.
11           THE COURT:  Okay.
12           THE DEFENDANT:  Thank you.
13           Your Honor, Mr. Nieves has been incarcerated
14  for over two years at this point.  Notwithstanding
15  the pandemic, this is a release motion and
16  dismissal, of course.  The case has already been on
17  once for motion when Judge Farber recused himself.
18  And it keeps getting pushed down, and I am seeing it
19  pushed down again today.  I don't think a release
20  motion should be put over for such a long period of
21  time.  That having been said, I do know you just got
22  the case; however, I think the smarter practice, the
23  fairer and just practice here, would be to release
24  Mr. Nieves pending the determination of the motion.
25           Now so you know, and he asked me, I forwarded

*Laura DeMattia - Senior Court Reporter*

1    you a letter earlier, and I think it shows that he

2    is a much more put together, educated, smarter

3    person than maybe what we are used to dealing with,

4    and what the charges supposedly suggest.  But the

5    other thing is, if you release him pending this

6    motion, they don't let him out on the street, they

7    put him in the civil commitment at Bellevue.  And

8    this is something Michael himself has pointed out.

9    Clearly he is very well put together.  He knows what

10   is going on.  This is not fair to have him stay in

11   jail while a release motion is pending.  So I ask

12   you to release him pending the hearing of the

13   motion, and Mr. Rivet can have his time, whatever

14   time he needs.

15          THE COURT:  People, do you wish to respond?

16          MR. RIVET:  Your Honor, the People's position

17   is that the motion for defendant's release is made

18   out in defense papers.  The People requested time to

19   respond.  I believe any release application would be

20   premature before a decision is made on those defense

21   motions.

22          MR. TURCHI:  Over two years now, over two

23   years, Judge.

24          MR. RIVET:  With respect to the amount of time

25   the defendant has been detained, Your Honor, a

*Laura DeMattia - Senior Court Reporter*

1    significant portion of that was when the defendant

2    was unfit, the 730 exam itself, and once he was

3    found unfit.

4         Additionally, Your Honor, when I went through

5    all the defendant's filings.  These are all the

6    filings that the defendant has made in response to

7    this case.  I won't go through a list of what they

8    are.  But the defendant's application have been

9    heard time and time again.  This application is one

10   in which the People will respond to in a timely

11   manner.  But any release prior to the People's

12   response, I just believe is premature, especially

13   given the defendant's history, and the facts of this

14   case.

15        THE COURT:  Well, I take it also that some of

16   the delay has been occasioned by the need to appoint

17   new counsel, which I understand has happened at

18   least once.

19        MR. RIVET:  This is the fourth defense

20   attorney to represent Mr. Nieves, Your Honor.

21        THE COURT:  Okay.  So that causes delay.

22   Also, until the motion has been responded to, as

23   well as the petition for a writ of habeas corpus,

24   before that has been responded to, I don't know

25   whether there is any legal basis to release

1    Mr. Nieves.  In the event that I conclude there is,

2    I will advance the case and order his release, but I

3    am not going to do so today.

4         So I do need to have the People respond to

5    both of these filings, and then I need some time to

6    review the case, all the filings, before issuing a

7    ruling.  So my suggestion is to put this case over

8    for decision May 21st, which is two weeks after the

9    People respond.  And as I said, if I know before

10   that, that I either must grant the petition, or that

11   the defendant is entitled to release because of more

12   than 90 chargeable days have elapsed before the

13   People have been able to state ready, I will advance

14   the case for that reason.  If that date is not good

15   for you, Counselor, then what date is better?

16        MR. TURCHI:  Could we do a sooner date, Your

17   Honor?  Maybe even the week before if the Court

18   permits.

19        THE COURT:  I can't guarantee I will have a

20   decision for you on that day, and the case might end

21   up being adjourned.

22        MR. TURCHI:  I would rather we at least come

23   in and keep it as quick as possible than Mr. Nieves

24   have to continue to be incarcerated pending a

25   decision.  We will deal with that then.  The earlier

*Laura DeMattia ~ Senior Court Reporter*

1   the better.  The 12th please.

2          THE COURT:  The 12th is impossible, Counselor.

3   The Court is entitled to a reasonable time to

4   resolve the motions, your motions, which raises, I

5   believe, eight separate grounds.  I will take some

6   time to resolve as well as the habeas corpus.

7   Earliest I can put this on, if there is time in the

8   calendar, would be the 14th of May.

9          MR. RIVET:  I was going to request, Your

10  Honor, that I might not be able to make that

11  appearance.  I believe I will have a procedure which

12  will render me unable to appear before the Court on

13  the 14th.  I realize it is on for decision, but

14  given the nature of this case, it is one I would

15  like to personally appear on.

16         THE COURT:  Well, of course, in the event that

17  I can conclude that I must grant the application to

18  release, somebody would have to cover for you if I

19  am advancing it.

20         MR. RIVET:  Understood.

21         THE COURT:  Can I ask the clerk, is there time

22  on May 14th?

23         THE CLERK:  3:00, 3:30, Judge.  And again,

24  that is assuming that Corrections can accommodate us

25  with a booth at that time.

*Laura DeMattia - Senior Court Reporter*

PROCEEDINGS                                    9

1          THE COURT:  Right.

2          Understanding somebody might have to cover for

3     Mr. Rivet, assuming I can have it by that date, we

4     will put the case on for May 14th at 3:30 in TAP A

5     for decision on both filings.  If I know in advance

6     of that, I must grant one or the other of the

7     applications for release, we will notify you

8     immediately.

9          MR. TURCHI:  Please.

10          THE COURT:  And if I don't have a decision on

11     that date, then we will have to adjourn, but I will

12     try to have it.

13          What, if anything, else should we be

14     discussing at this time?  As you know, I am very new

15     to the case.

16          MR. RIVET:  Nothing further from the People,

17     Your Honor.

18          MR. TURCHI:  My focus was the release.

19          THE COURT:  If nothing further, matter is

20     adjourned.

21                   *    *    *    *    *

22

23     Certified to be a true and accurate transcript.

24     _____

25     Laura DeMattia, Senior Court Reporter

              *Laura DeMattia - Senior Court Reporter*

Exhibit 13

Exhibit 19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CRIMINAL TERM PART 85
---------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK
ex rel. MICHAEL NIEVES,

                Petitioner,

    -against-                      DECISION AND ORDER

WARDEN GALLAUGHER,             Indictment No. 1241-2019
                                   Index No. 100016-2021
                                   SCID No. 30027-2021

                Respondent.
---------------------------------------------------------------X

MIRIAM R. BEST, A.S.C.J.

    This is a *pro se* petition for a writ of *habeas corpus* dated January 5, 2021.[1] Petitioner

Michael Nieves is charged in the indictment referenced above with Burglary in the First and Second

Degrees (PL §§ 140.30[3], 140.25[2]), Arson in the Second Degree (PL § 150.15), Reckless

Endangerment in the First Degree (PL § 120.25) and Unlawful Imprisonment in the First Degree (PL

§ 135.10). Petitioner claims that the "constitutional grounds & legal argument for an immediate case

dismissal" begin with the People's failure to comply fully with the automatic discovery rules of CPL

Article 245 (page 27 of 87). He also claims that he was subjected to an "unlawful, warrantless arrest

under an I-card, without probable cause based upon the application of a 'defective accusatory

instrument' and [a] falsified 'Felony Complaint,' dated April 9, 2019, at approximately 6:30 P.M.,

in violation of CPL Statute 180.80" (page 32 of 87); the facts in the felony complaint and the

accusatory instrument "did not support each evidentiary element of the offenses charged," requiring

dismissal of the indictment (*id.*); he was "denied his U.S. Constitutional and New York State

---

[1]Defendant's motion includes an affidavit of service indicating service on the District
Attorney of New York County, but not on the Attorney General or the Corporation Counsel.

Statutory rights to a Preliminary Hearing" (*id.*); and he was denied his constitutional right to due process (page 33 of 87).

Petitioner also sets forth "Additional Legal and Constitutional Grounds to Dismiss the Criminal Charges and the Indictment" (pages 68-81 of 87). Among these are a claim that the People's Voluntary Disclosure Form shows that Petitioner did not have the capacity, intent or mental culpability to commit burglary, since the police took him to Harlem Hospital for emergency psychiatric treatment on March 6, 2019, the date of the alleged crimes, and told him "we're not arresting you;" the body worn camera footage belies the police officer's statement in the felony complaint that he "observed defendant in the bathroom and the shower curtain, rug, and towels were on fire. . . . [and] damage to the wall inside the bathroom, the toilet and the floor;" the body worn camera footage "should confirm" that the claim in the felony complaint that Informant 1 told a police officer that she struggled with Petitioner over a dresser "never occurred;" Informant 1's additional statement that she observed Petitioner lighting a lighter in a way that caused her to fear for her safety also belies her claim that she struggled with Petitioner over a dresser and is further evidence that the police officer's statements in the felony complaint are false; and the indictment should be dismissed since "the police are not suppose[d] to arrest and charge [a] person for a criminal offense" after they have taken that person to the hospital for a psychiatric examination based on a belief that the person is likely to cause harm to himself or another.

The People oppose the granting of the writ. In a memorandum of law filed May 17, 2021, the People argue first that Petitioner has failed to comply with the requirements of CPLR § 7002(c)(6), because he did not disclose in the petition all of the other times he has sought the same or similar relief. As to the merits of the petition, the People argue that Petitioner's claims cannot be

-2-

brought by way of *habeas corpus* and in any event are meritless.

For the reasons that follow, the writ is denied and the petition is dismissed. No hearing is necessary.

## Analysis

As the People correctly argue, CPLR § 7002(c)(6) requires a *habeas* petitioner to set out "the date, and the court or judge to whom made, of every previous application for the writ, the disposition of such application and of any appeal taken, and the new facts, if any, presented in the petition that were not presented in any previous application." A *habeas* petition is defective if it fails to strictly comply with the requirements of CPLR § 7002(c), *People ex rel. Chaney v. Dagostino*, 137 AD3d 1436, 1437 (3d Dept 2016). Petitioner filed a *pro se habeas* petition on December 14, 2020 (SCID # 30304-2020, Index # 20-101146), raising the same claims he raises here, which the Honorable Steven Statsinger denied on January 20, 2021.[2] Petitioner did not disclose that petition in his current one and his current petition is therefore defective. Moreover, "[t]he instant [*habeas corpus*] petition is a successive application . . . which is neither warranted nor supported by changed circumstances. Accordingly, the writ . . . must be dismissed," *People ex rel. Leneau v. Warden of Otis Bantum Correction Facility*, 158 AD3d 773, 773-74 (2d Dept 2018).

In addition to these defects in the petition, which alone require denial and dismissal, the petition is also deficient on the merits. A person who is incarcerated is not entitled to a writ of *habeas corpus* unless that person's only remedy would be immediate release from custody. *People*

---

[2]The People assert that Petitioner also filed *habeas* petitions on August 29, 2019, November 17, 2020, and December 10, 2020, all identical to the petitions filed on December 14, 2020 and January 5, 2021 (Peo's Aff ¶ 11). This court has not seen the first three of these petitions, however.

*ex rel. Kaplan v. Commissioner of Correction of the City of New York,* 60 NY2d 648, 649 (1983) ("Relator is not entitled to habeas corpus relief because the only remedy to which he would be entitled would be a new trial or new appeal, and not a direction that he be immediately released from custody [citation omitted]."); *People ex rel. DeFreitas v. Callado,* 172 AD3d 1811, 1812 (3d Dept 2019) ("inasmuch as none of the grounds asserted by petitioner would entitle him to immediate release from custody, habeas corpus relief is inappropriate [citations omitted]."), *lv denied,* 34 NY3d 909, *cert. denied,* 141 S.Ct. 300 (2020); *People ex rel. Grant v. Scully,* 190 AD2d 543, 544 (1st Dept 1993), *app dism'd,* 92 NY2d 946 (1998). None of Petitioner's claims entitles him to immediate release.

Petitioner's first claim is that the People have not fully complied with their automatic discovery obligations under CPL Article 245. He states that his

> legal aid attorney requested for full automatic discovery around March, 2019 which Judge Farber ordered for the defendant that to date [h]as not been complied with, as the D.A. stated on October 13, 2020 that their [*sic*] still exist further discovery which has not been released or is lost; also wherein, the D.A. only had 45 days maximal for release.

(Pet. page 27 of 87.)

Since January 1, 2020, the People have been required to provide a defendant with automatic discovery pursuant to CPL § 245.20. Pursuant to CPL §§ 245.10(1)(a)(i), the People must perform their initial discovery obligations within 20 calendar days after a defendant's arraignment on an indictment when the defendant is in custody. When the People comply with their automatic discovery obligations, they must file a certificate of compliance, which is defined in CPL § 245.50(1). Here, the People filed a certificate of compliance on January 19, 2021, after Petitioner

-4-

filed the instant petition. But an alleged discovery violation by the People is not a proper basis for a *habeas* petition. CPL § 245.50(4) specifically requires that "[c]hallenges to, or questions related to a certificate of compliance shall be addressed by motion," not by a petition for a writ of *habeas corpus*. Moreover, while the failure to provide automatic discovery may result in remedies or sanctions pursuant to CPL §§ 245.20(5) and 245.80, in the absence of a motion challenging the certificate of compliance, this court may not consider sanctions. Accordingly, this branch of the petition fails to establish that Petitioner is entitled to immediate release from custody.

Moreover, even though speedy trial time may now be charged to the People for failing to comply with their discovery obligations, CPL § 30.30(5), which might lead to a determination that a defendant must be released under CPL § 30.30(2)(a), a motion for release under that section must be made before the court may entertain a petition for a writ of *habeas corpus*. *People ex rel. Chakwin v Warden*, 63 NY2d 120 (1984).[3]

Nor do any of Petitioner's other claims entitle him to immediate release. The question of whether his arrest was lawful will be decided at the pre-trial *Huntley/Dunaway* hearing that was ordered by Justice Curtis Farber.[4] Questions regarding the sufficiency of the evidence before the grand jury or the validity of the indictment must be raised on direct appeal in the event Petitioner is convicted. *People ex rel. DeFreitas v Callado*, 172 AD3d 1811, 1812 (3d Dept 2019); *People ex rel. Allah v. Lorquet*, 30 AD3d 352 (1st Dept 2006); *People ex rel. Grant, supra*. Questions

---

[3]On March 26, 2021, Petitioner's counsel filed such a motion for release. The People's response is due on June 14, 2021 and any defense reply is due by June 21, 2021.

[4]In any event, even if Petitioner's arrest were determined to have been unlawful, that ruling would not entitle him to immediate release, nor would it invalidate any eventual conviction, *Gerstein v. Pugh*, 420 US 103, 119 (1975), as Petitioner himself appears to recognize (*see* Pet p 33 of 87 at ¶ 10). It might, however, result in the suppression of evidence.

regarding Petitioner's mental state at the time of the alleged crime, and whether any witnesses have

made false or inconsistent statements about what happened at the time of the crime or at the time of

Petitioner's arrest, must await the pre-trial hearing and the trial.[5]

Finally, in Cycle 18 of his rap sheet it shows that Petitioner was arrested on March 6, 2019

(Pet. p 25 of 87). Cycle 18 also indicates that he was arrested on April 19, 2019 at 6:50 am (id.).

Without elaboration, Petitioner states this was a "violation of 180.80 CPL" (id.).

CPL § 180.80(2)(a) provides, in relevant part, that:

> Upon application of a defendant against whom a felony complaint has
> been filed with a local criminal court . . . and who, since the time of
> his arrest or subsequent thereto, has been held in custody pending
> disposition of such felony complaint, and who has been confined in
> such custody for a period of more than one hundred twenty hours, or,
> in the event that a Saturday, Sunday or legal holiday occurs during
> such custody, one hundred forty-four hours, without either a
> disposition of the felony complaint or commencement of a hearing
> thereon, the court must release him on his own recognizance unless
> . . . [p]rior to the application . . . [t]he district attorney files with the
> court a written certification that an indictment has been voted.

Petitioner's own statement of facts establishes that there has been no violation of CPL §

180.80. He was taken by police to the hospital on March 6, 2019 and was subsequently part of a

---

[5]Although the People discern a claim that Petitioner's "trial attorney is ineffective" (Peo's
Mem p 11), this court does not find such a claim in the petition. Even if Petitioner were raising
such a claim here, however, it would not result in his immediate release and is not a basis to
grant the petition. *People ex rel. Douglas v. Vincent*, 50 NY2d 901 (1980).

civil proceeding at Harlem Hospital pursuant to Mental Hygiene Law §§ 9.27[6] and 9.37.[7]  On April

9, 2019, petitioner was released from Harlem Hospital to a

> Transitional Residential Service program- "Road To Success" of
> Kingsboro Psychiatric Center with adjusted medications, an Assisted
> Outpatient Treatment (AOT) Court Order, and a Visiting Nurse
> Service, Assertive Community Treatment Care Coordinator,
> Stephanie Shelton, Harlem Hospital records reflect that the plaintiff
> was "*not a prison[er]*." **See:Exhibit (B)**.

(Pet pp 31-32 of 87, emphasis supplied.) After his release from the hospital, Petitioner was arrested

on April 9, 2019 at approximately 6:00 am by Fire Marshall Phillip Meagher "under an I-Card" (*id.*

p 32). Accordingly, Petitioner's own allegations make it clear that the time within which the People

had to vote an indictment began with his arrest on April 9, 2019 at 6:00 am. This is so because prior

to April 9th, Petitioner was not in police custody but rather was involuntarily committed to the

hospital pursuant to Mental Hygiene Law §§ 9.27 and 9.37 and thereafter released.

Petitioner was arraigned on the felony complaint on April 9, 2019 and the case was adjourned

to April 12, 2019. The Court's file shows that on April 12, 2019, in AR3 before the Honorable

Marisol Martinez Alonso, the People told the court that they had filed a certificate of grand jury

------

[6]Mental Hygiene Law § 9.27 is entitled "Involuntary admission on medical certification" and provides, in subsection (a), that "[t]he director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person. The examination may be conducted jointly but each examining physician shall execute a separate certificate."

[7]Mental Hygiene Law § 9.37 is entitled "Involuntary admission on certificate of a director of community services or his designee" and provides, in subsection (a), that "[t]he director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others."

action[8] and the case was adjourned to Part 81 for April 24, 2019 for Supreme Court arraignment. The time between Petitioner's arrest on April 9, 2019 at 6:00 am and April 12, 2019 when the People filed a certificate of grand jury action was well within the 120 hours provided for by the statute. Indeed, the court file does not indicate that any motion for release was made by Petitioner on April 12, 2019. Accordingly, this branch of petitioner's motion is without merit and must be denied.

Finally, Petitioner's claim that he was denied his federal constitutional and New York statutory rights to a preliminary hearing also fails. First, "[t]here is no constitutional or statutory right to a preliminary hearing [citations omitted], nor is it a jurisdictional predicate to an indictment [citations omitted]," *People v. Bensching*, 117 AD2d 971, 971 (4ᵗʰ Dept), *lv denied*, 67 NY2d 939 (1986); *see also Gerstein v. Pugh*, 420 US 103, 118-19, 126 (1975); *Strong v. Mance*, 2010 WL 1633398, * 7 (NDNY 2010); *Bilbrew v. Garvin*, 2001 WL 91620, * 9 (EDNY 2001) (Gleeson, J.). In any event, as the People correctly argue, any claim that Petitioner was denied his right to a preliminary hearing was rendered moot by the grand jury's indictment, *People v. Damphier*, 51 AD3d 1146, 1147 (3d Dept), *lv denied*, 11 NY3d 787 (2008); *see also People v. Hodge*, 53 NY2d 313, 319 (1981) ("the State, by presenting the case to a Grand Jury in the first instance, may bypass the preliminary hearing stage entirely").

---

[8]A copy of the certificate of affirmative grand jury action is attached to this decision as Exhibit A.

<u>Conclusion</u>

For all of these reasons, the writ is denied and the petition is dismissed.

Dated:  New York, New York
        June 4, 2021

<div style="text-align:center">

*Miriam R. Best*

Miriam R. Best
Acting Supreme Court Justice

</div>

Exhibit A

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART ___

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Michael Nieves

Defendant.

CERTIFICATE OF
AFFIRMATIVE
GRAND JURY
ACTION

Docket No.
CR-011626 - 19 NY
Grand Jury No.

Brandon Riddle , an Assistant District Attorney in the County of
New York, certifies that the Grand Jury has heard evidence in the above-captioned
case and has voted an indictment charging defendant with one or more crimes.

Dated:   New York, New York
         4-12-19

Respectfully Submitted,

Cyrus R. Vance, Jr.
District Attorney
New York County

By:

Assistant District Attorney
Of Counsel
Brandon Riddle

EXHIBIT (15)

Prosecutorial Misconduct - New York Criminal Procedure

**"Don't let him get away with it!"**

- *People v. Collins*, 12 A.D.3d 33 (1st Dept. 2004) ("Hold him responsible for his actions. Hold him accountable for his decision to be a part of narcotics street sales")
- *People v. Bhupsingh*, 297 A.D.2d 386 (2d Dep't 2002) (urging jurors not to let defendant "get away with it")
- *People v. Robinson*, 260 A.D.2d 508 (2d Dep't 1999) (holding improper a prosecutor's comment that "[t]he only way this defendant walks out of the courtroom is if you let him")
- *People v. Demott*, 178 A.D.2d 935 (4th Dept. 1991) (urging that jury should not "let [defendant] get away with it", superseded on other grounds by 186 A.D.2d 1068 (4th Dep't 1992)
- *People v. Fogel*, 97 A.D.2d 445 (2d Dep't 1983) (reversing a conviction because prosecutor, inter alia, urged jury not to let defendant "get away with" charged crimes)

**"My evidence was credible!"**

- *People v. Brown*, 26 A.D.3d 392 (2d Dep't 2006) (remark that witnesses were "credible and accurate," "told you the truth," and "told you exactly how it happened")
- *People v. Griffin*, 125 A.D.3d 1509 (4th Dep't 2015) ("egregious[]" vouching to argue complainant's statements on 911 call were "examples of the ring of truth" and "are truthful")

**"Thank god, it could have been worse!"**

- *People v. Fernandez*, 82 A.D.2d 922 (2d Dep't 1991) ("only God to thank" that no one had been killed during the robbery)
- *People v. Browne*, 106 A.D.2d 455 (2d Dep't 1984) ("thank God that [drug dealer] was caught in time" before someone could ingest drugs)
- *People v. Lindo*, 85 A.D.2d 643, 644 (2d Dep't 1981) (had defendant pulled trigger, case would have been "attempted murder or worse")
- *People v. Hendrickson*, 73 A.D.2d 676 (2d Dep't 1979) (good fortune that police arrived, preventing violence)

**"Jury, you must convict!"**

- *People v. Robinson*, 260 A.D.2d 508 (2d Dep't 1999) ("urging jurors to honor their oaths" by convicting)
- *People v. Goldstein*, 196 Misc.2d 741 (App. Term, 2d Dep't 2003) (urging jurors to "do what is right" by convicting defendant)
- *People v. Caparella*, 83 A.D.3d 730 (2d Dep't 2011) ("you have the power . . . to end it here with a verdict of guilty")
- *People v. Jodhan*, 37 A.D.3d 376 (1st Dep't 2007) ("[T]here is no reasonable view of [the evidence] that would lead you to the conclusion" that defendant was not guilty)
- *People v. Rogers*, 59 A.D.2d 916 (2d Dep't 1977) ("[W]e feel that we have proven this case, easily, beyond a reasonable doubt")
- *People v. Jodhan*, 37 A.D.3d 376 (1st Dep't 2007) ("[T]here is no reasonable view of [the evidence] that would lead you to the conclusion" that defendant was not guilty)
- *People v. Rivera*, 116 A.D.2d 371 (1st Dep't 1986) ("[T]he prosecution ha[s] more than met its burden of proof.")
- *People v. Rogers*, 59 A.D.2d 916 (2d Dep't 1977) ("[W]e feel that we have proven this case, easily, beyond a reasonable doubt")

**"Keep our streets safe!"**

- *People v. Collins*, 12 A.D.3d 33 (1st Dep't 2004) (urging jury to act as "community defender and avenger")

Prosecutorial Misconduct - New York Criminal Procedure

- ○ *People v. Miller*, 149 A.D.2d 439 (2d Dep't 1989) (imploring jury to "expand its role from that of a fact finder in this case to that of a community defender and avenger")
- ○ *People v. Tolliver*, 267 A.D.2d 1007 (4th Dep't 1999) (urging jury to convict to keep neighborhood safe)

Appealing to sympathy for complainant:

- ○ *People v. Presha*, 83 A.D.3d 1406 (4th Dep't 2011) (victim was "so cute" and "most conscientious, respectful kid" prosecutor had "ever seen")
- ○ *People v. Bowie*, 200 A.D.2d 511 (1st Dep't 1994) (calling deceased a "Teddy Bear")
- ○ *People v. McCray*, 140 A.D.3d 794 (2d Dep't 2016) (defendant "changed the complainant's life," and that she "had to move" and "couldn't even put her trash out alone anymore.")
- ○ *People v. Mohammed*, 81 A.D.3d 983 (2d Dep't 2011) (remark that the jury "saw what [the complainant] went through on the witness stand" and asked jury "to treat [the complainant] with dignity")
- ○ *People v. Smith*, 288 A.D.2d 496 (2d Dep't 2001) (holding that prosecutor improperly appealed to jury's sympathy by commenting that complainant was "courageous" for "coming before you" and that while "ill," complainant still came to court)

Disparaging defense or defense counsel:

- ○ *People v. Robinson*, 260 A.D.2d 508 (2d Dep't 1999) (accusing defense of following a script)
- ○ *People v. Brown*, 111 A.D.2d 248 (2d Dep't 1985) (implying that defense counsel's arguments were intended to confuse jurors)
- ○ *People v. Rivera*, 116 A.D.2d 371 (1st Dep't 1986) (accusation that counsel coached witness implied that counsel was "not convinced of his client's innocence")
- ○ *People v. Hicks*, 102 A.D.2d 173 (1st Dep't 1984) (attack on defense attorney's sincerity)
- ○ *People v. Jiminez*, 60 A.D.2d 610 (2d Dept. 1977) ("[T]he whole defense changed in the middle")
- ○ *People v. Morales*, 53 A.D.2d 517 (1st Dep't 1976) (accusing defense of inventing entrapment defense "when all other doors were closed")
- ○ *People v. Morgan*, 111 A.D.3d 1254 (4th Dep't 2013) (regarding the defense, "Are you buying it?")
- ○ *People v. Brown*, 26 A.D.3d 392 (2d Dep't 2006) (characterizing defendant's testimony as a "story" and a "load of garbage")
- ○ *People v. Damon*, 24 N.Y.2d 256 (1969) (accusing defense of "sandbagging witnesses")
- ○ *People v. Lombardi*, 20 N.Y.2d 266 (1967) (characterizing defense cross-examination as "foul")
- ○ *People v. Clemons*, 166 A.D.2d 363 (1st Dep't 1990) (defense cross-examination is "slander" and "character assassination" and comparing defense to "Alice in Wonderland")
- ○ *People v. Pagan*, 2 A.D.3d 879 (2d Dep't 2003) (defense is attempting to "mislead" jury "by asking it to focus on irrelevant issues")
- ○ *People v. Torriente*, 131 A.D.2d 793 (2d Dep't 1987) (comparing defense to "twilight zone")
- ○ *People v. LaPorte*, 306 A.D.2d 93 (1st Dep't 2003) (referring to defense counsel's remarks as "double talk" and warning jurors that "defense counsel was manipulating them")
- ○ *People v. Mehmood*, 112 A.D.3d 850 (2d Dep't 2013) (defense is "an elaborate attempt to distract [the jury] from the real issues in this case")
- ○ *People v. Spann*, 82 A.D.3d 1013 (2d Dep't 2011) (defense is a "distraction," a "smokescreen," and "smoke and mirrors")

Exhibit (16)

## JUDICIAL IMMUNITY:

A. Pullman v. Allen, 466 U.S. 522, 541-42, 104 S. Ct. 1970, 1981, 8 L. Ed. 2d. 565, 576 (1984) (allowing an injunction against a state judge's practice of incarcerating persons awaiting trial for non-incarcerational offenses and stating that "judicial immunity" is not a bar to prospective injunctive relief against a judicial officer acting in their judicial capacity").

B. Hafer v. Melo, 502 U.S. 21, 30-31, 112 S. Ct. 358, 363, 116 L. Ed. 2d 301, 313 (1991) (holding that when state officials sued in their individual cpacity, are "persons" within the meaning of § 1983 and therefore not immune under the 11th Amendment).

C. Mereles v. Waco, 502 U.S. 9, 11-12, 112 S. Ct. 286, 287-88, 116 L. Ed. 2d 9, 14 (1991) (Per curiam) "Judicial immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability  for nonjudicial actions, i.e., actions not taken in the Judge's judicial capacity. Second,

a judge is not immune for actions, though judicial in nature,
taken in complete absence of all jurisdiction."

D. Bradley v. Fisher, 80 U.S. 335, 351-52, 10 L. Ed. 646, 651
(1872) (noting that a judge does not have complete immunity
when he acts in a situation where he knows that he has
absolutely no jurisdiction over the subject matter of the
lawsuit).

E. Jenkins v. Morton, 148, F. 3d 257, 259-60 (3d Cir. 1998)
(holding that the PLRA does not require exhaustion of state
judicial review procedures and noting that the same is true
of Section 1983 claims).

F. Davidson v. Scully, 148 F. Supp. 2d 249, 254 (S.D. N.Y. 2001)
(keep in mind that qualified immunity is not a defense to a
claim for injunctive relief).

G. Project Release v. Prevost, 463 F. Supp. 1033, 1036 (E.D.N.Y.
1978) (finding that the court could issue a declaratory
judgment against officials despite their qualified immunity).

H. Forester v. White, 484 U.S. 219, 228-29, 108 S. Ct. 538, 545,
98 L. Ed., 555, 566 (1988) (holding that because it is the
nature of functions performed, not the identity of the actor
who performed it, that informs our immunity analysis, a judge
who fires an employee because of her sex was not absolutely
immune from suit).

I. Leclere v. Webb. 270 F. Supp. 2d 779, 794 (2003) (The Court
is pursuaded the [Federal Courts Improvement Acts] does not
bar injunctive relief where a judicial officer acts in other
capacities such as the enforcement capacity).


PROSECUTORY IMMUNITY:

J. Supreme Court v. Consumers Union of U.S., 446 U.S. 719, 100
S. Ct. 1967, 1977, 64 L. Ed. 2d 641, 656 (1980) (noting that
prosecutors, though shielded by absolute immunity for damages
liability, may be subject to § 1983 suits for injunctive
relief).

K. Burns v. Reed, 500 U.S. 478, 496, 111 S. Ct. 1934, 1944-45,
114 L. Ed. 2d 547, 565 (1991) (holding that absolute immunity

from liability damages under Section § 1983 did not apply to state prosecutors giving legal advice to police.

L. Imbler v. Pachtman, 424 U.S. 409, 420-24, 96 S. Ct. 984, 990-92, 47 L. Ed. 2d 128, 137-40 (1976) (A prosecutor enjoys absolute immunity from § 1983 suit for damages when he acts within the scope of his prosecutorial duties).

M. Zahrey v. Coffey, 221 F. 3d 342, 346 (2d Cir. 2000) (The nature of a prosecutor's immunity depends on the capacity in which the prosecutor acts at the time of the alleged misconduct. Actions taken as an advocate enjoys absolute immunity, while actions taken as an investigator enjoy only qualified immunity. This immunity law applies to Biven actions as well as actions taken under Section 1983).

N. Buckley v. Fitzsimmons, 509 U.S. 259, 277-78, 113 S. Ct. 2606, 2617-18, 125 L. Ed. 2d 209, 228-29 (1993) (holding prosecutor's prejudicial out-of-court statements to the press were not within the scope of his duties and therefore not entitled to absolute immunity).

## ELEVENTH AMENDMENT IMMUNITY:

O. Ex Parte Young Doctrine - Supreme Court Ruled that state officials can be sued for an injunction in Federal Court, even though the state cannot be sued. See: Ex Parte Young Doctrine, 209 U.S. 123, 155-56, 28 S. Ct. 441, 452, L. Ed. 714 (1908).

P. Verizon Md., Inc. v. Public Serv. Comm'n of Md., 533 U.S. 635, 645, 122 S. Ct. 1753, 1760, 152 L. Ed. 2d 871, 882 (2002) (allowing a plaintiff to seek injunctive relief against state commissioners sued in their official capacity).

Q. Monell v. Dept. of Social Servs., 436 U.S. 658, 691 N. 54, 98 S. Ct. 2018, 2036 N. 54, 56 L. Ed. 2d 611, 636 N. 54 (1978) (noting that the 11th Amendment does not prevent suit against local governments that are not considered to be part of the state).

R. Kentucky v. Graham, 473 U.S. 159, 167 N. 14, 105 S. Ct. 3099, 3106 N. 14, 87 L. ed. 2d 114, 122 N. 14 (1985) (official capacity actions for prospective [injunctive] relief are not

EXHIBIT (17)

**92-MAR N.Y. St. B.J. 36**

**New York State Bar Journal**
March. 2020
Joel R. Brandes[a1]

Copyright © 2020 by the **New York** State Bar Association; Joel R. Brandes

# STARE DECISIS, PRECEDENT AND DICTA

Lawyers and judges regularly treat dicta like a case holding.[1] In this article we attempt to distinguish a holding that is precedent from dicta.

"Stare decisis et non quieta movere" means to stand by things decided and not to disturb settled points.[2] The doctrine of stare decisis provides that once a court has decided a legal issue, subsequent cases presenting similar facts should be decided in conformity with the earlier decision.[3] Stare decisis is the doctrine of precedent, the "rule that precedents must be followed when similar circumstances arise."[4]

Stare decisis requires that the decisions of the Court of Appeals which have not been invalidated by changes in statute, decisional law, or constitutional requirements must be followed by all lower appellate courts, such as the appellate division and the appellate term,[5] and by all courts of original jurisdiction.[6] The doctrine of stare decisis requires trial courts in one department to follow precedents set by the Appellate Division of another department until the Court of Appeals or the Appellate Division in that Department pronounces a contrary rule. These considerations do not apply to the Appellate Division. While an Appellate Division should accept the decisions of sister departments as persuasive it is free to reach a contrary result.[7] Trial courts within a Department must follow the determination of the Appellate Division in another Department until such time as the Appellate Division of their own Department or the Court of Appeals passes on the question.

Where a question has not yet been decided by an Appellate Division, inferior courts in that Department must follow the determinations of the Appellate Division in any other Department until such time as their own Appellate Division or the Court of Appeals passes upon the question.[8] Where there is no applicable decision from the Court of Appeals or from the Appellate Division in the trial court's Department and the decisions from other Appellate Divisions are conflicting, the trial court is left to fashion its own decision. A court will give appropriate weight and consideration to the views expressed by the Justices of the Appellate Divisions and, where statutory interpretation is involved, developing a view that **\*37** is consistent with the overall objective of the statute.[9] A judgment of a trial court will not receive stare decisis treatment by an appellate court.[10]

Findings are a determination by a judge, or jury, of a fact supported by the evidence in the record.[11] A holding is a court's determination of a matter of law pivotal to its decision; a principle drawn from a decision. It is also a ruling on evidence or other questions presented at trial.[12] A precedent is a holding that must be followed when similar circumstances arise.[13]

Dicta are opinions of a judge that do not embody the determination of the court; opinions which are not on the point in question.[14] Statements made that are not essential to a decision on the questions presented are the dicta, and not the decision of the court. A judicial opinion "is only binding so far as it is relevant; and, when it wanders from the point at issue, it no longer has force as an official utterance."[15]

In *In re Fay*,[16] the Court of Appeals wrote, with regard to the question of what is precedent, "it cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the ... consideration of the cause, something else was found ... which disposed of the whole matter."

a special meeting called by the shareholders, the shareholders in attendance passed a resolution declaring defendant's conduct "objectionable" and directing the Board to terminate his proprietary lease and cancel his shares. The cooperative terminated defendant's tenancy in accordance with a provision in the lease that authorized it to do so based on a tenant's "objectionable" conduct." Defendant remained in the apartment, prompting the cooperative to bring this suit for, inter alia, possession and ejectment. Defendant challenged the cooperatives action and asserted, that his tenancy could be terminated only upon a court's independent evaluation of the reasonableness of the cooperatives action. The primary issue in the Court of Appeals was the proper standard of review to be applied when a cooperative exercises its *38 agreed-upon right to terminate a tenancy based on a shareholder-tenant's objectionable conduct.

The Court of Appeals held that the proper standard of review to be applied was the business judgment rule. The rule could be applied consistently with RPAPL 711 (1), which applied to this termination and required competent evidence to show that a tenant was objectionable. Under the business judgment rule, a court should defer to a cooperative board's determination so long as the board acts for the purposes of the cooperative, within the scope of its authority, and in good faith. Here, plaintiff was under a fiduciary duty to further the collective interests of the cooperative, whose shareholders overwhelmingly voted in favor of terminating defendant's tenancy, and it followed the procedures contained in the lease for doing so. There was no evidence of any bad faith by plaintiff's that would trigger further judicial scrutiny.

In *Pullman* the shareholders acted to terminate the defendant's tenancy -- not the Board. Were the Court of Appeals' statements about granting business-judgment deference to board votes directly related to the issue before the Court? Were they dicta? Does *In re Fay* support the conclusion that the statements were not dicta?[18]

*In re McDermott v. Bale*[19] was a Family Court custody proceeding, where the Attorney for the Children (AFC) appealed from an order which incorporated the terms of a written stipulation executed by the parties granting the parties joint custody of their two children, with primary physical residence to the mother and visitation to the father. The AFC refused to join in the stipulation, which Family Court approved over his objection. The Appellate Division affirmed.

The opinion in *McDermott* stated, in relevant part: "

> We reject the AFC's contention that the court erred in approving the stipulation. Although we agree with the AFC that he "'must be afforded the *same opportunity as any other party to fully participate in [the] proceeding"* ..., and that the court may not "relegate the [AFC] to a meaningless role" ..., the children represented by the AFC are not permitted to "veto" a proposed settlement reached by their parents and thereby force a trial ....

> We cannot agree with the AFC that children in custody cases should be given full-parry status such that their consent is necessary to effectuate a settlement. The purpose of an attorney for the children is "to help protect their interests and to help them express their wishes to the court" (Family Ct. Act § 241). There is a significant difference between allowing children to express their wishes to the court and allowing their wishes to scuttle a proposed settlement. We note that the court is not required to appoint an attorney for the children in contested custody proceedings, although that is no doubt the preferred practice ... Thus, there is no support for the AFC's contention that children in a custody proceeding have the same legal status as their parents, inasmuch as it is well settled that parents have the right to the assistance of counsel in such proceedings ....[20]

> In sum, we conclude that, where the court in a custody case appoints an attorney for the children, he or she has the right to be heard with respect to a proposed settlement and to object to the settlement but not the right to preclude the court from approving the settlement in the event that the court determines that the terms of the settlement are in the children's best interests ...."[21]

*39 What was the holding? What was precedent? What was dicta? It appears to us that the holdings were (1) that when an APC is appointed in a custody case, he has the right to object to a settlement but not to preclude the court from approving it and (2) children do not have full party status in a custody case.[22] These holdings are precedent in the Fourth Department. Everything else was dicta. No other portion of this brief opinion was ""necessary to the result."

In *In re Newton v. McFarlanee,*[23] the Family Court held a hearing, without first determining if there had been a change of circumstances, and then modified the custody order to give the mother sole custody of the child. Its three-line decision stated its conclusions that there were full changed circumstances and awarding her custody was in the best interest of the child, but did not state any findings or its reasoning. The Second Department reversed the order and dismissed the petition, for the reasons stated in the opening paragraphs of its opinion. There, it stated:

> This appeal raises several important issues pertinent to child custody determinations. We conclude that: (a) the attorney for the child has the authority to pursue an appeal on behalf of the child from an order determining the custody of the child; (b) the child is aggrieved, for appellate purposes, by an order determining custody; (c) the Family Court should not have held a full custody hearing without first determining whether the mother had alleged and established a sufficient change in circumstances to warrant an inquiry into whether the child's best interests were served by the existing custodial arrangement; and (d) the Family Court erred in failing to give due consideration to the expressed preferences of the child, who is a teenager.

There can be no doubt the paragraph quoted above contains the four holdings of the Appellate Division, which it denominated as its conclusions. Are these holdings precedent or just limited to the facts of this case? Did the court hold that the attorney for "a child" or "the child" has the authority to pursue an appeal on behalf of the child from an order determining the custody of the child? Did it hold that "a child" or "the child" is aggrieved by an order determining custody? Did it reverse and dismiss the petition because there were no findings, and no demonstration of a change of circumstances, or because the wishes of the child were not considered?

Not all cases are precedents. A close reading of the opinion will make it clear that the court was referring to this child and this set of circumstances. It held that the attorney for "the child" had the authority to pursue the appeal on behalf of the child from the order determining the custody of the child. It also held that "the child" was aggrieved by the order determining custody.

Assuming the opinion was not limited to this child, the Newton opinion indicates that the court based its conclusion that the attorney for the child has the authority to pursue an appeal on behalf of the child from an order determining the custody of the child on the language of Family Court Act §1120 (b). It provides that whenever an attorney has been appointed by the Family Court to represent a child, the appointment continues where the attorney files a notice of appeal on behalf of the child or where one of the parties files a notice of appeal. Because there is no requirement in the Domestic Relations Law or Family Court Act that the court to appoint an attorney for the child in a custody case, the holding must be limited to a case where an AFC is appointed, and would not precedent in the Second Department beyond its holding.

## CONCLUSION

It is not easy to distinguish dicta from precedent in an opinion. The easiest way to determine what is dicta is by the process of elimination. Work backwards from the holding or holding(s) of the court, which are usually prefaced by the words 'We hold "or "We conclude." Everything that is not necessary for the court to reach the holding is dicta. Remember, not all holdings are precedent.

Footnotes

[a1]   **Joel R. Brandes** maintains his office for the practice of law in *New York City*. He is the author of the treatise *Law and the Family New York, 2d (9 volumes)* and *Law and the Family New York Forms (5 volumes)* (both Thomson Reuters), as well as

[20]     *Id.* Citations omitted.

[21]     Citations omitted.

[22]     *See* also *Kessler v. Fancher,* 112 A.D.3d 1323 (4th Dep't 2017); *Lawrence v. Lawrence,* 151 A.D.3d 187 (4th Dep't 2017); and *Kanya J v. Christopher K,* 175 A.D.3d 760 (3d Dep't 2019) each holding that a child in a custody matter does not have full party status.

[23]     174 A.D.3d 67 (2d Dep't 2019).

**92-MAR NYSTBJ 36**

**End of Document**                                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the *New York Matrimonial Trial Handbook*. He writes and publishes *Bits and Bytes*,™ a bimonthly electronic newsletter for the New York divorce and family law bench and bar, a website, New York Divorce and Family Law (www.nysdivorce.com), and two blogs, "New York Divorce and Family Law" (https://brandeslaw.blogspot.com/) and "A Child Is Missing: The International Child Abduction Blog" (https://joelbrandes.blogspot.com/).

[1]   See Judith M. Stinson, *Why Dicta Becomes Holding and Why It Matters,* 76 Brook. L. Rev. 219(2010).

[2]   *People v. Taylor,* 9 N.Y.3d 129 (2007).

[3]   *People v. Bing,* 76 N.Y.2d 331, 337-38 (1990).

[4]   Doctrine of Precedent, Black's Law Dictionary (11th ed. 2019).

[5]   *Warnock v. Duello,* 30 A.D.3d 818 (3d Dep't 2006),

[6]   *Battle v. State,* 257 A.D.2d 745 (3d Dep't 1999).

[7]   *Mtn. View Coach Lines. Inc. v. Storms,* 102 A.D.2d 663 (2d Dep't 1984).

[8]   *Stewart v. Volkswagen of America. Inc.,* 181 A.D.2d 4 (2d Dep't 1992), *order rev'd on other grounds.* 81 N.Y.2d 203 (1993).

[9]   *Summit Const. Services Grp., Inc. v. Act Abatement, LLC,* 34 Misc. 3d 823 (Sup. Ct., Westchester Co. 2011).

[10]   *In re Bull,* 235 A. D. 2d 722 (3d Dep't 1997); *Samuels v. High Braes Refuge, Inc.,* 8 A.D.3d 1110 (4th Dep't 2004).

[11]   Finding of Pact, Black's Law Dictionary (11th ed. 2019).

[12]   Holding, Black's Law Dictionary (11th ed. 2019).

[13]   *See* Doctrine of Precedent, Black's Law Dictionary (11th ed. 2019).

[14]   *See Rohrbach v. Germania Fire Ins. Co.,* 62 N.Y. 47 (1875).

[15]   See *Colonial City Traction Co. v. Kingston City R.R. Co.,* 154 N.Y. 493, 495 (1897).

[16]   *In re Fay,* 291 N.Y. 198 (1943).

[17]   100 N.Y.2d 147. 149-50 (2003).

[18]   In *London Terrace Towers v. Davis,* 6 Misc. 3d 600, 612-13 (N.Y. City Civ. Ct., 2004) the Court held that the additional statement was dicta.

[19]   94 A.D.3d 1542 (4th Dep't 2012).

EXHIBIT (18)



## Central Question

Could a federal court stop a state official from enforcing an allegedly unconstitution
state law?

## Historical Context

The Progressive Era in the United States lasted roughly from 1890 to 1920 and was
characterized by social, political, and economic reform movements in a wide variety
contexts. Although the goals of Progressive reformers varied and were sometimes
contradictory, many activists sought changes that would lessen the influence of the
wealthy and powerful and give ordinary people—such as middle-class professional
farmers, and workers in the rapidly industrializing cities—more control over their live
Examples included "trust busting" to break up large and powerful corporate monopo
labor reforms to give workers improved hours, wages, and working conditions; and
efforts to increase democracy, such as the direct election of U.S. senators and refere
by which citizens could vote on proposed legislation.

Many Progressives focused their efforts on America's railroad companies, which we
then some of the largest and most powerful corporate interests in the nation. Railroa
rates for transporting farm products, manufactured goods, and passengers had bee
subject of heated controversy for decades. State legislatures began to set maximum
limits on rates in the 1870s, a practice the Supreme Court upheld in *Munn v. Illinois*

(1877). In 1886, the Court sharply narrowed the scope of state railroad regulation, holding that states could not interfere with rates for interstate transportation (a decision that led to Congress's creation of the Interstate Commerce Commission a year later). The states continued into the twentieth century to regulate intrastate rates, however, often doing so through legislatively created commissions.

Railroads and their shareholders, believing the rates set by state commissions to be unfair, brought lawsuits in federal court challenging their validity. Commonly, the railroads claimed that rates were so low as to be confiscatory, depriving them of property without due process of law in violation of the Fourteenth Amendment. Beginning in the 1890s and continuing into the early twentieth century, the Supreme Court upheld the ability of the lower federal courts to issue injunctions forbidding the enforcement of unreasonably low railroad rates.

The railroad rate decisions were part of a larger pattern that caused many Progressives to view the federal courts as enemies of reform. The Supreme Court was accused of overstepping its authority and displaying excessive deference to corporate interests in frequently striking down state economic legislation as unconstitutional. The most widely criticized such case was *Lochner v. New York* (1905), in which the Court invalidated a state maximum-hours law for bakers on the grounds that it interfered with liberty of contract. Progressives were hostile to federal court injunctions as well. In the 1890s and beyond, the federal courts expanded the use of their equitable powers, with a particular focus on enjoining labor strikes and boycotts. Critics described the practice, embodied by the injunction against the Pullman strikers upheld in *In re Debs* (1895), as "government by injunction."

*Ex parte Young* came before the Supreme Court, therefore, at a time in which state railroad rate regulation, the federal judiciary's invalidation of Progressive legislation, and the federal courts' use of the injunction power were all nationwide topics of controversy.

## Legal Debates before *Young*

The general debate over whether states could be sued by individual plaintiffs in federal court stretched back to 1793, when the Supreme Court decided *Chisholm v. Georgia*. In ruling that states did not possess sovereign immunity from federal lawsuits, the Court relied on language in Article III of the Constitution extending the judicial power to cases between a state and citizens of another state. In response to an outcry from state officials worried that a flood of suits over alleged Revolutionary War debts would deplete state treasuries, Congress passed and the states ratified the Eleventh Amendment, which excluded such suits from the federal judicial power. While the

Supreme Court broadened its interpretation of the amendment over the course of the nineteenth century, it was eventually called upon to determine the extent, if any, to which sovereign immunity applied to federal lawsuits against state officials.

The Supreme Court issued several decisions during the nineteenth century allowing lawsuits to proceed against state officials despite defendants' claims that the state was actually the party being sued in violation of the Eleventh Amendment. In the 1890s, the Court began to hear appeals from injunctions against state officials in railroad rate cases. In *Smyth v. Ames* (1898), a suit to enjoin the enforcement of a Nebraska rate law, the Court noted, "It is the settled doctrine of this court that a suit against individuals for the purpose of preventing them as officers of a State from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the State within the meaning of [the Eleventh] Amendment." A year later, in *Fitts v. McGhee*, the Court qualified *Smyth* and earlier cases when it dissolved an injunction against enforcement of an Alabama law regarding railroad bridge tolls. In that case, no particular state official had any duty to enforce the act in question, making the defendants parties in name only. There had to be at least some connection, the Court held, between the enforcement of a statute and the particular state official a plaintiff sought to enjoin.

## The Case

In 1906 and 1907, the state of Minnesota passed three laws regulating the maximum rates railroads would be permitted to charge for the transportation of merchandise, commodities, and passengers within the state. The statutes provided harsh penalties for disobedience, including fines as high as $10,000 in some instances, and the possibility of imprisonment for up to five years. In May 1907, stockholders of several of the affected railroad companies brought suits in equity in the U.S. Circuit Court for the District of Minnesota. The plaintiffs sought injunctions to prohibit the railroad companies from complying with the new laws and to bar the state Railroad and Warehouse Commission and the state Attorney General, Edward Young, from attempting to enforce them.



Edward Young

The lawsuits were founded on the assertion that the railroad laws violated the Fourteenth Amendment by depriving the railroads of their property without due process of law as well as depriving them of the equal protection of the laws. The state had set railroad rates so low, the plaintiffs alleged, that they amounted to confiscation. Moreover, the fines for noncompliance were so severe that the railroads could not afford to break the laws in order to test them in court, and no individual railroad employee would be willing to risk imprisonment to do so.

The circuit court issued a restraining order prohibiting Young from enforcing the most recent statute, which had not yet gone into effect. Young appeared before the federal court to challenge the order, claiming that the suit against him as Attorney General was actually a suit against the state of Minnesota and was therefore barred by the Eleventh Amendment. The federal court overruled Young's objection to the restraining order, and after hearing evidence it entered a preliminary injunction, barring enforcement of the statute until the case had reached a final resolution.

The following day, Young petitioned a Minnesota state court for a writ of mandamus (a court order that a party perform a specific action) directing the Northern Pacific Railway to comply with the statute in question by publishing and adopting the rates specified by the law. The court issued the writ, which was then served on the railroad. For having violated the preliminary injunction entered the previous day, the U.S. circuit court held Young in contempt of court and ordered that he remain in the custody of the U.S.

marshal (he was required to check in with the marshal once a day) until he paid a fine of $100 and dismissed the state court proceedings. Young then petitioned the Supreme Court of the United States for a writ of habeas corpus, alleging that his detention by the federal court was unconstitutional.

## The Supreme Court's Ruling

By a vote of 8–1, the Supreme Court ruled against Young, denying his petition for a writ of habeas corpus. In his opinion for the Court, Justice Rufus W. Peckham first dispensed with Young's claim that the U.S. circuit court lacked jurisdiction over the case because no federal question had been presented. The Court ruled that there were at least two federal questions in the case: (1) whether the railroad rates were so low as to deprive the railroads of their property without due process of law, and (2) whether the penalties for noncompliance were so severe as to prevent testing the laws in court, depriving the railroads of the equal protection of the laws. While not making a finding on the first question, the Court held the railroad statutes unconstitutional on the basis of the second.



Justice Rufus W. Peckham

Peckham next turned to Young's claim that the suit brought against him in the U.S. circuit court was in fact a suit against the state of Minnesota and was therefore barred by the Eleventh Amendment's grant to the states of sovereign immunity. An attempt by an official to enforce an unconstitutional law, Peckham asserted, was an action taken

"without the authority" of the state behind it and did not affect the state "in its sovereign or governmental capacity." Instead, it was "simply an illegal act upon the part of a state official . . . to enforce a legislative enactment which is void." The Court's ruling rested in part on the supremacy of federal law. By engaging in conduct that violated the U.S. Constitution, Young was "stripped of his official or representative character and . . . subjected in his person to the consequences of his individual conduct." "The State has no power," wrote Peckham, to provide Young with "any immunity from responsibility to the supreme authority of the United States."

Young also argued that the injunction should be ruled invalid under *Fitts v. McGhee* because he was not specifically charged with enforcing the rate statute. The Court rejected this assertion, taking a more expansive view than it had in *Fitts* regarding the connection between a state official and a challenged statute. It did not matter that Young's enforcement duty was not found in the rate statute itself, Peckham concluded. His duty as Attorney General to enforce the state's laws gave him a sufficient connection with the statute to make him the proper object of an injunction.

Peckham took note of the general rule that a court of equity lacked jurisdiction to enjoin criminal proceedings, but explained that an exception existed when such proceedings were brought under an unconstitutional statute. If a federal court had, prior to the commencement of state court proceedings, exercised jurisdiction over a constitutional challenge to the law, it was entitled to "hold and maintain such jurisdiction, to the exclusion of all other courts" until the matter was settled.

In a lengthy dissenting opinion, Justice John Marshall Harlan asserted that the Eleventh Amendment should have barred the federal lawsuit against Young. Young had been named as a defendant, Harlan pointed out, "*as, and only because he was,* Attorney General of Minnesota." The aim of the plaintiffs was not to restrain him individually, but only "*to tie the hands* of the *State*," so that it could not review the railroad statutes in its own courts. "It would therefore seem clear," Harlan concluded, "that . . . the suit brought in the Federal court was one, in legal effect, against the State—as much so as if the State had been formally named on the record as a party."

## Aftermath and Legacy

The *Young* case represented, and was a part of, the general expansion of federal judicial power that arguably characterized its era. Coming only three years after the Court's controversial ruling in *Lochner*, the decision was denounced by Progressives, who saw it as opening the door even wider for unwarranted federal interference with state

legislative reforms. The fact that the *Young* ruling had restrained the regulation of railroad rates—an issue of widespread concern—made it particularly susceptible to criticism.

By giving federal courts greater latitude to enjoin the enforcement of state laws, *Young* had significant implications for federalism. A prominent legacy of the case was its weakening of state sovereign immunity under the Eleventh Amendment. By declaring that state officials were stripped of their representative character and acted only as individuals when violating the Constitution, the Court made it more difficult for states to avoid federal court challenges to legislation. As a consequence, the supremacy of federal over state law was reinforced. While the *Young* opinion's strong language did not depart significantly from the Court's previous Eleventh Amendment jurisprudence, the fact that a state Attorney General was held in contempt by a federal court in the course of performing his official duties was highly controversial.

As part of the backlash to *Young*, Congress passed a statute in 1910 requiring that suits to enjoin the enforcement of state legislation on constitutional grounds be heard by a three-judge panel of the U.S. district court, rather than a single judge. The measure was quite limited in comparison to unsuccessful proposals for federal legislation that would have eliminated the *Young* doctrine.

Despite its initial unpopularity among reformers, the case gained new resonance during the height of the African American civil rights movement in the 1950s and 1960s. Many challenges to allegedly discriminatory state regulatory practices were litigated before three-judge courts, from which a direct appeal to the Supreme Court was available. Plaintiffs believed in many instances that having their case heard by a panel reduced the likelihood of having their suit derailed by a single unsympathetic judge, particularly in the Deep South. In 1976, Congress severely restricted the use of such three-judge courts, limiting them to cases involving legislative reapportionment.

Although the basic holding of *Young* remains valid law, the Supreme Court has restricted its scope and application significantly in recent decades. In *Seminole Tribe of Florida v. Florida* (1996), the Court found that Congress had established a detailed remedial scheme in a federal statute, thereby precluding the plaintiffs from bringing a suit under *Young* to enjoin state officials from violating that law. In the wake of *Seminole Tribe* and subsequent decisions, the availability of federal court suits for prospective injunctive relief against state officials acting in their individual capacity has become less certain.

## Discussion Questions

# Documents

## "Young Defies U.S. Court," *The New York Times*, July 11, 1907

*Attorney General Young's disobedience of the federal court's injunction came as no surprise, having been planned in advance, as this* New York Times *article revealed. Although the article predicted that Young would be sent to jail, his detention required only that he check in daily with a federal marshal.*

Attorney General Edward T. Young has decided to defy the mandate of Judge William Lochren of the United States Court in the pending railroad litigation, and face sentence to jail. He will take this course in order to maintain his position that, in his official capacity as Attorney General of Minnesota, he cannot be enjoined from performing his discretionary duties.

Notwithstanding Judge Lochren's decision that the Attorney General may be subject to injunction by "dummy" plaintiffs of railroads who are trying to kill low rates established by the Legislature, Young is actively preparing to bring suits against roads in State courts should they neglect to comply with the new rate law.

Next Tuesday opposing counsel will argue the question of whether a permanent injunction should be issued against Young as Attorney General; the State Railroad Commission, and Minnesota railroads to prevent enforcement of low passenger and freight rates. Should Young be enjoined he will disregard the injunction and bring proceedings against the railroads.

He will thus be in contempt of Judge Lochren's order, and the Federal jurist will probably issue a contempt warrant against the Attorney General. The latter will appeal to the United States Circuit Court of Appeals, and is quoted as saying that if necessary he will carry the question to the Supreme Court of the United States.

Document Source: "Young Defies U.S. Court: Minnesota Attorney General Faces Jail Sentence in Railroad Litigation," *New York Times,* July 11, 1907, p. 1.

## "Would Curb Power of Federal Courts," *The New York Times*, October 1, 1907

*Another* Times *article, covering a convention of state Attorneys General, illustrated that the legal battle over the regulation of railroad rates was an issue of nationwide controversy. Attorney General Young, a participant at the conference, expected to be arrested on charges of contempt of court upon his return to Minnesota.*

A strong desire to do away with the conflict of jurisdiction between State and Federal courts, and, as one of the phases of that, to restrict the power of Federal courts in their dealings with affairs pertaining wholly to a State, seemed to prevail at a convention of Attorneys General or assistants from thirteen States at the Southern Hotel to-day.

Most of the trouble was traced to the Fourteenth Amendment to the Constitution by Attorney General R. V. Fletcher of Mississippi, who said he did not see why it should not be repealed, as it did no good for the negroes, for whom it was originally passed, and succeeded only in embarrassing State courts....

Attorney General Hadley of Missouri said, in part:...

"Men who associate themselves together to operate railroads have neither a legal nor a moral right to receive more than a reasonable return on their investment.

"The amount of such return is a question that has not yet been thoroughly settled by the decisions of courts of last resort. No definite division of passenger and freight expenses can be made. And yet for years, upon the basis of affidavits of interested parties, with such a manifest lack of definite information concerning the earnings and expenses of the different classes of railroad traffic, United States District and Circuit Judges have exercised a veto power on the acts of State Legislatures and the decisions of duly authorized administrative boards." ...

Peculiar interest was given the paper on "Conflict Between State and Federal Courts," by Attorney General Young of Minnesota, by the fact that he expects to be arrested on his return to Minnesota in connection with a contempt case arising out of conflict between courts. Chairman Hadley announced that Attorney General Young had received a special dispensation to come to St. Louis.

Murmurs of approval greeted Young's statement that the most trouble arose from the exercise by Federal Courts of powers which the founders of the Government never intended they should have, and that it was plain these powers must be limited.

Mr. Young also said that many Federal Judges seem to misunderstand the relations between State and National Governments, and the extent of their own powers.

Document Source: "Would Curb Power of Federal Courts: Attorneys General of Thirteen States Consider Means of Ending State Conflicts," *New York Times*, October 1, 1907, p. 9.

### "Clank!," *The Minneapolis Sunday Tribune*, October 27, 1907

*As the Minnesota press reported, Young's detention by the federal marshal, with whom he maintained a friendly relationship, was more metaphorical than real, as he was required to check in*

*Ex parte Young*

*with the marshal once per day and was not incarcerated. Nevertheless, the* Tribune *noted, the federalism issues underlying Young's detention were serious ones.*

The attorney-general of the state in chains!

This is the spectacle which Minnesota is presenting to the world today.

Of course the chains are metaphorical. The gyves which bind Attorney General Edward T. Young are imaginary....

Back of it all the real meaning of the almost grotesque situation which has made of Attorney General Young a prisoner, with orders to report daily to United States Marshal W. H. Grimshaw, is a contest between state and federal government. It is a show down for the dual system of government at which European writers on politics have pointed the finger of warning and suspicion since the inauguration of the constitution.

The all important and closing act of this drama will be enacted in Washington sometime this week, where Assistant Attorney-General George F. Simpson and special counsel Thos. D. O'Brien are already training the heavy legal siege guns on the chief tribunal of the land.

The imprisoned attorney-general will hasten to the same place this week to argue his own case in the habeas corpus proceedings which he has brought to rid himself of the contempt judgment which Judge Wm. H. Lochren has imposed upon him. He will probably be accompanied by his federal keeper.

In the meantime Attorney-General Young continues to clank his imaginary chains and to report daily to his kindly jailer.

"He is the most troublesome as well as the most distinguished prisoner I have ever had," said Marshal Grimshaw, with a keen twinkle of appreciation. "You see, I have to be so mighty careful, for if I don't look out, he will escape from my jurisdiction and break into the governor's office." ...

It was with a view of endeavoring to learn what manner of man the attorney-general really is that the writer invaded the sanctum of the attorney-general at the capitol.

"How does it seem to be in chains?" was the question exploded at the quiet man who sat at his desk looking over some papers.

"I feel," he said in beginning, "a naturally reluctance to placing myself in this position. A lawyer naturally hates to be or to seem to be in contempt, but it seemed to me the only possible way of securing an immediate hearing on our case from the supreme court.

"In the original case before Judge Lochren, we argued the court had no right to enjoin a state officer from the performance of his discretionary duties, such as the enforcement of the two cent fare and the commodity rate laws. We contended that the suit against the attorney-general was virtually a suit against the state, which is provided against in the eleventh amendment.

*Cases that Shaped the Federal Courts*

"We will take the position at Washington that the federal court has no jurisdiction—that the eleventh amendment guarantees the state against suit and that in bringing the action against the attorney-general, the state was the real party to the suit."

[Document Source: "CLANK! Manacles on Attorney-General an Interesting Spectacle," *Minneapolis Sunday Tribune*, October 27, 1907, p. 15.]

### Supreme Court of the United States, Opinion in *Ex parte Young*, March 23, 1908

*This excerpt from the majority opinion in* Ex parte Young, *authored by Justice Rufus Peckham, addressed the question of whether the injunction against Attorney General Young was in fact one against the state of Minnesota. The answer rested on the fact that the act Young sought to enforce—for the regulation of railroad rates—was unconstitutional. Instituting proceedings in state court to enforce the law was therefore "simply an illegal act upon the part of a state official" for which Young could not escape liability by claiming to have acted on behalf of the state.*

The various authorities we have referred to furnish ample justification for the assertion that individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action....

In making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party.

It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced.... The fact that the state officer by virtue of his office has some connection with the enforcement of the act is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists....

The general discretion regarding the enforcement of the laws when and as he deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment to the injury of complainant. In such case no affirmative action of any nature is directed, and the officer

*Ex parte Young*

is simply prohibited from doing an act which he had no legal right to do. An injunction to prevent him from doing that which he has no legal right to do is not an interference with the discretion of an officer....

It is contended that the complainants do not complain and they care nothing about any action which Mr. Young might take or bring as an ordinary individual, but that he was complained of as an officer, to whose discretion is confided the use of the name of the State of Minnesota so far as litigation is concerned, and that when or how he shall use it is a matter resting in his discretion and cannot be controlled by any court.

The answer to all this is the same as made in every case where an official claims to be acting under the authority of the State. The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

Document Source: *Ex parte Young*, 209 U.S. 123, 155–57, 159–60 (1908).

### Justice John Marshall Harlan, Dissenting Opinion in *Ex parte Young*, March 23, 1908

*Justice John Marshall Harlan disagreed with the majority's characterization of Young as acting in his individual capacity. In his view, Young was performing the duties of his job, and would not have been sued but for the fact that he was the state Attorney General. Justice Harlan, therefore, would have barred the suit as violating the Eleventh Amendment grant to the states of sovereign immunity.*

Let it be observed that the suit instituted by Perkins and Shepard in the Circuit Court of the United States was, as to the defendant Young, one against him *as, and only because he was*, Attorney General of Minnesota. No relief was sought against him individ-

ually but only in his capacity *as* Attorney General. And the manifest, indeed the avowed and admitted, object of seeking such relief was *to tie the hands* of the *State* so that it could not in any manner or by any mode of proceeding, *in its own courts*, test the validity of the statutes and orders in question. It would therefore seem clear that within the true meaning of the Eleventh Amendment the suit brought in the Federal court was one, in legal effect, against the State—as much so as if the State had been formally named on the record as a party—and therefore it was a suit to which, under the Amendment, so far as the State or its Attorney General was concerned, the judicial power of the United States did not and could not extend. If this proposition be sound it will follow—indeed, it is conceded that if, so far as relief is sought against the Attorney General of Minnesota, this be a suit against the State—then the order of the Federal court enjoining that officer from taking any action, suit, step or proceeding to compel the railway company to obey the Minnesota statute was beyond the jurisdiction of that court and wholly void; in which case, that officer was at liberty to proceed in the discharge of his official duties as defined by the laws of the State, and the order adjudging him to be in contempt for bringing the mandamus proceeding in the state court was a nullity....

The only question now before this court is whether the suit by Perkins and Shepard in the Federal court was not, upon its face, *as to the relief sought against the Attorney General of Minnesota*, a suit against the State. Stated in another form, the question is whether that court may, *by operating upon that officer in his official capacity*, by means of fine and imprisonment, prevent the State from being represented by its law officer in one of its own courts? If the Federal court could not thus put manacles upon the State so as to prevent it from being represented by its Attorney General in its own court and from having the state court pass upon the validity of the state enactment in question in the Perkins-Shepard suit, that is an end to this *habeas corpus* proceeding, and the Attorney General of Minnesota should be discharged by order of this court from custody.

Document Source: *Ex parte Young*, 209 U.S. 123, 173–74, 177–78 (1908).

### Edward A. Purcell, Jr., *University of Toledo Law Review*, 2009

*In a 2009 piece, legal historian Edward Purcell placed the* Young *case in its historical context as part of a major expansion of federal judicial power that occurred in the late nineteenth and early twentieth centuries. A significant aspect of the federal courts' enhanced authority was their supervisory power over the states, by which they could block state regulatory actions and ensure compliance with federal law.*

More than a century after the Supreme Court's decision in *Ex parte Young*, judges and commentators still debate its meaning and significance. Writing for the *Young* majority, Justice Rufus Peckham declared that his opinion contained "no new invention" and was rooted firmly in precedents going back to the Marshall Court. In contrast, the sole dissenter, Justice John Marshall Harlan, charged that the opinion "departs" from "principles previously announced" and "would work a radical change in our governmental system." The views of subsequent commentators have ranged freely between those interpretive antipodes.

Perhaps the only conclusion that commentators have generally agreed on is that, whatever its legal standing, *Young* was highly controversial as a political matter. Progressives generally denounced it, while their adversaries praised it. Those contrasting views, not surprisingly, had less to do with *Young's* technical reasoning than with its practical consequences. *Young* affirmed a muscular power in the federal courts to enjoin the enforcement of state laws and regulatory actions, and commentators divided for the most part according to their views about the desirability of that result. Had *Young* come down three years after *Brown v. Board of Education* rather than three years after *Lochner v. New York*, the initial battle lines would have been strikingly different. Indeed, *Young's* legal reputation over the past century has risen and fallen, while its legal meaning has broadened and contracted, with the tides of American politics and the shifting political goals of its interpreters....

The decision was a key component in the transformation of the federal judiciary that the Supreme Court orchestrated between approximately 1890 and the First World War. The case did not mark a radical, or perhaps even substantial, break with the past; instead, it helped extend the trendlines that the Court had begun shaping after the post-Reconstruction settlement of the 1870s and 1880s. Ratifying, solidifying, and accelerating those trendlines, *Young* helped create a newly powerful and activist federal judiciary that emerged at the turn of the twentieth century and continued to operate into the twenty-first....

During the years from 1890 to 1917 the Supreme Court transformed the federal judiciary to meet the new challenges of a tumultuous and centralizing industrial age. The changes it made ranged across the doctrinal landscape, and their cumulative impact accelerated the nationalization and centralization of American law, government, and society. The Court imposed new national and centrally enforced limitations on governmental power, tightened federal judicial control over the states, extended the reach of congressional and presidential power, expanded the authority of federal judges to make national law, reconceptualized the role of the lower federal courts, and reoriented the jurisdiction of the entire federal judiciary to ensure the more effective enforcement of national law.... 

Thus, between approximately 1890 and 1917 the Court fundamentally reshaped the role and jurisdiction of the federal judiciary. It substantially widened the realm of national law that the federal courts controlled, expanded their equity and federal-question jurisdic-

*Cases that Shaped the Federal Courts*

tion, strengthened their ability to check state regulatory actions, and reoriented them away from state-law claims and toward cases presenting federal-law issues. Further, it blocked state efforts to avoid the mandates of federal law or the jurisdiction and judgments of federal courts, and it guaranteed access to a federal forum for all parties asserting federal-law claims without regard for either their citizenship or their rights under state law. In that context, *Ex parte Young's* significance emerges more clearly as but one integral part of a complex reorientation of the federal judicial system....

Most broadly, and as a practical matter, *Ex parte Young* was important for one simple and well-understood reason: it opened the doors of the federal courts widely to suits seeking injunctions against state and local officials brought by plaintiffs claiming injury from governmental actions that allegedly violated federal law. It ensured that federal courts, not just state courts, could hear such suits, and that in turn ensured that the federal courts would play a paramount role in construing relevant federal law and guaranteeing that state and local officials complied with its mandates. For plaintiffs, *Young* provided ready access to a highly preferred forum; for the federal courts, it provided a potentially sweeping supervisory power over the other levels and branches of government....

Thus, *Young* carried forward the Court's transformation of the federal courts on a wide front. It clarified and solidified critical doctrines that served to expand the role of the federal courts in protecting federal rights and controlling the actions of the other levels and branches of government, especially those of the states. It was a flower of that broad transformation, and its meaning and significance are most fully and accurately understood only in that context....

Considering *Ex parte Young* in the transformation's context suggests several conclusions. Perhaps most obvious, it shows that "Progressives" and their like were hardly the primary, let alone sole, force driving the processes of nationalization and centralization that remade American law, government, and society in the decades around the turn of the century. Rather, it was for the most part national business groups, the anti-Progressive wing of the Republican Party, and an emerging nationally oriented social and economic class that nourished the national market, structured the new centralizing corporate economy, and pressed for the efficiencies and protections they saw in uniform national law. In the process, they supported the expansion of both federal law and the enforcement capabilities of the national courts.

Recognizing the nature of the transformation also shows that the enduring achievement of the turn-of-the-century Court was not political or economic but institutional. Above all, it expanded the scope and content of federal law, strengthened the ability of the federal courts to enforce that law, and established more firmly the primacy of the federal judiciary in authoritatively construing a supreme national law. It did not so much impose

broad or severe limits on legislative power as it expanded the federal judiciary's ability to regularly supervise and, when necessary, check specific exercises of that power, especially by the states. Thus, the turn-of-the-century Court strengthened the role of the federal judiciary in American government and shifted power along both of the Constitution's structural axes: on one, from the states to the nation and, on the other, from all the levels and branches of government to the federal judiciary.

Document Source: Edward A. Purcell, Jr., "*Ex parte Young* and the Transformation of the Federal Courts, 1890-1917," *University of Toledo Law Review* 40, no. 4 (Summer 2009): 931–33, 960, 966–68 (footnotes omitted).

# Cases that Shaped the Federal Courts

This series includes case summaries, discussion questions, and excerpted documents related to cases that had a major institutional impact on the federal courts. The cases address a range of political and legal issues including the types of controversies federal courts could hear, judicial independence, the scope and meaning of "the judicial power," remedies, judicial review, the relationship between federal judicial power and states' rights, and the ability of federal judges to perform work outside of the courtroom.

- *Hayburn's Case* (1792). Could Congress require the federal courts to perform non-judicial duties?
- *Chisholm v. Georgia* (1793). Could states be sued in federal court by individual citizens of another state?
- *Marbury v. Madison* (1803). Could federal courts invalidate laws made by Congress that violated the Constitution?
- *Fletcher v. Peck* (1810). Could federal courts strike down state laws that violated the Constitution?
- *United States v. Hudson and Goodwin* (1812). Did the federal courts have jurisdiction over crimes not defined by Congress?
- *Martin v. Hunter's Lessee* (1816). Were state courts bound to follow decisions issued by the Supreme Court of the United States?
- *Osborn v. Bank of the United States* (1824). Could Congress grant the Bank of the United States the right to sue and be sued in the federal courts?
- *American Insurance Co. v. Canter* (1828). Did the Constitution require Congress to give judges of territorial courts the same tenure and salary protections afforded to judges of federal courts located in the states?
- *Louisville, Cincinnati, and Charleston Rail-road Co. v. Letson* (1844). Should a corporation be considered a citizen of a state for purposes of federal jurisdiction?
- *Ableman v. Booth* (1859). Could state courts issue writs of habeas corpus against federal authorities?
- *Gordon v. United States* (1865). Could the Supreme Court hear an appeal from a federal court whose judgments were subject to revision by the executive branch?
- *Ex parte McCardle* (1869). Could Congress remove a pending appeal from the Supreme Court's jurisdiction?
- *Ex parte Young* (1908). Could a federal court stop a state official from enforcing an allegedly unconstitutional state law?
- *Moore v. Dempsey* (1923). How closely should federal courts review the fairness of state criminal trials on petitions for writs of habeas corpus?

- *Frothingham v. Mellon* (1923). Was being a taxpayer sufficient to give a plaintiff the right to challenge the constitutionality of a federal statute?

- *Crowell v. Benson* (1932). What standard should courts apply when reviewing the decisions of executive agencies?

- *Erie Railroad Co. v. Tompkins* (1938). What source of law were federal courts to use in cases where no statute applied and the parties were from different states?

- *Railroad Commission of Texas v. Pullman Co.* (1941). When should a federal court abstain from deciding a legal issue in order to allow a state court to resolve it?

- *Brown v. Allen* (1953). What procedures should federal courts use to evaluate the fairness of state trials in habeas corpus cases?

- *Monroe v. Pape* (1961). Did the Ku Klux Klan Act of 1871 permit lawsuits in federal court against police officers who violated the constitutional rights of suspects without authorization from the state?

- *Baker v. Carr* (1962). Could a federal court hear a constitutional challenge to a state's apportionment plan for the election of state legislators?

- *Glidden Co. v. Zdanok* (1962). Were the Court of Claims and the Court of Customs Appeals "constitutional courts" exercising judicial power, or "legislative courts" exercising powers of Congress?

- *United States v. Allocco* (1962). Were presidential recess appointments to the federal courts constitutional?

- *Walker v. City of Birmingham* (1967). Could civil rights protestors challenge the constitutionality of a state court injunction, having already been charged with contempt of court for violating the injunction?

- *Bivens v. Six Unknown Named Agents* (1971). Did the Fourth Amendment create an implied right to sue officials who conducted illegal searches and seizures?

- *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.* (1982). Did the Bankruptcy Reform Act of 1978 violate the Constitution by granting too much judicial power to bankruptcy judges?

- *Morrison v. Olson* (1988). Could Congress empower federal judges to appoint independent counsel investigating executive branch officials?

- *Mistretta v. United States* (1989). Could Congress create an independent judicial agency to guide courts in setting criminal sentences?

- *Lujan v. Defenders of Wildlife* (1992). Could an environmental organization sue the federal government to challenge a regulation regarding protected species?

- *City of Boerne v. Flores* (1997). Could Congress reverse the Supreme Court's interpretation of the Constitution through a statute purportedly enforcing the Fourteenth Amendment?

EXHIBIT (19)

**RECKLESS ENDANGERMENT IN THE FIRST DEGREE**
**(Depraved Indifference)**
**Penal Law § 120.25**
**(Committed on or after Sept. 1, 1967)**
**(Revised December 12, 2006 [1] and June 5, 2012 [2])**

The (*specify*) count is Reckless Endangerment in the First Degree.

Under our law, a person is guilty of Reckless Endangerment in the First Degree when, under circumstances evincing a depraved indifference to human life, that person recklessly engages in conduct which creates a grave risk of death to another person.

The following terms used in that definition have a special meaning:

A person RECKLESSLY ENGAGES IN CONDUCT WHICH CREATES A GRAVE RISK OF DEATH TO ANOTHER PERSON:

when he or she engages in conduct which creates a grave and unjustifiable risk that another person's death will occur,

---

[1] This charge was revised in 2006 to accord with the Court of Appeals holdings in *People v Feingold,* 7 NY3d 288 (2006) (overruling *People v Register*, 60 NY2d 270 (1983) by holding that "depraved indifference to human life is a culpable mental state") and the cases decided with *Feingold: People v Mancini,* 7 NY3d 767 (2006) (leaving a victim to die is not depraved indifference murder); and *People v Swinton,* 7 NY3d 776 (2006)(the conviction for depraved indifference assault was modified to assault in the third degree because the evidence was insufficient to conclude that the parents of the victim acted with depraved indifference by feeding the child food which resulted in the child's severe malnutrition). *See also People v Suarez,* 6 NY3d 202 (2005); *People v Payne*, 3 NY3d 266 (2004); *People v Gonzalez*, 1 NY3d 464 (2004); *People v Hafeez*, 100 NY2d 253 (2003).

[2] The 2012 revision was for the purpose of adding language from *People v Lewie,* 17 NY3d 348 (2011), on the meaning of depravity [*see* text to footnote seven], and to expand footnote 11.

and when he or she is aware of and consciously disregards that risk,

and when that grave and unjustifiable risk is of such nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.[3]

Reckless conduct that results in a grave risk of death, however, is not enough to constitute this crime. And that is true no matter how grave or substantial the risk of death was. [4] To constitute this crime, the evidence must also show that the defendant acted under circumstances evincing a depraved indifference to human life.

DEPRAVED INDIFFERENCE TO HUMAN LIFE refers to a person's state of mind in recklessly engaging in conduct which creates a grave risk of death.[5]   A person has a depraved indifference to human life when that person has an utter disregard for the value of human life – a willingness to act, not because he or she means to cause grievous harm, but because he or she simply does not care whether or not grievous harm will result.[6] In other words, a person who is depravedly indifferent is not just

---

[2]   See Penal Law § 15.05(3); People v Boutin, 75 NY2d 692, 696 (1990). See also Hafeez, 100 NY2d at 259; People v Sanchez, 98 NY2d 373 (2002) overruled on other grounds by Feingold.

[4]   "Reckless homicide cannot be elevated into depraved indifference murder merely because the actions of the defendant created a risk of death, however grave or substantial that risk may have been" (Suarez, 6 NY3d at 213).

[5] "We say today explicitly ...:  depraved indifference to human life is a culpable mental state"   (Feingold, 7 NY3d at 294).

[6]   "...'depraved indifference is best understood as an utter disregard for the value of human life– a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not'" (Feingold at 296, quoting Suarez, 6 N.Y.3d at 214).

2

willing to take a grossly unreasonable risk to human life - - that person does not care how the risk turns out.[7] Depraved indifference to human life reflects a wicked, evil or inhuman state of mind, as manifested by brutal, heinous and despicable acts. It is evinced by conduct that is wanton, deficient in a moral sense of concern, and devoid of regard for the life or lives of others. [8]

[Add, if appropriate:

A person acts with a depraved indifference to human life when, having a conscious objective not to kill but to harm, he or she engages in torture or a brutal, prolonged and potentially fatal

---

[7] People v Lewie, 17 NY3d at 359, supra.

[8] "Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is 'so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy' as to render the actor as culpable as one whose conscious objective is to kill" (Suarez, 6 N.Y.3d at 214 quoting People v Russell, 91 NY2d 280, 287 (1998)).

This definition also applies "when the defendant intends neither to seriously injure, nor to kill, but nevertheless abandons a helpless and vulnerable victim in circumstances where the victim is highly likely to die, the defendant's utter callousness to the victim's moral plight –arising from a situation created by the defendant– properly establishes depraved indifference ...." (Suarez, 6 N.Y.3d 212). "[I]rrespective of what the actor does or does not do after inflicting the fatal injury, depraved indifference murder is not made out unless the core statutory requirement of depraved indifference murder is established" (id. at 210). Accordingly, this definition of "depraved indifference to human life" may also be used in what the Court of Appeals has termed to be "classic abandonment of a helpless victim" cases (id. at 212; See e.g. People v Mills, 1 NY3d 269 (2003) [pushing a young child into water and walking away]; People v Kibbe, 35 NY2d 407 (1974) [pushing an intoxicated person from a car onto a dark and snowy road]; But see People v Mancini, 7 NY3d 767 (2006)[assaulting a person and then leaving him does not necessarily constitute a depraved indifference to human life].

3

course of conduct against a particularly vulnerable victim.][9]

*[Add if appropriate:*

A person recklessly engages in conduct which creates a grave risk of death to another when he or she creates the risk but is unaware of the risk solely by reason of his or her voluntary intoxication.[10] However, in determining whether the defendant acted with depraved indifference to human life, you may consider whether the defendant's mind was affected by intoxicants to such a degree that he was incapable of forming the mental state of depraved indifference to human life.[11]]

---

[9] "[A]lthough we have reversed depraved indifference murder convictions in most cases involving isolated attacks, we have held that the crime is nevertheless established when a defendant– acting with a conscious objective not to kill but to harm– engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (*Suarez*, 6 NY3d at 212).

[10] Penal Law § 15.05(3).

[11] Penal Law § 15.25 provides that "Intoxication is not, as such, a defense to a criminal charge; but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged." In *Register*, the Court of Appeals held that "depraved indifference to human life" was not a culpable mental state, that "it is not an element in the traditional sense but rather a definition of the factual setting in which the risk creating conduct must occur – objective circumstances which are not subject to being negatived by evidence of defendant's intoxication." *Feingold* overruled *Register*, and held that "depraved indifference to human life is a culpable mental state" (7 NY3d at 294). Thereafter, in *People v Coon*, 34 AD3d 869 (3d Dept 2006), the Third Department noted that the defendant's level of intoxication by his voluntary use of crack cocaine made him "incapable of possessing the culpable mental state necessary to prove depraved indifference." Similarly, in *People v Wimes*, 49 AD3d 1286, 1287 (4th Dept 2008), the Fourth Department noted that "[t]here was no mention of intoxication during the plea allocution, despite the fact that intoxication could have negated the element of depraved indifference in the crime to which defendant pleaded guilty." The Second Department, however, has declined to hold that voluntary intoxication may negate the culpable mental state of depraved indifference to human life (*see People v Heidgen*, 87 AD3d 1016, 1025-1026 (2d Dept 2011) *affd without deciding that issue* 22 NY3d 259, *279 (2013). See also People v Wells*, 53 AD3d 181 (1st Dept 2008), and *compare with People v Valencia*, 14 NY3d 927 (2010).

4

In order for you to find the defendant guilty of this crime, the People are required to prove, from all the evidence in the case, beyond a reasonable doubt, both of the following two elements:

1.   That on or about _(date)_ , in the county of _(county)_ , the defendant, _(defendant's name)_, recklessly engaged in conduct which created a grave risk of death to another person; and

2.   That the defendant did so under circumstances evincing a depraved indifference to human life.

If you find the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of this crime.

If you find the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of this crime.

5

EXHIBIT (19)

# RECKLESS ENDANGERMENT IN THE FIRST DEGREE
## (Depraved Indifference)
## Penal Law § 120.25
## (Committed on or after Sept. 1, 1967)
## (Revised December 12, 2006 [1] and June 5, 2012 [2])

The (*specify*) count is Reckless Endangerment in the First Degree.

Under our law, a person is guilty of Reckless Endangerment in the First Degree when, under circumstances evincing a depraved indifference to human life, that person recklessly engages in conduct which creates a grave risk of death to another person.

The following terms used in that definition have a special meaning:

A person RECKLESSLY ENGAGES IN CONDUCT WHICH CREATES A GRAVE RISK OF DEATH TO ANOTHER PERSON:

when he or she engages in conduct which creates a grave and unjustifiable risk that another person's death will occur,

---

[1] This charge was revised in 2006 to accord with the Court of Appeals holdings in *People v Feingold*, 7 NY3d 288 (2006) (overruling *People v Register*, 60 NY2d 270 (1983) by holding that "depraved indifference to human life is a culpable mental state") and the cases decided with *Feingold*: *People v Mancini*, 7 NY3d 767 (2006) (leaving a victim to die is not depraved indifference murder); and *People v Swinton*, 7 NY3d 776 (2006)(the conviction for depraved indifference assault was modified to assault in the third degree because the evidence was insufficient to conclude that the parents of the victim acted with depraved indifference by feeding the child food which resulted in the child's severe malnutrition). *See also People v Suarez*, 6 NY3d 202 (2005); *People v Payne*, 3 NY3d 266 (2004); *People v Gonzalez*, 1 NY3d 464 (2004); *People v Hafeez*, 100 NY2d 253 (2003).

[2] The 2012 revision was for the purpose of adding language from *People v Lewie*, 17 NY3d 348 (2011), on the meaning of depravity [*see* text to footnote seven], and to expand footnote 11.

and when he or she is aware of and consciously disregards that risk,

and when that grave and unjustifiable risk is of such nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.[3]

Reckless conduct that results in a grave risk of death, however, is not enough to constitute this crime. And that is true no matter how grave or substantial the risk of death was.[4] To constitute this crime, the evidence must also show that the defendant acted under circumstances evincing a depraved indifference to human life.

DEPRAVED INDIFFERENCE TO HUMAN LIFE refers to a person's state of mind in recklessly engaging in conduct which creates a grave risk of death.[5] A person has a depraved indifference to human life when that person has an utter disregard for the value of human life – a willingness to act, not because he or she means to cause grievous harm, but because he or she simply does not care whether or not grievous harm will result.[6] In other words, a person who is depravedly indifferent is not just

---

[2] *See* Penal Law § 15.05(3); *People v Boutin*, 75 NY2d 692, 696 (1990). *See also Hafeez*, 100 NY2d at 259; *People v Sanchez*, 98 NY2d 373 (2002) overruled on other grounds by *Feingold*.

[4] "Reckless homicide cannot be elevated into depraved indifference murder merely because the actions of the defendant created a risk of death, however grave or substantial that risk may have been" *(Suarez*, 6 NY3d at 213).

[5] "We say today explicitly ...: depraved indifference to human life is a culpable mental state" *(Feingold*, 7 NY3d at 294).

[6] "...'depraved indifference is best understood as an utter disregard for the value of human life– a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not'" *(Feingold* at 296, quoting *Suarez*, 6 N.Y.3d at 214).

willing to take a grossly unreasonable risk to human life - - that person does not care how the risk turns out.[7] Depraved indifference to human life reflects a wicked, evil or inhuman state of mind, as manifested by brutal, heinous and despicable acts. It is evinced by conduct that is wanton, deficient in a moral sense of concern, and devoid of regard for the life or lives of others. [8]

[*Add, if appropriate*:

A person acts with a depraved indifference to human life when, having a conscious objective not to kill but to harm, he or she engages in torture or a brutal, prolonged and potentially fatal

---

[7] *People v Lewie,* 17 NY3d at 359, *supra.*

[8] "Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is 'so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy' as to render the actor as culpable as one whose conscious objective is to kill" (*Suarez,* 6 N.Y.3d at 214 quoting *People v Russell,* 91 NY2d 280, 287 (1998)).

This definition also applies "when the defendant intends neither to seriously injure, nor to kill, but nevertheless abandons a helpless and vulnerable victim in circumstances where the victim is highly likely to die, the defendant's utter callousness to the victim's moral plight –arising from a situation created by the defendant– properly establishes depraved indifference ...." (*Suarez,* 6 N.Y.3d 212). "[I]rrespective of what the actor does or does not do after inflicting the fatal injury, depraved indifference murder is not made out unless the core statutory requirement of depraved indifference murder is established" (*id.* at 210). Accordingly, this definition of "depraved indifference to human life" may also be used in what the Court of Appeals has termed to be "classic abandonment of a helpless victim" cases (*id.* at 212; See e.g. *People v Mills,* 1 NY3d 269 (2003) [pushing a young child into water and walking away]; *People v Kibbe*, 35 NY2d 407 (1974) [pushing an intoxicated person from a car onto a dark and snowy road]; *But see People v Mancini*, 7 NY3d 767 (2006)[assaulting a person and then leaving him does not necessarily constitute a depraved indifference to human life].

3

course of conduct against a particularly vulnerable victim.][9]

[*Add if appropriate*:

A person recklessly engages in conduct which creates a grave risk of death to another when he or she creates the risk but is unaware of the risk solely by reason of his or her voluntary intoxication.[10]  However, in determining whether the defendant acted with depraved indifference to human life, you may consider whether the defendant's mind was affected by intoxicants to such a degree that he was incapable of forming the mental state of depraved indifference to human life.[11]]

---

[9] "[A]lthough we have reversed depraved indifference murder convictions in most cases involving isolated attacks, we have held that the crime is nevertheless established when a defendant– acting with a conscious objective not to kill but to harm– engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (*Suarez*, 6 NY3d at 212).

[10] Penal Law § 15.05(3).

[11] Penal Law § 15.25 provides that "Intoxication is not, as such, a defense to a criminal charge; but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged." In *Register*, the Court of Appeals held that "depraved indifference to human life" was not a culpable mental state, that "it is not an element in the traditional sense but rather a definition of the factual setting in which the risk creating conduct must occur – objective circumstances which are not subject to being negatived by evidence of defendant's intoxication." *Feingold* overruled *Register*, and held that "depraved indifference to human life is a culpable mental state" (7 NY3d at 294). Thereafter, in *People v Coon*, 34 AD3d 869 (3d Dept 2006), the Third Department noted that the defendant's level of intoxication by his voluntary use of crack cocaine made him "incapable of possessing the culpable mental state necessary to prove depraved indifference." Similarly, in *People v Wimes*, 49 AD3d 1286, 1287 (4th Dept 2008), the Fourth Department noted that "[t]here was no mention of intoxication during the plea allocution, despite the fact that intoxication could have negated the element of depraved indifference in the crime to which defendant pleaded guilty." The Second Department, however, has declined to hold that voluntary intoxication may negate the culpable mental state of depraved indifference to human life (*see People v Heidgen*, 87 AD3d 1016, 1025-1026 (2d Dept 2011) *affd without deciding that issue* 22 NY3d 259, *279 (2013). See also People v Wells*, 53 AD3d 181 (1st Dept 2008), and *compare with People v Valencia*, 14 NY3d 927 (2010).

4

In order for you to find the defendant guilty of this crime, the People are required to prove, from all the evidence in the case, beyond a reasonable doubt, both of the following two elements:

1.    That on or about _(date)_, in the county of _(county)_, the defendant, _(defendant's name)_, recklessly engaged in conduct which created a grave risk of death to another person; and

2.    That the defendant did so under circumstances evincing a depraved indifference to human life.

If you find the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of this crime.

If you find the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of this crime.

5

## DECLARATION OF SERVICE
## BY MAIL

I, Michael Nieves, declare pursuant to 28. U.S.C. §1746 under penalty of perjury that on August 16, 2021, I served the annexed Summons & Complaint, dated: August 10, 2021, upon the United States District Court, Southern District of New York against Miriam R. Best - Acting Supreme Court Judge; Christopher Rivet - Assistant District Attorney; Brandon Riddle - Assistant District Attorney; ...  ..., Fire Marshal, Philip Meagher, #38; Police Officer, James Marcinek, #20371; Police Officer, Rufian Arshad, #20210; and The City of New York, by depositing a true copy of same, enclosed in a post paid properly address wrapper, in a post office/official depository under the exclusive care and custody of the United States Postal Service, within the State of New York, from Bellevue Hospital Prison Ward, 19-North, 462 First Avenue, New York, N.Y. 10016; directed to the defendants

Pro Se Intake Office
United States District Court
Southern District of New York
500 Pearl Street, Rm 500
New York, N.Y. 10007

Dated: August 7, 2021

Yours, etc...

*Michael Nieves*
Michael Nieves, Pro Se

Sworn To Me Before This
8th day of August 2021

Audrey A. Jeffrey
NOTARY PUBLIC

Audrey A. Jeffrey, BA·JD.
Notary Public, State of New York
No. 01JE6068330
Qualified in New York County
Commission Expires. Nov. 13, 2021

Michael Nieves
B/C#: 8952000392
Bellevue Hospital Prison Ward, 19-North
462 First Avenue
New York, N.Y. 10016













Pro Se Intake Office
United States District Court
500 Pearl Street, Rm. 500
New York, N.Y. 10007